# Exhibit A

Page 1

Volume I
Pages 1 to 125
Exhibits 9 to 12

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
EASTERN DIVISION

- - - - - - - - - - - - - - - - -x
                                 :
SHAUN CORDEIRO and KEVIN         :
MATLOCK, individually and on     :
behalf of all others             :
similarly situated,              :  Civil Action
          Plaintiffs,            :  No.
                                 :  1:23:CV-12901-AK
     vs.                         :
                                 :
GREP ATLANTIC, LLC, and EDDY     :
OWNER, L.L.C.,                   :
          Defendants.            :
                                 :
- - - - - - - - - - - - - - - - -x

DEPOSITION OF GREP ATLANTIC, LLC, through its designee, STEPHANIE DONLIN, a witness called by counsel for the Plaintiffs, appearing remotely via Zoom, from Chelmsford, Massachusetts, taken pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure, before Jane M. Werner, Registered Merit Reporter and Notary Public in and for the Commonwealth of Massachusetts, appearing remotely from Halifax, Massachusetts, on Thursday, April 23, 2026, commencing at 8:05 a.m.

PRESENT:

          ALL PARTICIPANTS APPEARED VIA
               ZOOM VIDEOCONFERENCE
     Maginnis Howard
          BY:  EDWARD MAGINNIS, ESQ.
          7706 Six Forks Road, Suite 101, Raleigh,
          North Carolina 27615, for the Plaintiffs.
          emaginnis@maginnislaw.com
          919.526.0450

30(b)(6)  Stephanie Donlin                          April 23, 2026
Cordeiro, Shaun, Et Al. v. Grep Atlantic LLC, Et Al.

Page 2

PRESENT:  (Continued)
    Shook, Hardy & Bacon L.L.P.
        BY:  BRANDON L. ARBER, ESQ.
        One Federal Street, Suite 2620, Boston, MA
        02110, for the Defendants.
        barber@shb.com
        617.531.1411

    Also Present:  Kristen Bor-Zale, Esq.

                * * * * *

Page 3

                I N D E X

WITNESS:          DIRECT  CROSS

STEPHANIE DONLIN
(By Mr. Maginnis)    4
                * * *
            E X H I B I T S
EX. NO.                        PAGE
EXHIBIT 9  Document entitled "AMENDED
        PLAINTIFFS' NOTICE OF
        RULE 30(B)(6) DEPOSITION GREP
        ATLANTIC, LLC"              6

EXHIBIT 10  Document entitled "GREP ATLANTIC,
        LLC'S RESPONSES TO PLAINTIFFS'
        1st SET OF INTERROGATORIES TO
        DEFENDANT GREP ATLANTIC, LLC"    28
EXHIBIT 11  Spreadsheet, Bates No. GREP-8155  70
EXHIBIT 12  Document entitled "GREP ATLANTIC,
        LLC'S RESPONSES TO PLAINTIFFS'
        1st SET OF INTERROGATORIES TO
        DEFENDANT GREP ATLANTIC, LLC"    112

                * * *

Page 4

                P R O C E E D I N G S
                STEPHANIE DONLIN
a witness called for examination by counsel for the
Plaintiffs, having been satisfactorily identified by
the production of her driver's license and being
first duly sworn by the Notary Public, was examined
and testified as follows:
                DIRECT EXAMINATION
    BY MR. MAGINNIS:
    Q.  Good morning.  Is it "Ms. Donlin"?        08:05:56
    A.  That is correct.
    Q.  How are you doing this morning?
    A.  Good.
    Q.  Have you ever had your deposition taken
before?                            08:06:05
    A.  I have.
    Q.  Have you ever had your deposition taken in
a 30(b)(6) capacity before?
    A.  I have not.
    Q.  Okay.  Do you understand the difference      08:06:14
between when you're being deposed just individually,
based upon what you know, and your role today, which
is to testify based upon what the organization
knows?

Page 5

    A.  I do, generally.
    Q.  Okay.  What circumstances were you deposed
previously?
    A.  Personal deposition for a personal injury
and another personal injury for professional work     08:06:44
with Greystar.
    Q.  Okay.  So in the first one --
    A.  Sorry, not personal injury.  A resident
injury.
    Q.  Like a slip-and-fall?              08:06:58
    A.  Yes.
    Q.  Both of them?
    A.  The personal one was an injury of myself.
    Q.  You were the plaintiff in a lawsuit?
    A.  Correct.                        08:07:10
    Q.  And was that lawsuit resolved to your
satisfaction?
    A.  Yes.
    Q.  And then in the second one, you were, what,
a witness --                          08:07:20
    A.  Correct.
    Q.  -- to one involving a Greystar complex?
    A.  Correct.
    Q.  Let me show you -- and what I'll do -- I

2 (Pages 2 - 5)

Page 6

should have set this up previously.

So I'll share my screen, but I'll also put a link in the Chat to a Dropbox link where I'll put these exhibits, in case you want to pull them up. There shouldn't be anything in there yet. But now 08:07:57 there will be.

MR. MAGINNIS: And Brandon, the first two depos, we just did sequential numbering, so I'm assuming just keep going? Is that fair?

MR. ARBER: Yeah, that works for me. 08:08:10

MR. MAGINNIS: So this is I think Exhibit 9.

(Document marked as Donlin Exhibit 9 for identification)

BY MR. MAGINNIS: 08:08:32

Q. And, Ms. Donlin, can you see my screen okay, or have you pulled the document up?

A. I do see the screen, and I did click on the Dropbox, yes; so I have both.

Q. And if you refresh -- when we do a new one, 08:08:46 it will refresh, and it will pop right in there.

A. Understood.

Q. Okay. So do you recognize this document?

A. I'm generally familiar with it.

Page 7

Q. You've seen it before?

A. Yes.

Q. So this is the amended plaintiff's notice of Rule 30(b)(6) deposition of GREP Atlantic, LLC. And just scrolling down, do you see there's a list 08:09:10 of topics that start on Page 5 of this document? Do you see that?

A. I do.

Q. And we don't have to go through them one-by-one, but have you reviewed all of the topics 08:09:21 in this amended notice?

A. I have reviewed the topics that are in relation to my deposition.

MR. ARBER: Are you talking about the topics on, like, the actual document or the 08:09:34 substance underlying those topics?

MR. MAGINNIS: We'll get to the substance, of course. I just know that there were --

BY MR. MAGINNIS:

Q. First of all, I know there were some topics 08:09:46 that you may not be designated for and somebody else might be designated for. Is that your understanding, Ms. Donlin?

A. That is correct.

Page 8

Q. Do you know which ones those are?

MR. ARBER: I can probably help out there, Ed, if that's acceptable to you.

MR. MAGINNIS: Sure.

MR. ARBER: We're going to produce another 08:10:06 witness for Topics 17, 28, 29, 32 and 33.

MR. MAGINNIS: Okay.

BY MR. MAGINNIS:

Q. Hearing that list -- 17, 28, 29, 32 and 33 -- that leaves 1 through 16, 18 through 27, 30, 08:10:28 31 and 34 for you, Ms. Donlin.

Are you prepared to testify regarding those topics?

A. To the best of my ability, yes.

Q. Let's talk about what you did to prepare 08:10:45 for today. What did you do?

A. I met with counsel three times --

Q. And I'll stop you right here. I can ask you about meeting with counsel, and you can say, "Yeah, I met with counsel. I met with Brandon" or 08:11:03 "I met with Ara," but I don't want to hear about what you talked about with counsel. Is that fair?

A. That's very fair.

Q. Okay. So you met with counsel. What else?

Page 9

A. Met with counsel, was provided documents in a shared file and reviewed -- briefed myself of what those documents were.

Q. What documents did you review?

A. Similar to the attached or shown document 08:11:33 here, there were a couple of depositions that were previously taken, some documents that were exchanges of communication, lease file. And as the process went on, there were other documents; motion to dismiss, etc. 08:11:56

Q. And when we show you some documents, I may ask you if this is something that you looked at.

You did review the deposition transcripts of Mr. -- was it Mr. Colindres and Ms. Price? Did you review those? 08:12:14

A. I did brief them.

Q. Did you talk to anyone at Greystar other than your lawyers to prepare?

A. I did brief myself of one of the operating systems that I currently don't have access to, which 08:12:30 is Entrata. I did have a conversation about the general operations of it. Other than that --

Q. Okay. So you do have familiarity with OneSite and Yardi?

3 (Pages 6 - 9)

30(b)(6)  Stephanie Donlin                              April 23, 2026
Cordeiro, Shaun, Et Al. v. Grep Atlantic LLC, Et Al.

Page 10

A.  I do.

Q.  And you had to educate yourself regarding Entrata?

A.  I haven't used it myself.  But I have been through some training demos.  So I wanted to refresh 08:12:52 myself of the processes.

Q.  And did you speak with anyone, or did you just kind of refresh -- walk through it on your own?

A.  I did speak to a senior community manager about some of the processes.                08:13:13

Q.  And who was that?

A.  It was John Powell.

Q.  And what community is Mr. Powell the senior community manager for?

A.  Elan Union Market.                08:13:28

Q.  And that's one of Greystar's managed properties that uses Entrata as its property management software?

A.  That is correct.

Q.  Did you speak with anyone else in 08:13:43 preparing?

A.  My supervisor knows I'm in a deposition today; but other than that, no.

Q.  What do you do at Greystar?

Page 11

A.  I'm the senior director of real estate.  I currently oversee parts of Massachusetts, Rhode Island, and New Hampshire for multi-family.  I currently have about 35 assets that are within my portfolio across three states.                08:14:12

Q.  So based upon your role as the senior director of real estate for an area that includes Massachusetts, you're personally familiar with Greystar's policies and procedures that are covered by these topics?                08:14:30

MR. ARBER:  Objection, vague.

Q.  You can answer.

A.  I have not memorized all of our procedures that are out there, but I'm generally familiar with there are available standard operations and 08:14:50 practices.

Q.  And I just want to make sure; because like we talked about earlier, it's not just based upon what you, Stephanie, knows, but what the organization knows.  You've spoken with your 08:15:02 lawyers -- and I don't want to get into that -- and you've spoken with an individual who's an expert on a PMS that you're not familiar with.  But it sounds like a lot of these topics are just going to need to

Page 12

be covered by your own personal knowledge of Greystar.  And I just want to make sure you have that.

A.  I do.

Q.  Okay.  So, for example, if we look at Topic 08:15:27 27, relating to recordkeeping, storage of documents, are you familiar enough to be able to answer questions about that?

A.  I'm familiar enough to answer it.

Q.  Okay.  And just another example, 24; "A 08:15:54 description of the ways in which your policies, procedures, or training regarding debt collection and/or evictions have been modified during the relevant time period."

Are you going to have familiarity with any 08:16:13 changes to policy or procedure during this relevant time period?

MR. ARBER:  Objection, vague.

A.  Generally familiar with the SOPs do change.

Q.  How long have you been at Greystar?        08:16:29

A.  I've been here 21 service years.

Q.  Always in the Massachusetts/Rhode Island area?

A.  At one point, I did cover Connecticut as

Page 13

well.

Q.  Okay.  Northeast part of the country?

A.  New England.

Q.  Okay.  Let's talk about Topic 1, which relates to the corporate structure of the GREP 08:17:02 entity that you're here on behalf of.

Who is your employer; do you know?

A.  Greystar.

Q.  So the employees of Greystar -- obviously it's a corporation, and so there's lots of entities 08:17:18 associated with a large corporation like Greystar.  But you think of yourself as a Greystar employee, as opposed to GREP Atlantic or some other entity?

A.  Correct.

Q.  Do you know who's on your W-2?        08:17:35

A.  I believe it says, "Greystar Management Services."

Q.  Okay.  So my understanding -- correct me if I'm wrong.  My understanding is that typically how it works is that for each entity -- meaning 08:17:57 multi-family property in which Greystar would have an ownership interest -- there would be an individual corporate entity that serves as the owner of that land; is that accurate?

4 (Pages 10 - 13)

Page 14

MR. ARBER:  Objection to form.

A.  Can you clarify the ownership interest?

Q.  Yeah.  So typically -- let's just start here.  Eddy Owner, L.L.C.; are you familiar with that entity?                    08:18:36

A.  I'm generally, familiar, yes.

Q.  That's the entity that owns the building that Greystar manages that Mr. Cordeiro and Mr. Matlock live at.  Is that your understanding?

A.  They lived at.                    08:18:57

Q.  Lived at, yes.  I wasn't trying to trick you.

A.  Yeah.  I just want to answer properly.

Q.  Just always trying to live in the present tense.  It makes things easier on me.         08:19:07

Okay.  So Eddy Owner, L.L.C., for example, would be an LLC that owns one entity; the building that Mr. Cordeiro or Mr. Matlock resided at.

A.  It is a single-purpose entity for that multi-family building.               08:19:28

Q.  And that's generally how it works; not just at Greystar, but in the industry.  Each property -- you used the term "single-purpose entity."  Each property will be owned by an LLC that serves as a

Page 15

single-purpose entity to own that property?

MR. ARBER:  Objection to form.

Q.  You can answer.  Unless your counsel tells you not to answer, his objections are for the record.                    08:19:58

A.  The entity is formed for that specific building.  I'm unsure -- well, I guess I am familiar with the building having two entities; one for a retail piece and one for a residential piece.

Q.  Right.  Some of these mixed-use       08:20:18 properties -- I think Ms. Price works at one of them?

A.  Correct.

Q.  And will those -- does Greystar have an ownership interest in Eddy Owner, L.L.C.?      08:20:32

A.  No.

Q.  Greystar does have ownership interest in some of the single-purpose entities that it manages, but it also will enter into property management agreements with these LLCs to manage the property?  08:20:51

A.  Correct.

Q.  When Greystar enters into management agreements regarding multi-family properties, is there going to be one for each single purpose in

Page 16

question, or would it be by investor?

MR. ARBER:  Objection.

A.  Can you clarify the location you're speaking of?

Q.  Massachusetts.                    08:21:32

A.  Typically, one entity is what Greystar uses.

Q.  Okay.  So I've seen references that Greystar does some work for properties that are owned by Goldman Sachs.                08:21:44

So Greystar would typically have a property management agreement not with a Goldman Sachs entity that owns all of the single-purpose entity, but with each single-purpose entity in Massachusetts?

A.  Correct.                    08:22:01

Q.  And the party that would enter into those agreements with the single-purpose entities, would that be GREP Atlantic, LLC?

A.  It may.

Q.  Would it always be in Massachusetts, or   08:22:14 would there be another Greystar entity that might enter into those agreements?

A.  If there was a Union building, there would be a different entity.

Page 17

Q.  Okay.  What entity would that be?

A.  I don't know off the top of my head.

Q.  So that's the delineation?  GREP Atlantic would manage -- would be the contracting party with the single-purpose entity in Massachusetts for all   08:22:43 of the entities that aren't owned -- that aren't Union buildings?

A.  Yes, that's what's currently used.

Q.  Okay.  Who owns GREP Atlantic, LLC?

A.  To be honest, I'm not sure if there is a   08:23:12 single answer for that.

Q.  In that there might be multiple owners, or...

A.  There may be different investment platforms contributing to that.                08:23:29

Q.  When you say, "investment platform," what do you mean?

A.  Different funds that contribute to the operation of GREP Atlantic.

Q.  Okay.  So below GREP Atlantic, there       08:23:46 wouldn't necessarily just be another Greystar entity.  There might be some organization with equity in that asset that comes from the original South Carolina Greystar, but there also could be

5 (Pages 14 - 17)

Page 18

entities that are owned by various investors, who also have a piece of GREP Atlantic; is that fair?

A.  I'm unfamiliar with that.

Q.  Okay.  Let's get to something where you're familiar.                    08:24:31

So your understanding of the ownership of GREP Atlantic is that there could be a number of investor platforms who have an ownership interest in GREP Atlantic?

A.  That's my understanding.                    08:24:45

Q.  And some of those might be from a Greystar-owned entity, but some might be from outside investors?

MR. ARBER:  Objection; mischaracterizes testimony.                    08:24:57

Q.  And if that's wrong, feel free to clarify.

A.  I'm not sure where it would directly come from.

Q.  The single-purpose entities -- the owners of -- strike that.                    08:25:26

The owners of the single-purpose entities that GREP Atlantic enters into agreements with, is there a portal that they can access to monitor the management of their asset?

Page 19

A.  There may be.

Q.  You don't know one way or the other?

A.  The owner could ask for a request to certain platforms.  So, yes, if they request it.

Q.  What certain platforms are you referencing? 08:26:06

A.  An example would be read-only access to the Yardi system that's used at the property.

Q.  So you're saying that the investor could request read-only access to the property management software for that individual asset; is that right?    08:26:26

A.  They could.

Q.  But is there any sort of separate system for investors to access to monitor the management of their properties?  Separate from the Yardi or Onsite that's used at the individual complex level. 08:27:03

A.  Not that I'm familiar with.

Q.  How does Greystar inform their owners -- like the owners of Eddy Owner, L.L.C.; do they receive a report?  Do they receive a statement?  How does Greystar send information regarding the          08:27:36 performance of the asset to Eddy Owner, L.L.C.?

A.  It could be in various ways.

Q.  All right.  Let's start with the first one.

A.  Verbal communication.

Page 20

Q.  Okay.  How else?

A.  Weekly reporting, emails.

Q.  Is that standard that there be a weekly report sent to an investor regarding the asset?

A.  Generally, yes.                    08:28:14

Q.  What's contained in the weekly report?

A.  That would include, but not limited to, leasing statistics, occupancy trend, could inform of rent, renewals, rent collection, capital projects, overall operational updates of the asset.          08:28:37

Q.  What was the last one you said?

A.  Overall operational updates.

Q.  Okay.  So CapEx would be kind of expenses associated with the improvement of the asset and overall operational.  Would that cover expenses of    08:28:59 the property?

A.  Operational could cover financial information.

Q.  So in the weekly report, would the expenses of the property be included in some way?          08:29:18

A.  It could, depending on that client and their expectations.

Q.  How would that vary, depending on their expectations?

Page 21

A.  Certain clients are more detail-oriented and ask more questions.  So those updates would be a little more detailed on a weekly basis.

Q.  Is that an automated process, or is that coming on an investor-by-investor level from, you     08:29:53 know, investor relationships?

A.  Are you referring to the weekly output?

Q.  Yes.

A.  It would generally be a combination of reporting that's pulled from the operating software  08:30:10 on a manual update.

Q.  For your detail-oriented investors, GREP would have the ability to provide them with itemized information regarding expenses?

MR. ARBER:  Objection to form.          08:30:32

A.  They could receive detailed outputs on a routine basis, yes.

Q.  So for your most detail-oriented of investors, if they wanted to see every bill from the maintenance crew -- you're a third-party vendor       08:30:55 planting the flowers -- GREP would have the ability to send that to them on a weekly basis?

A.  I think it would be very difficult to do that on a weekly basis.  Most financial output is in

6 (Pages 18 - 21)

30(b)(6)  Stephanie Donlin                                    April 23, 2026
Cordeiro, Shaun, Et Al. v. Grep Atlantic LLC, Et Al.

Page 22

a monthly reporting package, which does not include invoices or copies of invoices.

Q.   Okay.  So there's a weekly report, and then there's a monthly reporting package.

What's in the monthly reporting package    08:31:47 that's sent to investors?

A.   Examples would be a budget comparison, a trailing 12, a general ledger, bank account statements for that month, and any other necessary reports that the client may ask as part of the    08:32:06 property management agreement.

Q.   So there would be a general ledger of transactions that happened during the month; is that right?

A.   Correct.    08:32:32

Q.   How are those transactions stored?

A.   In the property management software.

Q.   Okay.  Well, in the property management software, there would be -- it would keep track of all the rental payments, right?    08:32:51

A.   Correct.

Q.   Would it also keep track of all of the vendor invoices?

A.   It would have an entry of those invoices.

Page 23

Q.   At a tenant level or kept somewhere separately?

A.   It could vary.

Q.   Let's talk about both, then.

How would it vary?    08:33:17

A.   A general ledger could include information regarding a final account statement, which would be resident -- per resident.

The opposite end of that question would be vendor-related, and it would be processed to the    08:33:44 general ledger under a chart of accounts.

Q.   Right.  And so my question was a little bit different from that.

So we know that the general ledger is going to have, on a line-by-line basis, each transaction,    08:33:59 right?  Positives and negatives, credits and debits, right?

A.   Yes.

Q.   And so the question was, The debits; where are the records of those stored?    08:34:17

A.   That could vary based on the asset and the software used.

Q.   Okay.  How would it vary?

A.   There may be a hard copy in a filing

Page 24

system.  There could be an electronic upload of that invoice onto the system of use.  I'm assuming that the vendor also has a copy.  So those are a couple of examples.

Q.   Well, you're not going to look to the    08:34:53 vendor maintaining a copy in order to preserve your records, right?

A.   Correct.

Q.   So there's either going to be a paper copy or an electronic copy of invoices received to    08:35:04 backstop the general ledger that's provided to investors?

A.   Yes.

Q.   And that would include legal invoices?

A.   It could.    08:35:18

Q.   It would, right?

A.   It would.

Q.   Yeah.  Does the property management agreement with these investors require Greystar to maintain all underlying invoices associated with    08:35:32 expenses?

A.   I'm not sure the direct verbiage within the property management agreement -- that there is something alluding to, you know, complying with any

Page 25

type of document law.

Q.   What do you mean by that?

A.   If a state requires you to hold documents for a certain number of years, we would comply with that.    08:36:10

Q.   Right.  I'm not talking about legal compliance.  I'm more just talking about kind of maintaining of records.

Is the property management agreement going to speak to GREP maintaining records regarding    08:36:25 credits and debits?

A.   I believe there's some language in there.

Q.   And the way those invoices might be stored is going to vary based upon the property management software?  Is that what you said?    08:36:47

A.   It could be the property management software, or maybe there's a client request of how to hold those documents.

Q.   Safe to say that in 2026, there's going to be some electronic version of these invoices at all  08:37:07 Greystar properties in Massachusetts?

MR. ARBER:  Objection; assumes facts.

A.   I can't confirm that with every asset.

Q.   Fair.  But it's the expectation of GREP

7 (Pages 22 - 25)

30(b)(6)  Stephanie Donlin                              April 23, 2026
Cordeiro, Shaun, Et Al. v. Grep Atlantic LLC, Et Al.

Page 26

that invoices be stored electronically?

MR. ARBER:  Objection; assumes facts.

A.  No, not electronically.  A copy.

Q.  Really?  In 2026, the largest property management company in the world keeps stuff in manila folders?

MR. ARBER:  Asked and answered.

MR. MAGINNIS:  And, Brandon, if you could limit your objections to the form.  Thanks.

THE WITNESS:  I'm sorry, was that not to answer?

MR. ARBER:  No.  You can answer the question.  I'm just objecting because the question has been asked three times.

MR. MAGINNIS:  It hasn't been answered yet.

MR. ARBER:  It's been answered three times.  But you can answer again.

A.  Technology has advanced to allowing for that electronic upload, but I would be remiss to say there aren't still hard copies in this year.

Q.  Are you aware of any GREP Atlantic property that maintains vendor invoices in paper form and not electronic?

A.  Not in specific.

Page 27

Q.  Can you name even one?

A.  I would think based on the software of use that my familiarity is, that the paper invoices would still be available.

Q.  And they might be available.  But the question is, Can you name one GREP Atlantic-managed asset that uses paper only, as opposed to paper being available?

A.  Not paper only.

Q.  The Union buildings -- this is the first I've heard of this.  About how many Union buildings are we talking about where GREP Atlantic would not be the managing entity in Massachusetts?

A.  None.

Q.  None, okay.  So GREP Atlantic, to your knowledge, would be the managing entity for all of the multi-family properties that Greystar manages in Massachusetts?

A.  To my knowledge.

Q.  Okay.  Let's talk about these varying softwares.  I want to start with Yardi; is that fair?

A.  Fair.

Q.  We've seen some references to modifying

Page 28

names associated with Yardi.  For example, I've seen a Yardi-Alliance and then a Yardi-Greystar 7S.  Are familiar with the difference between those two?

A.  Yes.

Q.  What's the difference?

A.  One is a Greystar-serviced operating platform, and the other one is an owner-serviced operating platform.

Q.  And is that kind of a binary distinction?  You're either going to be a Greystar-serviced operating program or an owner-serviced operating program?

A.  Yes.

MR. MAGINNIS:  And so I'll pull up a different document.  So we'll mark this as Exhibit 10.  And I'll share.

(Document marked as Donlin Exhibit 10 for identification)

Q.  I'm showing you a document that's been marked as Exhibit 10.  Can you see that, Ms. Donlin?

A.  I can.

Q.  And are you familiar with this document?  Is this something that you've reviewed?

A.  I believe I have.

Page 29

Q.  And this is GREP Atlantic's responses to plaintiff's first set of interrogatories.

And I'm just going to scroll to Interrogatory No. 2, which asks for "...all residential rental properties owned or managed by you in Massachusetts during the Relevant Time Period..."  Do you see that?

A.  Yes.

Q.  And then do you see there's a reference to an Exhibit A at the end of the response?

A.  I do see that.

Q.  And I'll just scroll to Exhibit A.  I promise this is going somewhere.

And so are you familiar with this chart, this chart that provides a list of Greystar owned or managed properties at the time this was sent.

A.  I'm familiar with it.

Q.  And I know that -- I know that some properties might leave because the contract expires, and some properties might come on because there's a new agreement.

But this was an accurate list, to your knowledge, at the time it was sent?

MR. ARBER:  Objection to form.

8 (Pages 26 - 29)

30(b)(6)  Stephanie Donlin

April 23, 2026

Cordeiro, Shaun, Et Al. v. Grep Atlantic LLC, Et Al.

Page 30

Q.  You can answer.

A.  I did not prepare the list.  But to the view, it appears to be accurate.

Q.  Okay.  And so I want to look at these operating softwares and just make sure I understand.  08:44:12

So the first one is "1550 on the Charles," and it uses Yardi-Greystar.  Do you see that?

A.  I do.

Q.  And so that would be the Greystar-serviced operating system, right?    08:44:27

A.  Correct.

Q.  And then just scrolling down, there's an "Addison" -- I guess there's two entries for the "Addison."  But one of them has a "Yardi-Redgate."  Do you see that?    08:44:42

A.  Yes.

Q.  Would that be an owner-serviced operating system?

A.  Yes.

Q.  Yardi-Wood Partners; would that be an    08:44:50 owner-serviced operating system?

A.  Yes.

Q.  And so any time it says, "Yardi-Goldman" Sachs, that would be an owner-serviced operating

Page 31

system?

A.  Yes.

Q.  But any time it says "Yardi-Greystar," "Yardi-Greystar 7S," that's going to be a Greystar-serviced operating system?    08:45:10

A.  Yes.

Q.  Tell me about the difference between a Greystar-serviced operating system -- strike that.

While we're here, is there going to be the same binary aspect to OneSite and Entrata, in that    08:45:28 it could be a Greystar-serviced operating system or an owner-serviced operating system?

A.  It could.

Q.  What differences exist between those two types of operating systems?    08:45:49

MR. ARBER:  Objection to form.

Q.  And we'll start with Yardi, if that's easier.

A.  Can you ask the question again?  Apologies.

Q.  Sure.  Functionally, what are the    08:46:01 differences between the Greystar-serviced operating system and the owner-serviced operating system?

MR. ARBER:  Objection to form.

A.  Functionally, there may be certain options

Page 32

within each of the programs that differ.  Customized sets of reports, for example.

Q.  Okay.  In that Greystar would have more customized reports or that the owner would want a specific sort of report?  I guess I'm confused.    08:46:44

A.  Example: Yardi may have a weekly operating snapshot that differs than the one that the owner has formatted within their program.

Q.  Okay.  Any difference, to your knowledge, among these operating systems in terms of how rent    08:47:13 is assessed?

A.  There could be some variation.

Q.  Any differences that you're aware of regarding rent being automatically assessed to the tenants on the 1st of the month?    08:47:33

MR. ARBER:  Objection to form.

A.  That is generally the process.

Q.  Okay.  Any differences that you're aware of in these systems relating to applying a payment?

A.  There may be variation within the system to  08:47:52 the priority of payments, yes.

Q.  There may be, or you're aware of some variations?

A.  Between the platforms, there may be, yes.

Page 33

Q.  But can you think of one?

A.  As far as payments to the oldest balance, it would be based on the owner expectation of what gets applied first.

Q.  Would that be in the property management    08:48:27 agreement?

A.  Likely not.

Q.  So I'll show you what's already been marked as Exhibit 1.

Can you see Exhibit 1, Ms. Donlin?    08:49:02

A.  I do.

Q.  Is this something you reviewed in preparation for today?

A.  I have seen it.

Q.  And this is -- I guess it's called an "SOP"  08:49:13 for Greystar?

A.  Correct.

Q.  And these are stored internally on an internet site for people to access as needed to see what the standard operating procedures are?    08:49:25

A.  Yes.

Q.  And I'm scrolling down to -- and you see that this one is No. 2080, "Collecting Delinquent Monies for Current Residents."  Do you see that?

9 (Pages 30 - 33)

30(b)(6)  Stephanie Donlin                         April 23, 2026
Cordeiro, Shaun, Et Al. v. Grep Atlantic LLC, Et Al.

Page 34

A.  Yes.

Q.  And then I'm looking at the "Task Breakdown."  Do you see that, No. 1?

A.  I do.

Q.  And it reads, "Distribution of funds will   08:49:52 apply to late charges and any other outstanding fees or charges before rent, unless state law prohibits."

Did I read that correctly?

A.  You did.

Q.  So the standard operating procedure for   08:50:05 Greystar is that late fees and other outstanding fees get applied before rent, right?

MR. ARBER:  Objection to form.

A.  That is what it says.

Q.  And that's what the SOP is, right?   08:50:21

MR. ARBER:  Objection to form.

A.  That is what it reads.

Q.  And this is GREP's standard operating procedure, right?

A.  Correct.                          08:50:35

Q.  Any reason to believe -- well, let me ask it this way:

Does GREP have an understanding that Massachusetts state law prohibits that?

Page 35

MR. ARBER:  Objection.  Calls for a legal conclusion.  You can answer.

Q.  I'm not asking about whether you're right or wrong on the law.  I'm asking about what Greystar's understanding is.              08:51:00

So does Greystar have an understanding -- because it says, "unless state law prohibits."  So does Greystar have an understanding that Massachusetts state law prohibits applying late charges and other outstanding fees or charges before  08:51:10 rent?

A.  They would comply with all lease obligations or state law.

Q.  Right.  Understood.  I'm asking about Greystar's understanding of whether Massachusetts   08:51:23 state law prohibits this or not.  It says, "unless state law prohibits."

So does Greystar have an understanding that Massachusetts has some sort of exception to their SOP?                               08:51:41

A.  Can you ask that again?  Apologies.

Q.  That's okay.  That was a poor question.

I'm wondering what Greystar's understanding is as to whether Massachusetts state law alters the

Page 36

SOP regarding application of late charges and other outstanding fees or charges before rent.

A.  Our understanding would be to comply with the law.

Q.  Not quite the question.             08:52:10

I'm just asking if Greystar has an understanding as to whether Massachusetts has a law that you would have to comply with on this issue.

MR. ARBER:  Objection to form.

A.  I don't know for sure.             08:52:30

Q.  You're not aware of any alteration to the general SOP for Massachusetts --

MR. ARBER:  Objection --

Q.  -- on this specific task?

MR. ARBER:  Objection to form.        08:52:43

A.  The SOP is a general practice for all of Greystar; not specific to Massachusetts.

Q.  Right.  And so what I'm asking is, Are you aware of any change to the SOP for Massachusetts specifically as to this Task Breakdown No. 1 that   08:53:08 we've just been looking at?

A.  There is no specific SOP change for Massachusetts.

Q.  Okay.  But it could be that -- and so on

Page 37

the Greystar-serviced operating systems, it's going to apply late charges and other outstanding fees or charges before rent?

MR. ARBER:  Objection; assumes facts.

A.  There is a priority payment.  And apologies 08:53:37 I don't have the order memorized.  But there are some fees, such as late fees, that may apply first and then rent shortly thereafter, but not all fees.

Q.  Well, would it be your understanding that the priority order for the Greystar-serviced       08:54:00 operating system would follow Greystar's standard operating procedures?

MR. ARBER:  Objection; assumes facts.

A.  It would follow the lease obligation.

Q.  Are you familiar with anything about the   08:54:15 Massachusetts standard apartment lease which would alter the standard operating procedure?

A.  There is language in the lease that outlines how to apply to outstanding balances.

Q.  Okay.  So fair to say that the lease may   08:54:39 indicate the order of which charges are going to be applied, and Greystar is going to apply them according to the lease?

MR. ARBER:  Objection; lacks foundation.

10 (Pages 34 - 37)

30(b)(6)  Stephanie Donlin                April 23, 2026
Cordeiro, Shaun, Et Al. v. Grep Atlantic LLC, Et Al.

Page 38

A. Can you ask the question again?  Sorry.

Q. Sure.  Well, let's ask it this way:

What is your understanding of how the lease for Massachusetts is going to dictate the application of payments to these various targets?    08:55:22

MR. ARBER:  Objection to form.

A. I don't have the words memorized.  However, it does indicate to apply to any rent obligations within the lease to the oldest balance first.

Q. Okay.  And your understanding is that    08:55:47 within the Greystar-serviced operating system, there is a record that sets forth the categories and the order in which they're going to be applied with regard to a payment.  You just don't have it memorized?                08:56:09

A. Correct.

Q. But it exists?  There's some sort of record in the operating system which provides a sequential order regarding application of payments?

MR. ARBER:  Objection to form.    08:56:22

A. There is available information on how that would be categorized.

Q. In what form is the information available?

A. It's more on the data end of the system

Page 39

setup.

Q. Okay.  So there's kind of rules in the database?

A. Correct.

Q. And the owner might have different rules in    08:56:51 their database regarding the application of funds?

A. They may.

Q. Would Greystar allow an owner to apply funds inconsistently with the terms of a lease?

A. If we were aware of an issue, we would    08:57:20 address it.  We're not responsible for the setup of that, however; the use of the program.

Q. Okay.  So when Greystar enters into a property management agreement with an owner that has its own serviced operating system, Greystar is    08:57:44 simply going to take the owner-serviced operating system as-is; is that right?

MR. ARBER:  Objection to form.

A. Generally, they provide us the software program directly.  There is some input that we may    08:58:08 provide for property data, if you will, that would help with the setup process.

Q. Okay.  Other than reports and potentially some rules, can you think of any other differences

Page 40

between for Yardi, the Greystar-serviced operating system, and the owner-serviced operating system?

MR. ARBER:  Objection to form.

A. Can you clarify what systems you're referring to?                08:59:03

Q. That's fair.  I was speaking kind of generally in that binary fashion that we were talking about earlier.

So you mentioned, for example, that the reporting capabilities might vary, depending on what    08:59:15 the receiver wants.  Fair?

A. Fair.

Q. And we've discussed that there could be some internal rules that might vary in terms of how payments are applied.  Fair?            08:59:28

A. Fair.

Q. What other differences might exist where it's still Yardi, but it's a Yardi Greystar-serviced operating system versus a Yardi owner-serviced operating system?                08:59:43

A. Another example would be the lease prospect input information could slightly differ from one to another.

Q. In terms of leads or follow-ups and things

Page 41

like that?

A. Correct.

Q. Anything that you can think of in terms of differences between the Greystar-serviced operating system for Yardi and the owner-serviced operating    09:00:16 system for Yardi that would vary in terms of keeping track of payments?

A. They generally have the same functionality.

Q. Any differences that you can think of in terms of entering in charges to an individual    09:00:42 tenant?

A. There could be some variation.

Q. Tell me about that.

A. An example would be a category to which Greystar generally uses.  For example, clubhouse    09:01:01 amenity.  And if someone rented the clubhouse, that would be listed under "clubhouse amenity," and the charge would be added.

In a client software, that may not be listed under "clubhouse amenity."  That may be    09:01:17 something that they only provide the option of "miscellaneous."  So that would differ.

Q. That makes sense.

So in terms of the categories of charges

11 (Pages 38 - 41)

30(b)(6)  Stephanie Donlin                                            April 23, 2026

Cordeiro, Shaun, Et Al. v. Grep Atlantic LLC, Et Al.

Page 42

that can be applied, it could be that certain charges will have different names of categories or different breadth of categories between the Greystar-serviced operating system and the owner-serviced operating system for Yardi?          09:01:52

A.  Correct.

Q.  And are you aware of any differences in categories associated with legal fees for those two systems?

A.  I'm familiar with a difference of wording, 09:02:09 yes.

Q.  Any differences in the same way that there's kind of a breadth difference, where there's more categories for a Greystar-serviced operating system or more categories for an owner-serviced 09:02:28 operating system when it comes to legal fees?

A.  Not necessarily.  An owner could have more than Greystar does.

Q.  They could, but are you aware of any?

A.  Not off the top of my head, but they could 09:02:42 have it.

(Ms. Bor-Zale enters the virtual room)

Q.  Generally on these operating systems, they're going to be -- they're going to be

Page 43

categorized as "attorney fees" or "eviction fees."

Are you familiar with any other ways in which these would be categorized?

MR. ARBER:  Objection to form.

A.  They could be listed under "miscellaneous," 09:03:15 possibly "damages," "eviction," "eviction/legal recovery."  So those are some of the examples.

Q.  Well, "eviction" and "eviction/legal recovery"; you should be able to spot those.  But I mean, are you aware of any properties that for 09:03:37 attorney fees would use "miscellaneous"?

A.  It's a possible option.

Q.  Are you aware of any?

A.  Not off the top of my head.

Q.  Are you aware of any Massachusetts 09:03:53 properties that would code attorney fees under "damages"?

A.  It's possible.  I'm not -- it's an option.

Q.  Anything is possible.

A.  Yeah.                                    09:04:07

Q.  And you could have a zillion different options.  But to your knowledge, all of the attorney fees for GREP properties in Massachusetts are going to be coded with something along the lines of

Page 44

"attorney," "eviction," or "legal"?

MR. ARBER:  Objection to form.

A.  I cannot confirm that.

Q.  Okay.  Can you think of any other category that any other property that GREP manages would use? 09:04:30

MR. ARBER:  Objection to form.

A.  Category for what?

Q.  Legal fees.

A.  Other than the ones that I listed, I'm not familiar with any others.                      09:04:48

Q.  And if you could list them one more time, just so I can remember the ones you said, that would be helpful.

A.  Sure.  The options would be "eviction/legal recovery," "evictions," "miscellaneous," "damages."  09:05:02

Q.  "Eviction/legal recovery," "eviction/miscellaneous"?

A.  Separate.  "Evictions," "miscellaneous," "damages."

Q.  Oh, okay.  But we already established that 09:05:23 with "miscellaneous" and "damages," you're not aware of any Greystar property actually using those categories for attorney's fees, but they could?

A.  They could.  I have not done that research,

Page 45

but my best knowledge is it's an option.

Q.  But the ones that you're familiar with are going to use either "eviction/legal recovery" or "evictions" as the category?

A.  I'm familiar with the charge codes.         09:05:49

Q.  Those are the two charge codes used for legal fees at the GREP properties that you're familiar with?

A.  I have seen that used.

Q.  Right.  And you're not familiar of any 09:06:01 other category being used other than those two?

A.  Not directly familiar.

Q.  Okay.  In terms of the storage of documents, is it going to vary in Yardi between the Greystar-serviced operating system and the 09:06:21 owner-serviced operating system?

A.  It could vary.

Q.  How?

A.  Capabilities within the operating software could differ with a document being uploaded 09:06:35 electronically in one source and not being available in another.

Q.  Okay.  Does the Greystar-serviced operating system provide for the uploading of documents?

12 (Pages 42 - 45)

30(b)(6)  Stephanie Donlin                                    April 23, 2026
Cordeiro, Shaun, Et Al. v. Grep Atlantic LLC, Et Al.

Page 46

A.  Yes.

Q.  Are you aware of any owner-serviced operating systems which don't provide for the uploading of documents?

A.  I am familiar with owner-serviced software that has limited capabilities of document upload.

Q.  Give me an example of that.

A.  Some would be restricted to just the "leased by" only attachments.  Others may allow for letters and notices to be uploaded.

Q.  In terms of the actual ability to upload or in terms of what they want uploaded?

A.  Both.

Q.  Okay.  Any other differences or distinctions that you can think of between Greystar-serviced operating systems for Yardi and owner-serviced operating systems for Yardi?

MR. ARBER:  Objection to form.

A.  Yardi may have a differential on the financial reporting.  Some software doesn't direct invoice entry into Yardi, and some use an alternate platform.

Q.  What alternate platform?

A.  That could vary, based on the specific

Page 47

asset.

Q.  And this is for accounting purposes?

A.  Correct.

Q.  So for owner-serviced operating systems, is Greystar not doing the accounting?

A.  We are.

Q.  Okay.  Let's talk about that, then.

Do you recall from Ms. Price's testimony that her understanding was that whether you use Yardi or OneSite or Entrata, the accounting goes through Yardi?  Do you recall reviewing that?

A.  I recall reviewing her deposition.  That specific question, no.

Q.  Anything from Ms. Price's deposition upon your review that you think she stated incorrectly?

MR. ARBER:  Objection to form.

A.  There were some things that I had further knowledge on or disagreed with.

Q.  Okay.  Like what?

MR. ARBER:  Objection to form.

A.  Is there a specific question that you could ask?

Q.  Well, you said there were some items that you have further knowledge on or disagreed with her

Page 48

statements.  So I'm wondering what those were.

A.  Yeah.  I briefed the deposition, and I know that there were some things that I didn't necessarily agree with or had further knowledge on specific -- if you could point me to one of the questions asked, I guess I could tell you if that was one of the questions.

Q.  Well, I just -- instead of doing that; instead of going through the deposition one-by-one and saying, "Do you agree with that," I'm asking you for an example of something you disagreed with.

A.  Just give me a minute.

Q.  Sure.

A.  I believe -- and not quoting -- there was a question about how invoices might be retrieved.  And I believe Ms. Price said, "I believe they could be pulled monthly," which to me is based on her knowledge.  And not every operating software has the ability to pull invoice activity just monthly.

Q.  They could do it more frequently than that?

A.  You could pull invoice activity on a daily basis if you prefer.

Q.  That kind of ties into the accounting that we were starting to talk about.

Page 49

A.  Uh-hum.

Q.  So tell me about if an invoice comes into an individual asset, as we're calling it, what is Greystar's policy and procedure about what's supposed to happen with that invoice from an accounting and payment perspective?

A.  Generally, when an invoice comes in -- whether it's electronic, hard copy -- the onsite team would review the invoice for services, at which point they would process for payment onto our accounting team.

So that's generally input into the various softwares of choice, at which point then -- in some softwares, the next level team member -- for example, a regional -- may approve invoices.  And then it's fed to our accounting team for further processing.

Q.  Okay.  And was Ms. Price correct that the accounting is all done in Yardi, or is that wrong?

A.  No, that was wrong for GREP.

Q.  So some of the GREP accounting is going to be in different software?

A.  That's correct.

Q.  What other software?

13 (Pages 46 - 49)

30(b)(6)  Stephanie Donlin                                    April 23, 2026
Cordeiro, Shaun, Et Al. v. Grep Atlantic LLC, Et Al.

Page 50

A.  RealPage.

Q.  So would the OneSite properties use RealPage?

A.  No.  They could use Yardi and RealPage or RealPage and RealPage.                                 09:13:44

Q.  Okay.  Because OneSite and RealPage are commonly owned, right?

A.  Apologies, yes.  The same, yeah.

Q.  But it could be that an asset that's using Yardi for the property management could use RealPage 09:14:04 for their accounting, and it could be that an asset that's using OneSite for their property management could use Yardi as their accounting?

A.  They could interchange.

Q.  Okay.  And you're aware of that happening 09:14:20 at GREP?

A.  I'm aware of RealPage on the -- I call it "front end" and Yardi on the back end; or RealPage on the front end and RealPage on the back end; and Yardi on the front end, Yardi on the back end.  09:14:33

Q.  Okay.  Not familiar with Yardi on the front end and RealPage on the back end?

A.  Correct.  I don't know that scenario.

Q.  By the way, we've got two accounting

Page 51

softwares that are used when an invoice is uploaded to the accounting team, fair?

A.  Those are two -- an asset may use a program to feed into the accounting software.

Q.  Give me an example of that.            09:15:06

A.  OpsTechnology.

Q.  What was the first word?

A.  Ops; OpsTechnology.

Q.  Is that a piece of software or a company?

A.  I assume it's a company.  And it is a  09:15:20 software.

Q.  What does OpsTechnology do?

A.  It processes -- if in use, it processes the invoices electronically.  You can manually upload an invoice to the database, at which point it's then 09:15:45 coded and processed through accounting for payment.

Q.  Is that a product that's been around for five-plus years?

A.  Approximately.  I believe a little over five years.                                               09:16:07

Q.  So it's not an AI-generated technology?

A.  I'm not familiar with it being AI at this point.

Q.  But essentially, it sounds like what

Page 52

OpsTechnology does is they're either an intermediary to assist with the uploading of invoices, or they're not there and the invoices still go through to the accounting team?

A.  That's correct.                          09:16:34

Q.  Okay.  So in the end, the invoices get to the accounting team at a corporate left, right?

A.  That's correct.

Q.  And would this be GREP Atlantic corporate level?  Massachusetts corporate level?  New England? 09:16:45 National?  Where does it go?

A.  They are national.

Q.  So invoices go to the national accounting team; is that right?

A.  Entries.  Not the actual invoice.        09:17:04

Q.  Well, would they upload the invoice?

A.  The accounting team does not upload the invoice.

Q.  The onsite team uploads the invoice?

A.  Yes.                                      09:17:21

Q.  So the onsite team uploads the invoice, and it's received by the accounting team, right?

A.  If they were using an electronic program to upload invoices.

Page 53

Q.  Do the GREP properties in Massachusetts use an electronic program to upload invoices?

A.  Not all.

Q.  For the ones that do not use an electronic program to upload invoices, what do they do?    09:17:40

A.  That could vary.

Q.  In what way?

A.  Yardi has a direct program where you can enter the information for the invoice into Yardi, and then that -- but there's not an upload of the  09:17:55 invoice.  It's the information that's entered.  It's more of a manual process, if that helps clarify.

Q.  It does.

Is that for all the Yardi properties or just some of them?                                      09:18:16

A.  It's by owner choice.

Q.  Can you think of a GREP-managed property that uses the option to upload the information regarding the invoice, rather than the invoice itself?                                             09:18:32

A.  Yes.

Q.  Who is that?

A.  Goldman Sachs properties.

Q.  So with Goldman Sachs-owned properties, the

14 (Pages 50 - 53)

30(b)(6)  Stephanie Donlin                                      April 23, 2026
Cordeiro, Shaun, Et Al. v. Grep Atlantic LLC, Et Al.

Page 54

data regarding the invoice would be uploaded, but the physical invoice would not?

A.  Correct.

Q.  But the physical invoice would still be stored onsite?                              09:19:00

A.  Correct.

Q.  Any other investors that you could think of that are similar to Goldman Sachs in this regard?

MR. ARBER:  Objection to form.

A.  Nuveen would be another example.        09:19:21

Q.  N-U-V-E-E-N?

A.  N-U-V-E-E-N, yes.

Q.  And so with Nuveen, same thing; they would upload the data regarding the invoice to the accounting team, but the actual electronic invoice 09:19:36 would be stored locally onsite?

A.  The onsite team would upload the information from the invoice and transmit it to the accounting team.  No invoices attached.

Q.  But the invoice would still be stored 09:19:53 locally?

A.  Generally, yes, uh-hum.

Q.  So when an invoice goes to the accounting team, whether it's including the invoice or just the

Page 55

data, like with Goldman Sachs and Nuveen, what happens next?

A.  The accounting team would get the transmitted information, whether invoice or no invoice.  They would review -- I assume they have an 09:20:19 approval process and a check-run process, and that could differ every week to every other week.  At which point they would process to the general ledger and process the payment according with the schedule.

Q.  Does the accounting team send feedback back 09:20:39 to the onsite team regarding the invoice, saying, "Okay, this is processed for payment?  This invoice is good to go?"  Something like that?

A.  Accounting generally does not report back any of that information.                          09:20:57

Q.  So the application of the invoice to a particular tenant's ledger is going to be done onsite around the time it's sent to accounting in the first place?

A.  Upon receipt of the invoice, any resident 09:21:14 charges would be applied.

Q.  Right.  So when an invoice is received onsite, the onsite team is uploading either the invoice or the data to accounting and then

Page 56

contemporaneously, either slightly before or slightly after, applying any resident charges to the ledger?

A.  If there were any resident charges, that's generally the process.                          09:21:45

Q.  So a example of something that wouldn't be a resident charge would be, you know, cutting the grass?

A.  Landscape contract, yes, yup.

Q.  But any charge that's associated with a 09:22:06 particular unit is going to get placed on their ledger?

MR. ARBER:  Objection to form.

A.  No.

Q.  Give me an example of something that would 09:22:17 not be placed on the ledger, where the work is specific to a unit?

A.  Broken dishwasher, and a maintenance contractor is called out.

Q.  Fair point, okay.  So for repairs within 09:22:30 the unit that were not the fault of the tenant, those are not going to get applied to the tenant ledger?

A.  They are not.

Page 57

Q.  Legal fees, though, that are applicable to a particular tenant are going to get applied to that tenant's ledger?

MR. ARBER:  Objection to form.  Assumes facts.                                                09:22:53

A.  They could.

Q.  When would they not be?

A.  Different owners have different expectations.  They may choose to not charge any type of legal fees.                                09:23:08

Q.  What owners that you're aware of choose to not charge legal fees?

A.  I am only familiar with one owner that has chosen not to charge legal fees.

Q.  Who's that?                                09:23:27

A.  That would be KKR.

Q.  KKR?

A.  That's correct.

Q.  Have they, to your knowledge, always chosen not to charge legal fees, or have they changed their 09:23:38 policy to now not charge legal fees?

A.  I don't know when they chose to do that.  I don't have that information.

Q.  Either way, for a KKR-owned property, if we

15 (Pages 54 - 57)

Case 1:23-cv-12901-AK    Document 103-1    Filed 06/17/26    Page 17 of 38

30(b)(6)  Stephanie Donlin                                   April 23, 2026
Cordeiro, Shaun, Et Al. v. Grep Atlantic LLC, Et Al.

Page 58

wanted to see if they were charging legal fees to a tenant, we could just look at the tenant's ledger, and there would either be legal fees on there or there wouldn't?

A. By looking at individual ledgers, you could make some determination, but it may not be explicitly clear.

Q. In what way?

A. If there were ledger charges listed as "miscellaneous," there may not be a note, without further research, of what it pertained to.

Q. Right. But you're not familiar of any instances in which legal fees were coded as "miscellaneous," right?

A. I have not pulled that information, but it is available.

Q. Any other properties that you can think of other than KKR for GREP properties in Massachusetts who've elected not to charge legal fees to tenants?

A. Not that I'm familiar with.

Q. And so for every other owned property in Massachusetts, a legal fee that's itemized to a particular tenant is going to get placed on their ledger and owed at the time the invoice comes in?

Page 59

MR. ARBER: Objection to form.

A. It may, yes.

Q. Other than KKR, right?

A. Correct.

Q. And once it's on the ledger, GREP's position is that the tenant owes it, right?

MR. ARBER: Objection to form.

A. They may. For example, it may have been posted in error.

Q. Sure. I mean, if there's a mistake. But if something is -- procedure is followed, and an invoice for Joe Smith is received and it's not a KKR property and it goes on the ledger, at that point, barring a mistake, Greystar's position is that Joe Smith owes that money, right?

MR. ARBER: Objection.

A. Generally, yes.

Q. I mean, for example, are you aware that there's been a counterclaim filed in this case against Mr. Cordeiro and Mr. Matlock?

A. Can you clarify "the counterclaim"?

Q. Yeah. In terms of that term? Do you know what that term refers to?

A. I just want to make sure I fully understand

Page 60

the question asked "the counterclaim."

Q. So you're aware, of course, that Mr. Cordeiro and Mr. Matlock are suing Greystar, right?

A. I understand that.

Q. And you're aware that in response, Greystar is suing Mr. Cordeiro and Mr. Matlock in the same case. That's called a "counterclaim." Are you familiar with that?

A. I'm vaguely familiar.

Q. You do know that your company has sued these tenants, right?

A. Are you referring to the eviction?

Q. No. I mean in this case right now that you're here to testify about.

A. Yes.

Q. You know that, right?

A. Yes, I'm generally familiar.

Q. Okay. And it's a lawsuit that claims that these tenants owe money, right?

A. Correct.

Q. And what does Greystar look to to determine the amount that they contend these guys owe?

A. For the balance due?

Q. Yes.

Page 61

A. Rent, parking, pets, damages.

Q. We're talking -- we're not quite on the same page.

A. Okay.

Q. It's understood that there are categories for which Greystar contends that these individuals owe money. But in terms of the source, for Greystar to determine how much they contend is owed, what does Greystar look to?

A. Understood. The lease. There may be client expectations and direction from a specific client or going through the eviction process of mediation and agreement, a settlement. So --

Q. Let me stop you there, because that's not quite the question.

A. Okay.

Q. Understood that there may be underlying expectations from owners and decisions are made. My question is much more simple.

In order to determine how much money Greystar contends these guys owe, where do you look to get that money amount?

A. The ledger.

Q. The ledger?

16 (Pages 58 - 61)

Page 62

A.  The ledger.

Q.  The ledger determines how much money Greystar thinks tenants owe, right?

A.  Correct.

Q.  Not just for Mr. Cordeiro and Mr. Matlock 09:29:05 in this lawsuit that Greystar has filed against them, but all the tenants.  The ledger governs how much money Greystar thinks people owe.

MR. ARBER:  Objection to the form.

A.  The ledger generally points to that number, 09:29:17 yes.

Q.  Absent a mistake.  Mistakes happen.

A.  Right.

Q.  But absent a mistake, the ledger is going to determine for all the tenants in Massachusetts 09:29:27 how much money Greystar thinks people owe?

MR. ARBER:  Objection to form.

A.  Yes.  The ledger -- the lease may depict some of those fees, but the ledger would be the first point, I would say.           09:29:43

Q.  Well, the lease is going to tell you what fees you can charge.  But the ledger is going to be the indicator of what fees were charged, right?

A.  Correct.

Page 63

Q.  So I'm assuming that with KKR, they've got the same template, at least, of everybody else in Massachusetts, right?

A.  Generally, the NAA lease has been used widely.                              09:30:05

Q.  And it's got the same language regarding attorney fees.  And we're not here, you and me, to discuss whether or not you can charge them or not.  That's for a later date.  But it's got the same language, right?                        09:30:17

A.  The default lease, yes, has the same language.

Q.  And so it's not going to be the lease that determines whether fees were charged.  It's going to be the ledger that shows whether fees were charged. 09:30:27

A.  Were charged, yes, ledger.

Q.  And it's going to show the date that it was charged?

A.  Yes.

Q.  And then it's going to show the date of any 09:30:36 payment that's made, right?

A.  Yes.

MR. ARBER:  Objection to form.

Q.  And then there's going to be rules that

Page 64

show how the payments are applied and to what charge they're applied, right?

A.  The ledger shows a sequence of payments and credits/debits, I would say.  How they are applied is not on the ledger.                    09:31:03

Q.  Right.  That's not on the ledger.  That's going to be in the individual operating systems.  There's going to be rules in place for how those fees are applied.  We already talked about that, right?                              09:31:15

A.  Yes.

Q.  And that's the same for Yardi, OneSite and Entrata, right?

A.  Yes.  The ledgers are the same, yeah.

Q.  For each of these systems, there's going to 09:31:29 be a rule regarding how the payments are applied, right?

A.  Correct.

Q.  And for each of these systems, there's going to be a ledger, and the ledger is what 09:31:36 Greystar uses to determine how much money is owed by these guys?

A.  Yes.

Q.  And the ledger is going to be the source

Page 65

for when those charges are assessed, right?

A.  There is a date per charge.

Q.  And the ledger is going to be the source of when a payment comes in, right?

A.  When the payment comes in and posted is on 09:31:58 the ledger.

Q.  Right.  It could be that -- and I know that you've got to close out the day at the end of the day.  And so it could be that it's entered into the computer not exactly the date that it's posted for, 09:32:16 right?

A.  Correct.

Q.  But there will be a record of when a payment is posted on each individual tenant ledger?

A.  Yes.  Apologies.  I don't know if it's on 09:32:31 my end.  But I can hear you; but visibly, you are delayed for the last few moments.  I can let you know if it persists.

Q.  Well, there's not much to see.  Don't worry about it.  As long as you can hear, it's okay.    09:32:52

A.  I just wanted to make sure that the sound didn't go out.  I don't know if there's any scrambling on my end.

Q.  I'm hearing you clearly.  And as long as

17 (Pages 62 - 65)

30(b)(6)  Stephanie Donlin                    April 23, 2026
Cordeiro, Shaun, Et Al. v. Grep Atlantic LLC, Et Al.

Page 66

Ms. Jane can hear both of us, then we should be good to continue. But let me know if it becomes a problem, and we can take a break.

A. Okay, I will.

Q. And so for each tenant in a GREP-managed property in Massachusetts, if we wanted to look at when certain charges were assessed and when certain payments were posted, we could look at that for any individual tenant in a GREP-managed property in Massachusetts, regardless of what operating system we're talking about?

MR. ARBER: Objection to form.

A. A ledger would be available in the software.

Q. There's little variances that we've already talked about between the operating systems. But all of these operating systems for GREP properties in Massachusetts are going to have a tenant ledger which contains when charges are assessed and when payments are posted, right?

A. There is a ledger, yes.

Q. And for all of those properties that charge attorney fees, when that attorney invoice comes in, it's going to be posted to the tenant ledger at the

Page 67

time that it's sent to accounting?

A. If it's being assessed, yes.

Q. And KKR is the only one you can think of that has at some point stopped charging attorney's fees, right?

A. I think from my knowledge from the client point of view, yes. Is there onsite discretion? I would not know that.

Q. And either way, you don't have to know what every single property does or did for an individual tenant, because it's going to be in the ledger. The ledger is going to have a record of every instance in which attorney's fees were charged and every instance in which a payment was processed after that attorney fee was charged, right?

MR. ARBER: Objection to form.

A. The information would be there. Further research may be required as to the details of it. For example, if "miscellaneous" is chosen, it wouldn't be completely clear if it was legal fees.

Q. Right. But you're not familiar of any instance in which that's ever happened?

MR. ARBER: Objection to form.

A. I've not seen it. I have not seen it

Page 68

specifically. But again, it's available for an onsite team member to choose.

MR. ARBER: Ed, when you get a chance, we've been going for over an hour, so a --

MR. MAGINNIS: How about now?

MR. ARBER: That's great.

MR. MAGINNIS: Take ten?

MR. ARBER: Sure. Very good. Thanks.

(Recess taken from 9:35 to 9:47)

BY MR. MAGINNIS:

Q. Ms. Donlin, are you ready to continue?

A. Yes.

Q. Before the break, we were talking about KKR as one of the owners of the GREP-managed properties where they've elected not to charge attorney's fees. Do you recall that?

A. Yes.

Q. And I looked back to try to figure out which properties we're talking about, and I couldn't initially figure it out.

Who is KKR? Do you know what that stands for? If not, it's okay.

A. I do not know what it stands for.

Q. What properties -- first of all, how many

Page 69

properties are we talking about?

A. One.

Q. And what's the name of it?

A. The Metlo.

Q. Can you spell that for me?

A. The -- T-H-E M-E-L-T-O [sic].

Q. M-E-L-T --

A. M-E-L-T-O.

Q. Oh, the Melto.

A. Metlo.

Q. The Metlo?

A. M-E-T-L-O.

Q. The Metlo is the only property in Massachusetts that you're aware of that does not charge attorney's fees?

A. I believe so, currently. I just don't know when that went into conversation.

Q. And we're here -- there's a relevant time period that's the subject matter of this lawsuit. And what we can do is we can look back at our records and we can see if there's any fees charged from The Metlo. And if they charged fees up to a point and then they stopped, that will be reflected in the records, right?

18 (Pages 66 - 69)

Page 70

A.  I understand, uh-hum.

Q.  I want to show you some documents -- and I know that -- I was looking at the topics during the break.  And is it fair to say that you are not here to testify about the process associated with pulling 09:49:27 the records from the property management's softwares to determine who may or may not be a part of this class; is that fair?

A.  I was not a part and not the person.

Q.  We're going to talk to an IT person or some 09:49:45 other person about that, right?

A.  That's my understanding.

MR. MAGINNIS:  Because there's kind of some overlap between the software itself and the records, I want to see if you can be helpful on this.  So 09:49:58 what I'm going to do is I'll mark this as 11, and I'll share.

(Document marked as Donlin Exhibit 11 for identification)

Q.  And so, Ms. Donlin, what I'm showing you is 09:50:26 something that was produced by Greystar in this lawsuit, and it's marked with a Bates number at the bottom GREP-8155.

And what this is used for, I'll represent

Page 71

to you, is when we're looking at a spreadsheet, you can't number a spreadsheet in the same way that you can number a piece of paper.  And so what happens is a placeholder document is used.

So I've marked GREP-8155 as an exhibit, and 09:50:55 then I'm going to show you the spreadsheet.  Okay?

A.  Okay.

Q.  And so this is the Excel file that's labeled "GREP-8155."  And my understanding is it refers to the records from the Yardi operating 09:51:29 systems that GREP manages in Massachusetts.  Okay?

MR. ARBER:  Objection to form.

A.  I can't confirm where this was pulled from.

Q.  Well, I'll just note to you that the file is called, "Detail Breakdown 2026_3_16 Yardi."  And 09:51:53 then as you can see on Column B over here, it refers to a Yardi code.  Do you see that?

A.  I understand, yes; I do see it.

Q.  And we have three spreadsheets.  And one is Yardi on one side and one is Entrata.  Okay?    09:52:10

A.  Okay.

MR. ARBER:  I'm just going to object, because the witness hasn't been produced for these topics, as you noted at the beginning of this sort

Page 72

of section.  If you want to ask questions about it, to the extent she has information that's helpful, I think she can answer.  But I would just object to that being part of the 30(b)(6) corporate testimony.

MR. MAGINNIS:  Understood.  And we're not 09:52:38 going to address the process for which these things were produced.  We'll save that for whatever individual is produced for that.

BY MR. MAGINNIS:

Q.  But I did want to ask you some questions 09:52:49 just about these categories, to see if you can be helpful.

Would it be helpful for me to zoom in or can you see?

A.  I can mostly see it.  I'll let you know to 09:53:04 zoom in.

Q.  And I'm just looking at the names of the columns.

A.  Could you expand them a little bit further? Some of them are cut off.                    09:53:15

Q.  We'll scroll, because there's a lot of them.  Is that more helpful?

A.  Much more helpful.

Q.  So I wanted to ask you -- and is it your

Page 73

understanding that these columns are going to reflect database entries in Yardi?  So for example, in Yardi, is there an entry to input the date of the start of the lease?

A.  Yes.                                    09:54:01

Q.  Is there an entry to put a resident ID?

A.  That is not entered.  That is automatic.

Q.  Okay.  But for every tenant file, a resident ID is assigned and stored in Yardi?

A.  Yes.                                    09:54:19

Q.  Okay.  We were talking earlier about that there could be a miscellaneous or there could be a damages figure that things are coded in.

Would that be this Column U, where it's either "legal" or "payment" or "evict" or "legal 09:54:43 res"?  Do you see those?

A.  I do.

Q.  Would that be where the code in the database would be utilized if somebody had coded a legal fee as "miscellaneous"?              09:54:59

MR. ARBER:  Objection to form.

A.  I'm not sure that that's the exact coding. But there is a code that appears similar in Yardi.

Q.  And you didn't compile this, so you don't

19 (Pages 70 - 73)

Page 74

know exactly what the code is that's referenced in here?

A.  I don't.

Q.  Do you see AA; that it refers to "Charge transaction IDs"?                   09:55:34

A.  Yes.

Q.  Do you know if each transaction has a separate ID that's stored in Yardi?

A.  I don't know that.

Q.  Looking at the property management system,   09:55:58 we talked earlier about Yardi-Alliance and Yardi-Greystar.  Do you recall those?

A.  Yes.

Q.  And was Yardi-Alliance an owner-serviced operating system or a Greystar-serviced operating   09:56:13 system?

A.  To my knowledge, it's an owner-serviced platform for software.

Q.  As you can see, the only references in here are these two; Yardi-Alliance and Yardi-Greystar 7S.   09:56:35 Do you know if all owner-serviced operating systems are just referred to as "Yardi-Alliance"?

A.  I don't know.

Q.  So you don't know whether or not all of

Page 75

these owner operating systems with different names attached to it are covered by this chart?

A.  I don't know.  I did not pull this information.

Q.  Okay.  But you're not aware that, for   09:57:09 example -- it's not like Yardi-Alliance is a term that's used to encompass all of the owner-serviced operating systems?

A.  Not that I'm aware with.

Q.  Is Yardi-Alliance just a version of Yardi?   09:57:22

A.  I believe so.

Q.  Give me one second.  I don't want to waste your time with stuff that you're not going to know. Just give me one second.

Do you know what OneSite TruAmerica is?   09:58:00

A.  I am familiar.

Q.  What's that?

A.  The owner software for the ownership group, TruAmerica.

Q.  Okay.  So that would be an owner-serviced   09:58:13 operating system for OneSite?

A.  Yes.

Q.  But it's not the only owner-serviced operating system for OneSite?  There would be other

Page 76

owner-serviced operating systems with a different name than "OneSite TruAmerica"?

A.  Correct.

Q.  Have you heard of Entrata Greystar GIG, G-I-G?                   09:58:59

A.  "GIG" is commonly referred to Greystar Investment Group.

Q.  Okay.  So would Greystar Investment Group -- would properties that use GIG -- Entrata Greystar GIG refer to properties for which Greystar   09:59:19 has an ownership interest?

A.  Yes.

Q.  And properties that use Entrata Greystar would refer to properties that use Entrata, but Greystar is just the managing entity?   09:59:35

A.  Correct.

Q.  Do all Greystar-owned properties use Entrata Greystar GIG in Massachusetts?

A.  I don't believe they do.

Q.  Okay.  Is there a GIG kind of qualifier   09:59:52 that's used for Yardi or OneSite as well?

A.  I believe they have one asset that is operating a RealPage OneSite.

Q.  So when I said all the Greystar entities

Page 77

use Entrata-owned -- when I said all the Greystar-owned entities use Entrata Greystar GIG, that was wrong, because there's one Greystar-owned entity that uses RealPage?

A.  Correct, I believe there is one.   10:00:25

Q.  See, it was a bad question.  I shouldn't have said "all."

So all but one in Massachusetts use Entrata Greystar GIG?

A.  I believe that's correct.  I would have to   10:00:35 fully confirm, but I believe that's correct.

Q.  And one of them where Greystar Investment Group owns the building or buildings uses OneSite, right?

A.  Say that again?   10:00:50

Q.  One property in Massachusetts that Greystar Investment Group owns uses OneSite?

A.  I believe that's correct.

Q.  What property is that?

A.  They do have multiple properties in the   10:01:07 Everett location.  I can't point to the exact one. Maybe Mason or Jade would be names, but I'm not 100 percent sure.

MR. ARBER:  Are you guys picking up the

30(b)(6)  Stephanie Donlin                                        April 23, 2026
Cordeiro, Shaun, Et Al. v. Grep Atlantic LLC, Et Al.

Page 78

honking from outside my window?

MR. MAGINNIS:  No.

THE WITNESS:  I am not.

MR. ARBER:  Great.  I didn't want to be disturbing you guys.                         10:02:11

THE WITNESS:  Good noise cancellation.

MR. MAGINNIS:  Perfect noise cancellation.

BY MR. MAGINNIS:

Q.  Okay.  Let's talk about the eviction process for GREP properties in Massachusetts.  Okay? 10:02:22

A.  Okay.

Q.  We talked earlier that nearly all or all of the properties are going to use an apartment association-templated lease?

A.  National Apartment Association specifically 10:02:39 for Massachusetts, yes.

Q.  The NAA Massachusetts-templated lease?

A.  That's correct.

Q.  And for all of those leases, rent is going to be due on the 1st of the month?                10:02:50

A.  It does indicate that, yes.

Q.  We're in April.  So let's say rent is due on April 1st for all tenants at Greystar properties in Massachusetts, right?

Page 79

A.  Yes.

Q.  Are there typically rent reminders sent either before or after the 1st by the onsite staff?

A.  Typically, there are.

Q.  No formal policy about how many and when, 10:03:21 but there typically are reminders sent?

A.  There is communication, yes.

Q.  Is there a general rule that Greystar asks its onsite staff to follow with regard to communicating with the tenants regarding rent?     10:03:42

A.  There's hands-on training which would indicate some of those best practices.

Q.  Nothing in a written document?  Just kind of on-the-job training that's passed on?

A.  I don't think that there's an SOP that      10:03:58 specifically states when letters are sent and how many.  But indication that rent reminders should be sent, I believe that's in the SOP.

Q.  So generally, some level of written reminders prior to a Notice to Quit being sent?     10:04:13

A.  Yes.

Q.  And a Notice to Quit would be sent on or about the 7th to the 9th of the month where a tenant has not paid their rent?

Page 80

A.  Typically.  It could vary based on a weekend or a PTO.  It may flux between that 7th or 10th time frame.  That is pretty typical.

Q.  It could be as early as the 7th.  But if it's a weekend or a holiday, it could be as late as 10:04:43 around the 10th?

A.  Correct.

Q.  And that's going to be using, again, a templated communication?

A.  A Notice to Quit is, yes, the template.     10:04:53

Q.  And I'll show you what's already been marked as Exhibit 2.

So does this appear to be the Notice to Quit that was sent to Mr. Cordeiro and Mr. Matlock on or about December 9th, 2022?                 10:05:17

A.  It appears to be.

Q.  Is this something that you reviewed in advance of today?

A.  I have seen it.

Q.  And again, this is just a -- other than the 10:05:27 name of the recipient and the address and the amount of rent and who's signing it, this is going to be a templated document?

A.  Generally, yes.

Page 81

Q.  And is it Greystar's policy for Massachusetts to have a constable serve this Notice to Quit to those individuals who haven't paid their rent?

A.  No.  It could be in various forms.         10:05:58

Q.  In what forms could it be?

A.  It could be delivered to the apartment.  It could be served by the constable.  It could be mailed, certified mailed.  Those are some options. The majority would be hand-delivered.            10:06:15

Q.  So Greystar has no SOP or rule regarding how the Notice to Quit needs to be served?

A.  I believe there is an SOP that indicates a legal notice.  As far as how it's delivered would be subject to the state or the actual notice.        10:06:40

Q.  But your understanding is that it could be hand-delivered, it could be certified mail, it could utilize the constable; but the majority of them are hand-delivered?

A.  Correct.                                   10:06:57

Q.  If it's sent by a certified mail, does that cost get passed on to the tenant?

A.  I'm not sure.  I have not done that research.  But I don't believe it has been.

21 (Pages 78 - 81)

30(b)(6)  Stephanie Donlin                                April 23, 2026
Cordeiro, Shaun, Et Al. v. Grep Atlantic LLC, Et Al.

Page 82

Q.  But if it's served by the constable, the invoice from the constable would come in and get treated in the ordinary course like any invoice in the way that we talked about previously?

A.  It could.                    10:07:32

Q.  It is, right?

A.  Uh-hum.

MR. ARBER:  Objection to form.

Q.  When an invoice from a constable regarding service of Notice to Quit comes to a complex, it would be placed on the tenant ledger and sent to accounting for payment, right?            10:07:42

MR. ARBER:  Objection to form.

A.  If received, the hard cost would be posted to the ledger if that was the expectation. The onsite team may have discretion that they just didn't post it, for whatever reason.  There's a possibility there.            10:08:01

Q.  Anything is possible?

A.  Yeah.                    10:08:15

Q.  Are you aware of any circumstances in which a constable was utilized to serve a Notice to Quit, and the units do not pass those costs on to the tenant?

Page 83

MR. ARBER:  Objection to form.

A.  I'm not sure on the Notice to Quit.  I would have to do further research with any type of charge that was posted to a ledger and the reason behind it.            10:08:47

Q.  Well, I mean, you knew that the Metlo doesn't charge attorney's fees, right?

A.  Attorney's fees, yes.

Q.  Are you aware of any property that doesn't charge constable costs?            10:08:58

A.  They should be charging hard costs, yeah.

Q.  So you're not aware of any property that does not charge the constable costs?

A.  I have not looked at every individual property, whether there are charges or not, so I have not.            10:09:16

Q.  Right.  You can't be aware of every transaction at every single property, but you are not aware of a property that elects not to pass those costs on?            10:09:28

A.  Correct.

Q.  And apologies for the double negative.  It might have even been a triple negative.

Okay.  So the Notice to Quit is served on

Page 84

or about the 7th to the 10th of the month, right?

A.  Yes.

Q.  And it's served either the majority by hand-delivery, but it could be by certified mail or it could be by the constable?            10:09:53

A.  The majority by hand-delivery, yes.

Q.  And then the tenant has 14 days to respond to that Notice to Quit and get their rent paid, right?

A.  If it's a 14-day notice, correct.            10:10:08

Q.  And in Massachusetts, isn't it always a 14-day Notice to Quit?

A.  It is not.

Q.  Okay.  Tell me about that.

A.  It could be a 14-day Notice to Quit or a 30-day Notice to Quit, which would be for someone that might be on assistive programs; Section 8, for an example.            10:10:15

Q.  So for a Section 8 tenant, it might be a 30-day Notice to Quit?            10:10:32

A.  That is correct.

Q.  And does Greystar have Section 8 housing that it offers?

A.  If the individual qualifies for the term's

Page 85

rents and utilities for that particular apartment that they're applying for, yes, we do.

Q.  Are there specific apartment complexes that you're aware of that have Section 8 tenants?

A.  I am familiar with some of them.            10:11:02

Q.  Can you give me some of them?

A.  Yeah.  Boston East would be one that I am familiar with a voucher-holder there.  Urbane at Alewife.  Those are some examples.

Q.  So the templated Notice to Quit is sent on the 7th to the 10th of the month, and it's going to have a duration in there; whether it be 14 days or 30 days?            10:11:22

A.  Yes.  And I'd like to backtrack just slightly.            10:11:34

If a property is within a Fannie Mae or a Freddie Mac loan, they do require a 30-day; not subject to just voucher-holders.

Q.  Okay.  So under the Fannie Mae servicing guidelines, they require a 30-day notice for tenants?            10:11:49

A.  That is part of their expectation, yes.

Q.  Well, so whether it's Section 8 or Fannie or Freddie or just the stock 14 days, there's some

22 (Pages 82 - 85)

30(b)(6)  Stephanie Donlin                                April 23, 2026
Cordeiro, Shaun, Et Al. v. Grep Atlantic LLC, Et Al.

Page 86

sort of deadline that's included in the templated Notice to Quit?

A. Yes. General dates, yes, yeah.

Q. And no late fees are charged until at least 30 days past due, right?                10:12:22

A. That is correct.

Q. But at the expiration of the Notice to Quit, regardless of what the deadline might be, if they are not current, the file is going to get sent to legal; is that right?                10:12:40

A. At the expiration, they could be sent to legal. Oftentimes, best practice would be to wait until the expiration of the month and then turn it to legal.

Q. Okay. Is there a small balance aspect,    10:12:55 where if they're not quite current, but have reduced it, it would not be sent to legal?

A. Yes. It could vary from asset to asset, client to client.

Q. I think Ms. Price said it was $500. Is    10:13:10 that your understanding of what the limit is?

A. The general practice is 500. Some clients will wait to ensure a full month if there's a balance, but that would be asset-by-asset. The

Page 87

general practice is 500.

Q. Okay. So the Notice to Quit might expire -- if we're at a 14-day Notice to Quit that's sent on the 7th, it could expire before the end of the month. And some investors might want it to go    10:13:42 to the lawyer right then. But others might wait until the end of that month and into the next month before it's sent to the lawyer?

A. The majority is waiting until the month expired.                10:13:58

Q. Let's take the majority, then. So if rent is due on April 1st, the Notice to Quit might go out April 7th to 10th, right?

A. Yes, around that time.

Q. And then with a 14-day notice, the majority 10:14:21 of them are going to wait until early May to refer to counsel, right?

A. That's typical.

Q. And those ones with 30-day Notices to Quit, like Fannie, Freddie, or with Section 8, they're    10:14:34 going to wait until the expiration of that 30-day period before they send it to counsel?

A. That is correct.

Q. But at some point -- at some point, all of

Page 88

these instances where there's a failure to pay rent are going to go to counsel with instructions to initiate an eviction proceeding?

MR. ARBER: Objection to form.

A. Yes, if they still have a balance at that    10:14:56 point.

Q. Right. If at any point they clear their balance, then it doesn't go to the lawyers, right?

A. Generally, yes.

Q. If they get it below $500, generally, it's   10:15:07 not going to go to the lawyers, right?

A. That's correct.

Q. What about once it goes to the lawyers, if they get it under $500, what happens?

A. It could vary. Yeah, it could vary.        10:15:24

Q. Ms. Price testified that once it goes to the lawyers, they've got to zero out the account to stop the process.

Do you think she was wrong on that?

A. I think perception may be of the question.  10:15:43 As far as carrying the balance, it would be -- if it went to the attorney, carrying the balance, minus any attorney's fees, if they were assessed.

Q. Okay. So if they've paid the rent, but

Page 89

haven't yet paid the attorney's fees, it could stop the process?

A. Generally, we're not -- let me backtrack.

If they haven't filed an answer before the court event and they haven't cured the balance, it    10:16:28 would proceed forward with the first court event. If perhaps they cured the full balance, minus any attorney fees before the answer, that would stop the process. After an answer is filed, I think that it's based on conversation. It could vary. If an    10:17:00 agreement is set to be made for anything that might be remaining on the account, that could vary.

Q. And we've jumped a little ahead. So I think where we were was it's referred to the lawyer upon the expiration of a Notice to Quit and they    10:17:18 haven't gotten the balance down to an acceptably low figure; whether it be zero, $500, or investor-dependent. Fair?

A. Fair.

Q. What is sent to the lawyer?                10:17:33

A. Clarity, for documents?

Q. Yeah, uh-hum.

A. Okay. Generally, they already have a copy -- well, let me backtrack.

23 (Pages 86 - 89)

30(b)(6)  Stephanie Donlin                    April 23, 2026
Cordeiro, Shaun, Et Al. v. Grep Atlantic LLC, Et Al.

Page 90

The initial start would be a copy of the Notice to Quit, the ledger, and the lease I believe is sent.

Q.  Anything else?

A.  They may ask for something else. That could be if it has any type of voucher -- there's an agreement with the Housing Authority -- they could ask for that.

Q.  And generally, you're not getting any specific communications. But the lawyers get an initial set of documents --

THE COURT REPORTER:  I'm sorry, you're breaking up. Can you please repeat the last question?

MR. MAGINNIS:  Sure.

BY MR. MAGINNIS:

Q.  Generally, attorneys will receive that initial set of documents, the Notice to Quit, the ledger and the lease, and they'll follow up with the community manager regarding any documents initially that they might need?

(Weak Internet Signal)

MR. ARBER:  Ed, you're slow motion.

THE WITNESS:  Yeah, I think I got that.

Page 91

Q.  Can you hear me, Ms. Donlin?

A.  Yeah. Generally if counsel is looking for additional documents, they would request.

THE COURT REPORTER:  You're frozen again.

MR. MAGINNIS:  Let's go off for a minute and let me see if I can fix this.

(Off the record)

BY MR. MAGINNIS:

Q.  Ms. Donlin, we were discussing that generally the attorneys will get a lease, a ledger, and a Notice to Quit. But if they need additional documents, they'll ask the onsite staff for it, and the onsite staff will get it for them?

A.  Correct.

Q.  During the course of an eviction process, what is the role of the onsite staff beyond that; providing documents where needed?

A.  Providing documents, providing updates as to complete occupancy checks to make sure that the individual hasn't, per se, skipped out. The team may have communication with the residents with their, call it, promise to pays or an update, which may be a role that they play. So that would be an example.

Page 92

Q.  Okay. Is the work that the onsite staff is doing, is that recorded anywhere in the property management software?

A.  There may be resident interaction notes as to any on-goings. It's possible. Not necessarily required.

Q.  Okay. But there may be communications between onsite staff and the eviction lawyer, just providing an update about what's going on at the complex?

A.  There could be.

Q.  Anything relevant in terms of the status of the case towards application of invoices to ledgers?

A.  Can you ask that again? Apologies.

Q.  Yeah. Well, we talked earlier about an invoice comes in, and it's associated with a tenant. And the general rule is that it's applied to the ledger and then sent off to accounting, right?

A.  Correct.

Q.  Does the status of the case get notated anywhere in a way that would impact the application of the attorney being invoiced to the ledger?

MR. ARBER:  Objection to form.

A.  Not that I'm familiar with.

Page 93

Q.  So, for example, you mentioned an answer. You know what an answer is, right?

A.  Generally.

Q.  It doesn't matter whether a tenant has filed an answer or not in terms of the applicability of the invoice to their ledger?

A.  Correct.

MR. ARBER:  Objection to form.

Q.  It doesn't matter whether the case is over or not regarding whether the invoice is applied to their ledger?

A.  Well, I think you'd have to review the invoice and what it pertains to in order to apply the charges. If there were applicable charges, they would be charged on receipt.

Q.  What attorney fee invoices would not be charged to a tenant upon receipt?

A.  General questions to an attorney. General requests for work to be done not associated with a resident.

Q.  I mean, I've seen one where a tenant hired a lawyer to write a letter regarding the quiet enjoyment of their property. Greystar had counsel respond, and then they charged them for the attorney

24 (Pages 90 - 93)

Page 94

fees to respond to the letter.  I mean, would that be appropriate?

MR. ARBER:  Objection to form.

A.  Who's charging?  I didn't follow that.

Q.  It was wild.  These tenants hired a lawyer and wrote Greystar a letter.  Greystar had their lawyer respond and then took the invoice from the lawyer responding and charged the tenant for it.

A.  I'm not sure that that actually happened. If you're telling me you have that information, I would need to review it.

Q.  Okay.  And it's neither here nor there.

A.  Yeah.

Q.  I mean, in terms of -- what the onsite theme is instructed to do is when they receive the legal fee invoice, if it's applicable to a particular tenant and one that is supposed to go on the ledger, it gets placed on the ledger.

MR. ARBER:  Objection to form.

A.  Typically, yes.

Q.  And so it wouldn't be dependent on the status of an individual case.

MR. ARBER:  Objection to form.

A.  Can you give me an example of "status"?

Page 95

Q.  An agreement for judgment.  Do you know what that is?

A.  I am familiar.

Q.  And so actually yesterday, Greystar produced some agreements for judgment from Greystar court cases.  Are you familiar with those documents?

A.  I have briefed some of them.

Q.  Do you know where those were pulled from?

A.  I do not.

Q.  Do you know if they were pulled from Greystar or if they pulled them from court records?

A.  I am not sure.

Q.  But some of those agreements for judgment -- I think there was, like, 20 people out of all of these that were produced -- some of them include agreements to pay costs.  Are you familiar with that occasionally being a part of an agreement for judgment?

A.  Some of those do include fees, yes.

Q.  And some of the ones that were produced yesterday included an acknowledgment from a tenant that they were agreeing they had to pay attorney's fees.  Are you familiar with that?

A.  That may be included, yes.

Page 96

Q.  I think there was one law firm that has inserted that into their agreement.  But that status of whether someone signed an agreement or costs or fees or whatever is not a part of the posting of the legal fees.  The legal fees get posted whether there's an agreement for judgment or not.

MR. ARBER:  Objection to form.

A.  If an action is taken for eviction, there could be fees applied.

Q.  Is the process different in any way for attorney fees when it's not associated with a failure to pay rent?

A.  Not that I'm familiar with.

Q.  There could be other breaches of the lease that would cause Greystar to bring in an attorney, right?

A.  Correct.

Q.  Like, what would be an example of that?

A.  Damages.

Q.  So the tenant trashes their place, and Greystar's counsel sends a letter indicating that they're in breach of the lease for trashing their place.  That's something that could happen?

A.  It could happen.

Page 97

Q.  And if the attorney then sent an invoice for the time associated with drafting that letter, that would get added to the tenant's account, right?

A.  It's possible, yes.

Q.  I mean, in the ordinary course, it would be, given the hypothetical we're talking about, right?

A.  Yes.

Q.  And those letters regarding a breach of the lease regarding something other than a nonpayment to rent are going to require the tenants to cure whatever the breach is, right?

A.  Cure any type of eviction?

Q.  No.  It could be damages.  It could be noise, right?  There's lots of ways in which a tenant could breach the lease other than through a non-payment of rent, right?

A.  Correct.

Q.  And for those ones that are of a severe nature, Greystar might utilize a lawyer to send the tenant communications indicating that the tenant was in breach of the lease, right?

A.  They may, yes.

Q.  And if the lawyer then sent an hourly

25 (Pages 94 - 97)

Page 98

invoice, that would get applied to the tenant's ledger, right?

A. Yes, it could be, uh-hum.

Q. And if the tenant doesn't cure whatever it is the breach is, what happens?           10:30:27

MR. ARBER: Objection to form.

A. Generally, we're seeking payment through communication; reminders, messages, conversation.

Q. So payment would be an example of damages. What's an example of a breach of a lease that           10:30:47 doesn't involve kind of out-of-pocket expenses?

A. Um, apologies.

Q. That's okay.

A. Nothing's coming to mind.

Q. What about noise? Crazy loud parties every           10:31:19 night. Would that be an example of something that might eventually get attention from management and from counsel?

A. It could. After a repeat offense, yes, it could.           10:31:35

Q. So in instances where the lawyer sends a letter for a breach of the lease that is not nonpayment-of-rent-related, what is Greystar's course of action if the tenant doesn't fix the

Page 99

problem?

MR. ARBER: Objection; incomplete hypothetical.

A. Hypothetically, we could produce a Notice to Quit for cause, which would further handle the           10:32:02 situation.

Q. Is there an expiration date associated with the Notice to Quit for cause?

A. I believe it's seven days. Apologies. Off memory, I'm not sure.           10:32:26

Q. That's okay. There's some sort of expiration date?

A. There is. There is.

Q. And if that expiration date comes and goes, what Greystar would do is they could file an           10:32:37 eviction proceeding, right?

A. That is correct.

MR. ARBER: Objection to form.

Q. And so the ultimate remedy for Greystar with regard to breaches of the lease, whether it's           10:32:49 non-payment of rent or otherwise, would be an eviction proceeding. It would either be a Notice to Quit or a Notice to Quit for cause?

MR. ARBER: Objection to form.

Page 100

A. It could be.

Q. And regardless of the bases for the onset of the eviction proceeding, the attorney fee invoices are going to get passed on to the tenant, regardless of what happens with the case?           10:33:19

MR. ARBER: Objection to form.

A. If there is an alternative agreement to waive those, so there may be a difference.

Q. Right. I mean, if the attorney fees ultimately get waived, they get waived. But in the           10:33:40 ordinary course, if an attorney fee invoice comes in, it's charged to the tenant, regardless of whether it's nonpayment of rent or not, right?

MR. ARBER: Objection to form.

A. Yeah, it could be charged, yeah.           10:33:55

Q. And regardless of what happens with a court case, whether it's a nonpayment-of-rent case or a Notice to Quit for cause court case, the attorney fees get passed on, no matter what happens with the disposition of the case?           10:34:11

MR. ARBER: Objection to form.

A. Again, I think that that could vary. Our goal is to settle the claim whether for cause, for possession. So typically, yes, we would pass them

Page 101

through. But there could be an alternative.

Q. Right. The goal is always a resolution.

A. Correct.

Q. But the placement of the invoices on the ledger are not dependent on the case being over or           10:34:42 not?

A. No.

Q. Can you think of any instances in which attorney fee invoices were charged to tenants that did not involve nonpayment of rent? I don't want to           10:35:07 talk about hypotheticals. Like a specific instance that you can think of.

A. I can't think of a specific instance --

Q. There's been some contentions in the case that the eviction code might not always apply to           10:35:23 nonpayment of rent, because there isn't a code necessarily for attorney fees that don't involve evictions. But are you aware of any instances in which that's actually happened?

MR. ARBER: Objection to form. And I would           10:35:37 just state that I don't think the witness could be expected to know every single instance.

THE WITNESS: Can I answer?

MR. ARBER: You can answer.

26 (Pages 98 - 101)

30(b)(6)  Stephanie Donlin                                    April 23, 2026
Cordeiro, Shaun, Et Al. v. Grep Atlantic LLC, Et Al.

Page 102

A.  I'm not familiar with exact entries. Further research would need to be provided on each individual entry.

Q.  We're here for the corporate deposition of GREP.  And ultimately, there's either going to be evidence that shows that there's charges that don't relate to nonpayment of rent or there aren't.

Like, are you aware of any?  I don't want to hear about it in three months.  If they exist, I want to hear about it today.

A.  Yeah, I mean, I can assume that there are charges outside of nonpayment, based on my personal knowledge.

Q.  But you're not aware of anything specific or how frequent or anything like that?

A.  I am not.

Q.  And even if there are attorney fee charges that don't have anything to do with nonpayment of rent, they would get added to the ledger in the same way attorney fee invoices for nonpayment of rent get added?

MR. ARBER:  Objection to form.

A.  There could be various forms.  As mentioned before, there's various account codes that could be

Page 103

chosen.

Q.  Various account codes.  But an account code would be chosen if there's an invoice from a lawyer applicable to a tenant, regardless of whether it's nonpayment of rent or some other bases to charge them for fees, right?

A.  There would be a charge code selected.

Q.  And in any of the instances in which you could have a breach of the lease, the charge code is getting placed onto the ledger, regardless of what the status of any court case might be?

MR. ARBER:  Objection to form.

A.  Invoice on receipt would be reviewed and applied.  So yes.

Q.  So to take your damages example.  Somebody trashes their apartment.  If you get an invoice from an attorney, you're not waiting until Greystar gets a judgment saying, "This guy damaged the property in the amount of $2,000 before you apply the attorney fees.  The attorney's fees just come on when the invoice comes in, right?

A.  Generally, yes, on receipt.

Q.  When an eviction process begins -- just backtracking to the lawyer.  So the lease and the

Page 104

ledger and the Notice to Quit are sent to the lawyers, generally, right?

A.  Correct.

Q.  And any additional documents the lawyers might require prior to the filing of the action, right?

A.  I'm sorry, the last couple of words broke up for me.

Q.  If there's any other documents that the lawyers might need prior to filing, they'll ask you for it, and Greystar onsite employees would provide the lawyers with the documents they needed prior to filing?

A.  Yes.  If available, yes.

Q.  And do you have an understanding that there are certain court costs associated with initiating a lawsuit?

A.  There are court costs, yes.

Q.  Like a filing fee that you've got to pay to the court in order to start any lawsuit?

A.  Yes.  I believe filing fee, service fee, constable fee.

Q.  Does Greystar ever advance those costs, or are those costs routinely advanced by the lawyers

Page 105

and then billed to Greystar?

A.  I believe they're sent directly to the onsite team.

Q.  The lawyers pay for it and then send it as part of their bill?

A.  I believe that's correct.

Q.  So there's not -- if we needed to identify amounts of costs that were paid to the court or the constable or however service took place, those would appear on the invoices from the lawyers.  It wouldn't be a payment from Greystar directly?

A.  For clarity, if we're talking about the relevant time period, at some point the constables were sending them directly to the site.  But I am familiar with it coming passed through the attorneys.

Q.  So there are some instances where the constable would send an invoice, and there are some instances where the lawyers would send an invoice.  Is that what you're referencing?

A.  That is correct.  Yes, I am.

Q.  But there's not a situation in which Greystar initiated the payment.  It would always be in response to an invoice from somebody?

27 (Pages 102 - 105)

30(b)(6)  Stephanie Donlin                                              April 23, 2026
Cordeiro, Shaun, Et Al. v. Grep Atlantic LLC, Et Al.

Page 106

A.  Yes.  We would not initiate payment in advance.

Q.  And so the records for payment of court costs would appear in the invoices from either the law firm or the constable?

A.  Yes, they are.

Q.  And these invoices would identify whether it's a court cost or whether it's a payment for attorney fee time?

A.  Yes.  Generally, they're broken out, uh-hum.

Q.  And so if we wanted to delineate between court costs and attorney fees from an individual invoice, we could do that by looking at the invoice?

A.  By looking at the invoice, yes.

Q.  Let's talk about compliance when it comes to these issues regarding charging of attorney fees.

And a clarification before we start.  I don't want to hear about any conversations with your lawyers.  If Greystar's knowledge about doing something comes from a conversation with your lawyers, just say that it's a conversation with your lawyer, and I won't ask you about anything.  But we do want to know where Greystar got its knowledge in

Page 107

its determination of its ability to charge these fees.

Is there any materials that Greystar utilizes from, say, the National Apartment Association regarding the charging of attorney's fees?

A.  The lease.

Q.  The lease, okay.

A.  The lease, uh-hum.

Q.  Are there any continuing education programs that might have been presented by an eviction lawyer or an apartment association that GREP employees would have attended?

A.  They may have.

Q.  Any idea on any specifics?

A.  I don't have the specifics.  They would be through the Massachusetts Apartment Association that are normally referred to as "NAA" or "GREB," Greater Boston Real Estate Board.

Q.  Would Greystar -- let me ask it this way.  Other than through the lease, does Greystar have any independent understanding of its ability to charge attorney's fees without a court order to do so?

Page 108

MR. ARBER:  Objection to form.

A.  Can you ask the question again?  Apologies.

Q.  Yeah.  I mean, is there any source, other than the lease, for which Greystar relies upon in its understanding that it could charge these fees absent a court order?

MR. ARBER:  Objection to form.  If you're trying to back into advice from counsel here --

MR. MAGINNIS:  I'm not.  No, I'm not.

BY MR. MAGINNIS:

Q.  And if it is advice from counsel, then I just want to know that.  But if it's, for example, "The Apartment Association told us in Y, Y, Z seminar that we could do it," then I want to know.  So that's what I'm getting at, Ms. Donlin.

What source does Greystar have for its knowledge -- its belief that it could charge these fees absent a court order?  And if the answer is "Our lawyers told us," that's fine, and we won't go any further.  But that's what we're getting at.

A.  To that answer, our lawyers told us the lease --

MR. ARBER:  Hold on.  Don't say what your lawyers told you.

Page 109

THE WITNESS:  I'm sorry.

Q.  I just want to know if the universe of knowledge is from privilege only or outside of privilege.

MR. ARBER:  So you can just say, "We don't have any unprivileged source."

A.  No unprivileged source that I'm familiar with.

Q.  Because that works both ways.  If you want to claim attorney/client privilege, it's certainly your right to do so.  But that's it.  Your source of -- Greystar's source of its belief that it could charge those fees comes solely from its attorneys, and it's choosing not to disclose communications regarding those conversations.  Fair?

A.  Fair.

Q.  Okay.  Were there conversations internally at Greystar, not including your lawyers, regarding the lawsuits that were filed in North Carolina about this issue?

A.  I am not familiar with that, no.

Q.  You are not familiar with the suits against Greystar for charging these fees in North Carolina prior to your involvement with this case?

28 (Pages 106 - 109)

30(b)(6)  Stephanie Donlin                        April 23, 2026
Cordeiro, Shaun, Et Al. v. Grep Atlantic LLC, Et Al.

Page 110

A.  I am not familiar with the North Carolina case.

Q.  Okay.  Even today, you're not familiar with that?

A.  I don't believe I've been briefed on that.  10:47:03

MR. MAGINNIS:  Okay.  Let's take ten.  I don't think we're -- we're not at the wrap-up point, but I want to get organized so we can move towards the wrap-up point.  So if we could just take ten now.  It's been about an hour, anyway.  And we'll  10:47:43 try to get you out of here before lunch, Ms. Donlin.

MR. ARBER:  Okay.  Thanks, Ed.  See you in ten.

(Recess taken from 10:47 to 11:04)

BY MR. MAGINNIS:                                  11:04:14

Q.  Ms. Donlin, are you ready to continue?

A.  Yes.

Q.  So we were talking earlier about the invoice, the legal invoices that come in.  And I think the testimony was there's a determination made  11:04:26 as to whether or not something is applicable to a tenant by the onsite team; is that right?

A.  Yes.

Q.  Are you aware of any guidance or scenarios

Page 111

where a portion of an invoice would be assigned to a tenant, but not the full invoice?

A.  I'm not specifically aware of any one invoice.  It could happen.

Q.  What scenario where -- is this under the  11:04:59 "anything is possible" thing, or is there a scenario that you're aware of where there could be a delineation?

A.  Invoices generally provide a level of detail that would indicate their validity.  If one  11:05:16 line item pertained to a resident charge-back and the other did not, there's a fair possibility that there's a partial charge-back.

Q.  But can you think of anything where that has happened or would happen in the ordinary course?  11:05:37

MR. ARBER:  I would just object to the level of detail in that question.  I don't know if you can expect the witness to know across thousands and thousands of tenant histories whether that's happened.                                          11:05:54

Q.  It's not intended to be a "gotcha."  I mean, my assumption is that if the legal fee invoice comes in and it's determined that it's the tenant's responsibility, then the amount that's on the

Page 112

invoice would go in.  But if that's not correct, then I want to know.

A.  I would have to refer to each individual invoice based on any charges.

Q.  But sitting here today, can you think of an  11:06:22 instance in which that would happen?

A.  No.  I don't know a specific instance.

Q.  In a nonpayment of rent invoice, all of the charge from the attorney's fees are going to go -- be passed on to the tenant?                            11:06:41

MR. ARBER:  Objection to form.

A.  It's possible.  The onsite team is responsible for that posting.  Again, mistakes could happen.

Q.  Of course.  In any instance, if we needed  11:06:56 to check any specific tenant, we'd have the legal fee invoice stored somewhere, and the ledger would contain the records of the charges being applied?

A.  Yes, they could be reviewed individually.

MR. MAGINNIS:  I'll show you what we'll  11:07:22 mark as 12.

(Document marked as Donlin Exhibit 12 for identification)

Q.  I'm showing you what's been marked as

Page 113

Exhibit 12.  Do you recognize Exhibit 12?

A.  I'm familiar.

Q.  And that's GREP Atlantic LLC's responses to plaintiffs' first set of interrogatories?

A.  Correct.                                       11:08:06

Q.  And is this something you reviewed in preparation for today?

A.  I did brief it.

Q.  And then I'll scroll just to the bottom. These answers were verified by a Frederick Raya.  Do  11:08:19 you know who that person is?

A.  I am familiar.

Q.  Who is that person?

A.  He's a regional property manager.

Q.  For what?                                      11:08:33

A.  Greystar.

Q.  Would he report to you?

A.  He does not report to me.

Q.  Would he report to someone who reports to you?                                                 11:08:56

A.  No.

Q.  As senior director of real estate, who do you supervise?

A.  I supervise a number of regional property

Veritext Legal Solutions
800.743.DEPO (3376)       calendar-carolinas@veritext.com       www.veritext.com

Page 114

managers.

Q. Okay. So you supervise regional property managers, but you don't supervise Mr. Raya?

A. That's correct.

Q. Got it.                                       11:09:23

I want to look at Interrogatory No. 10, which reads, "Identify all cases in which you petitioned a Massachusetts court for attorney's fees or legal costs in connection with a residential summary process action in 2019, including the court,  11:09:37 case number and outcome of each."

Did I read that correctly?

A. Yes.

Q. And within the answer there's some objections, but then it notes, "GREP will conduct a  11:09:49 reasonable search for the requested information and will supplement this response accordingly."

Did I read that correctly?

A. That's what it reads.

Q. Do you know if such a search has commenced?  11:10:04

MR. ARBER: And I would object to this as discovery on discovery. This is something we included in our objections and indicated we would not be providing a witness for. And those

Page 115

objections were adopted and agreed to.

Q. So I'm simply asking you if you know if GREP has conducted such a search.

MR. ARBER: And this is outside of the scope of the corporate deposition.                      11:10:27

THE WITNESS: Apologies. Am I to answer?

MR. ARBER: You can answer if you know.

A. I'm not specific as to the research that has been done to provide the supplemental information.                                             11:10:45

Q. So you're not aware of any search for instances in which Greystar's petitioned a Massachusetts court for attorney's fees or legal costs since 2019?

MR. ARBER: Same objection. Outside of the  11:10:55 scope of the deposition, as agreed to. And I'd also object to the extent this seeks litigation strategies and work product. You can answer in your personal capacity.

A. I'm not specifically aware.                  11:11:15

Q. Does Greystar contend that any of its tenants did anything wrong, other than not paying their rent?

MR. ARBER: Objection to form, vague,

Page 116

outside the scope.

A. Can you clarify the question?

Q. Sure. And I think what your counsel is getting at is he doesn't want me asking about legal theories. And that's fine. I'm not asking about  11:12:00 legal theories. I'm asking about what Greystar knows.

And so does Greystar -- is Greystar aware of any actions by either Mr. Cordeiro, Mr. Matlock, or anybody else who could be a part of this lawsuit  11:12:14 where they acted improperly, other than not paying their rent?

MR. ARBER: Objection. Again, form, vague, impossibly broad. I mean, you're talking about --

MR. MAGINNIS: Brandon, let's get back to  11:12:33 limiting your objections to the form, because you're coaching.

MR. ARBER: I'm not coaching. It's just that the question is improper. I mean, you can't ask a corporate witness about thousands and           11:12:43 thousands of eviction actions or tenant situations. She can't be prepared for that.

MR. MAGINNIS: You've raised defenses. We're entitled to ask about facts associated with

Page 117

the defenses. And so if Greystar is going to indicate that any of these people did anything wrong, other than not paying their rent, now is the time for us to hear about it. And if you're not aware of any, that's fine.                             11:13:08

BY MR. MAGINNIS:

Q. So you can answer the question, Ms. Donlin.

MR. ARBER: I'll say she can answer in her personal capacity. I'm not agreeing that this limits the corporate entity on our knowledge or   11:13:16 position on this situation. I mean, how could you possibly -- how could you prepare someone for that? You're going to review every docket and be familiar with every scenario?

MR. MAGINNIS: Well, I'll tell you this:     11:13:37 If you're going to use it in the case, that's exactly what you would do. And so now is the time. We're here for the testimony of the person of the entity, so I want to know what the entity knows.

BY MR. MAGINNIS:                                11:13:45

Q. So is the entity aware --

MR. ARBER: There's not even a class certified. There's not even a class certified.

MR. MAGINNIS: You're right.

30 (Pages 114 - 117)

30(b)(6)  Stephanie Donlin                                April 23, 2026
Cordeiro, Shaun, Et Al. v. Grep Atlantic LLC, Et Al.

Page 118

MR. ARBER:  So how would we possibly even know what group of people to search from?

You can answer the question, Ms. Donlin, but --

MR. MAGINNIS:  Your objection is noted.    11:14:05 And let me reask the question, and then you can answer.

MR. ARBER:  And my objection will stand for -- I'll just repeat the objection.  I'll just refer to the previous objection after you ask it.    11:14:15

MR. MAGINNIS:  That's fine.

BY MR. MAGINNIS:

Q.  Is Greystar aware of any facts which indicate wrongdoing by any of these tenants, other than not paying their rent?                11:14:29

MR. ARBER:  Same objection.

A.  I'm not specifically aware of the wrongdoings of each individual case.

Q.  Or even any alleged wrongdoings.  Sitting here today, Greystar has not identified any specific 11:14:45 wrongdoings by any class members, other than not paying their rent?

MR. ARBER:  Same objection.

A.  Can you ask that again?  I'm sorry.

Page 119

Q.  Sure.  Well, you say "I."  I just want to make sure you understand you're speaking on behalf of the entity.

So Greystar, sitting here today at its deposition, is not aware of any specific wrongdoings 11:15:11 by any of these tenants who might be applicable to this lawsuit, other than not paying their rent?

MR. ARBER:  Same objection.  And we object to -- this is outside the scope.  We've had this discussion of there is no way you could possibly 11:15:25 hold us to investigating every single -- every tenant.  It could be every tenant; not even just the -- because there's no class certified.  We don't even know what your class definition is.

But Stephanie, Ms. Donlin, in your personal 11:15:43 capacity, you can answer.

A.  I don't have any personal direct knowledge without further research.

MR. MAGINNIS:  And so let me just be clear. Are you instructing her not to answer on behalf of 11:16:00 Greystar?

MR. ARBER:  I'm objecting that this answer could be considered Greystar's position.

MR. MAGINNIS:  You can object, but are you

Page 120

instructing her not to answer?

MR. ARBER:  No, she can answer.  But my objection stands.  That's our position.

MR. MAGINNIS:  No, that's fine.  All right.

BY MR. MAGINNIS:                    11:16:16

Q.  I just want to make sure you understand that I'm asking you not what you, Ms. Donlin, knows, but what GREP knows.  And then you can answer the same question.

MR. ARBER:  In your professional capacity.  11:16:30 But you can answer.

A.  I am not familiar without further research. That still stands as my answer.

MR. MAGINNIS:  Okay.  We'll reserve our rights to question witnesses regarding Topics 17,    11:17:14 28, 29, 32 and 33.  But unless your counsel has questions for you, that's all the questions I have for you, Ms. Donlin.  Thanks.

MR. ARBER:  You said, 29, 32, 33 -- 17, 28, 29, 32 and 33?                    11:17:32

MR. MAGINNIS:  17, 28, 29, 32 and 33 are the topics for which we indicated at the start Ms. Donlin was not here on.

I don't have any more questions for you.

Page 121

MR. ARBER:  I have no questions.

(Whereupon, the deposition was adjourned at 11:17 a.m.)

31 (Pages 118 - 121)

30(b)(6)  Stephanie Donlin                         April 23, 2026
Cordeiro, Shaun, Et Al. v. Grep Atlantic LLC, Et Al.

Page 122

C E R T I F I C A T E

I, STEPHANIE DONLIN, do hereby certify that I have read the foregoing transcript of my testimony, and further certify under the pains and penalties of perjury that said transcript (with/without) suggested corrections is a true and accurate record of said testimony.

Dated at _____, this ____ day of _____, 2026.

_____

Page 124

___ ___ _____ _____

Page 123

SUGGESTED CORRECTIONS

RE: SHAUN CORDEIRO and KEVIN MATLOCK, individually and on behalf of all others similarly situated vs.

GREP ATLANTIC, LLC, and EDDY OWNER, L.L.C.

WITNESS: STEPHANIE DONLIN, Vol. I

The above-named witness wishes to make the following changes to the testimony as originally given:

PAGE  LINE    SHOULD READ         REASON
___ ___ _____ _____
___ ___ _____ _____
___ ___ _____ _____
___ ___ _____ _____
___ ___ _____ _____
___ ___ _____ _____
___ ___ _____ _____
___ ___ _____ _____
___ ___ _____ _____
___ ___ _____ _____
___ ___ _____ _____
___ ___ _____ _____
___ ___ _____ _____
___ ___ _____ _____
___ ___ _____ _____
___ ___ _____ _____
___ ___ _____ _____

Page 125

COMMONWEALTH OF MASSACHUSETTS)
SUFFOLK, SS.              )

I, Jane M. Werner, RMR and Notary Public in and for the Commonwealth of Massachusetts, do hereby certify that there came before me on the 23rd day of April, 2026, at 8:05 a.m., the person hereinbefore named, who was by me duly sworn to testify to the truth and nothing but the truth of her knowledge touching and concerning the matters in controversy in this cause; that she was thereupon examined upon her oath, and her examination reduced to typewriting under my direction; and that the deposition is a true record of the testimony given by the witness.

I further certify that I am neither attorney or counsel for, nor related to or employed by, any attorney or counsel employed by the parties hereto or financially interested in the action.

In witness whereof, I have hereunto set my hand and affixed my notarial seal this 7th day of May, 2026.

Jane M Werner
Notary Public
Commission expires 1/27/2028

32 (Pages 122 - 125)

Page 126

Brandon Arber

BArber@SHB.com

May 7th, 2026

RE:   Cordeiro, Shaun, Et Al. v. Grep Atlantic LLC, Et Al.

4/23/2026, 30(b)(6)  Stephanie Donlin (#8021145)

The above-referenced transcript is available for review.

Within the applicable timeframe, the witness should read the testimony to verify its accuracy. If there are any changes, the witness should note those with the reason, on the attached Errata Sheet.

The witness should sign the Acknowledgment of Deponent and Errata and return to the deposing attorney. Copies should be sent to all counsel, and to Veritext at (cs-carolinas@veritext.com).

Return completed errata within 30 days from receipt of testimony.

If the witness fails to do so within the time allotted, the transcript may be used as if signed.

Yours,

Veritext Legal Solutions

Veritext Legal Solutions
800.743.DEPO (3376)          calendar-carolinas@veritext.com          www.veritext.com

Massachusetts Rules of Civil Procedure

Part V. Deposition and Discovery

Rule 30

(e) Submission to Witness; Changes; Signing. When the testimony is fully transcribed the deposition shall be submitted to the witness for examination and shall be read to or by him, unless such examination and reading are waived by the witness and by the parties. Any changes in form or substance which the witness desires to make shall be entered upon the deposition by the officer with a statement of the reasons given by the witness for making them. The deposition shall then be signed by the witness, unless the parties by stipulation waive the signing or the witness is ill or cannot be found or refuses to sign. If the deposition is not signed by the witness within 30 days of its submission to him, the officer shall sign it and state on the record the fact of the waiver or of the illness or absence of the witness or the fact of the refusal to sign together with the reason, if any, given therefor; and the deposition may then be used as fully as though signed, unless on a motion to suppress under Rule 32(d)(4) the court holds

that the reasons given for the refusal to sign require rejection of the deposition in whole or in part.

DISCLAIMER:  THE FOREGOING CIVIL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE STATE RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.