# Exhibit B

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

EASTERN DIVISION

_____

SHAUN CORDEIRO AND KEVIN MATLACK,

INDIVIDUALLY AND ON BEHALF OF

ALL OTHERS SIMILARLY SITUATED,

     PLAINTIFFS,

V.                                    C.A. NO.: 1:23-CV-12901-AK

GREP ATLANTIC, LLC AND

EDDY OWNER, LLC,

     DEFENDANTS.

_____

VIDEO-RECORDED DEPOSITION OF SHAUN CORDEIRO

CONDUCTED REMOTELY FROM

BOSTON, MASSACHUSETTS

MONDAY, FEBRUARY 23RD, 2026 AT 9:59 A.M. EST

Page 2

APPEARANCES

ON BEHALF OF THE PLAINTIFFS, SHAUN CORDEIRO AND KEVIN MATLACK, ET AL.:

MICHAEL DUNN, ESQ.
BRYSON HARRIS SUCIU & DEMAY, PLLC
900 W. MORGAN STREET
RALEIGH, NORTH CAROLINA 27603
TELEPHONE NO. (919) 600-5000
E-MAIL: MDUNN@BRYSONPLLC.COM

ON BEHALF OF THE DEFENDANTS, GREP ATLANTIC, LLC AND EDDY OWNER, LLC:

ARA K. AYVAZIAN, ESQ.
SHOOK HARDY & BACON, LLP
100 N. TAMPA STREET, SUITE 2900
TAMPA, FLORIDA 33602
TELEPHONE NO. (813) 202-7100
E-MAIL: AAYVAZIAN@SHB.COM
MARY K. GROVES, ESQ.
SHOOK, HARDY & BACON, LLP
ONE FEDERAL STREET, SUITE 2620
BOSTON, MASSACHUSETTS 02110
TELEPHONE NO. (617) 531-1411
E-MAIL: MGROVES@SHB.COM

ALSO PRESENT:

JOHN LOFTUS, VIDEOGRAPHER, VERITEXT LEGAL SOLUTIONS

Page 3

INDEX

PAGE

DIRECT EXAMINATION BY MR. AYVAZIAN                8

EXHIBITS

NUMBER          DESCRIPTION          PAGE

EXHIBIT 1  LEASE APPLICATION AGREEMENT, SUBMITTED 3/30/22  52
GREP 320-325
EXHIBIT 2  APARTMENT LEASE CONTRACT, 9/12/22,          62
GREP 140-179
EXHIBIT 3  RESIDENT CHARGES/PAYMENT LEDGER, GREP 312-317  75
EXHIBIT 4  NOTICE TO QUIT, 12/9/22          85
EXHIBIT 5  SUMMARY PROCESS (EVICTION) SUMMONS AND      92
COMPLAINT
EXHIBIT 6  HOUSING COURT DOCKET, CASE DETAILS          111
EXHIBIT 7  MOTION TO FILE ANSWER LATE AND COUNTERCLAIMS,  112
5/12/23
EXHIBIT 8  E-MAIL RE: MOTION TO DISMISS - FULLY PAID,    120
5/9/23
EXHIBIT 9  INVOICE, 3/8/23          134
EXHIBIT 10 INVOICE, 4/14/23          140
EXHIBIT 11 INVOICE, 8/9/23          141

Page 4

EXHIBITS (CONTINUED)

NUMBER          DESCRIPTION          PAGE

EXHIBIT 12 INVOICE, 8/22/23          141
EXHIBIT 13 E-MAIL RE: FEES, PLAINTIFFS 227-229  143
EXHIBIT 14 E-MAIL RE: FEES, PLAINTIFFS 216-217  149
EXHIBIT 15 THEOCLES SUMMARY PROCESS AGREEMENT      165
EXHIBIT 16 TAYLO SUMMARY PROCESS AGREEMENT FOR JUDGEMENT  165
EXHIBIT 17 PLAINTIFF CORDEIRO'S SUPPLEMENTAL RESPONSES  169
TO DEFENDANTS FIRST SET TO INTERROGATORIES
EXHIBIT 18 E-MAIL CORRESPONDENCE WITH NECHEV,          171
PLAINTIFFS 42-47
EXHIBIT 19 E-MAIL TO NECHEV, 5/18/2023          180
EXHIBIT 20 E-MAILS WITH A. SANGIOLO, AG OFFICE, 1/2024  188
EXHIBIT 21 E-MAIL TO A. SANGIOLO, AG OFFICE, 12/14/2023  188
EXHIBIT 22 TEXT MESSAGE, PLAINTIFFS 2151          189
EXHIBIT 23 TEXT MESSAGE, PLAINTIFFS 2152          193
EXHIBIT 24 TEXT MESSAGE, PLAINTIFFS 2155          194
EXHIBIT 25 TEXT MESSAGE, PLAINTIFFS 2153          203
EXHIBIT 26 TEXT MESSAGE, PLAINTIFFS 2154          205
EXHIBIT 27 TEXT MESSAGE, PLAINTIFFS 2156          205
EXHIBIT 28 TEXT MESSAGE, PLAINTIFFS 2157          207
EXHIBIT 29 TEXT MESSAGE, PLAINTIFFS 2158          208
EXHIBIT 30 TEXT MESSAGE, PLAINTIFFS 2159          212

Page 5

EXHIBITS (CONTINUED)

NUMBER          DESCRIPTION          PAGE

EXHIBIT 31 TEXT MESSAGE, PLAINTIFFS 2160          214
EXHIBIT 32 TEXT MESSAGE, PLAINTIFFS 2161          216
EXHIBIT 33 TEXT MESSAGE, PLAINTIFFS 2162          217
EXHIBIT 34 E-MAILS RE: MISUSE OF RAFT FUNDING,          221
PLAINTIFFS 1000-1003
EXHIBIT 35 E-MAIL WITH FINAL ACCOUNT STATEMENT, EXHIBIT 2  225

Veritext Legal Solutions

800-726-7007                                          305-376-8800

Page 6

STIPULATIONS

The video-recorded deposition of SHAUN CORDEIRO was conducted remotely from Boston, Massachusetts on Monday, the 23rd day of February, 2026 at 9:59 a.m., said deposition was taken pursuant to Notice for use in accordance with the Federal Rules of Civil Procedure.

It is agreed that Kelley K. Bohan, being a Notary Public and Court Reporter for the Commonwealth of Massachusetts, may swear the witness and the reading and signing of the completed transcript by the witness is not waived.

Page 7

PROCEEDINGS

VIDEOGRAPHER:  Good morning.  We are going on the record at the time of 9:59 a.m. on February 23rd, 2026.  Please note this deposition is being conducted virtually.  The quality of the recording depends on the quality of the camera and the internet connection of all participants.  What is seen from the witness and heard on the screen is what will be recorded.  Audio and video recording will continue to take place unless all parties agree to go off the record.

This is Media Unit 1 of the video-recorded deposition of Shaun Cordeiro taken by counsel in the matter of Shaun Cordeiro, et al. v. GREP Atlantic, LLC, et al., it's filed in the United States District Court, the District of Massachusetts, Eastern Division, Case No. 1:23-CV-12901-AK.

This deposition is being conducted remotely using virtual technology.  My name is Jeff Loftus representing Veritext and I'm the videographer.  The court reporter is Kelley Bohan taken from the firm of Veritext.  I am not authorized to administer an oath, I am not related to any party in this action, nor am I financially interested in the outcome.

If there are any objections to proceedings, please state them at the time of your appearance.  Counsel and all present, including remotely, will state their appearance and affiliations for the record beginning with the noticing

Page 8

attorney.

MR. AYVAZIAN:  Ara Ayvazian on behalf of GREP Atlantic, LLC and Eddy Owner, LLC from Shook, Hardy and Bacon.

MR. DUNN:  I'm Michael Dunn on behalf of Plaintiff Shaun Cordeiro; Bryson, Harris, Suciu and DeMay.

MS. GROVES:  Katie Groves on behalf of Defendants, Eddy Owner and GREP, LLC.

SHAUN CORDEIRO,
a witness having been satisfactorily identified by the production of a driver's license, was first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. AYVAZIAN:

Q.  Good morning, Mr. Cordeiro.

A.  Good morning.

Q.  Again, my name is Ara Ayvazian and I represent the defendants in this lawsuit, GREP Atlantic, LLC and the Eddy Owner, LLC.  Can you please state your full name for the record?

A.  Shaun Michael Cordeiro.

Q.  And have you ever gone by any other names?

A.  No.

Page 9

Q.  Okay.  Have you ever been deposed in any other setting?

A.  No.

Q.  Have you ever had to give sworn testimony?

A.  No.

Q.  I'm going to go over some ground rules for depositions:

This is a question-and-answer session.  I'll ask questions and you answer as honestly as you can.

If you do not remember the answer to one of my questions when asked but later recall the answer, feel free to interrupt me and let me know.

If you don't understand a question, let me know and I will rephrase the question for you, otherwise, I'll assume that you understood the question.  Is that fair?

A.  Yes.

Q.  If you need to take a break, just let me know.  I just ask that you answer any pending question before we take a break.

A.  Okay.

Q.  So feel free to raise your hand or however you want to get my attention if I'm looking any other way, just feel free to yell out that you want to take a break.

You understand that we're here today for your deposition in a lawsuit that you filed against GREP Atlantic and

3 (Pages 6 - 9)

Page 10

The Eddy, correct?

A. Yes.

Q. And the court reporter is taking down everything that we say, and so far you're doing a great job, we just need to make sure that each of our answers are done verbally rather than nodding of the head or saying uh-huh or uh-uh. Do you understand?

A. Yes.

Q. Do you understand that you are under oath today?

A. Yes.

Q. Okay. Where are you currently located?

A. In Boston in my apartment. 5R Trenton Street, Unit 5 in Boston.

Q. Okay. Are you in a particular room of your apartment?

A. I am in my home office, yes.

Q. Okay. Is anyone else in the room with you?

A. No.

Q. I ask that you do not have any discussions with anyone about the substance of your deposition. Do you agree?

A. Yes.

Q. Do you have any documents related to this case in the room with you?

A. No.

Q. Okay. As I'm asking you questions, whether we come

Page 11

back from a break or not, I just ask that you don't look at any documents related to the case unless you are asked by me or your counsel when we are questioning you. Is that fair?

A. Yes.

Q. Is your cell phone in the room with you?

A. Yes.

Q. I just ask that you do not use your cell phone while you're testifying. Okay?

A. Yes.

Q. Are there any other electronic communication devices in the room with you?

A. No, I do not believe so.

Q. Okay. If there was an iPad or anything, same thing for the cell phone, as long as, um, if you could just look at the documents we present to you; and then avoid communicating on the iPad during questioning. Okay?

A. Yes.

Q. Are you planning on recording any of this deposition?

A. No.

Q. Okay. Now, originally, we did have this deposition scheduled for 11 a.m. Can you explain why we needed to start at 11 a.m.?

A. Yes. I have a treatment, a medical treatment, Monday through Friday that typically lasts until almost 11 a.m., and

Page 12

today it's canceled because of the weather.

Q. Okay. And if we -- if this case were to go to trial, would we have to start court at 11 a.m. each day?

A. No.

Q. Okay. Have you taken any medications today?

A. Yes.

Q. If so, which -- I'm sorry. Which medications have you taken?

MR. DUNN: Objection.

A. [No verbal response.]

Q. So what'll happen during this deposition is that I'll ask questions and your counsel will sometimes object. Unless he tells you not to answer, if you would please answer the question, we would appreciate that. So I'll ask the question again, counsel objected, but what medications have you taken today?

A. I have taken lamotrigine and Adderall and herbal vitamins and oils.

Q. Are there any potential side effects with these medications that you experience?

A. No.

Q. Okay. Do these medications, in your opinion, affect your memory at all?

A. No.

Page 13

Q. Okay. Besides any medication-related memory issues, is there any other memory issues that you would have that we should know about at this point?

A. No.

Q. Okay. Is there anything preventing you from giving honest and accurate testimony today to the best of your ability?

A. No.

Q. Okay. Now, you're represented by counsel in this case, correct?

A. Yes.

Q. And you're represented by Bryson Harris, correct?

A. Correct.

Q. Maginnis Howard, the law firm of Maginnis Howard, correct?

A. Correct.

Q. You're represented by Greater Boston Legal Services, correct?

A. Yes.

Q. You're represented by Legal Services Center of Harvard Law School, correct?

A. Yes.

Q. Are there any other firms that you are represented by?

A. No.

Q. Are there any other attorneys, outside of these firms,

4 (Pages 10 - 13)

Page 14

that you're represented by?

A. No.

Q. Okay. Are there any other attorneys that you reached out to about this case besides those four that we just mentioned?

A. I reached out to one attorney before reaching out to my current legal team.

Q. Do you remember which attorney that was?

A. I do not.

Q. Do you have the ability to figure out that information through e-mail or text or something else?

A. I am not sure that I would be able to.

Q. Okay. Did you reach out to them via e-mail?

A. I believe I called them.

Q. Okay. Do you think that Kevin would know?

A. Likely not.

Q. Okay. How about the attorney's -- the attorney general's office, did you reach out to them?

A. Yes.

Q. And did you reach out to the attorney general's office of Massachusetts before filing this case or after filing this case, or both?

A. Before and after.

Q. Okay. Mr. Cordeiro, what, if anything, did you do to

Page 15

prepare for this deposition today?

A. I reviewed some documents and I meditated.

Q. Okay. What documents did you review? Let's start with that.

A. I reviewed my responses to the interrogatories, and I think that's it.

Q. Did you review your original responses and the supplemental responses?

A. I believe so.

Q. Okay. Did you review the lease that was the subject of this lawsuit?

A. I did not review.

Q. Okay. Did you meet with your attorneys before your deposition today?

A. Yes.

Q. When did you meet with them?

A. I met with them on Friday, and I spoke to Mr. Dunn this morning.

Q. Okay. And which attorneys did you meet with on Friday?

A. I met with Sean Ahern from Harvard University's legal center; and James, a student.

Q. Okay. And how long did you meet with them on Friday?

A. I believe about an hour and a half.

Page 16

Q. Okay. And when you met with Mr. Dunn this morning, how long did you meet with him for?

A. We spoke on the phone for about 45 minutes.

Q. Okay. And before today and before Friday meeting with Sean, when was the last time that you met with your attorneys in this case?

A. I don't recall.

Q. Okay.

A. I don't recall.

Q. Okay. Outside of your attorneys, did you speak with anyone else about your deposition today?

A. I -- Kevin. And I told my mother that I have to sit for a deposition. But that's it.

Q. Okay. Now, have you spoken with anyone else about the lawsuit that you filed?

A. Yes.

Q. Okay. Can you tell us who those individuals are?

A. I spoke with my mother; Kevin; Betsy Hamilton, a friend of mine; I believe another friend Stephanie; and I spoke with the Boston Globe and the Guardian.

Q. Anyone else?

A. Not that I can think of right now.

Q. Okay, that's fair. So when was the last time you spoke to Betsy Hamilton about this lawsuit?

Page 17

A. Maybe, I'm not totally certain when, a week or two.

Q. A week or two ago?

A. Ago, yes.

Q. Okay. And what did you two talk about?

A. We talked about that I have a deposition. Oh, that -- and that we are in discovery.

Q. Okay. And how did the conversation about this deposition discovery come up with Betsy?

A. I just texted her or -- texted her that I have a deposition.

Q. Okay. And is Betsy Hamilton, does she have any connection to The Eddy or GREP Atlantic?

A. She is a former tenant.

Q. A former tenant of The Eddy?

A. Yes.

Q. Okay. How about your friend Stephanie, when did you last speak with her about this lawsuit?

A. Last year.

Q. Okay. And do you remember what you spoke with her about specifically?

A. No, not specifically.

Q. Okay. And what is Stephanie's connection, if any, to GREP Atlantic or The Eddy?

A. She's a former tenant.

5 (Pages 14 - 17)

Page 18

Q. Okay. And you mentioned, we'll start with the Boston Globe, can you tell me a little bit about how that began or the conversation with them began and when?

A. We were contacted by them and discussed the case.

Q. And when you said "we were contacted," you're referring to you and Kevin?

A. I'm re-- uh, my attorneys and then --

Q. Okay. So, okay. Who, do you know, who specifically you spoke with at the Boston Globe?

A. I -- Her name is Mara.

Q. Mara?

A. Mara.

Q. Okay. M-A-R-A?

A. That's correct.

Q. Okay. Just trying to help the court reporter out on that one.

When you said that they contacted, when you guys were contacted by them, did they send you an e-mail, a phone call, something else?

A. I don't know how they contacted my attorneys. But I received a phone call from one of the attorneys at Greater Boston Legal Services to ask me if I would be willing -- they had been contacted by the reporters and if I would be willing to talk with them.

Page 19

Q. Okay. And then at some point you did talk with the Boston Globe?

A. Yes.

Q. Okay. When did you speak with them about this case?

A. I am not certain of the exact date.

Q. Was it in the last week?

A. No.

Q. Was it --

A. [Inaudible.]

Q. Yeah, if you -- if you remember the time frame or at least can approximate, let us know.

A. I want to say, I believe, December and January, and I received an e-mail a few weeks ago to clarify something that we discussed.

Q. Okay. We would just ask that you keep that e-mail and don't delete it in case we seek production of it. The --

A. I believe it has already been deleted, but I will.

Q. Okay. Did you delete the e-mail?

A. Yes.

Q. Okay. Is that -- do you typically delete e-mails that you get in your inbox?

A. Yes.

Q. Okay. Did you produce any documents to the Boston Globe during any of these conversations or e-mails?

Page 20

A. No, I don't believe so.

Q. Okay. And what did you talk about specifically with the Boston Globe?

A. This case and my experience.

Q. Okay. Did Kevin participate in any of these conversations or was it just you?

A. Just me.

Q. Okay. Now, same questions I'm going to ask for the Guardian since you brought that up. When did you speak with the Guardian about this case?

A. Last summer.

Q. Okay. And do you recall them reaching out to you, or did you reach out to them, or something else?

A. It was the same scenario as the Boston Globe, she reached out to the attorneys, and then the attorneys asked me if I would be willing to talk.

Q. Do you remember who that individual was at the Guardian that you all communicated with?

A. I do not.

Q. Okay.

A. I don't recall her -- her name.

Q. Okay. Did you ever have specific communications, like e-mails, with the Guardian?

A. There were e-mails and a phone call.

Page 21

Q. Okay. Do you have those e-mails?

A. I do not.

Q. Okay. And going back for the Boston Globe, do you know how they got the information or your information or knew about this case to contact --

A. I don't. I do not.

Q. Okay. And for the Guardian, do you know how they learned of this case and decided to reach out?

A. I do not.

Q. Okay. Have you seen any publications or articles by either of these two sources since speaking with them?

A. No.

Q. Okay. Do you know if any are upcoming?

A. I'm not certain. I was told that they would be, but there's not a fixed date that I am aware of.

Q. Okay. And for the clarification e-mail that you received from the Boston Globe, do you remember what they were asking you to clarify?

A. I do not recall exactly what they asked me to clarify.

Q. Okay. Did you take any notes in preparation for today's deposition?

A. I did not.

Q. And outside of Kevin and your mother and I think you said Betsy, does anyone else besides your attorneys and those

6 (Pages 18 - 21)

Page 22

individuals know that you are here today for a deposition?

A. No, I don't believe so.

Q. Okay. And earlier you stated that you obviously spoke with Kevin about your deposition today, correct?

A. Correct.

Q. And did you speak with him about his deposition scheduled for tomorrow?

A. No.

Q. No, okay. Have you read any transcripts for, uh, to prepare for this deposition today?

A. Yes.

Q. Okay. Whose transcripts have you read?

A. I read the deposition of Destinee Price, part -- part of it.

Q. Okay. Did you read the deposition of Marvin Colindres?

A. No.

Q. Okay. Do you know if Kevin has read the depositions of Destinee Price or Marvin?

A. I am not certain.

Q. Okay. Before today's deposition, did you review the complaint filed in this case?

A. Yes.

Q. And when was the last time you reviewed, I should

Page 23

specify the amended complaint, which is the operative complaint in this case?

A. I don't recall.

Q. Was it within the last month?

A. [Indecipherable.]

Q. I'm sorry, what was that? It cut out.

A. I'm not certain.

Q. Okay, okay, that's fair. Thank you.

Before today's deposition, did you search for or collect any e-mails?

A. Yes.

Q. Okay. And what specifically did you search for and collect?

A. I used the search terms that were given to me, and I went through text messages and e-mails.

Q. Okay. And when was the last time you did that?

A. I don't recall the date.

Q. Okay. Now, you produced e-mails in this case, correct?

A. Correct.

Q. Is there a reason why those e-mails were saved and other e-mails you deleted?

A. Because they were communications with The Eddy, so I saved those throughout my time there.

Page 24

Q. Okay. And it's your standard practice to just delete e-mails in your inbox that aren't obviously, uh, that are not necessary to save in your opinion?

A. In general, yes.

Q. Okay. And before today, did you review a timeline of events?

A. I did not.

Q. Okay. Have you done any internet research regarding this case?

A. I may have early on. Yes, I believe early on.

Q. Okay. Do you remember what you researched early on?

A. I can recall googling some of the topics.

Q. Okay. Do you remember what you found when you did that research?

A. No.

Q. Okay. Did you print any of the information that you found?

A. Possibly.

Q. Okay. Do you think you still have that information somewhere?

A. I don't believe so.

Q. Okay. Do you remember any, producing any information or turning that information over to your counsel?

A. Yes.

Page 25

Q. Okay. Have you ever done any research about the specific defendants in this case?

A. Yes.

Q. Okay. And when was the last time you did that?

A. Last year.

Q. Okay. Do you remember what that research yielded?

A. Cases in which Greystar was being sued.

Q. Okay.

A. And a recent article I saw on the settlement with the Department of Justice.

Q. Okay. About one of the defendants?

A. Yes.

Q. Okay. Okay. Have you specifi-- have you written anything about this case on a website?

A. No.

Q. Have you written anything else about this case on a blog?

A. No.

Q. Have you made any posts on social media about this case?

A. I don't believe so.

Q. Okay. Have you made any posts on social media about the facts underlying this case?

A. I don't recall ever doing [indecipherable].

7 (Pages 22 - 25)

Page 26

Q.   Sorry, what was that?

A.   I don't recall ever doing that.

Q.   You don't recall, okay.  Sorry, sometimes the mic is cutting out so its --

A.   I'm sorry.

Q.   No, it happens all the time.

MR. DUNN:  I'm getting a little delay at times too, so.

MR. AYVAZIAN:  And, Michael, if you don't hear an answer or, uh, just let me know and I'll stop and we can clarify.

BY MR. AYVAZIAN:

Q.   Okay.  Now, in terms of the Boston Globe and the Guardian, did you give interviews to them?

A.   Yes.

Q.   Were they video recorded or audio recorded or something else?

A.   I'm not certain.  They weren't video recorded, for sure.  And I'm not certain, I don't recall if one of the reporters recorded the audio.

Q.   Okay.  If you can recall, what did you specifically say to the Guardian?

A.   I discussed my tenancy at The Eddy and my personal experience.

Page 27

Q.   Okay.  And same thing for the Boston Globe?

A.   I discussed my experience and my time living at The Eddy and, uh, I think that's it.

Q.   Okay.  And at whose direction, if anyone's, was it for you to do these interviews?

A.   No one directed me to do the interviews.

Q.   Okay.  And have you contemplated a public relations plan in this case with anyone?

A.   No.

Q.   Okay.  So for the specific defendants named in this lawsuit, GREP Atlantic and the Eddy Owners, would you consider them, or one of them, landlords?

A.   Yes.

Q.   Okay.  Would you consider them both landlords or one or the other?

A.   I would consider them property management, uh, owners as part of Greystar.

Q.   Okay.  Yeah, and you bring up Greystar.  If I do say Greystar, you understand that I'm either referring directly to Greystar or also GREP Atlantic, correct?

A.   Yes.

Q.   Okay.  Okay.  When did you decide to file this lawsuit?

A.   Do you mean date, a date?

Page 28

Q.   Yes.  Yeah, I realized that can mean different things.  Date-wise, when did you decide?

A.   I don't recall.

Q.   Okay.  And why did you file this lawsuit?

A.   Because I was being charged legal eviction fees without court ruling, without having an opportunity to present a case in front of the judge, and I found that to be unfair; and after speaking to the attorney general's office, I made the decision to -- to file a lawsuit.

Q.   Do you remember who you spoke with specifically at the attorney general's office?

A.   I do not.

Q.   Okay.  Okay.  What are the specific claims that you are alleging in this lawsuit?

A.   That Greystar doesn't have the right to assess legal fees without a judge's order, without a court order.

Q.   And do you understand that this lawsuit is brought -- was brought as a class action, correct?

A.   Yes.

Q.   What does a class action lawsuit mean to you?

A.   A class action lawsuit is, um, I'm currently serving -- Kevin and I are the lead plaintiffs, and we are representing or asserting this claim for ourselves but also for everyone else who has been affected by the same policy and practice.

Page 29

Q.   And in your own words, what is the class of individuals that you are seeking to represent in this lawsuit?

A.   Everyone that has been affected by this practice and charged these fees without an order, a court order.

Q.   Without a court order, okay.  And that -- I'll just ask it.  So what is the unfair practice that you allege?

A.   Charging legal fees without having a court order.

Q.   Okay.  Is it just the charging of legal fees, or is it the charging and receiving payment for these legal fees?

A.   Sure, it is charging legal fees to a tenant's account and then having -- tenants having to pay those legal fees to avoid being evicted from their apartment.

Q.   Okay.  Now, besides this lawsuit, have any of the other attorneys on this case assisted you in any other matter?

A.   Can you repeat that, please, your question?

Q.   Sure, yep.  Besides this lawsuit, have any other attorneys on this case assisted you in any other matter?

A.   Yes.

Q.   Which attorney and what was their assistance for?

A.   Sean Ahern, while he was working at Greater Boston Legal Services, assisted me with a small claims suit.

Q.   Okay.  And did he assist you and Kevin, or just you?

A.   Just me.

Q.   And how long ago was that?

Veritext Legal Solutions

800-726-7007                                                                                    305-376-8800

Page 30

A.  Last year.

Q.  Okay.  And what were the circumstances of that small claims suit?

A.  I was sued by a collection agency and had to appear in court here in Boston.

Q.  Okay.  And what was Sean's role in that case?

A.  He -- well, he works for Greater Boston Legal Services, and they provide like free legal advice, representation for those types of suits.  And this was before, before he was part of this specific case officially.  And he advised me on [inaudible] --

COURT REPORTER:  I'm sorry, I didn't hear that.  "He advised me" what?

MR. AYVAZIAN:  I'm sorry?

THE WITNESS:  I'm sorry?

MR. AYVAZIAN:  I had trouble hearing --

COURT REPORTER:  I didn't hear anything after "he advised me...."

A.  ...on that case.  And he represented me when we went in front of the magistrate.

BY MR. AYVAZIAN:

Q.  Okay.  And besides Sean in that one instance, any other, have any of these other attorneys or law firms represented you or assisted you in any other legal matter?

Page 31

A.  Another attorney at Greater Boston Legal Services is assisting me currently with a second small claims suit.

Q.  Okay.  And what are the circumstances of that small claims suit?

A.  A collection agency.

Q.  Okay --

A.  I assume.

Q.  -- a collection agency bringing an action against you in small claims court?

A.  Yes.

Q.  Okay.  And -- Sorry, one second.

A.  Sure.

Q.  Outside of these two small claims suits, are there any other cases -- or any of these four firms represented you in any other legal matter?

A.  No.

Q.  Okay.  Outside of these two small claims lawsuits, are there any other lawsuits that you've been a party to, whether a plaintiff or a defendant, besides this case and those two small claims court?

A.  Yes.

Q.  Okay.  What other cases would that be?

A.  So a federal lawsuit where I am bound by a strict non-disclosure agreement.  And I am not named specifically.  I

Page 32

have a pseudonym, and I'm not supposed to reveal that.  And it has nothing to do with housing or eviction.

MR. AYVAZIAN:  Okay.  So I think, if we can go off the record right now, I'll just -- we can talk without it being discussed.  Michael, do you agree?

MR. DUNN:  Yeah, that's fine.

MR. AYVAZIAN:  Okay.

VIDEOGRAPHER:  All right, this ends Media Unit No. 1.  We're going off the record at the time of 10:38 as indicated on the video screen, and we're off the record.

(WHEREUPON, the record was paused from 10:38 a.m. to 10:41.m.)

VIDEOGRAPHER:  All right, this begins Media Unit No. 2.  We are back on the record at the time of 10:41 a.m.  You may begin.

BY MR. AYVAZIAN:

Q.  Okay, Mr. Cordeiro, we just took a very brief break to discuss that last answer you just gave with counsel, for us to discuss it a little bit further.  Are you able to provide any additional information about this federal action that you just raised?

A.  No.

Q.  Okay.  At this point, we would just ask that Plaintiff's counsel and your representative try and get a little bit more information about that, uh, either the gag order or the

Page 33

confidentiality order in that case, and to let us know kind of where we're at with that.  And I just want to -- if there's any questions or if that case does -- somehow is relevant to this case, we would just ask that we have the ability, and we'll preserve the ability, to just ask you questions about that at this time.  But seeing that you have that order or protection in place, we'll just move on.  Is that fair?

A.  We can move on.

Q.  Okay.  Now, okay, so we have the two small claims cases, this other case; any other cases that you've been a party to a lawsuit?

A.  I don't believe so.

Q.  Okay.  All right.  Some easier questions to answer right off the bat.  Can you please state your date of birth for the record?

A.  January 9th, 1980.

Q.  And, again, where do you currently reside?

A.  In Boston.

Q.  Okay.  And do you live in an apartment, a house, a condo, something else?

A.  A condo.

Q.  Okay.  And is that the address, at the Trenton address that you provided?

A.  Yes.  Yes.

9 (Pages 30 - 33)

Veritext Legal Solutions

800-726-7007                                                                 305-376-8800

Page 34

Q. And how long have you lived at that address?

A. Since we moved out of The Eddy.

Q. Okay. And I think that would be March 2024; does that sound right?

A. That sounds correct.

Q. Okay. And who do you currently live with?

A. Kevin.

Q. And what is your legal relationship with Kevin?

A. We signed a lease together and he's my partner.

Q. Okay. Are you married?

A. I am not married.

Q. Okay. Is there any domestic relationship, like official relationship like that that's --

A. We are registered with American Airlines, which is his employer, as having a domestic partnership as they define it.

Q. Got it, okay. Is that a legal relationship?

A. I'm not -- we haven't registered with any state --

Q. Okay. That's what I was getting at.

A. -- or government authority.

Q. Okay, got it. And in your household, who handles paying the bills?

A. Predominately, I do.

Q. And I know I said "handles" the bills, I guess I should have said who specifically, who pays the bills; would

Page 35

that be you?

A. Predominantly, yes. Making the payments predominantly, yes.

Q. Yeah. And does anyone else, besides Kevin, contribute to household expenses besides yourself and Kevin?

A. [No verbal response.]

Q. And I guess --

COURT REPORTER: I'm sorry, I didn't hear an answer.

A. I'm sorry. In general, no. My mother has contributed before.

Q. Okay. Okay. And when you were living, the last time you lived at The Eddy, were you -- you were living with Kevin, correct?

A. Correct.

Q. Was anyone else living in that apartment, the last apartment that you guys were in at The Eddy?

A. No.

Q. Okay. And when you lived at The Eddy last, you were Apartment 1010, correct?

A. That's correct.

Q. Okay. And did Kevin live with you the entire tenancy that you were there for that apartment?

A. Yes.

Q. Okay. And back then who handled or paid the bills at

Page 36

that time?

A. Predominantly, me.

Q. Okay. And how long did you live at Apartment 1010 at The Eddy?

A. If we were at The Eddy for a total of about two years, so I think in 1010 a year.

Q. Okay. And before 1010, you were in Apartment 509, correct?

A. Yes.

Q. Okay. And that would put you in 509 for about a year based on what you just said, right?

A. Short of a year.

Q. Okay. And prior to living at Apartment 509, where did you live?

A. In Philadelphia.

Q. Okay. In another apartment building?

A. Yes.

Q. Okay. And was that with Kevin too?

A. Yes.

Q. Okay. Now, before living at The Eddy, so I guess we'll go right back to Philadelphia and your times before that, had you ever received an eviction notice?

A. No.

Q. Had you ever received a notice to quit?

Page 37

A. No, I don't believe so.

Q. And I'm guessing I know the answer to this, but have you ever had an eviction case filed against you before The Eddy?

A. No.

Q. Okay. Before living at The Eddy, did you ever apply for rental assistance?

A. No, I didn't. I don't believe so, no.

Q. Okay. Before The Eddy, did you ever rely on third-party financial assistance such as friends or family?

A. No.

Q. Okay. Is anyone in your family a landlord?

A. No.

Q. Okay. Have you ever owned any rental properties?

A. No.

Q. Do you know if Kevin has ever owned any rental properties?

A. I don't believe so.

Q. Okay. What is your educational background?

A. I have an MBA in finance. I also have a Master of Science in Business. And I studied my Ph.D. at Virginia Tech in business; I focused on behavioral economics. And I have some advanced math training in a Master of Science program in mathematical and quantitative finance.

Q. Okay. I guess let's start, let's go a little bit back

10 (Pages 34 - 37)

Page 38

earlier. Where did you go to college?

A. Undergraduate?

Q. Yes. Sorry.

A. University of South Carolina.

Q. Okay. And after you go to the University of South Carolina, what schooling, what came immediately after that?

A. I attended a community college to take some quant classes --

Q. "Some quant classes," is that what you said?

A. Quant classes, yes. Some mathematic courses. And then Winthrop University for my MBA in Finance. And then University of North Carolina for consumer advanced training and a Master of Science in the medical finance program. And after that, Virginia Tech.

Q. Got it. Okay. And what was the last year that you were in -- or were in school?

A. In 2020.

Q. Okay. And were you ever, have you ever served in the military?

A. No.

Q. Okay. Has Kevin ever served in the military?

A. [Inaudible.]

Q. It cut out, but I think -- Can you just say it again?

A. "No."

Page 39

Q. I saw your answer. I just wanted to make sure we have that on the record.

So 2020, you're done with school. Where do you go work at that point?

A. I started freelance consulting while I was in my Ph.D. program and I started my own business.

Q. Okay. What kind of business did you start?

A. Consulting, management and economic consulting.

Q. Okay. And you know what, I'll ask now, and we'll go backwards if I need to. Where do you currently work?

A. I work for myself. I have my own business.

Q. Okay. So from 2020 until now, is it really you're your own employer?

A. Yes.

Q. Okay. Prior to 2020, where did -- where, if anywhere, did you work right before that?

A. I was a research assistant at Virginia Tech for five years and a teaching assistant as well.

Q. Okay. And before that, where did you work?

A. I worked for the government, Mecklenburg County government. I was a statistical analyst and quality management director.

Q. Okay. Have you ever worked for an apartment building before?

Page 40

A. No.

Q. Have you ever worked for a leasing office before?

A. No.

Q. Okay. Have you ever worked in the residential housing sector before?

A. No.

Q. Okay. So for your work now, what sort of tasks are your day to day, is your day to day like?

A. Tasks for clients?

Q. Sure. I guess what -- what do you do for work now, what does it consist of?

A. So it varies. But, currently, I'm -- for the past year, I've predominantly been working with FinTech and training AI models.

Q. Okay. Does your company, do you have like an LLC or a form-- a formal corporation?

A. Yes, an LLC.

Q. Okay. What is the formal name of your corporate entity?

A. The LLC is Cordeiro Management Consulting.

Q. Okay. And is that registered in the state of Massachusetts or somewhere else?

A. Pennsylvania.

Q. Okay. So when you, can you explain a little bit more

Page 41

to us what developing AI and FinTech, can you just break it down a little bit more for what that is that you do?

A. Yes. I teach LLM, large language models, to respond more accurately and effectively to user prompts using financial economic theory, quantitative methods. And I review output that firms will, uh, this specific firm will give me from their clients, and evaluate, based on rubrics that sometimes I design and sometimes they have already been given to me, the quality of those responses based on my training and existing research.

Q. Okay. Do you travel often for work?

A. No.

Q. Okay. Seeing that you're your own employer, do you ever have to review contracts?

A. I -- yes.

Q. Okay. And what type of contracts do you review?

A. So I have hourly and fixed rate contracts with clients, and I have been asked to sign NDAs by some clients that I've worked with.

Q. Okay. And how often are you reviewing contracts?

A. Reviewing contracts, does that include non-disclosure agreements?

Q. Yes. And so like in terms of you being your own employer and working with clients, how often would you say that you review contracts, whether it be an NDA, whether it be

11 (Pages 38 - 41)

Page 42

contracts with like clients not NDA, just in general?

A. Not often because I predominantly work with clients through Upwork, and they have their own agreements, user -- in terms of use and agreements with those clients before they come to me so I'm not given individual contracts in general. I have a few private clients. But in the past two years, I have not had many so I have not reviewed many of them.

Q. Okay. In the last six years that you've been your own employer, have you ever drafted a contract?

A. I have adapted a template for a non-disclosure agreement and hourly and fixed agreements.

Q. Okay. So if you were to have a new client, you would send them a contract that you adapted with your fees and rates for the services that you would provide?

A. Yes.

Q. Okay. And have you ever had to negotiate a contract with any of these clients?

A. No, sir.

Q. Okay --

A. Other than rate, let me say that.

Q. Other than your rates, okay.

A. Other than my rate, no, I don't believe so.

Q. Okay. In the six years of you doing this, how many contracts do you -- can you approximate drafting, whether it be

Page 43

your rates, that initial statement of work, anything like that?

A. In that I only modified templates, so I have never drafted anything completely on my own.

Q. Okay. So I guess how many -- how many templates have you modified in the six years for clients, changing of rates, anything like that?

A. I don't know.

Q. Okay. When you are putting your template or fixing your template, is there anything in those contracts that talks about indemnification clauses or anything of legal note?

A. I don't -- I don't know.

Q. Okay. When you were a resident at The Eddy in both Apartments 509 and 1010, was your employment the primary household income -- income source at the time?

A. We both worked, and then I became the primary source of income.

Q. Okay. Okay. Outside of your work and Kevin's work, were there any other sources of income during the time you were living at The Eddy?

A. [Inaudible.]

Q. Okay --

COURT REPORTER: Oh, I'm sorry. I didn't hear the answer.

THE WITNESS: "No."

Page 44

COURT REPORTER: Thank you.

BY MR. AYVAZIAN:

Q. Okay. Did you --

A. Income? I'm sorry, could you -- could you clarify income? What do you mean by income?

Q. Yes. Sources of income coming in, so reported income to the government besides your two jobs' paychecks?

A. No.

Q. Okay. During those years at The Eddy, did you experience any periods of unemployment or reduced income?

A. [Inaudible.]

Q. It didn't catch the answer, sorry.

A. "Yes."

Q. It's okay. Can you explain that?

A. Let's see, Kevin -- I'm sorry. Me specifically you're talking about, correct?

Q. Yes, yes, you.

A. Okay. So, yes, unfortunately, there's a bit of an ebb and flow with clients. There was a period in which I was not paid by multiple clients in one short period and didn't have other clients so my income was reduced significantly.

Q. Okay. So clients owed you money, they didn't pay, you're your own employer, and that's kind of it?

A. That's --

Page 45

Q. You were in a worse position because they wouldn't pay according to the contract that they signed?

A. That's correct.

Q. Did you ever have to bring a suit against them for failure to pay?

A. Unfortunately, the clients were international clients so I was not able to collect, and I didn't even know how I would collect on that.

Q. Did you ever --

Sorry to cut you off, I apologize.

A. Again, I had no way that I knew of to collect from an international client.

Q. Okay. Outside of that circumstance where these clients weren't paying your bills, were there any other periods of unemployment or reduced income for you during those two years?

A. Yes. I mean, that persisted in terms of a significant drop in clients, and so, yes, I mean, throughout that period the income was reduced more than one time.

Q. Got it. And I'm assuming that that problem still exists today, even though you're outside of living at The Eddy, that problem still exists where clients may not pay a bill on time or at all?

A. Far less frequently. I've shifted my business model

12 (Pages 42 - 45)

Page 46

because of that situation.

Q. Got it. That's good. Okay, so I'm going to ask about any convictions or criminal-related charges just to have the information on the record. I just wanted to give you that preview. Have you ever been arrested before?

A. Yes.

Q. What were you charged with?

A. A DUI.

Q. Okay. Any other arrests?

A. There were two.

Q. Two DUIs?

A. DUIs, uh-hmm.

Q. Okay. Have you ever been convicted of a crime?

A. Convicted? Pled guilty?

Q. Yes, pled guilty to a crime --

A. Yes.

Q. -- so a misdemeanor or a felony, not a violation.

A. For the DUIs.

Q. Okay. Were they misdemeanors or felonies?

A. Misdemeanors.

Q. Okay. What that, uh, what state was that in?

A. North Carolina and in Virginia.

Q. And do you remember the years that those occurred or the final judgment was entered?

Page 47

A. I believe 2015. It may have been 2016 when it was entered.

Q. Okay, okay. Besides those two, any other convictions?

A. No.

Q. Okay. All right, I'm about to kind of go into a little bit further questions, do you need a break at all?

MR. AYVAZIAN: Michael, do you need a break at all?

THE WITNESS: So I was going to say yes. I am freezing and I'm not sure if something is wrong with the heat.

MR. AYVAZIAN: Sure. Do you want to -- do you want to take 10 minutes, come back 11:15?

THE WITNESS: Do you think we could have 15 minutes just so that I can investigate what's going on with the heat quickly?

MR. AYVAZIAN: Yeah. So let's all plan to be back, ready to go at 11:20?

THE WITNESS: Okay.

MR. DUNN: All right, sounds good.

VIDEOGRAPHER: Okay, this is Media Unit No. 2. We're going off the record at the time of 11:05 as indicated on the video screen, and we are off the record.

(WHEREUPON, a break was taken from 11:05 a.m. to 11:20 a.m.)

VIDEOGRAPHER: All right, this begins Media Unit No. 3. We're back on the record at the time of 11:20 a.m. You may

Page 48

begin.

MR. AYVAZIAN: Thank you.

BY MR. AYVAZIAN:

Q. Okay, Mr. Cordeiro --

A. Let me shut off -- I'm sorry, let me shut off my screen.

Q. All right. Hopefully, your heat and everything is working.

A. [Shakes head.]

Q. No? Okay.

A. I don't know what's wrong with it, but [indecipherable] --

Q. Okay. You let us know --

COURT REPORTER: Will you repeat that one more time? I'm sorry.

THE WITNESS: I said no, it's -- something is going on with the heating, but I'm going to -- hopefully, it's fine. It'll be fine.

BY MR. AYVAZIAN:

Q. All right. Well, you let us know if anything changes where we need to stop the questioning or pause for a brief moment or however long it takes for you to thaw out, so just let us know.

Okay. So I just wanted to go back real quick. When

Page 49

you said you reached out to another firm prior to hiring your current counsel; do you remember that?

A. Yes.

Q. Okay. Do you know when you officially hired your current counsel?

A. I don't know the date.

Q. Okay. You said that you were working with Sean Ahern on a small claims matter prior to his involvement in this case, correct?

A. That's correct.

Q. Do you know when Sean became involved in this matter?

A. I don't know the date. It was after.

Q. Okay --

A. I believe it was after the small cour-- the small claims.

Q. Okay. And Sean became involved in this matter after this case was filed?

A. I'm sorry, he was involved?

Q. Was Sean -- did Sean become involved in this case that we're here for after the filing of the case?

A. Yes.

Q. Okay. And did you ask Sean to become involved in this matter?

A. No.

13 (Pages 46 - 49)

Veritext Legal Solutions

800-726-7007                                                              305-376-8800

Page 50

Q. Okay. Do you know how Sean got involved in this matter?

A. We discussed that this case had been filed. He was aware of that, and the only thing that I know is that Bryce Harrison's [ph.], he had contacted them or they -- yeah, he had contacted them because he works in housing, consumer protection, and they came to some agreement and asked me what I thought about it and if they would be okay if it -- if I felt like that would be beneficial and if that was okay. And I said yes.

Q. Okay. And was he at Greater Services of Boston?

A. Greater Legal Services of Boston, yes.

Q. Okay. And then --

A. I don't -- I don't know if he had transitioned to his new role at Harvard Law School's legal clinic. He may have, he may have been there. I'm not certain if he was still at Greater Boston Legal Services, and I don't recall -- or if he had started at Harvard.

Q. Got it. Got it, okay. But he, so he's the connection between Greater Boston Legal Services and the Harvard legal services to both?

A. Yes, I believe so.

Q. Okay. Got it, okay. All right, I just wanted to clear that up, just the timing of it and make sure.

Okay. So now we're just going to focus on your time

Page 51

at The Eddy. Okay?

A. Okay.

Q. So earlier you characterized Eddy and GREP as property managers and owners. You understand -- or let me know if this is correct. But do you understand that Greyst-- that GREP and Eddy are businesses that provide apartments to tenants for a fee?

A. [Inaudible.]

MR. AYVAZIAN: Did you get that, Madame Court Reporter?

A. Yes.

Q. Okay --

A. No, I'm sorry. It seems to be cutting out.

Q. Yeah, this happens quite a bit. It's not your fault, and it's -- I mean, it happens. This is the problem with Zooms. But I think if we were in person today, I think we'd all agree this would not have gone forward because of the weather outside. So sometimes it's convenient and sometimes it's not, but we'll work through it.

Okay. Would you agree that tenants of The Eddy would be in a landlord-tenant relationship with The Eddy?

A. Yeah, I guess, yes.

Q. Okay. And before moving into Apartment 509, do you remember where you -- when you first toured a unit at The Eddy?

Page 52

A. I did not tour the unit at The Eddy. Kevin did in person. And then I had a video call with a leasing agent who kind of showed me the apartment, but Kevin did the actual on-site tour of The Eddy.

Q. Okay. And do you remember what individuals from The Eddy or Greystar, GREP Atlantic, that you dealt with before becoming tenants in that building?

A. The leasing agent.

Q. Do you remember that person's name?

A. Christian.

Q. Okay. And the first time that you lived at The Eddy was in -- was Apartment 509, correct?

A. Yes.

Q. Okay. When did you first submit an application to lease a unit at The Eddy?

A. I don't know the date.

Q. Okay. I'm going to show the first exhibit were going to mark as Defendant's Exhibit 1. Let me find --

(EXHIBIT 1 MARKED FOR IDENTIFICATION)

BY MR. AYVAZIAN:

Q. Can you see my screen?

A. I can't see it well. I'm going to try and move you guys to another monitor that's bigger.

MR. AYVAZIAN: Okay. And just while you're doing it,

Page 53

this is -- this is Defendant's Exhibit 1, and we'll mark this Exhibit 1. And this is Bates stamped G-R-E-P, GREP 320, and this goes to 325.

BY MR. AYVAZIAN:

Q. Okay. Can you see this now, Shaun?

A. Yes.

Q. Okay. Have you seen this document before?

A. I don't recall seeing it before.

Q. Would you agree that this is your lease application agreement at The Eddy?

A. It appears to be.

Q. Okay. And this document contains yours and Kevin's information to rent a unit at The Eddy, correct?

A. [No verbal response.]

Q. Sorry, did you say an answer?

A. I'm just looking at it.

Q. Okay.

A. It appears to, yes.

Q. Okay. And do you see that under, towards the top of the document on 320 for "Application - Shaun Michael Cordeiro," it lists your annual income; do you see that?

A. Yes.

Q. And it shows your annual income at this time was 170,000 per year, correct?

14 (Pages 50 - 53)

Page 54

A. Correct.

Q. And then Kevin's down below says 33,000 and change per year?

A. And 11,424.

Q. And that's "other income," that 11,000 number, correct?

A. Correct.

Q. Okay. Do you know what that other annual income was for the 11,000 that Kevin was receiving?

A. I don't.

Q. Okay. And do you see your initials on the bottom left of this document?

A. Partially. I see the "S" and something else.

Q. Okay. And I will move to GREP 325. Is that your signature on the bottom left of that document?

A. Yes, it appears to be.

Q. Okay. After submitting this application to the Eddy, did you sign a lease at some point for Apartment 509?

A. Yes.

Q. Okay, I'll stop sharing this right now.

Do you remember reading the lease in its entirety before signing?

A. [Pause.] Sorry. I remember reviewing the lease.

Q. Okay. Do you remember reviewing the lease's

Page 55

provisions regarding default?

A. I remember seeing them. I don't know that I read it word for word through everything.

Q. Okay. Would that apply the same -- would that same answer apply to like the attorney's fees provision?

A. I recall seeing it, yes, so similarly.

Q. Okay. Do you remember asking any questions about the provisions of the lease when signing for Apartment 509?

A. I remember asking about the security deposit, and I do recall pet rent, asking about that.

Q. Okay. How about any of the attorney's fees provisions?

A. I don't recall ever asking that. In the beginning, I don't -- in the beginning before signing the lease, I don't recall asking about that.

Q. Okay. And at some point you and Kevin signed the lease for Apartment 509, correct?

A. Correct. Correct.

Q. And you move into Apartment 509, correct?

A. Correct.

Q. Do you remember at this point what individuals you were dealing with at The Eddy in terms of the property managers?

A. Yes.

Q. Okay. Who were -- who was it at that time?

Page 56

A. Destinee Price and Kayla Agustin.

Q. Okay. Do you remember when they identified themselves who they said they worked for, whether it was Greystar or The Eddy? GREP? something else?

A. Greystar.

Q. Okay. And at some point you stop living in Apartment 509, correct?

A. That's correct.

Q. Okay. And why did you move out of Apartment 509?

A. When the financial situation occurred, when the income -- my income started to drop significantly, and Kevin was suffering after-effects -- he had neurosurgery on a brain tumor, and so when he stopped working, and then -- so when that financial situation occurred, I immediately contacted the property management and let them know so that we could downsize as quickly as possible to a one-bedroom apartment.

Q. Okay. And when you say you contacted property management, was that Destinee or Kayla or someone else?

A. Yes. One of the two of them, or both.

Q. Okay. And then after you're in 509, you downsize, and then you move into Apartment 1010, correct?

A. We were supposed to move into Apartment 1313. We signed a lease for that apartment in June, I believe, and then seven days before we were to move into that apartment, Destinee

Page 57

e-mailed me and reneged on the contract. And then, eventually, we were left with 1010, that was the only option available for a one-bedroom apartment, so we signed that lease and we did move into 1010 eventually.

Q. Okay. For that Apartment 1313, do you remember the circumstances for why you did not move into -- I know you said reneged on the lease so I'm just getting into that. So do you remember the circumstances for why you did not move into 1313 and chose 1010?

A. So we didn't choose necessarily 1010. But I can tell you that seven days before we were to move into 1313, Destinee said that the existing tenants there, they were purchasing a home and the closing date had moved and they were holding over. They were going to stay --

MR. DUNN: Oh, no.

MR. AYVAZIAN: Yeah, he froze. Mr. Cordeiro, can you hear us?

THE WITNESS: Um --

MR. AYVAZIAN: Oh.

THE WITNESS: -- can you hear me?

MR. AYVAZIAN: Now we can. I think you --

MR. DUNN: Yeah, I can hear you now. You froze for a second.

MR. AYVAZIAN: -- froze for a few seconds.

15 (Pages 54 - 57)

Page 58

THE WITNESS: It says my internet connection is unstable. It just popped up a message.

MR. AYVAZIAN: Okay. Well, right now we can hear you just fine, so --

THE WITNESS: You can? All right. So I'll continue and you just let me know if you can't hear me; is that okay?

MR. AYVAZIAN: Yes.

THE WITNESS: Yeah?

MR. AYVAZIAN: Yep.

A. Um, I forgot where I was. So at that point I requested rent abatement. There was a $1,000-plus difference in the rent between the one bedroom 1313 and 509, and she said no. And she said that in a week either we move -- and the rent was due, it was 42-something, so the $1,000 more and refused the rent abatement. And we had a back-and-forth several times about that The Eddy had allowed them to stay in 1313, and that, um -- I went back to the lease and looked up the rent abatement and questioned that and said, you know, ultimately that this is, you know, your decision and that it says if a tenant is holding over and preventing someone who has an executed signed lease to move in, then you're resp-- then they're responsible for that difference in the rent. And she said she spoke with a legal team and they said no, that they couldn't evict the tenants in 1313. And I told her that's not what we were ask-- we weren't

Page 59

asking you to evict anyone. And then she said -- At that point I believe is when 1010, that apartment, she said we -- you could take 1010. And I said, well, we've already transferred utilities and hired people to help us move and packed up this apartment, 509, and we didn't want to move into 1010. It's not the apartment we chose. And she said, well, it will not be available until October; should you choose to wait until October, we'll not be able to honor the rent charges, the monthly rent price we gave you in the contract and that it would be higher; and that they would allow us to move into 1010 for the same rental price that they were supposed to for 1313.

And so I had seven days before I had to pay the much higher rent price or take an apartment we didn't want but we needed somewhere to live, quickly.

Q. Okay. Okay. And that, that was you dealing, and Kevin, dealing with Destinee Price I think you said, going back and forth on that, and others?

A. Yes. Destinee Price predominantly, and Kayla a little bit. When we received the lease for 1010, the security deposit was higher than the monthly rent. And I spoke with Destinee about that as well, multiple times, and request that they, you know, refund or credit our account for the difference between one month's rent at 3200, I believe, and it was 3629 that they were holding the security deposit. And she told me no two or

Page 60

three times, and then said that she was not allowed to change security deposits. And I let her know that was more than one month's rent and that's not allowed in Massachusetts, because she denied it. And then, ultimately, Kayla e-mailed me and said, I'm going to credit your account for the 460-odd dollars. I can't remember the exact amount. Four-something. I think it was 460-something, and so that was eventually done.

Q. Got it, okay. All right. So 1313, you had that, um, the lease falls out, and then you have the option of going to 1010, and then you move from 509 to 1010. Correct?

A. The lease I wouldn't characterize as "fall out".

Q. Yeah, that was my own words. My apologies.

A. The lease, they just chose not to honor it so 1010 is where we ended up.

Q. Okay. So you sign -- okay, so you eventually, after 509 and they don't honor the lease at 1313, you and Kevin sign a lease for Apartment 1010?

A. That's correct.

Q. Okay. And do you remember if the Apartment 1010 lease was essentially in sum and substance, except for the amount of rent, essentially the same terms as your 509 lease?

A. I think so.

Q. Okay. Do you remember when your lease at 1010 or your tenancy began?

Page 61

A. I think it was September.

Q. Of 2022?

A. Yes, I believe so.

Q. Okay --

A. Yeah, that sounds -- that sounds correct, yes.

Q. Okay. And before you signed the 1010 lease, do you review the provisions of the lease?

A. I recall it looking the same. And beyond, you know, your rent/the price, security deposits, I always check pet rent. I'm a pet owner, so. I don't know that I reviewed it again, other sections, because it appeared to be similar or the same.

Q. Yeah, okay. And I think you said earlier your rent in 1010 was 3200 a month, correct?

A. Thirty-two hundred was the rent, and then $100 total for storage unit and $200 for parking.

Q. Okay. So those, 3200 rent, and then the other monthly fees added on, parking, storage --

A. Thirty-five hundred total.

Q. Okay.

A. Plus utilities and all of that total, but yeah.

Q. Got it, okay. I am going to show you now the lease. You might have to look at it on your other screen.

A. Yeah.

Q. It's probably a little small on this one, so I

16 (Pages 58 - 61)

Page 62

apologize.

A. [Indecipherable.]

Q. I'm just going to -- I'm just going to zoom out a second just to show. Okay, so now I'm showing you, we'll mark this as Exhibit 2, and this is a 40-page document that was produced, GREP 140 to GREP 179.

(EXHIBIT 2 MARKED FOR IDENTIFICATION)

BY MR. AYVAZIAN:

Q. Do you recognize this document to be your lease for Apartment 1010?

A. Can you increase the size for me?

Q. Yeah. Absolutely, I understand.

A. It appears to, uh, to be the lease.

Q. Okay. I'm just going to zoom out really quick so we can see the bottom number. I'm going to go to page GREP 146, and I'm going to zoom in just to the bottom. Is that your signature on the bottom left signed 9/12/2022?

A. Yes.

Q. And is that Kevin's to the right?

A. It appears to be Kevin's signature.

Q. And then that's Kayla Agustin who you mentioned earlier as, uh, dealing with, correct?

A. Yes.

Q. Okay. So I just want --

Page 63

Sorry, what was that?

A. Yes.

Q. Okay. I'm just going to go back. Okay. Now I'll zoom in in the top right. Do you -- Sorry, bottom left. Do you recognize at the, or see at the bottom left that this lease is marked "Copyright" -- copyright symbol -- "2021, National Apartment Association, Inc. - 6/2021, Massachusetts"?

A. Yes, I see that.

Q. Does that doc-- does that marking and text mean anything to you?

A. No.

Q. Okay. And when you signed this lease -- I'll withdraw that.

When you signed this lease, you were agreeing to the terms in the lease, correct?

A. I suppose. From what I'd read I was agreeing to the price, the location, when to pay the rent, the lease term, the security deposit.

Q. And do you see at the top right of this document, and tell me if I need to move in, but it says, "This is a binding document. Please--" er, sorry, "Read carefully before signing." Do you see that?

A. Yes. I see that, yes.

Q. And no one forced you or Kevin to move or rent at The

Page 64

Eddy, correct?

A. Correct.

Q. And there's other --

A. Yes, correct.

Q. There's other luxury apartment buildings in Boston, correct?

A. Correct.

Q. But I think you mentioned this too, you liked The Eddy because it's a pet-friendly building, correct?

A. That's correct.

Q. We're going to take a look, I'm going to have to zoom in, but we're going to move to this on page 1, the "Rent and Charges" section right here. I'll zoom in, make it a little bit easier. Maybe that's too much. Okay. Do you see here it says rent and charges 3200 per month?

A. For rent. I see for rent, per month for rent.

Q. Per month per rent, yep -- Per month for rent.

And then this paragraph underneath, it states on the third line: "You must pay your rent on or before the first day of the month (due date) with no grace period."

Do you see that?

A. I see that.

Q. Okay. And do you see further down in this, maybe about six lines up underneath the $100 mark, it says: "If you

Page 65

don't pay rent on time, you'll be delinquent and all remedies under this lease contract will be authorized."

Do you see that?

A. I see that.

Q. And "We'll also have all other remedies for such violation."

A. I see that.

Q. Okay. Would you agree that based on reading six -- paragraph six where "rent and charges" and what we just read, that rent was due on the first of the month. Would you agree to that premise?

A. Yes.

Q. And according to the lease, if rent wasn't paid on time, you would be considered delinquent and all remedies under the lease would be authorized. Would you agree with that?

A. If you don't pay all rent on or before -- I'm sorry. Rent is not considered acceptable, you're saying -- I'm sorry, could you repeat that, please?

Q. Sure. Would you agree that according to the lease, if you don't pay rent on time, you'll be considered delinquent?

A. If you don't pay rent by the due date, based on what you're showing me, you will be considered delinquent, yes.

Q. Okay --

A. That's what I'm reading.

17 (Pages 62 - 65)

Page 66

Q. Okay. What was your -- what is your -- what was your understanding at the time of how rent was supposed to be paid under this lease at The Eddy?

A. "Supposed to be paid," what do you mean?

Q. I'll withdraw that question. Sorry, it's a bad question.

What payment method did you use most often to pay your rent while at the Eddy?

A. Most often? I don't know. We used two options, two. Well, two, um, we paid in two different ways.

Q. And what were those ways?

A. ACH and then certified funds.

Q. Okay. I am now going to go to GREP 143. We're taking a look at 26 here, "Joint and Several Responsibility." Do you see that on the screen?

A. I see that.

Q. And it states: "Each resident is jointly and severally liable for all lease contract obligations."

Do you see that that?

A. I see that.

Q. And what does that provision mean to you today?

A. I don't --

Q. Okay, okay.

A. I don't know. I'm not an attorney, I don't know.

Page 67

Q. Okay, fair. We're going to go to the next page. And this at the top, it says "Responsibilities--" I'll zoom out a little bit to get the full page, "Responsibilities of Owner and Resident." Do you see that?

A. The "Responsibilities of Owner." "Default By Resident."

Q. Oh, sorry, at the very top in gray.

A. Ah, I'm sorry.

Q. That's my fault. I'm thinking that you can see my mouse so I apologize. All right --

A. "Responsibilities of Owner and Resident"?

Q. Yes.

A. Yes.

Q. Now, on 29, "Default by Resident," that section, the first line reads: "You'll be in fault if you or any guest or occupant violates any terms of this lease contract including but not limited to the following violations:" And the first one, "You don't pay rent--" Do you see that?

A. I see that.

Q. And it says, "You don't pay rent or other amounts that you owe when due." Correct?

A. I see that.

Q. Okay. And later on, three -- two paragraphs below it says "Eviction." Do you see that?

Page 68

A. I do.

Q. And the lease states: "If you default, we may end your right of occupancy by giving you a 14-day written notice to vacate in the event that the default is due to your non-payment of rent, or a seven-day written notice to vacate to in the event that the default is due to any other provisions of the lease."

Do you see that?

A. I do.

Q. Okay. And now top right, first line: "After giving notice to vacate or filing an eviction suit, we may still accept use and occupancy charges or other sums due; the filing or acceptance doesn't waive or diminish our right of eviction, or any other contractual or statutory right."

Do you see that?

A. Yes, I see that.

Q. Okay. And then in "Other Remedies," a coup-- two paragraphs below, four or five lines down its sentence starts with "Upon your default--" Do you see that?

A. Yes.

Q. Okay. So that sentence reads: "Upon your default, we have all legal remedies, including, but not limited to, termination of your tenancy, pursuit of an eviction, and reimbursement for any and all attorney's fee and/or litigation costs or expenses." Correct?

Page 69

A. Correct.

Q. And then the next line after -- sorry, two lines later it says: "Any and all amounts which remain unpaid for 30 days from the date due shall bear interest at the maximum rate permitted by law, in which event interest shall accrue at the highest amount permitted by law. You shall be responsible for any and all attorney's fees, expenses, or other costs incurred by the landlord to enforce any provision of this lease whether related to your conduct or the conduct of your household member(s), guest(s) and/or invitee(s)."

Do you see that?

A. I see it.

Q. Okay. And now would you agree that when you signed the lease that you agreed to these terms in the lease?

A. No.

Q. Okay. Why not?

A. Well, "you shall be responsible for any and all attorney fees, expenses, or other costs," I have no idea what -- what that would be. It's not -- It's vague and I don't know -- There are no specifics there, so I don't -- I don't know that I agreed to paying any fees or costs or what those would possibly be. I did not think that it would be anything that they felt they could add for attorney's fees, expenses, or costs, and -- yeah, so I don't -- no, I did not know that I was, uh, or that I

18 (Pages 66 - 69)

Page 70

did agree to any -- any fees or expenses or any costs that they put on my account ledger.

Q. Do you know if Kevin read these provisions before signing the lease?

A. I don't know.

Q. Okay. Is there a possibility that he read these provisions and agreed to them when he signed the lease?

A. I don't know.

Q. Okay. When you signed this lease, or Apartment 509's lease, did you ask any questions about what you just read in this "Other Remedies" paragraph about what attorney's fees, expenses, or other costs were?

A. I don't recall asking any questions when I signed the lease for 509 about this specific section.

Q. And how about --

A. I don't --

Q. Oh, sorry about that.

A. Oh, no, it's fine. And I don't recall asking questions about this section before I signed the lease for 1010.

Q. Okay, fair enough. And would you agree that the terms and provisions of the lease that we just read do not require a court judgment in order for attorney's fees, expenses, or other costs to be assessed to a tenant?

MR. DUNN: Objection.

Page 71

A. Continue? Or?

Q. Yes, you can answer.

A. Can you please repeat that again?

Q. Sure. Would you agree that in the provisions of the lease that we just read, it does not require -- these provisions do not require or mention the requiring of a court judgment in order for attorney's fees, expenses, or costs incurred by the landlord to be added to a tenant ledger?

MR. DUNN: Objection. You can answer.

A. No.

Q. No, it doesn't state that; correct?

A. No, I don't agree.

Q. Well, where does it say --

A. The question, the question you just asked me there which was --

Q. Okay.

A. -- and I don't.

Q. Okay. Where -- If you don't agree that it doesn't say anything about a court judgment, where does it require --

A. No, no, what I was saying is -- what I'm saying is I see "amount permitted by law" a few times there, so I don't see the words that "attorney's fees, expenses, or other costs must be ordered by a court," I don't see those words.

Q. Yep. And I'm not trying to trick you. I'm just

Page 72

asking specifically does it -- does it say in there that "you shall be responsible for all attorney's fees as long as a court enters judgment"; it doesn't say that, correct?

A. It does not. Those words are not there, no.

Q. Okay. I understand your contention of what you said earlier about why you brought this case, I wanted to point out and make sure --

A. The wording.

Q. -- on the page that the wording doesn't say anything about a court judgment.

Okay. Now, at some point you made pay-- you made payments towards your tenancy, correct?

A. Yes.

Q. And you made on-time payments, correct?

A. Yes.

Q. And as you told us earlier, at some point while at Apartment 1010 you fell behind on your rent, correct?

A. Yes. Yes, that's correct.

Q. And I'll give you the chance now, can you explain the circumstances for why you fell behind on your rent in Apartment 1010?

A. Same issue when you asked me before. You've asked me that, I mean, it's the same scenario.

Q. Okay. So -- Okay.

Page 73

A. And, uh, yeah.

Q. And that --

A. Also --

Q. Yep?

A. I'm sorry. I apologize, I shouldn't have spoke. So, also, a rental assistance check was not credited to my account when it should have been, so we -- that falling behind, we weren't behind but then fell behind soon after. If that makes sense.

Q. Okay. I'll -- we'll break that down a little bit more.

A. Yeah.

Q. Okay. I appreciate your answer.

A. Yep.

Q. Okay. So as you just said, you made on-time payments at certain points, and then at some point you're unable to make an on-time payment in full from your account, correct?

A. That's correct. That's correct.

Q. Okay. And then I asked you the circumstances for why you started to fall behind on rent and you said the same as before, correct?

A. Yes. It had con-- the situation continued.

Q. And that's, I just want to, that situation that you're talking about was being an employer or your own self-employer

19 (Pages 70 - 73)

Page 74

and running a business and you're sending out invoices or bills, like you said, to international clients. They don't pay. And because they don't pay, your cash flow gets stopped. Correct?

A. Correct. And also Kevin had to go on medical leave --

Q. Okay. That's what I was going to ask --

A. -- and wasn't able to work.

Q. Okay. So Kevin goes out on medical leave, and I think you said he had brain tumor surgery, correct?

A. He did, yes.

Q. Okay. Do you remember when Kevin had -- first had that done?

A. So the first surgery was in 2022 right before we moved into The Eddy, and then he started to have odd complications when we moved into The Eddy. So I want to say winter of early 2022 was the actual surgery, but you'll have to ask him the specific dates. And then these symptoms started to occur like with his endocrine system and other medical issues started to occur while we were living in Apartment 509.

Q. Okay. Okay. Did you ever tell management -- Sorry, I'll withdraw that.

Once you start having some financial difficulties with the circumstances of work and obviously Kevin having to go out for his medical needs, did you contact management, property management at The Eddy to explain anything at that point?

Page 75

A. Yes.

Q. Okay. Do you remember who you spoke with at The Eddy about that?

A. Yes. Destinee and Kayla. More Destinee, but both of them, yes.

Q. Okay. Now, at that point in time, how was your relationship with Kayla and Destinee?

A. Just formal. I mean, I'm trying to think. At that point we had had previous issues -- a previous issue, but generally speaking, it was a professional, normal tenant-landlord kind of relationship.

Q. Okay. So we'll -- we're going to take a look at your resident charges that I'm going to put on the screen. I think that the font size might be the smallest yet so bear with me.

A. All right.

Q. Okay. So I'm just showing the whole document in full. So I'm showing -- and we're going to mark this as Defendant's Exhibit 3. This is Bates stamped GREP 312 through 317 just to show you that real quick.

(EXHIBIT 3 MARKED FOR IDENTIFICATION)

BY MR. AYVAZIAN:

Q. Okay. Do you recognize this document as it is, or do you want me to make it bigger?

A. Well, could you make it bigger first, and then I

Page 76

can --

Q. Yes. We'll go to the top.

A. [Reviews document.] I have not see-- I do not recall ever seeing this, this specific document.

Q. Okay. Do you see that this document says on the top left "OneSite Rents"?

A. I do see that.

Q. Do you see "Personal Info" on the left-hand side, "Name: Shaun Cordeiro, Kevin Matlack." Do you see that?

A. Yes, I do see that.

Q. Okay. Do you see here below that it has "Building: 1010," "current resident," a phone number and an e-mail address?

A. Yes.

Q. Okay. Taking a look at this first page, is there anything that makes you not believe that this is your resident charges and payment ledger for at least starting on April 1st of 2022 at The Eddy?

UNKNOWN SPEAKER: God dammit.

A. I don't know because I've never seen --

UNKNOWN SPEAKER: Fucking bitch.

MR. AYVAZIAN: What?

THE WITNESS: What?

MR. AYVAZIAN: Anyone know where that just came from?

THE WITNESS: No.

Page 77

MR. DUNN: I have no idea.

MR. AYVAZIAN: Is there someone in this Team? Want me --

VIDEOGRAPHER: I don't know, my audio is all off.

THE WITNESS: That is not here.

COURT REPORTER: I was on mute.

MR. DUNN: Not here.

THE WITNESS: I definitely heard -- I definitely heard that horrible language.

VIDEOGRAPHER: I thought I heard something too.

THE WITNESS: I don't know where it's coming from.

MR. AYVAZIAN: Yeah, okay. Um, all right, well, that was -- that was weird. I'm in my office alone right now. I don't know what -- where that came from. That shot out through my speaker.

MR. DUNN: Yeah, mine too.

MR. AYVAZIAN: Okay. Well --

THE WITNESS: Mine too. At first I thought one of you said it, and I -- [making a facial gesture] -- let's not -- let's not start that.

MR. AYVAZIAN: No. Okay, well, we'll just --

MR. DUNN: All right, let's just move on.

MR. AYVAZIAN: -- for that. I just hope the court reporter didn't take that down. So, yeah, we'll continue

Page 78

looking at this document if everyone is okay with that? All right.

BY MR. AYVAZIAN:

Q. Okay, so I think we left off --

A. -- at I said that I -- I have not seen this document before so I can't say for certain if -- what exactly it is. I see what it says that it is, but I've not seen this document before. I was never sent this document.

Q. Okay. Well, let's -- let's take a look at it. I do believe that this document at some point was attached to your pleadings in this case, but we will -- we will go through. Do you see on this, GREP 312, that there are a series of charges and payments listed?

A. I see "charge" and "credit."

Q. Okay. And, for example, do you see about halfway -- halfway through on the screen it says: 6/1/2022, 509, CA-Rent, Base Rent, 4273. Do you see that?

A. I do.

Q. Okay. And that would be your base rent at The Eddy in Apartment 509, correct?

A. It seems correct to me. I recall 42-something.

Q. Okay. So we can see items listed on here. For example, a couple of lines below that it says in that fourth column or fifth column "insufficient funds," and then you see

Page 79

next to that a parentheses with $1500, correct?

A. I see that, correct.

Q. And then all the way to the right, the last column, it's kind of like a running balance based on those charges, credits, or however you want to characterize it, that's the amount that's either owed or a surplus on -- as to this document, correct?

A. Correct, I see that.

Q. Okay. So we're going to move on to page 2. And then we see it go from Apartment 509 to 1010 at one point, correct?

A. Correct.

Q. Okay. And we see the date 9/22/2022 as being right around the time of that switch; is that fair to say?

A. I see that date, correct, in 1010, yes.

Q. All right. So a couple lines down from that we see "WelcomeHome ACH payment - Shaun Cordeiro," 9/26/2022. Do you see that?

A. Yes. I see that, yes.

Q. And then it shows a payment of 590.35, and then there's a zero balance at that point on this ledger, correct?

A. Yes, I see that. Yes, I see that.

Q. Okay. Now, up until this point in time, you would agree that there has not been any legal fee or eviction charge to your ledger from any of your time spent at The Eddy; is that

Page 80

correct?

A. I don't know. I have not looked at every single entry in the document that you just showed me.

Q. Okay, sure. So, but based on your knowledge of being an owner at Apartment 509, were you ever charged an eviction fee or a legal fee?

A. I don't recall ever being charged, in 509, an eviction or legal fee.

Q. Okay. So we will, right here in October 1st of 2022, we see a charge for rent, base rent 3200, correct?

A. Yes, I see that.

Q. And then with the water bill, the storage bill for 50 and the storage bill for 50, that together came to 3371.54, right?

A. Yes, that's correct.

Q. And then you make a payment and then you make another payment and then we have a zero balance, correct?

A. Yes, correct.

Q. And then that same, it seems like a week later, there's an insufficient funds so 1308 bounces back, and that balance goes back to 1308.61 at that point, correct?

A. According to this document, yes, correct.

Q. Okay. And let's see here. Now, we have on this document on November 1st, the rent hits for 3200 and it goes to

Page 81

4791.43, correct?

A. I see that, yes.

Q. And then we have another partial payment "Check Scan - Shaun Cordeiro" 1309, and that drops it down to the 3482 number, right?

A. Correct. That's correct.

Q. And then the December rent hits, and we now go up to $6823.83 owed, correct?

A. I can't really see that, but it --

Q. Oh, sure, sure. Let me zoom in for you. Okay, so we have December rent right here, this 3200 -- 6823 --

A. Yes, I see that number.

Q. Okay.

A. I see 6,823.83.

Q. Okay. So at this point, December 1st, 2022, the outstanding balance is, on December 1st, 2022, is $6823.83, correct?

A. According to this document, correct.

Q. Okay. Now, based on your recollection, this is the month that you and Kevin received your first notice to quit; is that correct?

A. I am not certain that it was -- Oh, the month? Did you say the month?

21 (Pages 78 - 81)

Page 82

Q. Yeah, this month in December of '22 --

A. Yes.

Q. -- this is when you received that notice to quit, correct?

A. Yes. Because we submitted that notice to quit with the RAFT application, it was required, so we must have received it for December 16th, I believe.

Q. Okay. So at this, when you received that notice to quit, that was served due to the non-payment of the full rent at that point, correct?

A. Correct.

Q. Okay. Now, do you dispute the validity of that notice to quit? At that point in time when you received that notice to quit in December of 2022, do you remember disputing the validity of that notice to quit?

A. I'm not sure what you mean by dispute the validity. With whom?

Q. Yeah, I guess it's a good question. Did you have a -- take any issue with it, pers-- like --

I'll withdraw the question. Let me fix it.

When you received the notice to quit, did you believe it was a valid notice to quit?

A. To be honest, I don't know the date and I don't remember what I thought, that's all I can say I know. I

Page 83

remember receiving it around that time to me.

Q. Okay. And would you agree that when you received the notice to quit in December of 2022 that you had on your ledger outstanding rent?

A. Yes.

Q. Okay. And would you agree that based on the provisions of the lease that we read before, at that point in time based on the amount owed according to your ledger, that you were delinquent under the lease?

A. According to the lease, yes. Yes, yes.

Q. Okay. And at that point being delinquent under the lease, did you understand that the notice to quit was the beginning of an eviction process?

A. No.

Q. Do you agree that under the lease, because you were delinquent at that point in time, that The Eddy and Greystar/GREP could start an eviction process because of the amount owed?

A. My understanding was that they could start an eviction process, not based on the amount owed, I don't think. I remember thinking that it had to be -- I was under the impression it had to be, before an eviction would happen, at least over 30 days because they couldn't charge late fees until it was over 30 days, so I don't recall thinking this is the

Page 84

start of an eviction.

Q. Okay.

A. I hope I answered your question.

Q. I mean, your answer is your answer. So if I have follow-up I'll definitely, you know, come back with it. But answer it as best as you can is really just what we ask, so. Okay. One second. [Pause.] I'm just taking a look at my notes real quick. I'll stop sharing that.

A. I just have to throw out there that I will need to have a little, short break soon. I have to use the restroom and --

Q. Okay.

A. -- I don't want you to start and then we --

Q. Yeah, let's --

A. -- have to stop in the middle of question --

Q. That's okay.

A. -- complicated.

Q. Yeah, let's go off the record.

VIDEOGRAPHER: Okay. This ends Media Unit No. 3. We're going off record at the time of 12:20 p.m. We're off the record, folks.

(WHEREUPON, a break was taken from 12:20 p.m. to 12:31 p.m.)

VIDEOGRAPHER: We are back on the record. This begins Media Unit No. 4. The time is 12:31 p.m. You may begin.

Page 85

MR. AYVAZIAN: Thank you.

BY MR. AYVAZIAN:

Q. Okay, Mr. Cordeiro, last we went off we briefly spoke about just the timing of the notice to quit that you first received in December of 2022, correct?

A. Yes.

Q. Okay. I'm just going to share my screen now.

MR. AYVAZIAN: And I believe we're at Defendant's 4?

COURT REPORTER: Yes, Defendant's 4.

MR. AYVAZIAN: Okay, thank you.

COURT REPORTER: You're welcome.

(EXHIBIT 4 MARKED FOR IDENTIFICATION)

BY MR. AYVAZIAN:

Q. Can you see my screen?

A. Yes, I can see your screen.

Q. Okay. Looking at Defendant's 4, do you recognize this document?

A. Yes.

Q. Okay. And is this the notice to quit that you and Kevin received in December of 2022?

A. I believe it is.

Q. Okay. And do you see on the top right it has the date December 9th, 2022?

A. I see that, yes.

22 (Pages 82 - 85)

Page 86

Q.  And above that it has the housing court stamp?

A.  [No verbal response.]

Q.  In blue?

A.  I see -- I see that it has the housing court stamp, but it didn't, what I received, December lacked.  Does that make sense?

Q.  Yes.  So December 9th is the notice to quit, and then on the top right it looks like it has a date filed of January 17th in housing court, correct?

A.  That's correct.  Yes, I see that.

Q.  And this notice -- ope -- this notice to quit, going to the second page, it's signed by Kayla Agustin, right?

A.  I see that, yes, yes.

Q.  Okay.  All right, so looking at this notice to quit, which is the one you received in December of '22 that we were talking about, it states that the landlord's -- for section B -- that, "The reason for your landlord's action is for non-payment of rent," and it lists $6,429.03.  Correct?

A.  It says that, yes.

Q.  Okay.  So when you and Kevin received this notice to quit, what was your understanding of what this document was at the time?

A.  Letting me know that we were behind on rent in that amount.

Page 87

Q.  Okay.  And after you received this notice to quit, did you read the section J down below where it says that an eviction may be brought?

A.  I see that.  I vaguely remember reading that.  I certainly reviewed this.

Q.  What step-- Do you remember how you guys received the notice to quit?

A.  I believe it was left on our door.

Q.  Okay.  And what do you remember, what steps do you remember taking once you received this notice to quit?

A.  I -- we applied for RAFT.  I don't have the exact date, but I want to say that we applied for the RAFT before -- before the notice to quit.  And then I had to submit the notice to quit, um, so the application is pending -- You must, to get approved for RAFT, you have to have by that time a notice to quit.  But I believe we had already submitted the application because it was approved on December 16th, seven days later, and it certainly takes more than seven days for the government for that to process.  So before this, I'm fairly certain that we had already submitted the application.  When I received this, we submitted this immediately to RAFT.

Q.  Got it.  And --

A.  And we can -- Can I fin-- uh --

Q.  Yeah, absolutely.  Sorry.

Page 88

A.  No.  Also, we had informed both Destinee and Kayla that we applied for rent -- er, RAFT, I'm sorry -- the situation, that what was going on with Kevin's health and the financial situation, they knew, and that we were submitting this notice to quit immediately to RAFT.  And that's what we did.  So they were aware as well of what we did.

Q.  Yep.  You answered my next question that I almost interrupted you with, so thank you.

A.  Okay, good.

Q.  Okay.  Going back to the ledger.  So we see here, December 1st, these four entries, but it totals up like we said to the 6823.  Then you make a $500 payment so 6323.83.  Do you see that?

A.  I do.

Q.  Okay.  And the notice to quit that we just looked at had an amount, if you'll recall, 6400.  So the notice to quit was a little bit higher than what you owed on -- as for this ledger for December, as of December 6th, 2022?

A.  I believe that the notice to quit had partial charges for January would be -- because I believe it was exactly $100 more.

Q.  Okay.

A.  Is that right?

Q.  Well, the notice to quit was sent in December.  So

Page 89

would you agree that it would not have January charges at least in December of 2022, that it would just --

A.  It certainly shouldn't have.  But it is incorrect, it doesn't match what was owed.

Q.  Okay.

A.  According to this document, 6323.83 is what was owed on December 6th, and we received that December 9th and those -- those values are different.

Q.  I agree -- I agree with you there.  I'm just, uh, I'm just letting -- the notice to quit amount was higher than this amount at this point in time by however amount; they just didn't match at that point, correct?

A.  That's correct.

Q.  Okay.  So would you agree that, looking at this ledger in front of you, that the next time -- that January 1st rent hits and that amount goes up 9822.83, according to this document, as of January 1st, 2023?

A.  According to this document.  There's an error.  So based on the error in the document, it does say January 1st, 2023 and a balance of $9,822.83.

Q.  Okay.  Now, I just want to ask you about what do you mean by "error in the document"?

A.  So the document, essentially, it's a ledger of all charges and credits that were placed on the account and the

23 (Pages 86 - 89)

Page 90

dates they were placed and amount total. And there's a running total on the far right.

Q. Yep.

A. The January 17th entry is incorrect in that it should say December 21st or 22nd. And the amount is correct $6,429.03. Therefore, the January 1st entry in this entry should not be $9,822.83. It would be that amount less $6,429.03.

Q. I get what you're saying. Okay. So we'll just take it a step back, and then I'll let you clarify that point.

Okay. So you believe, right, that this payment of $6,429.03, that this ledger is showing it was made on January 17th, 2023; correct?

A. That's what this ledger says, yes.

Q. Right. This ledger says that it was made on January 17, 2023 --

A. Yeah.

Q. -- and that after this payment was applied on, what it says is January 17th, 2023, it brought the amount owed on January 1st from 9822 and change to 3393 and change, correct?

A. It says that amount on January 17th, that that was the new --

Q. Correct.

A. -- amount owed, yes.

Q. Okay, all right. And you're taking issue and saying

Page 91

that this January 17th, 2023 payment by "Government Subsidy - Cordeiro charge," you believe it should have been reflected on the tenant -- er, on the ledger earlier, correct?

A. It should have been a credit on the ledger when it was cashed on December the 22nd.

Q. Okay. So if that was the case -- Actually, let me, uh, I'll withdraw that question for a second. I'm going to get into the RAFT issue in a moment. I'm going to let you explain that process of the check that you're talking about, and the cashing.

But at this point, according to the ledger where it says January 17th, 2023, at that point in time an eviction action had already been started against you and Kevin, correct?

A. By January 17th an eviction process had been started. I believe it was January 9th we received that --

Q. [Indecipherable.]

A. -- before 17th of January.

Q. Okay. And --

A. Or on the same day. It may have been on the same, same day actually.

Q. I'll pull up the housing court information that has it. It was just I wanted to see what your memory was, if you remember the eviction action happening between the time you got the notice to quit, the time that you're alleging that payment

Page 92

was cashed, and the time that this payment was eventually applied, like you said, there was an eviction action brought before this January 17th date, correct?

A. I believe we received the eviction notice, the summons, I -- the summons for the eviction, I believe. My recollection is we received it on January 17th and that it said it had been filed on the 16th of January.

Q. Okay.

A. That's my recollection. So I want to say we received it on the same -- on January 17th.

Q. Okay.

A. But it may have been a few days before that.

Q. Okay.

A. I'd have to check, but --

Q. Yep, no problem. We'll just -- I'm going to show you this. This is Defendant's 5.

(EXHIBIT 5 MARKED FOR IDENTIFICATION)

BY MR. AYVAZIAN:

Q. And do you recognize this document? And I'll go slowly down.

A. Because if you look at the top right, January 17th?

Q. Yep.

A. So it was filed on the same day that the government subsidy was applied.

Page 93

Q. And do you -- you do recognize this summons and complaint though?

A. Yes.

Q. Okay. And this is the "Summary Process (Eviction) Summons and Complaint" filed. It says, "To: Defendants Shaun Cordeiro; Kevin Matlack"; that's your apartment. Correct?

A. That's correct.

Q. And here it has that -- has an amount owed of 9,328.07 which you're disputing, correct?

A. This document says $9,328.07.

Q. Yep. And then on the bottom right it says that "service by" date, and I think you had mentioned the January 9th date. Do you remember being served with that --

A. So January 9th is --

Q. -- on January 9th?

A. So, can you scroll back up, please.

Q. Yep.

A. Can you scroll back?

COURT REPORTER: And if I can just remind everyone to speak one at a time. I know it's difficult on Zoom.

A. Sorry. Would you scroll all the way up?

Q. [Complies with request.]

A. "Date filed: January 17th." Okay. Could you scroll back down, please, to the bottom of this page?

24 (Pages 90 - 93)

Page 94

Q. [Complies with request.]

A. "Service by: January 9th." "Entry date by: January 16." I see that. I see that, uh-hmm. I believe we -- January 9th is my birthday so I feel like that was the day that Marvin left it at the door --

Q. Okay. So that --

A. On the door.

Q. -- that'd be January 6th, 2023?

A. No.

Q. No? Okay.

A. No. I believe it was the 9th.

Q. Okay. That's -- I just wanted to show this for the dates. So this summons and complaint was the start of the eviction action brought against you and Kevin by Greystar and the prior owners before The Eddy was purchased by Tishman, correct?

A. This is the eviction summons and complaint, yes.

Q. Okay. Yep, okay. And right here in the summons and complaint on the left-hand side it says "account annexed," and that's where it itemizes that ninety-- however they got to the 9300. Do you see that where it says --

A. I do see it.

Q. Okay. Looking back at that same document, making it a little bit bigger and moving on to page 2, do you see on the

Page 95

left-hand side it says "Fees For Service" and it lists --

A. I see it.

Q. -- an amount of items? And it list an amount --

COURT REPORTER: I'm sorry, can we make sure we talk one at a time? It's becoming kind of conversational, so -- so let Counsel get his full question out before you answer, please.

I'm sorry, can you repeat your question?

MR. AYVAZIAN: Yes.

BY MR. AYVAZIAN:

Q. Do you see on the left-hand side the fees of service listed with numerous entries to a total of $62?

A. Yes, I see that.

Q. On this particular page 2, it says "Defendant" up top "Shaun Cordeiro," correct?

A. I see that, yes.

Q. Okay. And then we move to the next page, it says "Defendant: Kevin Matlack"?

A. Yes.

Q. And then the same itemized fees for a total $62. Do you see that?

A. Yes. Yes.

Q. Is there anything unfair about these charges for $62 each that you are aware of?

A. A constable did not deliver this. This was delivered

Page 96

by Marvin. And it was not served by a constable, and it was left on our door. And the fees for service, according to this document, are for an officer to serve. The service fee $30, copy a dollar, travel, use of car, mailing; we were never served by a constable or an officer.

Q. Okay. And do you see here that this officer or constable, Samuel Desrosiers, checked off and signed that a copy of this summons was mailed first class to you and Kevin on January 6th, 2023?

A. I see a signature. I don't know if it is a constable, but I see that it says it is and a signature and the date you'd mentioned, yes.

Q. Okay. Do you remember ever receiving that first-class mail?

A. I don't.

Q. Okay.

A. I don't recall. I remember it being Marvin leaving it at the door.

Q. Okay. Now, we talked earlier about the RAFT issue. So at the time that the notice to quit is served in December, I believe you mentioned that you then took or needed the notice to quit to apply for rental assistance, correct?

A. We needed the notice to quit to have the application approved.

Page 97

Q. Okay.

A. So it was sent in. My recollection is that was, everything had been sent in from us, but we needed the notice to quit; they require it for it to be approved. As part of the application they ask for -- the application will say pending, and pieces that are -- that, uh, on our end that are -- that we need to upload. And for it to be fully approved, you need to have a notice to quit that they can see.

Q. Okay.

A. So does that make sense?

Q. Yes. And I'll clear it up. When did you start applying for that rental assistance?

A. The first time would have been, it was before the notice to quit. I don't have the exact date.

Q. Okay. So that, you applied for -- actually, I'll withdraw that.

What was the name of the rental assistance that you first applied for; was it RAFT?

A. RAFT, yes.

Q. Okay. And you applied to RAFT because at that point you had -- before getting the notice to quit -- because at that point you knew that you would not -- you were falling behind on rent; is that fair?

A. I believe we were already behind.

25 (Pages 94 - 97)

Page 98

Q. Okay. And --

A. Or knew that we were, yes.

Q. When you applied for RAFT, is it just you that applies, or do you and Kevin get placed on one application?

A. I applied, and then you list the person, if any, that live with you and provide their information as well.

Q. Okay. And do you have a copy of that first application that you submitted in December of 2022?

A. I'm not certain whether I do or not. They do. I may have saved it on another computer, but I am not certain that I have that copy.

Q. Okay. We may send just a request for you to search for that after today just to give you a heads up.

Okay. What sort of application materials are required for applying besides filling out the application itself?

A. I believe we had to submit a notice to quit -- I mean we did have to submit a notice to quit; I believe driver's licenses; and any other assistance that you were receiving; so MassHealth, uploading that, the card as evidence; and I believe a description of what was going on financially, why you -- why you needed it.

Q. Okay. Does anyone assist you while filling out this application or gathering the materials?

A. No one assisted me, but you can request assistance I

Page 99

believe. There's a -- they give you, when you apply online it's pretty self-explanatory, you can click on help and FAQs and such, so that is available.

Q. Okay. And did you have any attorneys assist you with your RAFT application?

A. No.

Q. Okay. And you requested RAFT assistance for that December 2022 amount outstanding?

A. Yes.

Q. Okay. And did you receive that full amount that you requested?

A. On December 16th, we received the approval letter, as to The Eddy, for the amount that you see listed that was listed as government subsidy payment. It's for that amount. And so we received that approval on December the 16th.

Q. Okay. So you get the approval award, correct?

A. Correct. There's an approval award letter and it goes into detail about what that means, that the check has already been sent. That same letter from RAFT is sent to The Eddy because they have -- the management there has, uh -- there's a portal, and so the same day that I received it, they received it. And it talks about what that means and, in terms of an eviction, and there's an explanation there of, you know, if you filed an eviction against this tenant already, if it includes

Page 100

any amount reimbursed by this check, uh, by award, you need to stop the process, dismiss the case; or if you're going to file an eviction against this tenant, you cannot include the amount that is being reimbursed by RAFT and it lists the amount. And that's -- so that's what we received on December 6th.

Q. Okay. And the sum of what the reward -- er, sorry, the award letter said you were going to be given, how does that get paid out?

A. So there are two ways. For us, I will say that it was a paper check, but it can also be ACH. And we received information about the bank account information late from property management at The Eddy. And we wanted to just submit this, and so ours, the first one, was sent as a paper check on December 16th.

Q. To who?

A. To The Eddy, to what the address provided by property management.

Q. Okay. And when did The Eddy let you know that they received that check?

A. January 17th.

Q. Okay. And between the time that you got that award letter and January 17th, what happened?

A. Could you be more specific what you mean --

Q. Sure. So you said that The Eddy received the check,

Page 101

correct?

A. Yes.

Q. Do you know when The Eddy received the check?

A. Yes.

Q. When did The Eddy receive that RAFT payment check?

A. Can I rephrase that? I know when they ca-- presented it at the bank. They cashed it. I know the date that they cashed it. So I can't say the exact date that it was received by them, but I know when it was cashed.

Q. Okay. When do you know that it was cashed?

A. The date I know, December 22nd. December 22nd. It may have been December 21st, so 21st or 22nd this gets --

Q. And --

A. -- but for certain December 21st or the 22nd.

Q. And how do you know that The Eddy received or cashed -- Sorry, I'll withdraw that.

How do you know that The Eddy cashed that RAFT check on either December 21st or December 22nd?

A. The firm that handles the processing of the checks, that send those checks out and deals with that end of it, the financial end of RAFT, which at the time was Nan McKay, and I was told by RAFT to contact Nan McKay, that they would have all the information related to the check. So I did. I e-mailed them. And they said that they could -- they said, I can tell

26 (Pages 98 - 101)

Page 102

you that the check was presented to the bank and cashed on December 22nd. And I had not asked -- I had not e-mailed to verify the date, I had e-mailed to say I believe this check was received before this date or cashed before this date, I just need to know what date was this cashed. And it was December 22nd. And that was the employee at Nan McKay, and there they issue those checks.

Q. Okay. So they told you at Nan McKay that the check was cashed by the GREP or Eddy entity in December of 2022?

A. Yes.

Q. Okay. And based on that information they told you, that's why you believe the cash was -- the check was cashed in December of 2022 as opposed to January of 2023; is that correct?

A. Partially. I, also, after receiving that spoke to Marvin directly and said: "The ledger says January 17th. We've been told it was December the 22nd. There seems to be a discrepancy there." I was speaking to him and he was on the other side of his desk, and he was looking at our ledger in the computer and said, "It is odd that it says January 17th because it was scanned in the office December 21st and Destinee's initials are there."

Q. Okay. And from your conversation with Marvin of what you learned about that, what do you believe happened?

A. I believe that the check was received. I believe it

Page 103

was cashed on December 22nd. And I believe that nearly every day that I e-mailed asking Destinee and Kayla, 75 percent of time I would say Destinee, had they received the check; and was told no over and over and over again all the way until January 17th when I e-mailed -- Because along this, during this time period, unfortunately, because it's a government payment, you have to wait 30 days to do a payment inquiry. And so I let them know on the 30th day I would be doing a payment inquiry and that RAFT had -- I and that -- the associates I spoke with at RAFT were concerned and didn't understand why the check had not been received and -- Because RAFT doesn't have the information at the time about the checks, as Nan McKay handled those. I didn't really understand that at that point.

And on the 30th day, I e-mailed Destinee and I said, "At 5:01 p.m. today, I am going to start this payment inquiry and find out exactly where this check went because they're going to trace it." And I believe it was about 51 minutes later she e-mailed me back and said, "Oh, I just found it and credited it to your account just now."

I believe that she received it. I believe that she lied to me the entire time. Again, that's my belief. And I believe that this process continued and the entire time she knew she had already deposited this check.

Q. And why do you think that Destinee would have lied

Page 104

about this?

A. I don't know.

Q. And do you believe that if the check that was received and cashed on December 21st or December 22nd, would that have zeroed out your balance at The Eddy?

A. I would have had a credit of a hundred-ish dollars.

Q. So the check would have overpaid the balance and you would have actually had more money in your account than zero?

A. I would have -- I had made a payment before, that we had just looked at, so it would have, yes, it would have been slightly above zero and I would have had to have a credit. I would have had a credit on my account, and going into January 1st, we would have owed less than one month's rent.

Q. Okay. And when did you figure out that -- or when did you receive the e-mail or communication from Nan McKay that the check was cashed in December of 2022 as opposed to January of 2023?

A. I don't remember.

Q. Okay. As you sit here today, how do you feel about what Destinee, I'll say "allegedly," did to you and Kevin with that RAFT check?

A. Painful.

Q. And because of the timing of when this check was applied to your account, do you believe that the eviction action

Page 105

brought against you was done unlawfully?

A. I'm not an attorney so I don't know. All I can say is that December 22nd, we were no longer, as of that date, we were no longer behind by any amount of rent, um, and January 1st we owed less than what our monthly charges were because we had a credit balance.

Q. Okay.

A. So that's all I can say. I don't know.

Q. Okay. After this first RAFT application, did you apply to RAFT at any other times?

A. Six times.

Q. Okay. And how was the process of getting the checks and ca-- and then being cashed and applied to your account with those?

A. It was miserable. The -- Let's see. We applied with RAFT the second time during this process immediately after January 1st, so I believe like before the eviction summons. You can verify those dates. I sent it over. I -- but to my recollection, I can't remember exactly, but it was January. And we submitted everything we needed to submit. It must have been immediately after or having received that eviction summons because I remember uploading it. It may have been later part of the same application, but it was the first application immediately after.

27 (Pages 102 - 105)

Page 106

And one of the applications timed out because the landlord failed to upload a document. Which in one of the cases was a business card. And so you have a certain period of time. And from multiple e-mails, I sent multiple e-mails, and that was not done, so that was pulled, timed out.

And then a second time the bank account information wasn't uploaded by the landlord. That application timed out as well. We had submitted everything we needed to and were simply waiting for that.

And the third time, Kayla pulled our RAFT application and told RAFT that -- this is according to RAFT -- that we had received RAFT, we had already received the RAFT funding. And that application was pulled.

Every time it stretched this time longer and longer. Weeks of waiting, resubmitting. Weeks of waiting, resubmitting over and over five more times after the initial first one we had just discussed. All of those, all of them, were pulled or timed out because the landlord failed to submit documentation that they needed to submit for the approval, for the final approval. Because we had already been approved for RAFT up to $10,000, so we were just waiting for that. And at the end, I got to the point where I was -- Kayla had left -- I was going downstairs and sitting with Marvin to make certain these things were getting done, and to catch him up on what had been going on and

Page 107

its process and how important this was and how I didn't understand why they had not done their part, that this all would have ended. And he was very kind. He walked into what I would consider a bit of a storm, and daily almost, we spoke, e-mailed, or I went down there and sat with him. And he got it all done. And they received the check right after that final attempt. And I want to say it went from January until May, five additional applications.

Q. And how did that make you feel?

A. Just the stress was incredible, overwhelming, frustration. Emotionally, it was horrendous to know that this could have been avoided. In terms of "avoided," I mean the emotional toll that it put on us that didn't have to happen. And so that was, um, that was difficult for me and it became almost a part-time job.

Q. And do you believe that all those times timing out and the reasons for why the applications were not getting processed was intentional?

A. I don't know.

Q. Is that what you believe?

A. I don't know. I go back and forth. I don't know. I think, was it a total incompetence? or was it a purposeful action [ph.]. I go back and forth. So I don't -- I don't know for certain.

Page 108

Q. Okay. Going back a little bit. So the funds that you get from RAFT, do you have to pay those back?

A. No.

Q. Okay. And how much do you think that you received in RAFT payments since that first application?

A. The maximum you're allowed to receive is $10,000.

Q. In total or per year?

A. In total.

Q. Okay, okay.

A. It may be per year, a 12-month period. There may be a -- I believe there is a period between, you know, you can only receive this amount in 12 months. Maybe I -- Don't quote me, I can't be a hundred percent certain, but there is a limit of the difference between that first RAFT payment and I -- I really believe $10,000, whatever that difference was, you'll see reflected on the ledger, and that was that maximum amount that we were permitted during that period.

Q. Okay --

A. Or all --

Q. Or it all, okay. Now having -- now that we've spoken about the ledger and the RAFT and then the eventual application of that RAFT check to your ledger, which it said was January 17th, 2023, your eviction action was brought based on the outstanding rent plus that January rent, correct?

Page 109

A. I suppose. I mean, the eviction summons had that, that total, so I don't know what the reasons per se were, but I know that that's what that piece of paper said.

Q. Okay. So let's just go back to the eviction action now. We left off with talking about the summons and complaint being served on you and Kevin by Marvin leaving it at the door and a housing court eviction case beginning, correct?

A. Correct.

Q. Okay. And you understand that even in this federal case, that attorneys -- your attorneys filed a complaint in this action, right?

A. Yes.

Q. And that it costs money to file a complaint in court, correct?

A. Yes. There's a filing fee I believe.

Q. Yeah. And it also costs money for an attorney to draft a complaint. Would you agree?

A. I would agree that most attorneys, besides pro bono work, would charge a fee.

Q. And in the same relation, you'd agree that attorneys, outside of pro bono, would expect to be compensated for their work on a case; is that fair?

A. I would venture to guess they would.

Q. And there is different types of fee arrangements with

28 (Pages 106 - 109)

Page 110

attorneys. Would you agree with that?

A. I'm not certain.

Q. Okay. So there's flat rates. Do you know what that is?

A. I know what a flat rate is. I don't know how attorneys charge or what they charge for these types of things. I have no idea.

Q. Okay. I'll just ask anyway just to make the record clear. Do you know what a contingency fee is?

A. I believe that I do.

Q. And there's also, outside of a flat rate or a contingency fee, attorneys may work for an hourly rate; is that fair?

A. Yes.

Q. Okay. As a general matter, would it be unfair for attorneys to seek payment for their work on a case?

A. I don't know.

Q. Would it be unfair for attorneys to seek reimbursement for out-of-pocket expenses that they had to incur for a client?

A. I don't know.

Q. Okay. We'll take a look at, I believe this is Defendant's 6, and this is going to be the housing court docket. And this was attached as Exhibit 6 to your amended complaint.

A. Let me...

Page 111

(EXHIBIT 6 MARKED FOR IDENTIFICATION)

BY MR. AYVAZIAN:

Q. Do you recognize this?

A. [Pause.] Yes, that looks -- yes.

Q. Okay. And I'll just scroll down slowly. So this is, you would agree that this is the eviction docket sheet, and it has the entries and docket dates for each of the items that happened in this case; is that correct?

A. Yes. Yes.

Q. Okay. And there's numerous events on this docket, correct?

A. I see more than one event, yes.

Q. Okay. So, for example, there is on March 23rd, 2023, it says that a housing specialist status conference was held, correct?

A. Yes.

Q. And do you remember that event?

A. I do remember some of that event.

Q. Was that the mediation that occurred in this case?

A. I don't know that it was called mediation. I believe that was a Zoom meeting and there was a housing specialist also on the call.

Q. Okay. And do you remember if anyone for the plaintiffs in this case appeared? "Plaintiffs" meaning Greystar

Page 112

or The Eddy.

A. Yes.

Q. Okay. Was it their attorney?

A. I believe so.

Q. Do you remember the name of that attorney?

A. I do not.

Q. Okay. And do you have any reason to believe that the attorney for Greystar and The Eddy should not have been paid for their work associated with all of these entries?

A. [Indecipherable.]

COURT REPORTER: Did you say, "I don't know"?

A. I don't know. I'm sorry. Yes, I said "I don't know."

Q. No worries. And according to this eviction docket, you filed motions to continue, correct?

A. That's correct.

Q. And you also filed a motion to file a late answer and counterclaims. Do you remember that?

A. Yes.

(EXHIBIT 7 MARKED FOR IDENTIFICATION)

BY MR. AYVAZIAN:

Q. Okay. And I'm now showing you Defendant's 7. Is this that motion to file answer late and counterclaims that we just referenced?

A. Can you just stop scrolling for a second?

Page 113

Q. [Complies with request.]

A. Yes, that appears to be, yep.

Q. Okay. And who helped you prepare this document?

A. No one.

Q. And did you draft it, or did Kevin draft it?

A. I did.

Q. And up until this point, had you sought any legal assistance for your eviction case?

A. Yes.

Q. And who was that with?

A. I don't recall.

Q. Would you say it was a law firm or a personal friend?

A. It was an attorney. I found some attorneys online and called a few.

Q. And what did that attorney advise you when you contacted them?

A. Well, they didn't advise me. They let me know how much they would charge.

Q. Okay. And were there any e-mail communications with these attorneys?

A. I don't recall. I do remember making phone calls. I don't know if there were e-mails as well.

Q. Okay. So scrolling through this motion to file late answer and counterclaims, this states on the top right, "Summary

29 (Pages 110 - 113)

Page 114

process answer with counterclaims with jury trial request." Correct?

A. Correct.

Q. And it lists under "facts," your name, the apartment and unit, your rent; correct?

A. Correct. This is a -- this is a template from like Mass Legal Aid. I found it online. Mass Legal Aid or something like that.

Q. Okay. That was what I was going to ask is where did you begin with drafting this document?

A. From that website, um, it's, uh -- I can't -- I believe it's Mass Legal Aid or Mass Legal Help. It provides a number of documents and some explanation of the process itself. So I -- that was the only resource that I -- that I had.

Q. Okay. And, for example, it states right off the bat: "Defense - Tenancy Not Properly Terminated and/or Case Not Properly Brought." Correct?

A. Correct.

Q. And we can scroll down and it lists as a violation of a security deposit law, correct?

A. Correct.

Q. And is this what you alleged -- alluded to earlier about the lease for Apartment 1313 and then 1010?

A. That is part of what is stated in number 11 in that

Page 115

document.

Q. Okay. And then beneath that we have "defense and counterclaim" listed for "violation of consumer protection law." Correct?

A. That's correct, yes.

Q. And then in this one you specifically refer to Mass. Gen. Law 239 and/or Chapter 93A, correct?

A. That's what it says.

Q. Okay. And you were, when you filed this document, you were asserting, as it says here "defense and counterclaim" for Chapter 93A; is that fair?

A. It says that, yes.

Q. And then it says, paragraph 12: "Each of the acts stated in this Answer/Counterclaims was unfair and/or deceptive." Is that the first line?

A. That is the first line, yes.

Q. Okay. And then for 13 it says, "Landlord acted in the following additional unfair or deceptive ways:" 13(b) states, "The landlord charged me constable or court fees unlawfully." Correct?

A. Correct.

Q. And did -- Where did you come up with this counterclaim for Chapter 93A to include in this document?

A. The research that I did on that site. And, uh, it had

Page 116

the, uh -- sorry, I'm tired -- it had the statutes, and it sort of went through and: Does this apply? Yes. Okay, well, here's the information. And this template was sort of already pre-- would sort of pre-populate some of this information based on your responses to these questions online. And I was directed, I remember being directed to this specific statute and reviewed it, read it. And between -- it's been a long time, but between that, the resources template, that's how I arrived here.

Q. Got it. And you'd agree that this Chapter 93A counterclaim here is the claim that you're bringing in this case?

A. I would not say -- No, it isn't. Those aren't exactly the same, no.

Q. Okay. The 13(b) of charging constable or court fees unlawfully, how is that different from what you're bringing this place based on -- this "case" based on?

MR. DUNN: Objection.

Q. You can answer.

A. So you asked if this counterclaim, that counterclaim, number 13 specifically states: "The landlord acted in the following additional unfair or deceptive ways," and there are two listed, A and B, and so that claim was based on both A and B.

Q. Okay. How about just B, focusing on B, is that --

Page 117

would you say that 13(b) is the same claim brought in this case?

MR. DUNN: Objection.

A. I would not say it's exactly the same, no.

Q. And how would it be different?

A. I think that it doesn't have legal fees. 13(b) just says constable or court fees, it doesn't have legal fees, attorney's fees listed there. And it is only talking about me. This case not about me and Kevin, this case is about me and Kevin and all of the other people that were charged attorney's fees and legal fees for -- it was ordered by a court, so they're different.

Q. Okay. And you'd agree that the 13(a) is not being brought in this case, correct?

A. I agree, correct.

Q. Now, why did you choose not to bring any of the counterclaims from this housing court case in this case?

A. I'm not sure I understand what you're asking me.

Q. Well, you'd agree that this counterclaim and defense document you filed lists violations of security deposit law and multiple unfair and deceptive ways to violate Chapter 93A, correct?

A. Correct.

Q. Why did you not bring the additional claims you raise in this housing court filing in this case?

30 (Pages 114 - 117)

Page 118

MR. DUNN: Objection.

A. I wanted to focus on, um, there were so many different things that I thought this would conflate everything, and so I wanted to start here. And I have not ruled out other actions. I can say for this, this was the focus.

Q. Okay. So you say you have not ruled out further actions. Do you mean further action against Greystar or The Eddy?

A. Correct.

Q. Are you -- Have you spoken with anyone about bringing additional claims against Greystar or The Eddy?

A. I have spoken to my attorneys and mentioned these issues and -- but I have not started anything or have a specific plan to or when or how. However, I am not throwing this information away that's -- that has happened, these things that have happened. I don't know if that makes sense.

Q. Okay. Okay. One second. [Pause.] One moment, sorry.

THE WITNESS: So is it burdensome to take an hourly 10-minute break, or --

MR. AYVAZIAN: Um --

THE WITNESS: -- that to break? Or are we almost done?

MR. AYVAZIAN: We are not almost done. We could take

Page 119

a break. If we wanted to have a little bit longer of a break, I think now would be the time; or we can go a little bit further and take a little bit longer of a break? If there's no problem, I can start again right now.

THE WITNESS: For me, I'd rather -- I mean, I would prefer taking short breaks multiple times than taking a long break at all.

MR. AYVAZIAN: That's fine. Yep, I agree. Okay. Do you need a break right now or can I continue?

THE WITNESS: So, does everyone mind if we -- just 10 minutes and kind of maybe do that every hour, just 10 minutes?

MR. AYVAZIAN: Sure.

THE WITNESS: As opposed to I don't need a long break of any kind.

MR. AYVAZIAN: Okay. Let's take a break until 1:45.

THE WITNESS: Okay --

VIDEOGRAPHER: All right, this ends Media Unit No. 4. We are going off the record at the 1:36 p.m. And we are off the record.

(WHEREUPON, a break was taken from 1:36 p.m. to 1:46 p.m.)

VIDEOGRAPHER: This begins Media Unit No. 5. We are back on the record at the time of 1:46 p.m. You may begin.

BY MR. AYVAZIAN:

Q. Okay, Mr. Cordeiro, last we left off we talked a

Page 120

little bit about that motion for late file -- uh, late answer and counterclaims that you had filed in the housing court eviction action, correct?

A. Correct.

Q. Okay. And in that eviction action, do you recall any of the attorneys' names for Greystar or GREP and The Eddy that were brought up?

A. Yes.

Q. And who were that?

A. Nechev.

Q. Nechev?

A. Yes.

Q. And that's N-E-C-H-E-V, for the record?

A. Yes.

Q. And that's Vladimir, correct?

A. Correct.

Q. Okay. And going back to those, um, that eviction case and with Vlad. I'm going to show you what's going to be marked as Defendant's 8.

(EXHIBIT 8 MARKED FOR IDENTIFICATION)

BY MR. AYVAZIAN:

Q. Okay, do you see my screen now?

A. Yes.

Q. Okay. And this, for the record, is Bates stamped

Page 121

Plaintiff's 417 and 418. Do you recognize what's been marked as Defendant's 8?

A. Yes.

Q. And these are e-mails between you and Vlad Nechev, correct?

A. Correct.

Q. And this is dated May 19th, 2023; correct?

A. Correct.

Q. Okay. So in this first e-mail with the time stamp of 6:46 a.m., you e-mail Vlad and you list two eviction, slash, recovery fees charged on your ledger; is that correct?

A. Correct.

Q. And you note that together these two charges, as they appeared on your ledger, total $652, right?

A. Correct.

Q. Okay. And the first one you list is March 20th, 2023 $477, right?

A. Yes.

Q. And then the next charge, May 1st, 2023, 175; correct?

A. Yes.

Q. And with the eviction action being filed in January and you sending this e-mail on May 19th, these charges added to your ledger occurred while the eviction case was pending; is that correct?

31 (Pages 118 - 121)

Page 122

A.   Correct.

Q.   All right.  And I'll give you a chance to read this top e-mail.  But would you agree that in this e-mail, after you list these two charges and mentioned that you paid these charges, you tell Vlad to ignore the counterclaims that you filed; is that correct?

A.   [Reviews document.]  Would you repeat the question, please?

Q.   Sure.  Do you agree that in this e-mail it states that you paid the $652 in charges?

A.   No.

Q.   That second paragraph when it says "everything has been paid in cash," is that not going to the fees?

A.   No.

Q.   Okay.  In the last paragraph of that e-mail, does it state for Vlad to please file the motion to dismiss and then ignore the e-mails you received for filings that you submitted?

A.   It says that.

Q.   Okay.  And then in the subsequent e-mail, Vlad responds to you and says he's going to confirm with his client about -- sorry, he says he's going to confirm with his client and get back to you; is that correct?

A.   Yes.

Q.   And he's confirming with his client about dismissing

Page 123

the eviction lawsuit; is that correct?

A.   I don't know.

Q.   Okay.  Looking at the e-mail chain at the top with the subject matter "Motion to Dismiss - Fully Paid"; that's what it states, right?

A.   It says that, yes.

Q.   Okay.  And in that last paragraph, "Please file the motion to dismiss tomorrow morning"; you write that, correct?

A.   Yes.

Q.   And then that's where Vlad says, "I will confirm with my client and get back to you"?

A.   Yes.

Q.   And in the e-mail, the last e-mail that you sent to Vlad you said: "I'm so ready for this mess to end.  I don't think I can handle another sleepless night."  Is that correct?

A.   I'm not sure that was the last e-mail I sent him.  But in this, what you're showing me, I said that.  I don't know if that was -- I don't believe that was the final e-mail I sent to him.

Q.   I agree with you.  I'm not saying the last time you ever communicated, just the last e-mail on this exhibit?

A.   That is the last e-mail on that exhibit, yes.

Q.   What did you mean by "the mess" in that line "I'm so ready for the mess to end"?

Page 124

A.   The eviction proceedings.

Q.   Okay.  And would you agree that at no point did Vlad say you had to pay those legal fees that totaled $652 for the eviction case to end?

A.   Are you referring directly in these documents?  In the documents that are put in front of --

Q.   We'll start in this document.

A.   In document number one, I e-mail him.

Q.   Yeah, I'm sorry, in this exhibit.  In this exhibit, we'll start, did Vlad ever say that you needed to pay the $652 for the eviction case to end?

A.   He does not state that in this exhibit.

Q.   Do you remember him ever stating that?

A.   Yes.  In subsequent e-mails he did.

Q.   And what do you believe he said spec-- he said about paying those fees for the eviction case to end?

A.   He said, um, in an e-mail to me, he said that he had -- he was referring to our time meeting outside the courtroom, and changed everything he said.  And in that e-mail, said that his client had spent, something about had spent money on legal fees, and I told you that they're -- my recollection is they're entitled to collect on those fees but would have to do so at a different time or a different action.  Something like that.

Page 125

Q.   Okay.  So based on that e-mail, if he said that they had to collect it in a different action, that would not mean the eviction case had to continue until you paid those fees, correct, just that it would have to be in a separate action?

A.   That's not right.

Q.   Sorry, what was that?

A.   No, that's not right.

Q.   Okay.  So is it your belief that you had to pay the eviction fees -- sorry, the fees related to the eviction legal recovery in order for your eviction case to end?

A.   Yes.

Q.   Okay.  And you're stating that Vlad told you that?

A.   I am stating that Marvin told me that Vladimir refused.  That he spoke with him and Vladimir had refused to remove those eviction fees, and therefore, the action wouldn't be voluntarily dismissed and he was unable to zero out my balance.  And I had been told repeatedly that if your balance does not hit zero dollars, the eviction process will continue; and it does not, that clock does not start over and stop this process until it is at zero.  With this, my account was at $652.  It was not at zero.

Q.   Okay.  And when -- Vlad did eventually file a motion -- er, sorry -- did file a voluntary dismissal of this case, your eviction case, correct?

Veritext Legal Solutions

800-726-7007                                                    305-376-8800

Page 126

A. After I paid those fees, correct.

Q. After you paid those fees, okay. And at the time -- Well, we'll take a look back at Exhibit 7 here. This housing court docket shows, right, on May 23rd, 2023, it says "R41(a)(1) Voluntary Dismissal." Correct?

A. Correct.

Q. And then above that or I guess in the middle it says: "For the following reason: Plaintiff's request." Correct?

A. Correct.

Q. Okay. So at that time the $652 was paid, correct?

A. Correct.

Q. Okay. And I'll come back to what these 477 and 175 are for in a moment. But at the time that Vlad filed that dismissal, the eviction case was over, correct?

A. Correct. I believe so.

Q. Okay. So we're going to focus now on the charges that were added to your ledger regarding the fees and costs of the eviction. Okay?

A. Okay.

Q. Going back to your ledger. Which let me share that screen real quick. And this is marked GREP 314. Do you see towards the bottom of the page, the charge labeled on March 20th, 2023? I think it's the fourth one up. It says charge, in the fourth column "CH Eviction" and then "Eviction/Legal

Page 127

Recovery - Cordeiro" and then "477." Do you see that?

A. I see that, yes.

Q. Okay. And again I just mentioned it, but when do you see that this charge was added?

A. I see that that document states that it was added March 20th, 2023.

Q. Okay. And that, so that charge was added during the eviction case, correct?

A. Correct.

Q. And did you ever raise this charge on your ledger to the eviction case judge?

A. We did not present the case to the eviction judge.

Q. Okay. Did you ever raise this charge of the 477 on March 20th, 2023 to the housing specialist?

A. I don't remember.

Q. Okay. Do you remember raising it to anyone during this eviction besides Vlad--

A. It's in the counter-- It's in the counterclaim.

Q. Okay. So when we talked about the constable and fees, is that what you were referring to, this 477 charge?

A. I don't recall if I was -- I don't recall. It does says court fees, so I don't remember all of what I was thinking of at that time. I can't recall.

Q. Okay. No, I understand that. Okay. And then on the

Page 128

next page at 315 here, do you see the entry on May 1st, 2023? Again, "CH Eviction" and then "Eviction/Legal Recovery - Cordeiro." "175." Do you see that?

A. Yes.

Q. Okay. Did you ever raise this charge to the housing specialist?

A. I don't recall.

Q. Do you think that this, was this charge as a part of your counterclaims?

MR. DUNN: Objection.

A. I don't recall.

Q. Okay. Now, there was a third charge, right, for $175 that was charged to you at some point. Do you remember that?

A. Yes.

Q. And you disputed that charge with Marvin, correct?

A. I disputed all of the charges with Marvin. But when I saw that charge, that was when I sent an e-mail to Marvin, and in that e-mail disputed that and the other charges.

Q. Got it. Because the first two charges were brought, were put on the ledger during the eviction case, correct?

A. I believe so.

Q. And the third charge, that third 175 was brought after the eviction case had already been dismissed, correct?

A. Correct, yes.

Page 129

Q. Okay. And that third charge for the 175, that was subsequently removed from your ledger, correct?

A. I believe it was credited.

Q. Okay. Credited, removed, that charge was not paid by you?

A. I don't know if it was removed before or after I paid it.

Q. Okay --

A. I paid whatever I was paying at the time. I don't recall.

Q. Okay, got it. Outside of those three charges that landed on your ledger, do you recall any other charges for eviction or legal recovery that was added to your ledger, or was it just those three?

A. I think it was just, it was three. I don't recall if there were anymore after that.

Q. Okay. So that would be, if it was just those three, that would be $477 that we just looked at right at the bottom here on the, uh, four lines up. The 175 that was added on May 1st and then the 175 that was added after the eviction case got dismissed, correct?

A. That appears correct, yes.

Q. And adding that up, and you're probably a better mathematician than me with your degree, but that would be $827

33 (Pages 126 - 129)

Page 130

of fees that were added to the ledger at some point? Not counting whether it was -- one of them was reversed or credited, but that would be added, 827; is that fair?

A. Yes.

Q. And then with the 175 that was credited, that would mean $652, which is that same amount we saw in the e-mail to Vlad, of being added to your ledger for which a payment was made, correct?

A. [No verbal response heard.]

Q. Are you with me?

A. I said correct. I'm sorry, it must have cut out.

Q. Oh, okay. All right. So now looking at your ledger on December 31st of 2023, there's a legal fee credit for $490; is that correct?

A. That's what the document says.

Q. Okay. So doing the math, $652 minus $490 is $162; is it fair to say?

A. That is fair to say.

Q. Okay. And do you understand as you sit here today that the $162 represents the court costs for bringing the summary eviction action that was billed to Greystar and The Eddy?

A. No.

Q. Okay. Do you understand that that 162 is made up of

Page 131

$5 for the summons, $135 for the filing fee, and $22 for the e-filing fee?

A. No.

Q. Okay. So at this -- I'll take a step back. So with the $652 and then being credited 490, would you agree that at that point all of the attorney's fees charges were either removed or credited to your account, and that all that was left was the court costs for the eviction action, if they do add up to be $162?

A. No.

Q. No? What do you disagree about that?

A. I don't know what portion of that -- I don't know what portion of that goes to attorneys and goes to the court. I don't have any information. I was not given invoices.

Q. Okay. Well, let's talk about the invoices. When did you first become aware of that first assessment of the legal fee/attorney fee being added to your ledger?

A. I don't remember.

Q. Do you remember, it was before you filed the counterclaim, correct?

A. I don't recall.

Q. Okay. When did you first -- So, okay. When did you before -- Sorry, I'm going to take a step back.

You sent that e-mail to Vlad while the eviction case

Page 132

was pending, and you listed that $477 charge in the e-mail. Remember?

A. Yes.

Q. Okay. So at some point during the eviction action you learned of that charge?

A. At some point, yes.

Q. Right. Okay. Do you remember how you first learned of that charge? Was it by reviewing your ledger? Was it by Kevin telling you? Something else?

A. I believe reviewing the ledger.

Q. Okay. And what did you do after you saw that amount on your ledger?

A. I don't recall exactly what I did after that.

Q. Okay. Do you remember contacting anyone initially?

A. Uh, I'm sorry, I apologize. I did contact the attorney general's office.

Q. Okay. So you contacted the attorney general's office while your eviction case was pending?

A. I believe so. I can't be a hundred percent certain, but I remember contacting the attorney general's office. I don't remember the dates. It was before this action was filed because I -- but that's all I can --

Q. Okay. Did you request the invoice when you first learned or saw that $477 on your ledger?

Page 133

A. I requested invoices for all the charges more than once, but I don't remember the exact time or exactly when I did.

Q. Okay. Do you remember contacting anyone at The Eddy about this, specifically this $477 charge?

A. I don't know for certain that specific charge.

Q. Okay.

A. I'll say that I did contact people at The Eddy, management at The Eddy multiple times about the charge, about all of the charges as well, I enlisted them, but I don't remember when that happened exactly.

Q. Okay. What was your understanding at the time you saw the charge for why that $477 was assessed?

A. My understanding -- I don't -- I don't remember. I remember discussing it in housing court, and my assumption was if you pay this off, that rent that you owe, then you won't be evicted so you don't have to pay these fees.

And that would have been right before that when we went to housing court, like when I filed the counterclaim, and then when I spoke to Vladimir who told me I would not have to pay these fees because they would be voluntarily dismissing them. I'm not sure if you're talking about the period right after I saw the charge? I don't remember. But that's what I do remember.

Q. Okay. What is your understanding now of why the 477

34 (Pages 130 - 133)

Page 134

was charged, specifically that charge?

A. I don't know.

Q. Okay. Did you ever see the invoice for the 477?

A. No.

(EXHIBIT 9 MARKED FOR IDENTIFICATION)

BY MR. AYVAZIAN:

Q. Okay. We'll take a look at that invoice. This will be Defendant's 9, I believe, unless the Madame Court Reporter yells at me. Do you see my screen?

A. Not yet. It doesn't say anything has been shared with me.

Q. Okay.

A. I see what appears to be an invoice.

Q. Okay. Do you see the law firm's name on the top left corner, Scolnick, Laverty and Gouveia, LLP?

A. I do.

Q. Do you recognize that law firm as being the eviction firm?

A. Yes.

Q. Okay. And do you see, as we move down, it says "customer" in that middle table, Customer: Greystar or The Eddy. Do you see that?

A. Yes.

Q. Okay. And then on the left-hand side of the invoice,

Page 135

we have invoice number 35954 and invoice date of March 8th, 2023. Do you see that?

A. I do.

Q. Okay. And as we move further down, we see here a breakdown of a number, a quantity, SKU, description. And in the description box, do you see "Eviction Matter vs. Shaun Cordeiro" as the main description at the top?

A. I do.

Q. Okay. And then for the total amount, the grand total on the bottom, do you see 477?

A. I do.

Q. Would it be fair to characterize this invoice as a bill?

A. I don't know.

Q. Okay --

A. It looks like a bill to me, but I don't -- I'm not certain that it is.

Q. Okay. And it shows here the invoi-- in the invoice, details in the "description." It describes certain acts that were done such as: consultation of client, review of ledger card, review of notice to quit, preparation of court filing: summary process summons and complaint, preparation and e-filing of affidavit of compliance. Do you see that that?

A. I do.

Page 136

Q. And them, um --

A. It says zero.

Q. Right, correct. And then remember earlier we discussed the $162 that remained after you -- after that $490 credit was applied?

A. Yes.

Q. Okay. And do you see here the expense: $5 summons fee; expense: $135 for filing fees; and then $22 for e-filing fee. Do you see that?

A. Yes.

Q. Would you agree that those three added up equals 162?

A. Yes.

Q. Okay. And then beneath that it has just billable hours, $140; correct?

A. Yes. It said --

Q. And then --

A. Yes.

Q. -- that on the left-hand side near the second column it says 2.25 for quantity. So 2.25 --

A. Yes.

Q. -- times 140 equals 315 on this invoice?

A. Yes.

Q. Okay. And would you agree that this invoice, the 477 is what was eventually passed back to you and added to your

Page 137

ledger?

A. I don't know that.

Q. Okay. Do you believe that the amount of legal fees charged in this invoice was reasonable for the work performed?

A. I have no way of knowing that, calculating that.

Q. Okay. If a court had ordered you to pay this 477, would you have paid it?

A. If a judge had ordered me to pay it?

Q. Yes.

A. I would have to pay it. I wouldn't have a choice.

Q. Okay. Now, the second charge that we discussed earlier, the 175, do you remember when you became aware of that?

A. Do you mean the charge in August?

Q. No. The one in May of 2023 while the eviction case was pending?

A. I don't recall when.

Q. Did you contact anyone about that charge?

A. The attorney general's office, I believe.

Q. Okay. Do you remember if you specifically requested this invoice or information about that charge from The Eddy?

A. Yes, I did.

Q. Okay. Do you know if you got a response?

A. I was ignored several times. Eventually, my -- they responded with what appeared to be a screenshot of a partial

35 (Pages 134 - 137)

Page 138

Excel spreadsheet. A few cells that vaguely said "legal eviction - 175" or something like that.

Q. Okay.

A. And it appeared to be a screenshot of part of an Excel spreadsheet. It was not an invoice.

Q. Okay. I'll show you now this, uh, this invoice. Again, do you see at the top the law firm Scolnick, Laverty & Gouveia?

A. Yes.

Q. And same, Customer: Greystar or The Eddy. Correct?

A. Correct.

Q. And this invoice is now dated April 14th, 2023, Invoice 37625, and in the description it says "In Reference to: Eviction Matter versus Shaun Cordeiro." Correct?

A. Correct.

Q. And in this description it has additional information reflected such as "appearance at hearing on March 23rd, 2023." Correct?

A. Correct.

Q. And then courthouse mediation with opposing party, conference with housing specialist - continued pending RAFT. Do you see that that?

A. I see that.

Q. Okay. And the billable hours, as you see, 1.25 in

Page 139

quantity and the price 140 resulting in a charge of 175. Do you see that line?

A. I see it.

Q. And then the grand total of this invoice is for $175, correct?

A. Right.

Q. So anything unusual in this bill that pops out to you?

A. I don't know what would be usual or unusual about it --

Q. Okay.

A. -- about this. I don't know how it's -- but I don't know what is typical and what is not typical.

Q. Okay. And would you agree that this $175 amount is what was billed back to you on May 1st, 2023 for that $175?

A. I don't know. I know that I was charged $175. I don't know that it's this.

Q. Okay. There was the char-- the second charge that you referred to in your e-mail to Vlad, correct?

A. I think so.

Q. Okay. And at the time that this charge was placed on your ledger and when you observed it to be on your ledger, do you remember reviewing your lease to identify any provisions which discussed the assessment of attorney's fees to you?

A. I don't know.

Page 140

Q. Okay. When you first realized these charges were on your ledger, did you ever refer back to your lease?

A. Yes, I believe so.

Q. And do you remember when you did that, was it after the eviction case?

A. I don't remember exactly when that happened.

MR. AYVAZIAN: Okay. Now, I don't know if I marked this, this was marked as Defendant's 10.

COURT REPORTER: You have not marked it yet.

MR. AYVAZIAN: Okay. If we can mark this as Defendant's 10.

(EXHIBIT 10 MARKED FOR IDENTIFICATION)

MR. DUNN: Ara, real quick then, did it have a GREP number on it, a production number?

MR. AYVAZIAN: We produced these last week so don't -- I didn't pull up the ones we produced. Do you want me to -- It's on the drive that we shared in an e-mailed to you all.

MR. DUNN: Okay, thanks. I just didn't know if it had a number on it.

MR. AYVAZIAN: No. But I can probably get that for you really quick. [Pause.] This was GREP 8114 through GREP 8117 is what we produced last week.

MR. DUNN: Okay, thank you.

MR. AYVAZIAN: Yep.

Page 141

(EXHIBIT 11 MARKED FOR IDENTIFICATION)

BY MR. AYVAZIAN:

Q. Okay, so I'm now showing you this invoice that's dated August 9th, 2023. Do you see this?

A. I see it.

Q. And we'll mark this as Defendant's 11. Do you see that this invoice to, how it says Customer: Greystar and The Eddy; and then the eviction matter, "Eviction Matter vs. Shaun Cordeiro" for a total of $140. Do you see this?

A. I do see it.

Q. Do you agree that your ledger never included an invoice charge for $140?

A. I don't know.

Q. Okay. Would you agree that this invoice states that it was prepared for the "preparation and filing of the notice of voluntary dismissal" in your case?

A. I see it says that.

Q. Okay. Are you aware that Greystar/The Eddy was billed by the law firm for $140 for doing that?

A. I don't know.

Q. Okay. Do you know -- Actually, I'll withdraw that question. And I'll mark this as Defendant's Exhibit 12.

(EXHIBIT 12 MARKED FOR IDENTIFICATION)

36 (Pages 138 - 141)

Page 142

BY MR. AYVAZIAN:

Q. And this is an invoice dated August 22nd, 2023 from the law firm Scolnick, Laverty & Gouveia to Greystar and The Eddy for 175. Do you see that?

A. I see it.

Q. And this is the invoice that you disputed with Marvin, correct?

A. I don't know. I disputed the charge of 175. I never seen an invoice to dispute.

Q. Okay. This would be the second 175 invoice shown to you, correct?

A. Today?

Q. Yes.

A. Yes.

Q. And this date is after the eviction case ended, correct?

A. I think it says August 22nd, 2023.

Q. Yes, you're right. You're correct.

A. And if that's what it says, then yes.

Q. Is that better?

A. Yes.

Q. Okay. August 22nd, 2023 is the invoice date, correct.

A. Yes.

Q. Do you know if this charge was the one that was

Page 143

removed as a courtesy?

A. I don't know.

Q. Okay. I'll mark this as Defendant's Exhibit 13.

(EXHIBIT 13 MARKED FOR IDENTIFICATION)

BY MR. AYVAZIAN:

Q. This is Bates stamped Plaintiff's 227 through Plaintiff's 229. Do you recognize this e-mail that you sent to Marvin on Friday, August 25th, 2023?

A. Yes.

Q. And if you'll recall, when you wrote this e-mail to Marvin, what prompted you to contact Martin about legal fees in this case? And I'll give you a chance to read it if you need to.

A. Yes. [Reviews document.] This was the first e-mail I sent on Friday, August 25th. Yes, I wrote that.

Q. Okay. And as we scroll down, Marvin eventually provides -- responds and provides you with the invoice you're asking about, correct, on August 28th, 2023m 1:43 p.m.?

A. I don't remember receiving that.

Q. Okay. Well, this is marked Plaintiff's 228. Do you remember producing this?

A. I remember producing tons of e-mails, but I don't remember this specific e-mail.

Q. Sure.

Page 144

A. I don't remember seeing this.

Q. Okay. You'd agree that you did receive this e-mail from Marvin though, correct?

A. I don't remember it. But if it's -- if it's here, I'm not -- it certainly wasn't invented. [Witness reads document to self.]

Q. My question is, as you see the e-mails produced marked Plaintiff's 228, Marvin, according to what's in front of you now in this document, Defendant's 13, Marvin did respond with this particular invoice, correct?

A. I don't know that -- I don't know that I thought that was even an invoice. I think it just says, it says, "Please see the snip above in the body of our e-mail."

Q. And I understand earlier you testified that, to an Excel, an Excel table, right, that this is what you were referring to?

A. No --

Q. No?

A. -- that's not what I was referring to.

Q. Okay. Well, I'll scroll down a little bit further. Looking at this last e-mail produced, Plaintiff's 229 dated September 6th, 2023. Kevin is cc'd on this e-mail as well, correct?

A. Yes.

Page 145

Q. And this is an e-mail from you to "Eddy Assistant Manager" who -- it was Marvin that you were communicating with, correct?

A. Correct.

Q. Okay. Now, looking at the second paragraph. It states, starts with "I understand," and you state later on in the second sentence "...that the law states that a landlord cannot collect legal fees of any kind unless they win an eviction case." Correct, you wrote that?

A. Correct.

Q. What law were you referring to to make that statement?

A. I don't know. I don't remember.

Q. This e-mail was sent before you filed the lawsuit in this case, correct?

A. Correct.

Q. And did any attorney tell you that premise?

A. No.

Q. Where did you get that from?

A. I must have gotten it from reading, but I'm not certain.

Q. Well, would you agree that that sentence is the basis for this lawsuit?

MR. DUNN: Objection.

A. I don't know. I need to -- Let me read it. Can I do

Veritext Legal Solutions

800-726-7007                                                                    305-376-8800

Page 146

that?

Q. Absolutely.

A. [Reviews document.] Can you tell me your question or repeat the questions, please?

Q. Sure. I was, um, the question I just proposed was --

MR. AYVAZIAN: Actually, Madame Court Reporter, can you read that back?

COURT REPORTER: [Reads back requested question and objection.]

A. I would not agree with that statement.

BY MR. AYVAZIAN:

Q. Okay. So as you sit here today, you don't remember where you got, specifically, where you got the information that there's a law that states a landlord cannot collect legal fees of any kind unless they win an eviction case?

A. All I can say is that using the resources that I found, that was the impression I was under. This was not from an attorney.

Q. Okay. Is there a chance that those resources were wrong when --

A. I'm not a lawyer. I'm not certain. I'm not a lawyer.

Q. Okay. And on September 6th, 2023, you were not repre-- you were not represented by counsel, correct?

MR. DUNN: Objection.

Page 147

A. Correct. Correct. I don't believe -- I don't believe so.

Q. Okay.

A. I don't remember the exact date so I can't -- I don't know.

Q. Okay. In that last paragraph in the -- Sorry, one second. In the paragraph starting "I need a response," in the third sentence it states: "This situation has been non-stop insanity, and discriminatory, and I'm exhausted with all of it."

Do you see that?

A. [No verbal response heard.]

Q. Let me know when you see that.

A. Oh, I said yes.

Q. Oh, okay.

A. I must have cut out.

Q. I totally understand, yeah.

Why did you say that the situation has been discriminatory? What did you mean by that?

A. I was referring to discrimination against people who needed assistance, who needed government assistance. At the time, we had gone through a total of six RAFT applications that timed out or were pulled because of the landlord, and that is how I felt, that they were discriminating against us and impeding the process. And it was -- it went for -- now we're in

Page 148

September -- January -- well, before, December, all the way until you see the credit for the government payment. And then after with legal fees. And then the attorney general to get legal fees removed. And then more legal fees. And it never -- it felt as if it never would end. That is the insanity and discriminatory part.

Q. And why do you believe that it would be, Greystar would or The Eddy would discriminate against people seeking RAFT as opposed to others?

A. Why do I believe that?

Q. Well, I'm asking. You say its discriminatory for people seeking public assistance, correct?

A. Yes.

Q. So why do you think that Greystar would be discriminating against people seeking public assistance?

A. Because of my experience in seeking the assistance, they serve to impede, in my opinion. And the process lasted, as I said before, forever. And it felt like forever, months and months, and so that's how I felt.

Q. Okay. So for your circumstances, you believe that it was a discriminatory practice?

A. I believe that it could have been, and I felt that way.

Q. And you'd agree that RAFT funds are the same as cash,

Page 149

correct?

A. I don't know. I don't know what the agreement is.

Q. Meaning that the $5 RAFT pays would be the same as if you paid $5, correct?

A. I don't know. I don't know if there's a tax break if -- or I don't know what the agreement, the details of the agreement are.

(EXHIBIT 14 MARKED FOR IDENTIFICATION)

BY MR. AYVAZIAN:

Q. Okay. I'll mark this e-mail as Exhibit 14. This is Plaintiff's 216 and it bleeds over to Plaintiff's 217. This document in front of you is an e-mail from you to Marvin at both of his accounts with Kevin cc'd on October 14th, 2023; is that correct?

A. Yes.

Q. And in this e-mail in the second paragraph, it states -- in the third line in the middle starting with "moreover":

"Moreover, I sent proof that Greystar may not under Massachusetts law collect those fees once a case has been voluntarily dismissed."

Do you see that that?

A. I do.

Q. And when you said "collect those fees," you're referring to the $175 charge above that was the eviction fee

38 (Pages 146 - 149)

Page 150

that came in in August, correct?

A. [No verbal response.]

Q. Just let me -- I don't know if it cut out or not, sorry.

A. I'm just reading.

Q. Yep, no problem.

A. Would you repeat the question, please?

Q. Sure. In that line where you said, "Moreover, I sent proof that Greystar may not under Mass. law collect those fees...." When you said "those fees," you're referring to the eviction or legal-related fees, correct?

A. From the legal recovery fees, yes.

Q. From the eviction case?

A. Yes.

Q. And you state next -- Well, actually, before I ask that question. For that sentence, "Moreover, I sent proof...", do you remember what proof you sent?

A. I do not.

Q. Okay. Do you know who you sent proof to?

A. Marvin, certainly. I mean, I'm guessing. This is -- If I'm saying to him I sent proof, then it, likely, it was to him, and maybe other members of management.

Q. Okay. Now, do you remember what that proof was that you are claiming to have sent, that under Massachusetts law

Page 151

Greystar may not collect those fees once a case has been voluntarily dismissed?

A. I don't remember exactly what that proof was.

Q. Okay. And the next line: "Under MA law, Greystar can only collect those fees when a tenant eviction proceeding results in the eviction (removal) of a tenant."

Do you see that?

A. I do.

Q. Do you remember what Massachusetts law says that?

A. No. I remember, again, reading Mass. Legal Aid. I read a lot on that and what their resources were related to that. So that is what I read, and that's how, that's where this stems from in terms of what I'm referring to.

Q. Okay. And do you see that the sentence, skipping the "therefore" sentence but going to the next one: "If Greystar wanted to collect those fees, they could have done so through another venue, i.e., small claims court."

Do you see that?

A. Yes. That's directly from Vladimir.

Q. Okay. So did you rely on what Vladimir said to believe that that practice is unfair?

A. Which? Assessing fees?

Q. Without going to another venue.

A. In part, yes.

Page 152

Q. And do you understand that if Greystar did go to another venue, such as a small claims court to collect fees generated during an eviction case, that just means more fees are generated to go take someone to small claims court?

MR. DUNN: Objection.

A. I don't know.

Q. And that would be more work for attorneys, and then according to the lease, that work would be passed back to a tenant?

MR. DUNN: Objection.

A. I don't -- I don't know.

Q. Okay. And later on in the e-mail on, uh, it starts with paragraph, "While I do not want to start another legal battle with Greystar, I will." Do you see that?

A. Yes.

Q. And that I think in the next line you say, you talk about the Massachusetts Attorney General's Office: [As read.] "I'm going to have to hire an attorney and file all of this evidence that I've kept since this all started with the MA Attorney General, Housing Authority, RAFT to begin a payment inquiry investigation and sue for any and all damages (including legal fees) due to me because of this issue."

Do you see that?

A. I do.

Page 153

Q. And then you say that, "Their lawyer may have gotten away with lying to my face three times last time." Do you see that?

A. Yes.

Q. What did, um, what did the lawyer that you're referring to, how did they lie to your face three times?

A. Vladimir told me three times outside while we were sitting, um, mediating, that's what the judge had all of us do, he said to me over and over: If, you know, you agree to pay this past due rent -- this is the past due rent check -- you don't have to worry about all of these fees because once we're -- you pay that, we voluntarily dismissed it, those fees go with it. You're not going to have pay those. Legally, you don't owe them.

And he asked me to sign a document stating that I would take care of the all past due rent. I refused to sign it because I was unsure, I didn't have an attorney with me, and I didn't trust him.

And so three times during that conversation he insisted that if I paid those, paid the past due rent, he would voluntarily dismiss the case, and under Massachusetts law, he would not -- because if, say, you guys dismi-- because Greystar dismissed it, that I would not be liable for any of those fees because I couldn't be charged those fees because I wasn't going

39 (Pages 150 - 153)

Page 154

to be evicted. And he said that three times.

Q. Okay.

A. And that is why the agreement we signed at court is an agreement only for a continuance because I did not trust what he was saying. I did not trust him. And that's what I'm referring to.

Q. Okay. And -- Okay, one second. A little bit further down, Shaun, the paragraph that starts, "Let's deal with this amicably and be done with it"?

A. Yes.

Q. The -- this paragraph, towards the end of this paragraph after you say, "I think you're an honest man...," the next sentence: [As read.] "However, your office did not produce anything to verify or validate this debt or provide anything to us necessary to meet the criteria listed in the prior paragraph."

Do you believe that if you were presented with these invoices that describe the work being done in the eviction proceeding at the time that they were put on your ledger, that you would've -- they would have been less unfair to have been assessed to a tenant?

MR. DUNN: Objection, form.

A. No.

Q. You believe it's --

Page 155

A. But I would have --

Q. Sorry.

A. No. But I would have had more information.

MR. AYVAZIAN: Okay. Well, we are right around that hour mark. Do you want to take a quick break and come back at three, or keep going? You let me know.

THE WITNESS: I should probably take a -- I'm sorry, I'm going to need like 10 minutes about every hour, and that's just so I can rest my brain for a second; if that's okay?

MR. AYVAZIAN: Yeah, I offered.

THE WITNESS: I don't want to make everyone's life miserable. I don't. Really, I don't.

MR. AYVAZIAN: No, it's fine. Let's go off the record and come back in 10 minutes at three o'clock?

THE WITNESS: Okay.

VIDEOGRAPHER: This ends Media Unit No. 5. We're going off the record at the time of 2:50 p.m., and we are off the record.

(WHEREUPON, a break was taken from 2:50 p.m. to 3:01 p.m.)

VIDEOGRAPHER: This begins Media Unit No. 6. We're back on the record at the time of 3:01 p.m. You may begin.

MR. AYVAZIAN: Okay, thank you.

BY MR. AYVAZIAN:

Q. Now, we just went over all of the invoices that were

Page 156

put on your account or at least at some point billed to Greystar about your account. So my next question is going to be focused on having looked at those invoices and the charges for those invoices on your ledger, what do you specifically believe was unfair about Greystar's or The Eddy's conduct?

A. What I believe is unfair about their conduct? Charging those fees and me having to pay those fees to zero out my account and stop this eviction without a judge ordering me to pay those fees. And that those fees, a judge should determine whether or not those fees were reasonable. I have no way of evaluating or assessing that.

Q. And if Greystar did seek court approval, like you just mentioned, when should that have been done in your case?

A. I believe it should have been done from the beginning when the filing, the initial filing. And then throughout the proceedings they could have added those fees and added that to this case to the court dock-- and to submit them to court and request those so, along the way, that was -- I knew that they were asking the court to also be reimbursed for fees that they were allegedly charged.

Q. And if they sought fees intermittently as the eviction action is going on, that would be more work to collect funds against you, correct?

MR. DUNN: Objection.

Page 157

A. I don't know that that would be anything more than what you just showed me.

Q. Well, if they --

A. If they were sending -- To me, if they were providing the invoices to you, they could just upload those invoices as well; or I don't see that as some huge process or endeavor that requires much effort.

Q. Okay. So you're saying the step of uploading an invoice to the court as it's going on would be one way that you think would be a fairer process; is that correct?

A. I think that however attorney's fees in every lawsuit are requested, that that would be part of the process. And the fair part would come in when a judge looked at those fees and said, yes, you owe this money, you have to pay this, Mr. Cordeiro, or to whatever tenant. Okay. But I cannot, and no tenant, right, can determine what is reasonable. It's a subjective term. And who makes that decision right now is you, Greystar determines what is reasonable. That is unfair. Because if I can't make that assessment, that means I'm relying solely, and obligated to pay, and relying solely on the hope that you are -- that your client is using good, fair judgment. And I don't know that and tenants don't know that.

Q. And another way that you brought up earlier, or at least you said Vlad brought it up, would be a separate action as

40 (Pages 154 - 157)

Page 158

well such as small claims court; is that correct?

A. So that thought came directly from him, from Greystar's attorney. So when I had -- when I was thinking they can't collect these fees because I'm not being evicted and then Greystar's attorney reinforced that belief, I think the same thing, then that was what I believed and how I feel. And so I think that answers your question, and if not --

Q. Oh, I'll ask follow-up. I'm just, you know, I did ask sort of an open-end so --

A. Okay.

Q. I mean, I appreciate your answer.

So specifically in your situation, what do you believe that Greystar should have done differently?

A. I think I just --

Q. Okay.

A. -- answered that question.

Q. Okay. So that would be following the procedure of providing the invoices; and that for a court to deem, whatever the bill is, to be reasonable before they are added to a tenant's ledger?

A. And that tenant to be forced to pay them to zero out their balance so that they are not evicted. And that is just one idea. One way that could possibly work. I don't know the law. Obviously, I'm not a lawyer so I don't know if there are

Page 159

other ways, but to me, that is at least one possibility.

Q. Okay. So would you agree that, boiling that down, would be that Greystar's practice of assessing fees without a court judgment about those fees is unfair?

A. No. I would add that forcing the tenant to pay, not just assessing, but having to pay those fees as well before a court has deemed them reasonable or checkable, required to pay. So assessing and having to pay them.

Q. Did Marvin or anyone at Greystar tell you you had to pay those eviction-related fees in order for the eviction case to get dropped?

A. Yes.

Q. And who was it?

A. So Marvin told me that the account, as I said earlier, I said this earlier, cannot go to zero. He was not allowed to remove those fees, and that if they weren't paid, the account wouldn't go to zero. If the account doesn't go to zero, the action continues because he would not voluntarily dismiss it. So, therefore, the action would not have ended based on Greystar's management, Greystar's attorney -- and not just Marvin, I don't -- I don't want it to seem as if he is the only person has said that. Destinee also said that. And Kayla. All of them have said this throughout this since the beginning. Once we've received the check and your account is at zero, this

Page 160

is over. Once your ledger reaches zero, your account balance is zero, this is over; until that time, the clock continues.

So absolutely I was told from multiple people at Greystar and who were representing Greystar in court.

Q. Do you remember if they told you this through e-mail or something else?

A. So I described to you the conversation I had with Vladimir, so that was a conversation. And Destinee, I absolutely recall an e-mail in which we discussed fees in which we discussed the balance multiple times; there were e-mails with her. Kayla, I believe. Marvin, yes, through e-mails certainly. And there were conversations, verbal conversations as well.

Q. Okay. Okay. Now, we spoke about the charges billed to Greystar by the attorneys for their work on your eviction. And we looked at those invoices. And my question is: Having looked at all of those invoices now, is there any reason -- sorry, is there anything unreasonable in those charges to you in your opinion?

MR. DUNN: Objection.

A. I -- I cannot evaluate the validity of those invoices. I don't know that they're an accurate depiction of what was billed. I don't know if they were paid. I don't have any of that information. I don't know what your agreement is, what Greystar's agreement is with the attorneys. I don't know when

Page 161

they were produced, so I can't answer that confidently.

Q. Okay. And is there any reason you'd believe a court would not order payment of these invoices by you?

MR. DUNN: Objection.

A. I'm not a lawyer, yeah, I -- so I don't -- I don't know. I would imagine that not every landlord gets -- that does petition for those fees, receives them. I don't know what the reasons would be either way. But a judge would do their job --

Q. And if --

A. -- and make sure that they were reasonable and that they needed to be paid.

Q. And if a judge did their job and found invoices or charges on an invoice to be reasonable in the ones that were charged to you, would you have paid them?

A. If I was ordered to pay those fees by a judge, I would have to pay them. So if I was under a court order to pay them, I would pay them. I have no choice.

Q. Okay. And, again, do you know sitting here today, and referring back to the e-mails that discussed it, but what law, or if there is a law, that says that attorney's fees cannot be assessed to a tenant without court order?

MR. DUNN: Objection.

A. I don't recall. I don't know.

Q. Okay. And would it have been unfair if Greystar

41 (Pages 158 - 161)

Page 162

brought a separate action to seek attorney's fees such as the small claims that we discussed?

A. I don't know. I would consult an attorney.

Q. Okay. Would it have been more preferable for you in this case for them to have brought a separate action to collect the fees that were charged to your account?

A. I don't know that if I would prefer them to -- them to sue me for anything, anyone to sue me.

Q. Okay. What if the attorney's fees appeared in a settlement agreement between eviction defendants and a landlord plaintiff, is there any reason to think that a judge would not approve a settlement agreement for tenants to pay fees that are billed at a later time?

MR. DUNN: Objection.

A. I'm not going to answer that. I think that a judge would make that decision. They would review it. I don't know what they would do with it, but I certainly --

Q. Okay. Let me show you --

A. -- think that the judge would look at it.

Q. Sorry, what was that?

A. I said I certainly think that a judge would have to look at that.

Q. Okay. I'm going to show you a court agreement, a sample one.

Page 163

A. Okay.

Q. And in this agreement it says at the top "Commonwealth of Massachusetts, Housing Court Department." Do you see that?

A. Yes.

Q. And I'm going to scroll down to the second page where it says "Summary Process Agreement." Do you see that underlined?

A. I do.

Q. Okay. Now, if you take a look at 8(c), and we have language here that says: [As read.] "Defendant(s)," who's the tenant as it indicates at the top, "acknowledges that he/she are responsible for attorney's fees pursuant to the written lease agreement and shall be billed separately at a later date for those fees" -- I'll have to scroll up a little bit -- "and will comply with the lease in regards to payment of same."

Do you see that provision?

A. I see it.

Q. And this particular example of a court agreement is signed by a judge. Would you agree?

A. I don't know. I see a signature and the word "judge," I don't know.

Q. Okay, fair enough. And above that a housing specialist, and there's a signature above that?

A. Yes, there are names and signatures.

Page 164

Q. Now, would you agree that in this settlement agreement called a "summary process agreement" between a plaintiff-landlord and a defendant-tenant, that the court approved a situation where the judge doesn't know the numb-- the amount of fees, correct?

MR. DUNN: Objection.

A. [Inaudible.]

COURT REPORTER: I'm sorry, I didn't hear your answer.

A. I just said I -- I -- I'm trying to read this. I do see number four, the balance of court costs are listed. [Reviews document.] Uh, your hand, your -- could you move your mouse?

Q. Oh, sorry.

A. Thank you. [Reviews document.] Would you scroll down to the next page, please?

Q. [Complies with request.]

A. So I don't know what the lease says.

Q. Right.

A. So I don't know if the lease lists fees, and if the judge has seen the -- I imagine they would have reviewed the lease, but I don't know. So I don't -- I don't know that the judge has or hasn't seen the lease or if the lease is specific about fees or what has been given to the judge, that could have potentially been given. The judge could have been given: Here

Page 165

are the fees. We're going to bill them later. And this is what the lawyer charges and this is why.

I don't know all of that, so I don't know that the judge doesn't know what the fees are.

Q. Okay. And I'm going to --

MR. AYVAZIAN: Sorry, this was Defendant's 15.

(EXHIBIT 15 MARKED FOR IDENTIFICATION)

MR. AYVAZIAN: I'm going to mark this next one Defendant's 16.

(EXHIBIT 16 MARKED FOR IDENTIFICATION)

BY MR. AYVAZIAN:

Q. And again this is another sample agreement for judgment. Commonwealth of Massachusetts Housing Court at the top. Do you see that?

A. I do.

Q. And this is for a Ryan Taylo, Defendant --

A. Yes.

Q. -- and it says "Summary Process Agreement For Judgment." And if I scroll down, we go to 5(c) and again we have the language: "Defendant acknowledges that he/she/they are responsible for attorney's fee pursuant to the written lease agreement and shall be billed separately at a later date for those fees, and will comply with the lease in regards to payment of same." Do you see that?

42 (Pages 162 - 165)

Page 166

A. I see it.

Q. And would you agree that if the lease provision were similar to what was in your lease, that this is an example of a court saying that a provision like that is valid?

A. No.

MR. DUNN: Objection.

Q. And why not?

A. Because, as I said in the last answer, I don't -- I don't know that this, 5(c), "pursuant to the written lease," that that written least agreement looks like my written lease agreement, the one I signed. I don't know if they discussed fees. And 4(b), this, just looking at it quickly, this example appears to list a number of payments. It's $500 towards the judgment and court costs. "Make a payment of $1,000," in 4(c), "towards the judgement and court costs totaling" this, with a final payment of 334. It appears to me that they have gone over the total amount due. And so I don't -- I don't know what their lease agreement says, and I don't know what the judge reviewed or not. It's -- I'm -- it's the same as my last answer pretty much.

Q. Okay. Do you agree that it would for each -- if any tenant at The Eddy entered into one of these agreements with the court, it would have -- you'd have to look at the lease and this judgment to figure out if it was unfair for them to be billed

Page 167

separately at a later date for attorney's fees?

MR. DUNN: Objection.

A. [Inaudible.]

Q. Sorry, your mic cut out.

A. I said I'm not an attorney. I think we're -- I'm not sure. We're getting a bit thick into the legal aspect of this. I'm not certain.

Q. Okay. If this, if an order like this was entered in your case, and it said that you and Kevin acknowledge that he/she/they are responsible for attorney's fees pursuant to the written lease agreement and shall be billed separately at a later date for those fees, would you have paid those fees with the way that this language is written?

A. I would have asked for specifics about the fees. I would have asked the judge to clarify, you know, what do you mean by "pursuant to the lease agreement." My lease agreement does not specify fees, what fees, how much, what's reasonable. And I don't feel comfortable with my landlord determining what reasonable is, and ask if the court could tell me or give me guidance on what I should anticipate and what is reasonable, and that the landlord provide some sort of itemized list of. This is the typical charge because of this, this, this, and this. So that way a judge could determine, all right, well, this -- this is -- these are reasonable charges and that's what we're

Page 168

referring to. Then it would be -- then I would sign it because I would know. It wouldn't be the landlord's determination what is reasonable because you could choose $1 million, you could have Johnnie Cochran, you could do whatever you'd like to do, and I have no ability to fight back, so, yeah.

Q. If the $477 charge was found reasonable by a court and the court ordered you to pay that amount -- Actually, withdrawn. Sorry.

I guess my question is if the court ordered the assessment of attorney's fees after finding it's reasonable, now just the ordering the assessment of fees being put on your ledger, would you have paid those fees?

A. If -- I want to make sure that I understand what you're asking. If the court did not order me to pay them?

Q. Correct.

A. But ruled that you could assess them?

Q. Yes.

A. Then? Could you repeat just the end there?

Q. Would you have paid those fees?

A. I don't know. I mean, I don't know, possibly. I don't know.

Q. Okay. Do you believe all legal fee provisions in leases are unfair or only this one in your lease?

A. So I don't --

Page 169

MR. DUNN: Objection.

A. Sorry. I don't -- have reviewed all the -- all legal provisions in every lease, so I don't -- I don't know.

Q. Okay. I'm showing you Exhibit 17. Do you recognize this document?

A. Yes.

Q. And is this one of the documents that you stated you reviewed today -- er, sorry, reviewed in preparation of today's deposition?

A. I believe so.

Q. Okay. And for the record, this, it's "Plaintiff Shaun Cordeiro's Supplemental Response to Defendant's First Request" -- Oh, you know what, sorry about that. Let me close this out. I pulled up the wrong one.

(EXHIBIT 17 MARKED FOR IDENTIFICATION)

BY MR. AYVAZIAN:

Q. Sorry, this I'll mark as Defendant's 17. "Plaintiff Shaun Cordeiro's Supplemental Responses to Defendant GREP Atlantic, LLC's First Set of Interrogatories."

Do you recognize this document?

A. Yes.

Q. Okay. And was this one of the documents that you looked at to prepare for today's deposition?

A. Yeah, I believe it was.

43 (Pages 166 - 169)

Page 170

Q. Okay. I'm going to scroll down to page 4.

A. Okay.

Q. Actually, sorry, page 5. And -- Sorry, page 4, Interrogatory No. 9, it states: List the names of any and all tenants, of which you are aware, that were assessed legal fees, costs, or expenses by Defendants pursuant to Provision 29 of the lease agreement."

Do you see that?

A. I do.

Q. Okay. Now, in your supplemental answer, which is on page 5, the last sentence states that: "Plaintiff became aware that other residents at The Eddy had been charged eviction legal fees in the same matter as himself when communicating with representatives of the Defendants, who informed him that this practice of charging eviction legal fees was applied uniformly to all tenants as a matter of policy."

Do you see that answer?

A. Yes.

Q. Okay. How did you come to an understanding that the practice of charging eviction legal fees was applied uniformly as this answer notes?

A. I was told by management, property management, that this was -- that charging eviction legal fees in this way is Greystar policy, that's what we do, that's how we've always done

Page 171

it.

Q. Have you spoken to any other individuals or tenants at The Eddy that went through the same process of being charged attorney's fee--

A. I have not --

Q. Okay.

A. -- spoken to anyone.

Q. Any communication --

A. In the manner that you described -- Oh, I'm sorry.

MR. DUNN: Let him finish. Thanks.

A. Sorry. In the manner that you've described within the context of that, of your question, I have not.

Q. Okay. Have you spoken with any other tenants of The Eddy that were assessed legal fees?

A. No.

(EXHIBIT 18 MARKED FOR IDENTIFICATION)

BY MR. AYVAZIAN:

Q. Okay, I'm showing you now what's been marked as Defendant's --

MR. AYVAZIAN: 18?

COURT REPORTER: Correct.

MR. AYVAZIAN: Okay, great.

BY MR. AYVAZIAN:

Q. Do you recognize this e-mail chain?

Page 172

A. Yes.

MR. AYVAZIAN: Okay. And, Michael, this is Plaintiff's forty-- it starts with 42 to 47.

MR. DUNN: Yes.

BY MR. AYVAZIAN:

Q. Okay. And this first e-mail, May 19th, 2023 at 1:35 p.m., this is from you to Vlad with Kevin cc'd, correct?

A. Yes.

Q. Okay. And is this that the, uh, in this top e-mail, what you referred to about talking with Marvin about the fees; is that correct?

A. That's -- yes.

Q. Okay. And do you see here it states that, to Vlad: [As read.] "I got the e-mail from Marvin informing the case will be dismissed, but the legal fees will remain on the account."

Do you see that?

A. Yes.

Q. And would you agree that that, the way that you wrote it means that the eviction case will be dismissed but that you do not have to pay the legal fees that were --

A. No.

Q. -- on the account for your eviction to not be dismissed?

Page 173

A. No. No. In fact, I didn't believe either of them because both of them had told me on previous occasions or had been part of conversations with other members of property management. If you are going to dismiss this case, why are you leaving these legal fees on my account? My thoughts were: You're leaving these legal fees on my account so my account doesn't go to zero. I don't trust you.

So, no, I never thought that I wouldn't have to pay those.

Q. Okay. And in the next e-mail from Vlad to you, Vlad states that the case will be dismissed, "However, as I mentioned to you in court, my client's position is that they had to spend legal fees to bring you to court for non-payment of rent and they can recover legal fees under your lease agreement."

Do you see that?

A. I see it.

Q. Okay. Do you have any issues with that sentence that Vlad wrote?

A. What do you mean by "issues"?

Q. At the time that he wrote that, did you understand what they meant -- sorry, what Vlad meant that you would have to pay for the cost that Greystar incurred to bring the eviction against you?

A. Did I understand that he was suggesting, that he was

44 (Pages 170 - 173)

Page 174

saying that I would need to pay those legal fees?

Q. Yes.

A. At that point, I was shocked and surprised because I had been told, you will absolutely not need to pay these, that they will be removed because they're not allowed to be there if we voluntarily dismiss it. So this is shocking to me because I had not been told this before. I had been told something completely different. So this was me -- This was shocking to me because he did not say that to me ever. That's a lie.

Q. And what is specifically the lie here?

A. Exactly what I've said, he lied to me and told me, as I said previously, that I would not have to pay those fees at all, that they would be dismissed with the action. And here he is telling me, oh, we'll dismiss it, but I told you that you would have to pay this at another, um, that they could recover these legal fees. That is a lie. He did not say that. So, at this point, I don't trust either of them.

Q. Got it, okay. At this point in time when the eviction case -- excuse me, sorry. At this point in time on May 19th, so this was a couple of days before the eviction case was dismissed, had you paid the $652 in fees that were on your account?

A. I don't think so.

Q. Okay. When did you pay those fees?

Page 175

A. If you scroll down, I believe you can see May 19th, uh -- Can you go up? No, I mean, um -- Please.

Q. This way or the other way?

A. No, the other way. The other way, please.

Q. [Complies with request.]

A. Go to the next e-mail.

Q. [Complies with request.]

A. Okay, hold on. [Reviews document.] Okay, after the e-mail that says "Vladimir, when will the motion to dismiss to be filed," it's the next one I think.

Q. [Complies with request.]

A. So to your question, as you can see, Friday, May 19th I said, I tell him to send me an itemized list of these fees and the total amount that Greystar thinks that we owe them now and let me know if they intend to add additional fees to our ledger.

And then, "Thank you, Shaun. I agree. You will see any and all fee" -- "any and all fees Greystar alleges you owe them on your ledger." That's May 20th.

Q. I see that.

A. "I sincerely hope you receive only positive news regarding--" blah, blah, blah. And if you go to the next e-mail. Let's see. "To be clear, we're talking about the $652?" Now, this is Saturday, May 20th at 6:41 p.m. "Once I pay that, Greystar and I start at zero. Correct?"

Page 176

And I say zero because I have been told for over a year that it must be at zero or this will not end.

"Correct? If that's the situation, then I will take care of that very soon after I receive the voluntary dismissal and we can all move on with our lives."

"That's all I see on the account that my client sent over and confirmed."

"Okay. I'll keep an eye out for the filing."

"No worries, by law, once the eviction case where the landlord is seeking possession is dismissed, your tenancy is re-instated."

"I have no intention of fighting...." [Witness reads to self.] Right.

So I think it speaks for itself. I have not, up and to that point, paid the fees because I was told they would be dismissed. And now I've realized he's lied in court, outside of the courtroom to me three times, and now he's lied to me again via e-mail.

Q. Now, at the time they said that there was going -- this case was going to be voluntarily dismissed, you still had not paid the $652 based on these e-mails, correct?

A. Based on those e-mails, I had paid everything less the $652?

Q. Right.

Page 177

A. That's correct.

Q. Okay. So if you did not pay that 652, is it your belief that they would not have filed a dismissal?

A. That's correct.

Q. And what makes you believe that based on -- is it anything based on these e-mails, or is it something else?

A. It's everything that I've mentioned. Everything that I've mentioned

Q. It was all the conversations?

A. All of the conversations, all of the zero balance, all of that. And the situation, it just continued. So I knew no matter what, I had to pay these or I was going to have nowhere to live; that was my firm belief given everything up until this moment.

Q. I'm just going to take a look at my notes real quick.

A. Sure.

Q. And during these e-mail exchanges, did Greystar ever threaten to proceed with or reinstate the eviction case if you did not pay the legal fees?

A. I do not recall receiving an explicit threat with those words.

Q. Okay. [Pause.]

A. Sorry, can we just --

Q. You want to take a break?

45 (Pages 174 - 177)

Page 178

A. No, I don't want to take a break. I wasn't aware that Discord is running in the background, a work thing, and a message just popped up. I want to make sure that it's closed out. Is that okay?

Q. Yeah, I'm -- that's fine by me.

A. I apologize. I didn't even know it was [inaudible]. [Pause.] I closed you gu-- closed you guys out too. I think that it's -- Oh, sorry. I'm so sorry.

Q. No worries. Are you ready?

A. Yes.

Q. Okay. So was there anything in writing that -- Actually, I withdraw that. You already answered that. I'm sorry. [Pause.]

MR. AYVAZIAN: All right, why don't we take a little bit of a break. I'm wasting everyone's time right now looking through my notes. Why don't we come back at four o'clock. Does that sound okay?

MR. DUNN: Yeah, sounds good. Does this mean we're almost -- we're almost done?

MR. AYVAZIAN: I'm getting I think in the homestretch I will say. I don't -- I don't think we're staying here til 7 p.m. Um, I don't think we're staying here til 6 p.m. But let me -- let me see how much time I've got. I'm trying to skip through some things now to save some time.

Page 179

MR. DUNN: All right.

VIDEOGRAPHER: This ends Media Unit No. 6. We're going off the record at the time of 3:52 p.m.

(WHEREUPON, a break was taken from 3:52 p.m. to 4:02 p.m.)

VIDEOGRAPHER: All right, we are back on the record at 4:02 p.m. This begins Media Unit No. 7. You may begin.

MR. AYVAZIAN: Thank you.

BY MR. AYVAZIAN:

Q. Just to go back a step. Shaun, when you paid the $652 and you let Vlad know that you were going to make that payment for the voluntary dismissal, was that your intent to resolve the counterclaims that you brought as well?

MR. DUNN: Objection.

A. No.

Q. Okay. And going back to the reasonableness of the invoices. I understand you said you don't know how to gauge the reasonableness of it, but my question is: Would the conduct on behalf of Greystar been more unfair if the amounts billed were excessive compared to the actual work completed?

MR. DUNN: Objection. You can answer.

A. I don't know if they would be. I mean, if they lied? I'm understanding, the way I understand the question is if they lied about the charges? That would be more unfair. It's not being honest.

Page 180

Q. Well, I guess my follow-up would be if it wasn't a lie and if the charges were just higher say because it took more time to do than what a court found was reasonable for that project, would that have been more unfair?

A. I would think that whatever the court finds reasonable is what is reasonable.

Q. Okay. All right, I believe this will be Defendant's 19, Plaintiff's Bates stamped 1888.

(EXHIBIT 19 MARKED FOR IDENTIFICATION)

BY MR. AYVAZIAN:

Q. Shaun, do you see this e-mail from you to Vlad on May 18th, 2023?

A. I do.

Q. Okay. And here it states in the number 1 point, bullet point: "We're going to be able to take care of the total current charges, less the $652 for legal fees, more than likely tomorrow." Do you see that?

A. I do see it.

Q. Now, at that point when you "say less the $652," is that because you weren't going to pay the 652 but you wanted those fees removed from the ledger?

A. Less the 652 is referring directly to the conversation that I had with Vladimir at court, outside, that I would not be responsible for that 652 because legally I couldn't be charged

Page 181

those.

Q. Okay. And it was your belief at the time that if that 652 remained on the ledger, that the eviction case would not have proceeded to be dismissed?

A. I believe that had 652 remained on the ledger, that this eviction case would have continued.

Q. Okay. And that, at that point, all that would have remained on the -- or all that you would have owed would have been the 652?

A. My belief was that the 652 was for legal fees that I would not be liable to pay. That's why I paid everything but the legal fees that I did not owe.

Q. Okay. And at that point if the 652 stayed on the ledger and everything else was caught up in payment, then all the court would have to resolve is the 652 and the reasonableness of those; is that correct?

MR. DUNN: Objection.

A. No. No. I believed that they, at that point, they were to be removed. I wouldn't have to think about going to court or a judge to review anything because they were supposed to be removed.

Q. Okay. Now, further down in this e-mail, that last kind of larger paragraph starting with "additionally," you state: "However, the residents absolutely cannot stand the

46 (Pages 178 - 181)

Page 182

property management." Is that correct?

A. Yes. Yes, that's correct.

Q. Okay. And then a line later you say, "Three sets of friends have moved out because of Destinee."

A. Yes.

Q. And that's referring to Destinee Price?

A. Yes, that's correct.

Q. You then say, "Xandy, who is my buddy and an attorney that's moving out with his girlfriend, got to this same point with Destinee and now only communicates directly with the building's attorneys."

A. Yes.

Q. Have you ever spoken with Xandy about this case?

A. No.

Q. Okay. Did Xandy ever help you fill out your -- or for your eviction case?

A. No.

Q. Okay. Do you know if Xandy had any of the same legal assessment fees -- sorry, the assessment of legal fees?

A. He -- no, I -- that was not the issue.

Q. Okay. And then in the last sentence, continuing to Plaintiff's 1889, it says: "Lastly, heads up, many of us have had it and the building is about to get trashed on social media." Do you see that?

Page 183

A. Yes.

Q. Do you know if that ever happened?

A. I don't know.

Q. Again, did you post anything on social media?

A. No, I did not.

Q. Okay. In that last paragraph, you thank Vlad, apologize, and then say, "I want to thank you for your candor and seemingly genuine desire to help us get through this mess."

Do you see that?

A. Yes.

Q. Okay. Today, and also in your written discovery responses, you talked about discussing the eviction, this case, with several third parties, correct?

A. I talked about some of the third parties that I spoke to in general about this case.

Q. And that would be, you raised Betsy Hamilton and Stephanie, correct?

A. That's correct, yes.

Q. Okay. Do you have any text messages talking about the case with Betsy?

A. I sent everything to my attorneys, text messages included.

Q. Okay. How about with Stephanie?

A. All text messages, so yes.

Page 184

Q. Okay. And with Betsy, was it all text messages or e-mails? phone?

A. Text messages. And then, you know, conversations with friends, uh, with my friend.

Q. Okay. And you also listed Maribeth Adams?

A. My mother.

Q. Okay. And Stephanie Thomas; is that correct?

A. That's Stephanie, that's the same person.

Q. And Lindsay Beaudry?

A. Beaudry, yes, uh-hmm. She also lived at The Eddy.

Q. And Elizabeth Hamilton I'm guessing is Betsy Hamilton?

A. Betsy. Yes, I'm sorry, that is Betsy.

Q. Okay. Are any of these individuals attorneys?

A. No.

Q. Okay. Do any of these -- have any of these individuals been assessed legal or eviction fees that you're aware of by The Eddy?

A. Not that I'm aware of, no.

Q. Okay. Any chance you remember the name of that attorney you spoke with before filing your eviction case -- er, sorry, before filing, the filing of the eviction case?

A. No. No. But there wasn't a great deal of detail that -- it was predominantly, "What are you going to charge me?"

Q. Okay. One second, please. Earlier we discussed and I

Page 185

think you talked about e-mailing with the attorney general's office for Massachusetts in this case, remember?

A. Yes.

Q. Okay. So I'm showing you Plaintiff's 2097. It might be a little bit smaller. And do you see this is from Shaun Cordeiro to Amy Sangiolo --

A. Yes.

Q. -- on January 7th, 2024?

A. Yes.

Q. Okay. Who is Amy Sangiolo?

A. She works for the attorney general's office.

Q. Okay. How do you know her?

A. When I contacted the attorney general's office, she's the person I assumed was assigned the case or however you phrase that.

Q. Okay. And you say here in this first paragraph that only 490 of the 652 from the tenant ledger was removed, correct?

A. That's correct.

Q. Okay. And that this e-mail was sent after the lawsuit had been filed, correct?

A. I don't know what the date is. I can't see the date.

Q. January 7th, 2024.

A. Oh, you just told me that. I'm sorry.

Q. That's okay. It's getting late.

47 (Pages 182 - 185)

Page 186

A. Yes. I suppose, yes.

Q. Okay. In this e-mail where my mouse is, about four paragraphs down, you talk about the security deposit, correct?

A. That's correct.

Q. And in the next paragraph you talk about this pending class action but no representation or legal assistance regarding the security deposit, right?

A. Yes.

Q. Okay. So in this context, your e-mail to Amy is talking about, it looks like, seeking relief for a security deposit and possibility of suing for treble damages for the security deposit issues as the last paragraph indicates; is that true?

A. I wrote that last paragraph of this e-mail. At the time I was -- this was yet another issue, and I was being ignored by property management. And I had not thrown out the idea of also suing for treble damages for the security deposit violations.

Q. Right. And that's one that you stated earlier that's still a possibility, correct?

A. Yes.

Q. Sorry for the headache, I'm scrolling up. I just wanted to check something real quick.

And, again, this is an e-mail. This is Plaintiff's

Page 187

2077 from you to Amy. It looks like December 14th, 2023. Do you see this and recognize this e-mail?

A. I see -- I see it.

Q. And this e-mail was sent to Amy after the lawsuit was filed, correct?

A. I'm not sure the exact date the lawsuit was filed, but I can see that this, the date that you said, December, I think you said 14th? In this e-mail I can't see that.

Q. Yeah.

A. Ah, December 14th. I can tell you December 14th, 2023 that this e-mail was sent.

Q. Okay. And you say, "Amy, we have not received a credit on our account for any legal fees." Correct?

A. Correct.

Q. Okay. And then later down in this e-mail you state "I don't know," in the second-to-last paragraph: "I don't know if I need to file a second complaint or if we can add these items to the existing complaint. Initially, I wasn't sure, totally sure of my rights, and we've suffered a lot of bullying and intimidation from Greystar." Correct?

A. Correct.

Q. And what do you mean by "a lot of bullying and intimidation"?

A. Everything that I've described - lying, going back and

Page 188

forth, these multiple RAFT applications, all of it. Refusing to answer e-mails. Refusing to provide invoices. Refusing to provide any information about my security deposit, where it was being held. The threat of being evicted. All of it.

Q. And it's -- In this e-mail you're referring to all of Greystar's conduct against you and Kevin, that's been the bullying and intimidation?

A. I said "we've" suffered a lot of, so it must be referring to me and Kevin.

MR. AYVAZIAN: Okay.

COURT REPORTER: Counsel, did you want to mark these last two e-mails?

MR. AYVAZIAN: Yes, actually, 20 and 21.

(EXHIBIT 20 MARKED FOR IDENTIFICATION)

(EXHIBIT 21 MARKED FOR IDENTIFICATION)

MR. AYVAZIAN: They're all part of one document for, just to, for Michael, this was in the e-mail composite that you all provided --

MR. DUNN: Yeah.

MR. DUNN: -- and the filing was Kevin Matlack Discovery 2026.

MR. DUNN: Yeah.

MR. AYVAZIAN: Just giving you that heads up of where that is.

Page 189

MR. DUNN: No, I know it.

MR. AYVAZIAN: Okay.

COURT REPORTER: And just to make sure I understand, the e-mail on January -- in January is Exhibit 20, and the e-mail on December 14th is Exhibit 21?

MR. AYVAZIAN: Yes.

COURT REPORTER: All right. Thank you so much.

MR. AYVAZIAN: Thank you. Thank you for catching that.

(EXHIBIT 22 MARKED FOR IDENTIFICATION)

BY MR. AYVAZIAN:

Q. Okay, Shaun, I am going to show you what I have here as text messages, Plaintiff's 2151. Do you see this?

A. Yes.

Q. Now, this file was produced to us as Kevin Matlack IMG 2151.pdf. Are these your text messages or are these Kevin's text messages, or do you not know by looking at them?

A. I actually don't. I don't know for certain.

Q. Okay. I'm going to mark this as Exhibit --

A. Oh, I don't think this is mine. I don't think is mine. I mean, my --

Q. This is yours?

A. I don't think this is my text message, but I -- I don't think it is.

48 (Pages 186 - 189)

Page 190

Q. Okay. Do you know for sure that it's your text message or not?

A. I don't think it is, that's all I can say.

Q. Okay. Did you --

A. But I don't think so.

Q. Did you produce text messages to your counsel?

A. Yes.

MR. AYVAZIAN: Counsel, I don't recall seeing text messages from Shaun produced just given that, uh, just maybe if we could follow up later. But if they're -- in case they were not produced and relevant, we would just ask that the deposition be left open to address those specifically.

BY MR. AYVAZIAN:

Q. Okay. And while I have Exhibit 22 up, when it says "Andrea The Eddy," do you know who that is?

A. Andrea. Um, I don't know her last name, but she lived at The Eddy.

Q. Okay. Were you on a group thread with Andrea at any point talking about this case?

A. So I -- I don't know that this is about this case. Is it?

Q. Your counsel -- er, sorry, your counsel produced these records to us. The word "Destinee" seems to be highlighted so --

Page 191

A. I was told to search --

Q. -- in general --

A. Oh, sorry.

COURT REPORTER: I'm sorry, could you repeat that?

Q. Yep. I'm just asking --

A. [Inaudible.]

MR. AYVAZIAN: Sorry, who do you want? Let me finish my question quick, uh, quickly, Shaun, just to maybe --

THE WITNESS: Sure.

MR. AYVAZIAN: -- help clarify and clear it up for the court reporter.

BY MR. AYVAZIAN:

Q. My question is just generally, were you on a group thread with Andrea -- er, sorry, Andrea from The Eddy and did you discuss this case?

A. I don't know that that was on a group thread. Possibly. Possibly. But I did not discuss, that I can recall, I don't recall ever discussing this case with Andrea because we were not close, so.

Q. Okay --

A. The group -- the group text -- let me clear -- the group texting, I mean, it's possible because we had group texts for a book club and group texts for whatever. So that, I -- I don't know, but I did not -- I don't ever recall speaking to her

Page 192

about this.

Q. Okay. Now, for your text messages, do you know which -- what text messages you produced, like who they were to?

A. I searched key terms and I took screenshots. Honestly, I didn't, you know, go and see who because I didn't want to do all of that until -- and so I just did what I was told and sent them. So if I have forgotten to say a name, it's there because I did it that way so I was as transparent as I could be.

Q. Okay. If you did find a text message that hit on a search term, how did you produce that?

A. A screenshot. But --

Q. Okay.

A. -- if you could -- You can search in an iPhone. The search bar of text messages, all of them, and so I put each key term, screenshot, screenshot, screenshot. You may have one or two that has Destiny's Child listed, but you have them. So I did that, each of those terms.

Q. Okay. Were there text messages that discussed the case that you did have in your phone?

A. There were text messages that matched those key terms, so.

Q. And those key terms were provided to you by counsel?

A. Yes, they were.

Page 193

Q. Okay. Okay. Do you have those text messages still saved on your phone, or did you delete those text messages?

A. They have to still be on my phone. I didn't delete anything so they have to still be on my phone because all I did was search and screenshot.

Q. Okay. We just ask that you preserve those text messages in case they came up later. Thank you.

A. I assumed that if they -- in case they were, I had no intention to delete them.

Q. Okay. All right. I'm pulling up, we'll mark this as Exhibit 23.

(EXHIBIT 23 MARKED FOR IDENTIFICATION)

BY MR. AYVAZIAN:

Q. This is another text message Kevin Matlack IMG 1522.pdf produced as Plaintiff's 2152. These are not your text messages, I'm assuming?

A. They're from Kevin's phone.

Q. What says it's Kevin's phone? And I'll get -- I'll get to another example. But as you see these now, are these your text messages?

A. If they're not from my phone, then they're not my text messages.

Q. Okay.

A. I don't text from Kevin's phone, and he does not text

49 (Pages 190 - 193)

Page 194

from my phone, that I know of.

Q.  Okay.  So let's mark this as Exhibit 24 for now, produced as Plaintiff's 2155.

(EXHIBIT 24 MARKED FOR IDENTIFICATION)

BY MR. AYVAZIAN:

Q.  This text message, the bottom text, do you see that it's -- looks like it's to Kevin Matlack?

A.  Yes.

Q.  So is this Kevin, is this Kevin texting himself that you're aware of, or is this your text message?

A.  I don't see a phone number, and I don't remember all my text messages from 2023 so I can't be certain.  It's from one of us.  I don't think Kevin would text himself.  So the one to Kevin Matlack 10/16/23?

Q.  Yes.  And reading that --

A.  I would --

Q.  -- it says --

A.  Do you want me to read it for you?

Q.  Sure.

A.  "I'm honestly and truly considering going to buy a gun and drive over to Destinee's office and blow her fucking head off."

Q.  Is that -- Did you write that?  Or are you aware of you writing it or Kevin writing it?

Page 195

A.  I mean, I must have.  If it's to Kevin I -- and this is my phone, then I must have written it.

Q.  Well, that's what I am trying to figure out because it was produced as Kevin Matlack IMG 1525.  So it was pro--

A.  Um --

Q.  Sorry.  I know we're talking over each other, I don't want to do that.

-- so it's produced as that PDF, and I'm just trying to figure out, out of these text messages since they're all labeled Kevin Matlack, if any of these are actually your text messages?

A.  So, as I said, I certainly sent text messages.  The last one?  I don't recall the text messages I sent in 2023.  So by looking at them, I am just trying to deduce as you are.  I don't recall.  But if this is from Kevin and it's blue -- [Pause.]  I can't be totally sure.  I hate that they're all labeled that because -- but I, um -- let see.  Kevin wouldn't have texted himself so I'm guessing that at least this bottom text message is mine.  Like, he wouldn't have texted himself so I don't --

Q.  Okay.

A.  But I can't -- I can't say for certain because I can't see where it came from and whose it is.  I don't know why it's all labeled like that so I...

Page 196

Q.  Okay.  Who did you produce your text messages to?

A.  To my attorneys.  So --

Q.  And you said you were represented by four different firms.

A.  Sure.  I believe that I sent them to Sean Ahern at Harvard.  I can't remember, um, I may have sent them all to Kevin and said, "Upload all of these text messages.  Will you upload yours?"

Q.  Okay.

A.  So, but they were absolutely uploaded and produced.

Q.  Okay.  All right, so I hate to assume.  I don't -- it's -- it's -- based on what you're saying, it's hard to gauge of whether these are yours or not.  Do you remember, so if we look at this IMG 1525, do you recall this message to Stephanie Elyse Mary Elyse Mary Thomas --

Is that one person, sorry --

A.  No.

Q.  -- or is that multiple people?

A.  That is one person.  And now that makes me believe that this is Kevin's.  This whole thing is Kevin's because we made fun of her name.  We would pip on her [ph.].  and in my phone she's Stephanie Elyse Mary Thomas.

Q.  Okay.

A.  And he made fun of the length of her name.  So

Page 197

Stephanie Elyse Mary Elyse Mary Thomas, I -- this is, like, this is Kevin's.

Q.  Okay.

A.  I believe.  Because she's not labeled like that in my phone.

Q.  That's what I figured.  I saw that.  It figured that if that's one person, I doubt you and Kevin would have her listed as a contact with that long of a name, so.

A.  That's a great assumption that she's not saved in that way.

Q.  But you still at least haven't -- a question remains as to this Kevin Matlack text to presumably himself, if this is his --

A.  I would have been from me.

Q.  Okay.

A.  If he produced it and it's to him, then that's likely from me.

Q.  And in order for it to be listed here, is it that you actually copied the message in your phone and then sent it to him?  Or how would it appear that it says Kevin Matlack, that it's from Kevin Matlack or to Kevin Matlack?

A.  I don't know.  I don't know.

Q.  Okay.

A.  I'm thinking that I -- If he searched his phone with

50 (Pages 194 - 197)

Page 198

those key terms --

You're wondering why it doesn't say from Shaun. Well, I'll have to be honest, I -- her name doesn't appear in that way on my phone. I don't know, maybe he copied and pasted it and sent it to himself? I don't know. But I don't know that these are mine because of the things that we said, so I can't be certain.

Q. Okay --

A. I don't think they are, but.

Q. So without, okay, without us knowing exactly who this last text message is from, is this -- if it was from you, is that something that you said?

A. It's possible.

Q. Okay. Is that something that you would have -- that you would agree with?

A. "Agree with," what do you mean? Killing someone?

Q. Well, the thought process of "I'm honestly and truly considering going to buy a gun and driving over to Destinee's office to blow off" -- "to blow her fucking head off."

A. So I am incredibly sarcastic and have a very dark sense of humor. That was not a real thought. That was I am sick and tired of this, and that's the language that I used.

Q. And above that the "...voluntarily dismissed by them, but I have proof that they 'misappropriated' government funds.

Page 199

I'm going to prove that Destinee committed fraud."

Is that a text message that you sent or Kevin sent?

A. It would be likely me, but I -- it would be likely me.

Q. So then in this circumstance, how does it be in Kevin's production?

A. I don't, as I said before, I don't.

Q. Okay.

A. I don't know why other than, potentially, because I sent, I really think I sent everything to him because I had been doing so much, and I said, "Upload all of these with yours." So that's why they may be all marked in this way. But you have them all so I -- but, so those -- yeah, but she's not seen in my phone like that, so.

Q. Right. Okay.

A. And I can look, you know.

MR. AYVAZIAN: Well, Michael, at this time I just would like to request that these messages be produced in the format for each plaintiff as if it was -- or that indicates which plaintiff said what if there is a mix up of some way. I will also note that this, each text message seems to just be a search term hit and does not include the relevant or context of the conversation, so we would just ask that those be produced, the context surrounding each text. As you can see, there's blue with a marking next to it, that there's more about the text

Page 200

message. And then, obviously, if there's any text messages that are responsive and that Shaun did provide that are not included in this, we would just ask that they be produced and that this deposition be held open for a discussion about these text messages.

BY MR. AYVAZIAN:

Q. Okay. So, Lindsay Beaudry text message on 10/19/23, "And following up on my e-mail to the MA state and federal government who will be investigating The Eddy, Destinee, Kayla, and Greystar for misuse, abuse, and fraud with government funds." Smily face.

Based on the language in there of "my e-mail to MA state and federal government," would that be you more likely than not?

A. More likely than not. But, as you said, I can't be a hundred percent sure, so --

Q. Do you know if Kevin -- Sorry.

A. -- so it's possible. It's likely, more likely that it is mine, but --

Q. Do you know if --

A. -- I don't want to answer it if I don't know for sure.

Q. Do you know if Kevin ever e-mailed the MA state and federal government?

A. I don't know. I don't think so, but I don't know.

Page 201

You'll have to ask him.

Q. Okay. And the top text messages to Stephanie Thomas which state: [As read.] "...I don't care if I get thrown out on the street, two things at bare minimum will happen: Destinee will get fired from Greystar, and Greystar will pay me something. I don't care if it's 20,000 or...." And then there's a number we don't know how large of a sum that is, correct?

A. I see that, yes.

Q. Do you know if that's your message as you read it, or not?

A. Again, I -- I don't want to speculate and -- I'm not sure.

Q. Okay. All right, so I'm just going to go back to sort of the first texts just to see. Looking at this and now having looked at the other exhibits, and this is again 2151 we previously marked, do you know if it was you or Kevin that said, "Destinee is an idiot and Kayla is a lying hooker"?

A. So the language, the latter language sounds more like Kevin. But I -- I don't -- I don't know so I don't -- I can't say.

Q. How about this message on January 20th, 2023 in blue?

A. I don't know for sure whose it is, but it could be either of ours.

51 (Pages 198 - 201)

Page 202

Q. Okay. And it says, "No. I'm a cunt to Destinee" with an emoji, correct?

A. It does, uh-hmm.

Q. Okay. I believe we marked this one as Exhibit 23, this is 2152.

COURT REPORTER: Correct.

Q. And this just seems to be a continuation of hits. It looks like we have that line here about Destinee and Kayla. We don't know if this is yours or Kevin's, correct?

A. I remember this conversation with Andrea only because, the March 12th, 2023, she was talking to me about this horrible neighbor that she had and the issue she was having with management about dealing with this girl who was threatening and -- but I don't know if it was, uh, Kevin also received those messages.

Q. Okay. So do you think that these are your messages?

A. I -- it's poss-- I think so.

Q. Okay.

A. I think so, but I can't be a hundred percent certain.

COURT REPORTER: And, counsel, I apologize, that's Exhibit 23 that's 2152.

MR. AYVAZIAN: Yes. Thank you. Thank you. We haven't marked this one. This is 2153. Could we mark this as Exhibit 25.

Page 203

(EXHIBIT 25 MARKED FOR IDENTIFICATION)

BY MR. AYVAZIAN:

Q. Now, the top line it looks like, I don't know who it's to, but it says: "I'm getting red hot. I'm going downstairs. If Destinee even gets kind of slick out her mouth, imma swing on her." Do you know who wrote that?

A. No. So that, 6/14, is a group text message because I had dengue and I was hospitalized, and we named the group "Shaun is dying of some third-world disease at Mass Gen." But we may have continued conversation beyond that period, but that was a -- or a small group text message so I think it was me, Steph, and Betsy.

Q. Okay.

A. And Kevin was also on there as well.

Q. Okay. How about these other messages to Betsy, do you believe these are your text messages or Kevin's?

A. I don't want to say because I'm not -- if I'm not sure, I don't want to say they are.

Q. --

A. And so --

Q. Yep?

A. -- I don't think that -- I don't feel like going through these text messages. I feel like I'm going to be giving you the same answer, which is if I can't be sure and you can't

Page 204

be sure, then I can't answer any of that.

Q. Okay. Well, I certainly understand that. I'm just wondering if there's any language in a text message where all of a sudden you're like "I remember sending that," which is why I'm going through this process for each one.

A. To be honest, I doubt that I'm going to remember any of them from three years ago almost, but I will let you know.

Q. Okay. And on this message, 5/14/2023 to Betsy, having gone over the eviction docket and everything, that was in the -- that was during the eviction case, correct?

A. On 5/14, I believe that was after court. I don't remember the dates. But I don't have what the court date was. I can't recall right now what the court date was.

Q. If the eviction was filed on May 21st of 2023, this text message, whether sent by you or Kevin, was while the eviction case was pending, correct?

A. Yes, I -- yes.

Q. Okay. So on this 5/14 text: "I'll get the whole thing continued, then depose Destinee and Kayla, subpoena their e-mails and price [sic] that she committed fraud. However, Greystar will settle with me before they go through a fraud case."

Is that you or Kevin, if you can recall?

A. I can't recall exactly. Yeah, I don't know.

Page 205

Q. So when -- okay. Do you understand, do you know, that if it was you, what you were referring to?

A. So I don't -- I don't want to say like "if it would have been me" or "if it was me" and then conjecture because I would rather know that it was me. I don't know that it was so I can't -- I can't answer that and be confident or give you anything of substance if I'm not sure.

Q. Okay. This is Plaintiff's 2154, and we'll mark it as Exhibit 26.

(EXHIBIT 26 MARKED FOR IDENTIFICATION)

BY MR. AYVAZIAN:

Q. Do you know if these text messages are yours or Kevin's?

A. I don't.

Q. Okay. This is Plaintiff's 2156. We'll mark this as Exhibit 27.

(EXHIBIT 27 MARKED FOR IDENTIFICATION)

BY MR. AYVAZIAN:

Q. Again we see a text labeled "Kevin Matlack," November 21st, 2023. "...get through some period of self-induced misery or getting fucked over by some douchebag cunts like Destinee. Very soon this prothesis won't be able to take the force of chewing and snap too and then I'll look...."

Is that --

52 (Pages 202 - 205)

Page 206

A. So that's from, that's from me because the prosthesis, I was getting dental implants during that time.

Q. Okay. And -- okay. And this was shortly before the class action was filed. Do you agree?

A. It was on November 21st, 2023.

Q. The text below to Alysha and Alex, who are they?

A. They were also former ten-- they are former tenants at The Eddy.

Q. Okay. "...second suit is for what Destinee did." Do you know if -- "I'm talking to the MA attorney general's office and the state of MA. They sound very, very soon...."

You or Kevin --

A. I can't tell you. If this is the same, it's possibly me. It's likely me. If it's the same string of text messages in the same document then I'm assuming it's me.

Q. But we still don't know, right, why it says Kevin Matlack then if it's you?

A. Well, if it's me and I searched the term, then it would say "Kevin Matlack," it would be a text message that I sent to him in the string.

Q. Okay, got it.

A. So...

Q. But, again, in this one it's Stephanie Elyse Mary Elyse Mary Thomas, this doesn't match the name as it's saved in

Page 207

your phone, correct?

A. Correct.

Q. So this may not be you?

A. I wrote that text message to Kevin right there.

Q. The 11/21/23?

A. Because of the word "prosthesis."

Q. Right.

A. So I wrote that text message, I am certain about that.

Q. Okay. Okay. How about the one above to Stephanie Thomas: [As read.] "And that's c**t Destinee made me believe that she was going to give me a deal for screwing me out of another apartment"?

A. I think that's likely me.

Q. Okay. And this Alysha and Alex, "...second suit is for what Destinee did." Are you or Kevin referring to this federal lawsuit when you say "second suit"?

A. I have no idea.

Q. Okay. Would you need to see the context of this text message to understand it further?

A. Maybe.

Q. If it was you that sent it?

A. Maybe.

(EXHIBIT 28 MARKED FOR IDENTIFICATION)

BY MR. AYVAZIAN:

Page 208

Q. Okay. Okay.

A. These are Kevin's text messages because you can see his, I think, his little face, the dinosaur.

Q. So this would be, the dinosaur face, "Don't say Destinee" you're saying would be Kevin --

A. Yes.

Q. And then the "Destinee" above would likely be you even though the message itself says it's from Kevin Matlack?

A. So what would happen is when I search the term and take the screenshot, it will pull up the text message on that date. There's the term and there's the term. But his, these are likely from him because they're highlighting "don't say Destinee," and he's -- the search term in bold is with Kevin so I -- again, I don't -- I can't be certain.

MR. AYVAZIAN: And this was Plaintiff's 2157 marked as Exhibit 28. Okay. Plaintiff;s 2158 we'll mark as Exhibit 29.

(EXHIBIT 29 MARKED FOR IDENTIFICATION)

BY MR. AYVAZIAN:

Q. The top message dated, it looks like, sometime in February of 2025 to Stephanie Thomas. I know that it's blurred but --

A. Yes.

Q. "You don't 'know' this, but we started discovery in the lawsuit. Guess who I'm forcing my lawyers to depose and

Page 209

absolutely grill to a crisp? Destinee Price."

Who sent that?

A. Me, I believe.

Q. Okay. So you're communicating with Stephanie Thomas about this case in -- after the lawsuit was filed?

A. Yes, February the lawsuit was filed a year ago, 2025.

Q. Okay. And the text message below that, "Destinee done fucked up," --

A. That's not --

Q. -- that's a message you received --

A. Right.

Q. -- from Stephanie Thomas?

A. Correct.

Q. And then the one below that, "...about the anti-trust lawsuit too?"

A. That would be from me because blue means I sent it.

Q. Okay. Is there -- are you planning on filing an anti-trust lawsuit?

A. There was an anti-trust lawsuit. So that's what we're discussing is an anti-trust lawsuit where Greystar recently settled with the Department of Justice. So this was in the media.

Q. Okay. That's the one in the media that you discussed at the very beginning of the day today?

53 (Pages 206 - 209)

Page 210

A. Yes, yes, yep.

Q. Okay. So again with these text messages, we would just ask for the full context of the text message.

And then this, it jumps from January of 2025 to December of 2023 and then Andrea. Is that a --

A. [Clears throat.] So --

Q. -- and then the bottom one is with Kevin Matlack. So these are all your texts with individuals?

A. [No verbal response.]

Q. Did you answer? Sorry, it cut off.

A. I haven't answered.

Q. Okay.

A. Betsy, January 13, 2025, I recognize that text message as mine for cert-- for sure.

Q. Okay.

A. If they're in the same string then, I mean, I would assume, but I -- I recognize that text message to Betsy. I recall sending that.

Q. Okay. And then again with this top one --

A. Yes, likely, as I said before.

Q. Likely. But the contact name is different than as it appears in your phone?

A. That's correct.

Q. Okay. But do you remember writing that, or no?

Page 211

A. I may have written it. I don't want to say for certain.

Q. Okay.

A. The only thing I could think of why the name is written like that, the new iPhone update sometimes sucks in contact information from social media connections or from friends on Instagram or what have you, so it may be doubled. But when I -- I don't see that in my phone. I didn't save it like that, and so that's -- that's why I don't want to say for sure. I would rather provide you what you're requesting.

Q. Okay. Now, all these text messages that we've looked at, whether they're yours or Kevin's, it's all for Destinee being the search term so far, correct?

A. So far.

Q. And what is it about Destinee that is calling for these text messages?

A. What do you mean what is it about her?

Q. Well, "Guess who I'm forcing my lawyers to depose and absolutely grill to a crisp? Destinee Price."

A. What is -- why would I said that? Why --

Q. Yes.

A. -- why is she being --

As we discussed earlier, she is the one that lied to me over and over again. She's also the one who, when we talked

Page 212

about previously about other residents complaining and hating property management, she is the one that everyone mentioned first. And Xandy's issues, and other people's issues that were close to me, the center of that was her. So these weren't just my, uh, some unique, random experience with her. This was a consensus among the people that I knew. And people I didn't know very well.

(EXHIBIT 30 MARKED FOR IDENTIFICATION)

BY MR. AYVAZIAN:

Q. All right, now 2159, we'll mark this as Exhibit 30. At the top it's blurred out kind of, but it says to Lauren Bergame [ph.]?

A. Bergamo.

Q. Who's that?

A. So that's -- yes, that is -- this is these -- that is my friend, not Kevin's.

Q. Okay. And who is she?

A. She is a friend of mine. So we've been friends for a very long time since we were 20.

Q. Okay. So it says: "...I demanded my lawyers depose that lying bitch Destinee that held the check to make us late and lied to me over and over. Lucky for her, I have this gorgeous...." Correct?

A. Yes.

Page 213

Q. And how did that sentence start, and also finish, if you know while wee sit here today?

A. I don't know.

Q. Okay. And then the text beneath that to Lindsay, is that you?

A. Yes, it must be. Yes, because these are copied and pasted so it's the same message.

Q. Yep. And that's to Lindsay talking about the lawsuit against Greystar and The Eddy surviving the motion to dismiss by a federal judge in Massachusetts --

A. So whatever --

Q. -- correct?

A. So whatever information that I had, these were, all of this is -- this "Guess what? A few months ago...," I found out about this, surviving the motion to dismiss with the ruling, so this was after the ruling. I told her the ruling.

Q. Okay. Now, why are you sharing information about this case at this time with these individuals?

A. Because these are people -- these are people that were close to me or friends, and they know that this is going on and so I'm talking to my friends.

Q. Okay.

A. They're not lawyers, no - Stephanie, Betsy, Lindsay, Lauren.

54 (Pages 210 - 213)

Page 214

Q. Okay. Plaintiff's 2160 we'll mark as Exhibit 31.

(EXHIBIT 31 MARKED FOR IDENTIFICATION)

BY MR. AYVAZIAN:

Q. Now, the top one is to a Kirstie --

A. Correct.

Q. -- Pura? Pura?

A. Uh-hmm.

Q. Who is that?

A. That is my best friend.

Q. Attorney?

A. No.

Q. Okay.

A. A speech language pathologist.

Q. Okay. And this one is: "...much time uploading 150 files for my attorneys, one of them was a 576-page chain of every e-mail between Destinee (the property manager) and me. I need to cry now because reliving that was so painful. I have a meeting with...."

Correct?

A. Yes.

Q. What is -- what came before in the dot, dot, dot; at the end of the dot, dot, dot?

A. I don't know.

Q. Okay. The Betsy Hamilton text on August 1st, 2025,

Page 215

"Destinee, Kayla, Marvin, that lying lawyer Nechev" is talking about the receiving depo summonses?

A. Yes.

Q. Was there any further discussion about that between you and Betsy in this direct e-mail -- er, sorry, direct text thread?

A. That is what popped up, that means that is was -- that's it.

Q. Okay. Did she send something after, right after you wrote that?

A. I don't remember August 1st of 2025.

Q. Okay. And the July 25th, 2025 to Betsy Hamilton: "Do you remember the name of that cunt bag new manager post-Destinee?"

A. Yes.

Q. Who were you referring to?

A. I can't remember her name. Um, Danielle.

Q. And what did -- Was Danielle an employee of Greystar or The Eddy?

A. She -- she took over Destinee's position.

Q. Okay. And what did she do for you to say that about her?

A. She is the one who refused to provide the information about my security deposit, where it was being held; refused to

Page 216

show -- show me that they had paid interest on it; refused to allow me to see any records related to my security deposit; and she refused to respond to multiple e-mails. And I went downstairs to speak to her, and she said she wouldn't speak to me, that everything had to go through legal. So I wasn't.

MR. AYVAZIAN: Plaintiff's 2161, we'll mark this as Exhibit 32.

(EXHIBIT 32 MARKED FOR IDENTIFICATION)

BY MR. AYVAZIAN:

Q. So this is a text, it says to Kevin Matlack 12/5/25.

A. So --

Q. -- are your messages, correct?

A. Yes.

Q. Do you know whose this text message it was at the top where it says: "My initial reaction here was...great...more bullshit. However, our conversation alleviated some of that. Just beat these fuckers into the ground. My only other requests are th--"

A. I don't know. I can't see it, it's blurred, and I don't know that it has any mention -- so I don't know if it's anything to do with this.

Q. Okay. And then November 25th, 2025 to Betsy: "Of course, Destinee will also be deposed, but I don't want her to go first because I want to catch her in a lie" -- catch "them"

Page 217

-- "I want them to catch her in a lie."

Is that you texting Betsy that?

A. All of these text messages are me.

Q. Okay.

A. All of them.

Q. Okay.

A. That are in blue.

Q. When you say, on the bottom, to Betsy, "Kayla is on maternity leave," and then you say, "That bitch knows everything Destinee did"; what did you mean by that?

A. Everything that we've talked about, all of the lying, she knew because she was cc'd on those e-mails, many of them, and she knew that these things had occurred in terms of that the check had been deposited, for instance, because it was, according to Marvin, it had already been logged in the ledger on their end. And she worked closely with her. Kayla worked closely with Destinee on everything because often Destinee would pass me off to Kayla. "Speak to Kayla about this." "Speak to Kayla about this." And then Kayla would say talk to Destinee about something, so they knew.

MR. AYVAZIAN: Okay. And this is Plaintiff's 2162, we'll mark this is Exhibit 33.

(EXHIBIT 33 MARKED FOR IDENTIFICATION).

55 (Pages 214 - 217)

Page 218

BY MR. AYVAZIAN:

Q. And this, this just says Friday as the date, but to Kevin: "Actually, I hope they fire Destinee and blame her for everything and pay us off."

A. Yes.

Q. You wrote that?

A. Yes.

Q. Now, when it says "Friday," do you know what date you wrote that?

A. So it would have been Friday, since it says Friday, it would have been the Friday before they were submitted to you.

Q. Well, we got them on Tuesday last week, so would it have been two weeks ago?

A. So whenever I -- these were sent, uploaded, it would have been whatever Friday was before that date.

Q. Okay.

A. Do you know what I mean?

Q. No, I get it. I get it.

And then Kevin writes to you on January 23rd, presumably about collecting these text messages: "...lost a lot of texts when my phone got stolen so I searched Destinee's name and not a lot came up, but I'm sure there's plenty of us calling her a cunt and hoping she dies...."

Do you know what came before the dot, dot, dot, or

Page 219

after the dot, dot, dot?

A. I do not.

Q. Okay. Do you know if you responded to that?

A. I don't.

Q. You don't know?

A. I don't know.

Q. Okay. And then the text to Betsy: "...countersuing us for $5,000. However, no one is surprised," and talking about your deposition with you, um, you and Kevin being deposed, correct?

A. All I say is that Kevin and I will be deposed next month.

Q. Okay. And then this last one, but this is the one that we, um, was cut off earlier, so this is you to Kevin:

"My message to Scott, our lawyer: 'Thanks for chatting with me last night. It put me at ease. My stepdad died suddenly a few weeks ago and I've been dealing with a lot. My initial reaction was...great...more bullshit. However, our conversation alleviated some of that. Just beat these fuckers into the grou--"

A. So this text message is discussing conversations I had with my attorney.

Q. Right. And that --

A. With our attorney.

Page 220

Q. Right.

A. And the next text message is a text message with my attorney.

Q. Right. And I'm not asking about that, and that's hidden so I can't see that so that's -- Okay.

So after reviewing these text messages it appears that, would you say, that some of these are Kevin's and some of these are yours at this point?

A. I would say that the ones that I said were mine are certainly mine.

Q. Okay.

A. Um, I can't speak -- I don't recall sending the ones that I said I don't recall.

Q. Yeah.

A. And the ones that I do, I told you, yes.

Q. Okay. All right. And do you think -- do you think that you would be a suitable class representative in this case?

A. Yes.

Q. Do you think that all the possible class members would feel the same way about Destinee?

A. I don't know.

Q. How about of your -- your goals of this case as brought up in those text messages?

A. Those are not my goals in this case.

Page 221

Q. Okay. I'm going to show you, this Plaintiff's 1000. This is an e-mail. We'll mark this as Exhibit 34.

(EXHIBIT 34 MARKED FOR IDENTIFICATION)

BY MR. AYVAZIAN:

Q. This is an e-mail from you to Kevin, October 17th, 2023, and it states --

Sorry. Do you recognize this e-mail?

A. Yes.

Q. And it says: "I was right. I knew it. Now they have committed a crime, and I am going to make sure that Destinee and Greystar go down for this. I knew it. Kevin, they put us through hell for sport. OMFG, I knew I wasn't crazy. ~ Shaun"

Do you remember sending that?

A. Yes.

Q. Okay. Wouldn't you agree that your goal here is saying that Destinee and Greystar go down for this?

A. My goal is to make sure that -- In this e-mail, I am referring to specifically the fraud, the RAFT funding. The subject is there: "Misuse of RAFT Funding." So my recollection is "go down for this" is specifically referring to the misuse of RAFT funding as it says in the subject.

Q. Okay. Okay. And we talked about it in, or alluded to it, in one of the text messages. You understand that you are facing, you and Kevin are facing a counterclaim in this case,

56 (Pages 218 - 221)

Page 222

correct?

A. Yes.

Q. And what is it, what is your understanding of that claim pending against both of you?

A. That my understanding is that there's a counterclaim, Greystar is countersuing us for 5,000-what-have-you dollars.

Q. And that it's a breach of contract claim?

A. I don't know --

MR. DUNN: Objection.

A. I don't know that those, that term, was said to me or that I read that specific term.

Q. Okay, fair enough. When you signed the lease, you agreed to pay a fixed amount of rent monthly, correct?

A. Yes.

Q. And you moved out of The Eddy in March of 2024; is that correct?

A. That's correct.

Q. Why did you move out?

A. Our lease was ending.

Q. Okay. Do you remember receiving a final account statement from Marvin at The Eddy after you moved out?

A. I, at the time, I did not. And -- but I feel like I came across it recently when it was brought up in a conversation. So I think that I have seen the account, the

Page 223

final account statement just recently. I had forgotten about it, and -- but I believe I have that.

Q. Okay.

A. [Indecipherable.]

Q. Okay. And --

COURT REPORTER: I'm sorry, say that one more time?

THE WITNESS: I'm sorry. I said I hope that's not more confusing.

COURT REPORTER: Thank you.

BY MR. AYVAZIAN:

Q. When you moved out in March of 2024, you still owed a balance, correct?

A. No.

Q. Did you, when you moved out, do you believe that your account had been zeroed?

A. When I moved out, I believed that the amount of money, that that amount that I was being told that I, uh, that was supposedly my balance when I moved out, would be mitigated by all of the other violations that I have yet to pursue, and so I didn't do anything with it as we move through this process, so.

I also got conflicting information from Greystar. I received another e-mail that had another amount from RealPage, I think, and a phone call from someone at Greystar who alleged another amount that was supposedly left as the balance, so no.

Page 224

Q. Okay. What made you think that the amount, when you left that you owed, would be mitigated by future claims that you have not brought?

MR. DUNN: Objection.

A. I, at the time when we left, I knew that we would be engaging in litigation, and I wanted all of these issues to be addressed in whatever way was legally possible. So my intent was to ensure that all of these issues that have occurred would be dealt with, so that's why.

Q. Okay. And dealt with in one packaged proceeding?

A. I didn't know.

Q. Okay.

A. No, so I didn't make that assumption that it would be one packaged proceeding. I just knew that I fully intended on going through whatever I needed to do within the bounds of the lawsuit to deal with all of these things that happened.

Q. Okay. Is it fair to say that then you withheld paying off your final balance, whatever that was, because you thought you were going to pursue actions that would give you money?

MR. DUNN: Objection.

A. No.

Q. Okay.

A. No.

Q. Would it be fair to say that when you left and moved

Page 225

out of Greystar in March of 2024, that your account ledger would have shown you owed somewhat of a balance?

A. Possibly.

(EXHIBIT 35 MARKED FOR IDENTIFICATION)

BY MR. AYVAZIAN:

Q. Okay. I'm showing you, I believe we're at Defendant's 35. Do you recognize this e-mail on April 11th, 2024 from Marvin to you and Kevin?

A. I believe I might have submitted this, I believe, as part of discovery, and that's just a guess, yes.

Q. Okay. And in this e-mail it's titled, or the subject line, sorry, "The Eddy - Final Account Statement." Correct?

A. That's what it says, yes.

Q. Okay. And on page 1 of this e-mail to Shaun and Kevin it says: [As read.] "Attached please find your final account statement. Your final account balance due is $5,142.65. Please note that this" -- "Please note that this is the balance after applying your security deposit of 3,200 to your unpaid rent balance (and not to other fees) in compliance with Massachusetts law."

Do you see that first paragraph?

A. I see it.

Q. Okay. And would you agree that's Marvin telling you and Kevin that after the security deposit has been applied to

Veritext Legal Solutions

800-726-7007                                                                                          305-376-8800

Page 226

the balance, that the balance due is $5,142.65?

A. Yes, it says "to your unpaid rent balance." However, that balance due includes other charges.

Q. Okay --

A. That's not just rent.

Q. Okay. And then the paragraph below that: "Please note that a legal fee credit of 162 has also been applied to your ledger account." Do you see that?

A. I see that.

Q. Okay. And it then says: "Your balance does not include, and we are not seeking to recover, the costs associated with the eviction action arising from you tenancy."

Do you --

A. I see that.

Q. -- see that? Okay.

Now, going down to page 3, this is the final account statement that Marvin sent to you and Shaun in that e-mail, correct?

A. Sent to me and "Kevin" in that e-mail.

Q. Sorry. I am sorry, you and Kevin. You've still got it today. Thank you.

A. No problem.

Q. This is the final account statement that you provided to both of you?

Page 227

A. If it was attached to that e-mail, then he must have. I don't recall if that's exactly what I was given.

Q. Okay. And on this final account statement where my mouse is, it says "Balance at move-out: $8,347.73" on the left-hand side, correct?

A. That's what it says, yes.

Q. Okay. And then it says security deposit in parentheses, and then at the very bottom it says, "Total account balance due: $5,142.65." Correct?

A. That's what it says, yeah.

Q. And like you indicated before, that number, if we go up top, is for parking, two storage charges, a base rent, and then an NSF fee of a hundred, and then two water charges minus the security deposit. Is that a fair accounting?

A. I don't know if the numbers are correct, but I can -- what you've listed or what the items are that are listed in that section, yes.

Q. Okay. So as you sit here today, do you dispute that the total account balance due is still $5,142.65?

A. Yes.

Q. And what is it that you dispute about that amount being due?

A. Well, first, I don't know, the NSF fee, I don't recall that. I also don't understand why in April of 2024 there are

Page 228

water charges from October of 2023 - that means November, December, January, February, and March - I don't know why those are there. And I don't -- I don't have those bills so I don't know what that's -- why that would be there.

Q. Is there a chance that when you initiated this federal action, you stopped paying those charges?

A. Water bills?

Q. Those specific charges, yes.

A. I didn't -- No, I mean, payments were made after and everything is on one ledger. So whatever payments were made were payments to all of these things.

Q. Okay. Since moving out and receiving this final account statement, have you made any payments to The Eddy?

A. No.

Q. Okay. And why not?

A. As I just said, I am -- right now, we are in litigation, and there are extenuating circumstances and other avenues that I believe that I don't, that will mitigate this total account balance due that's listed.

Q. Okay. Do you agree that at this point in time with this amount owing, that The Eddy is at a financial loss for not getting that money from you?

A. No. I --

MR. DUNN: Objection.

Page 229

A. No. I don't know that.

Q. Okay. Is there anything unfair about this counterclaim being brought against you for the amount of rent and fees that are due and that you owe?

MR. DUNN: Objection.

A. Yeah, I don't believe I owe it.

Q. Okay. If you -- Okay, withdraw that.

Would you agree that the fact that you still owe money, according to this final account statement, to The Eddy is personal to you and Kevin and not any potential class members?

A. We don't owe money to The Eddy.

Q. Is that something that you plan to litigate, moving forward, is the amount of money you may or may not owe to The Eddy based on this final account statement?

A. I would have to speak to my lawyers about how that's going to be handled.

Q. As a potential class representative, do you agree that there may be other class members who are tenants or former tenants of The Eddy who also have debts outstanding to The Eddy?

A. I don't know. I don't -- I can't know that. My lawyers will figure that out.

Q. Okay. Would you agree that it would be a case-by-case basis to figure out if any former tenants are potential class members but still owe money to The Eddy?

58 (Pages 226 - 229)

Page 230

MR. DUNN: Objection.

A. No. I don't think it has anything to do with whether or not they were assessed and paid legal fees without a court ruling.

Q. What damages are you seeking individually in this case?

A. I am not seeking damages individually.

Q. Okay.

A. I'm seeking damages -- [clears throat]. I'm sorry, now I can't talk. [Clears throat.] I am not seeking damages for me personally. I'm seeking damages for the entire group of people that have gone through this similar situation and have had to deal with this and have been charged these fees without a court ruling. This isn't about me.

Q. And as you sit here today, would you agree that all of the monies that you were charged and paid related to the legal and eviction fees and costs have been credited back to you?

MR. DUNN: Objection.

A. No.

Q. What legal fees and costs have you paid that have not been credited back to you?

MR. DUNN: Objection.

A. I don't know that the 160-whatever dollars, I don't -- I haven't looked at that final statement, that ledger, and

Page 231

checked what is real, what isn't, and I don't know that I was ever given that credit. And I assume you're speaking about me personally? You said "you."

Q. Yes.

A. Okay, me personally. So I don't know then.

Q. Okay. Do you believe that when you paid the -- any legal or eviction charge, that it was your money or RAFT money that paid the charge?

MR. DUNN: Objection.

A. Do I believe it was -- it was either my money or RAFT money, yes, both.

Q. But you couldn't apportion a certain amount of what was yours and what was RAFT's to a specific dollar amount, correct?

A. I remember, to the ledger, you can't apportion out which dollar went to rent and what dollar went to parking and which dollar went to storage. I didn't send separate dollars or I -- there is no way.

VIDEOGRAPHER: We're at an hour and 30 minutes, could I just take a quick video media break?

MR. AYVAZIAN: Yes. And I'm getting very close, Shaun, just to give you that heads up. So do we want to take a little break or just continue and push?

THE WITNESS: We can -- we can continue, yeah.

Page 232

MR. AYVAZIAN: Okay. So what we'll --

THE WITNESS: How much longer is it? I -- I don't know what you mean by wrapping up. So if it's going to be another hour, I'll totally take a break. But if -- I don't know, I'm not trying to push you or anything, I just, um, if we're still going at six, I would like to take a break; if we're not, then we're not. Is that fair to say?

MR. AYVAZIAN: Let's take a five-minute break because I don't know what your plaintiff's coun-- what counsel is going to do. So let's just come back at 5:40. Does that sound fine, a comfort break; or do you need longer?

THE WITNESS: If we're going to have a break, can we just do 10 minutes --

MR. AYVAZIAN: Sure.

THE WITNESS: -- so I can use the restroom and --

MR. AYVAZIAN: -- 5:45 --

VIDEOGRAPHER: This ends Media Unit No. 7. We're going off the record at the time of 5:34 p.m. as indicated in the video screen. We're off the record.

(WHEREUPON, a break was taken from 5:34 p.m. to 5:42 p.m.)

VIDEOGRAPHER: All right, this begins Media Unit No. 8. We're back on the record at the time 5:42 p.m. You may begin.

MR. AYVAZIAN: Thank you.

Page 233

BY MR. AYVAZIAN:

Q. We're back from break. Shaun, is there anything you wanted to say or clarify?

A. Yes. When you look at the text messages, I just figured something out on the phone, I'm not sure why it's blurred or if it's -- at the very top. At the very top, there's a blue box that says "search." Those are all from me because it was me searching my phone, screenshotting. And then I sent them to Kevin who sent them over. If there is a photograph, an image of a contact, like a circle with my name with a photo, it's from Kevin. So anything, any text messages you have, any screenshots, if the top of them says "search," they're mine. The very top of the text message it will say "search" because they were screenshots, and they were uploaded in that way. And if it's not, it doesn't say "search" at the top and it shows contact image, then it's from Kevin, those are his text messages; and mine say "search" at the top.

Q. Let's take a quick look at that to make sure I know what you're saying. Okay, so we have here --

A. "Search."

Q. -- this one says "search" --

A. Mine. Anything that says "search" is going to be mine.

Q. Okay. This one says "search" --

59 (Pages 230 - 233)

Page 234

A. Yes.

Q. -- yours?

A. Yes.

Q. So all these are yours?

A. Yes. Anything that says "search" would be mine.

Q. Okay. So all of these, every single one says "search" up top, right?

A. Is that every sin-- every single text message you have, or every single one you've shown me?

Q. Every one I've brought up today says "search."

A. Then it's mine. It should be mine. Because I just, uh, with my iPhone looked at it, and "search" was me searching. And the other text messages would have, Kevin's would have, at the top, would be a bubble with, um, the contact name.

Q. Okay --

A. So I believe, I believe, that all of those are mine. I believe based on that.

MR. AYVAZIAN: Okay. So we'll just note for the record now these text messages in all the exhibits that were marked regarding the text messages were produced as labeled Kevin Matlack IMG and a number. So we will clarify that tomorrow with Kevin. But we still have the outstanding request of the full text messages or the context at least of the conversation regarding the name Destinee brought up.

Page 235

BY MR. AYVAZIAN:

Q. Do you recall, Shaun, if any other search hits were found outside of the search term "Destinee"?

A. Anything that -- I took screenshots of whatever popped up, so whatever I uploaded for my attorneys were the search terms.

Q. And when these text messages were put together, were they all like put into one word document and then saved, or was each one of these a screenshot that was converted to a PDF. Do you know?

A. I don't know. I know that I took screenshots of every single one and then sent them to Kevin to upload.

Q. Okay.

A. That's the extent of what I did with the text messages.

Q. Okay. Thank you for double-checking that.

A. Sure.

Q. Okay. Like I said, I'm going to start -- I'm going to wrap up. Shaun, earlier you said that you're not seeking damages individually and that you are doing this for -- it's not about you, it's for the class, correct?

A. Correct.

Q. Okay. What damages do you believe the class suffered?

A. So that's much more for my attorneys to -- to figure

Page 236

out. I don't -- I don't know.

Q. Okay. Do you believe that potential class members who were reasonably charged fees by Greystar would be damaged?

A. I don't know what "reasonable" would mean, so I --

Q. If a --

A. -- I can't really say who -- who's determining what's reasonable, and I don't know.

Q. If a court were to find that a potential class member's charges were reasonable but the eviction fee itself was not pursuant to a court judgment, would you consider them to be damaged?

MR. DUNN: Objection.

A. I don't know.

Q. Okay. How do you believe class-wide damages in this case should be calculated?

MR. DUNN: Objection.

A. It's something that the attorneys and the judge would determine. I have no idea.

Q. Do you believe that class-wide damages should take into consideration any outstanding rent of each tenant that's a potential class member?

MR. DUNN: Objection.

A. I don't know. I don't know how that works.

Q. Okay. Do you believe that class-wide damages should

Page 237

be calculated by taking into consideration any settlement agreements between potential class members and Greystar or The Eddy?

MR. DUNN: Objection.

A. I -- I don't know how that works. I don't know.

Q. How about taking into account any court-entered judgments as to potential legal fees being assessed in the future?

MR. DUNN: Objection.

A. I don't know.

MR. AYVAZIAN: Okay, at this point, I have no further questions. Thank you, Shaun.

THE WITNESS: Thank you.

MR. DUNN: I don't have any questions myself either.

THE WITNESS: Thank you.

VIDEOGRAPHER: Okay, so we are off the record at 5:50 p.m. And this concludes today's testimony given by Shaun Cordeiro. The total number of Media Units was eight. It'll be retained by Veritext. And we are off the record, folks.

COURT REPORTER: And then just quickly, counsel, on the written record, can I ask if you would like to order a copy of the transcript when it's ready?

MR. AYVAZIAN: Yeah, we'd like to.

MR. DUNN: Yeah, e-transcript. So condensed and, you

Page 238

know, the regular package, each condensed and regular.

(WHEREUPON, the deposition of SHAUN CORDEIRO was suspended at 5:50 p.m.)

Page 239

COMMONWEALTH OF MASSACHUSETTS          HAMPSHIRE, ss.

I, KELLEY K. BOHAN, a Court Reporter and Notary Public duly commissioned and qualified in and for the Commonwealth of Massachusetts, do hereby certify that there came before me on the 23rd day of February, 2026 at 9:59 a.m., the person hereinbefore named, identification as prescribed by Executive Order 455 (03-13) issued by the Governor of the Commonwealth of Massachusetts, was by me duly sworn to testify to the truth and nothing but the truth of his knowledge concerning the matters in controversy in this cause; that he was thereupon examined upon his oath, and his examination reduced to typewriting under my direction; and that this is a true record of the testimony given by the witness to the best of my ability.

I further certify that I am neither attorney or counsel for, nor related to or employed by, any of the parties to the action in which this deposition is taken, and further, that I am not a relative or employee of any attorney or counsel employed by the parties hereto or financially interested in the action.

My Commission Expires:  December 25, 2026

Kelley K. Bohan
Court Reporter/Notary Public

Page 240

Michael Dunn
mdunn@brysonpllc.com
          March 18th, 2026
RE:  Cordeiro, Shaun, Et Al v. Grep Atlantic, LLC, Et Al
     2/23/2026, Shaun Cordeiro (#7904575)

   The above-referenced transcript is available for review.
   Shaun Cordeiro should read the testimony to verify its accuracy. If there are any changes, Shaun Cordeiro should note those with the reason on the attached Errata Sheet.
   Shaun Cordeiro should, please, date and sign the Errata Sheet and email to the deposing attorney as well as to Veritext at Transcripts-fl@veritext.com and copies will be emailed to all ordering parties.
   It is suggested that the completed errata be returned 30 days from receipt of testimony, as considered reasonable under Federal rules*, however, there is no Florida statute to this regard.
   If the witness fails to do so, the transcript may be used as if signed.
          Yours,
          Veritext Legal Solutions

   *Federal Civil Procedure Rule 30(e)/Florida Civil Procedure Rule 1.310(e).

Page 241

Cordeiro, Shaun, Et Al v. Grep Atlantic, LLC, Et Al
2/23/2026, Shaun Cordeiro (#7904575)
          E R R A T A  S H E E T
PAGE_____ LINE_____ CHANGE_____
_____
REASON_____
PAGE_____ LINE_____ CHANGE_____
_____
REASON_____
PAGE_____ LINE_____ CHANGE_____
_____
REASON_____
PAGE_____ LINE_____ CHANGE_____
_____
REASON_____
PAGE_____ LINE_____ CHANGE_____
_____
REASON_____

Under penalties of perjury, I declare that I have read the foregoing document and that the facts stated in it are true.

_____  _____
  (Shaun Cordeiro)                DATE

61 (Pages 238 - 241)

**[& - 17th]**                                                    Page 242

**&**

**&** 2:5,11,14 138:7 142:3

**0**

**02110** 2:15
**03-13** 239:5

**1**

**1** 3:9 7:10 32:8 52:18,19 53:1,2 64:12 126:4 168:3 180:14 225:14
**1,000** 58:11,14 166:14
**1.25** 138:24
**1.310** 240:25
**1/2024** 4:14
**10** 3:23 47:11 118:20 119:10 119:11 140:8,11 140:12 155:8,14 232:13
**10,000** 106:20 108:6,15
**10/16/23** 194:14
**10/19/23** 200:7
**100** 2:11 61:14 64:24 88:20
**1000** 221:1
**1000-1003** 5:8
**1010** 35:19 36:3 36:6,7 43:13

56:21 57:2,4,9 57:10 59:2,3,5 59:10,19 60:10 60:10,13,17,19 60:23 61:6,13 62:10 70:19 72:17,21 76:12 79:10,14 114:23
**10:38** 32:9,11
**10:41** 32:13
**10:41.m.** 32:11
**11** 3:24 11:21,22 11:24 12:3 114:24 141:1,6
**11,000** 54:5,9
**11,424** 54:4
**11/21/23** 207:5
**111** 3:17
**112** 3:18
**11:05** 47:20,22
**11:15** 47:11
**11:20** 47:16,22 47:24
**11th** 225:7
**12** 4:4 108:10,12 115:13 141:23 141:24
**12/14/2023** 4:15
**12/5/25** 216:10
**12/9/22** 3:14
**120** 3:20
**12901** 1:11 7:14
**12:20** 84:20,22

**12:31** 84:22,24
**12th** 202:11
**13** 4:5 115:17,18 116:14,20 117:1 117:5,12 143:3 143:4 144:9 210:13
**1308** 80:20
**1308.61** 80:21
**1309** 81:4
**1313** 56:22 57:5 57:8,11 58:12 58:16,24 59:11 60:8,16 114:23
**134** 3:22
**135** 131:1 136:8
**14** 4:6 68:3 149:8,10
**140** 3:23 62:6 136:14,21 139:1 141:9,13,20
**140-179** 3:12
**141** 3:24 4:4
**143** 4:5 66:13
**146** 62:15
**149** 4:6
**14th** 138:12 149:13 187:1,8 187:10,10 189:5
**15** 4:7 47:12 165:6,7
**150** 214:14
**1500** 79:1

**1522.pdf** 193:15
**1525** 195:4 196:14
**16** 4:8 94:3 165:9,10
**160** 230:23
**162** 130:16,20 130:24 131:9 136:4,11 226:7
**165** 4:7,8
**169** 4:9
**16th** 82:7 87:17 92:7 99:12,15 100:14
**17** 4:9 90:15 169:4,15,17
**170,000** 53:24
**171** 4:11
**175** 121:19 126:12 128:3,12 128:22 129:1,19 129:20 130:5 137:12 138:2 139:1,4,13,14 139:15 142:4,8 142:10 149:24
**179** 62:6
**17th** 86:9 90:4 90:12,18,20 91:1,12,14,17 92:3,6,10,21 93:23 100:20,22 102:15,19 103:5 108:23 221:5

Federal Rules of Civil Procedure

Rule 30

(e)  Review By the Witness; Changes.

(1)  Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A)  to review the transcript or recording; and

(B)  if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2)  Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.

Page 242

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

EASTERN DIVISION

- - - - - - - - - - - - - - - - -x

SHAUN CORDEIRO AND KEVIN          :

MATLACK, INDIVIDUALLY AND ON      :

BEHALF OF ALL OTHERS              :

SIMILARLY SITUATED,               :

           Plaintiffs,        :   C.A. No.

    vs.                         :   1:23-CV-12901-AK

GREP ATLANTIC, LLC AND EDDY       :

OWNER, LLC,                       :

           Defendants.        :

- - - - - - - - - - - - - - - - -x

CONTINUED REMOTE VIDEOTAPED DEPOSITION OF SHAUN CORDEIRO Volume II, appearing remotely from Boston, Massachusetts, a witness called by counsel for the Defendants, taken pursuant to the Federal Rules of Civil Procedure, before Ken A. DiFraia, Registered Professional Reporter and Notary Public in and for the Commonwealth of Massachusetts, appearing remotely from Peabody, Massachusetts, on Wednesday, April 29, 2026, commencing at 9:37 a.m.

Page 243

(ALL PARTICIPANTS ATTENDED VIA ZOOM)

PRESENT:

Bryson Harris Suciu & DeMay, PLLC

(by Michael Dunn, Esq.)

Raleigh, NC 27603,

mdunn@brysonpllc.com

919.600.5000

for the Plaintiffs.

PRESENT:  (Continued)

Shook Hardy & Bacon, LLP

(by Ara K. Ayvazian, Esq.)

100 N. Tampa Street, Suite 2900,

Tampa, FL 33602,

aayvazian@shb.com

813.202.7100

for the Defendants.

THE VIDEOGRAPHER:  Marc Friedman

* * * * *

Page 244

I N D E X

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|

SHAUN CORDEIRO, Resumed

BY MR. AYVAZIAN     246

* * * *

E X H I B I T S

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 36 | Copy of Plaintiffs' Third Production of Documents, Bates Nos. PLAINTIFFS 002282-002368 | 250 |

* * * *

Page 245

P R O C E E D I N G S

THE VIDEOGRAPHER:  Good morning.  We are going on the record at 9:37 a.m., on Wednesday, April 29, 2026.

Please note this deposition is being conducted virtually.  The quality of recording depends on the quality of the camera and internet connection of all participants.

What is heard from the witnesses and seen on screen is what will be recorded.  Audio and video recording will continue to take place unless all parties agree to go off the record.

This is Media Unit No. 1 of the video recorded deposition of Shaun Cordeiro, in the matter of Shaun Cordeiro, et al., versus GREP Atlantic, LLC and Eddy Owner, LLC.  The case is filed in the United States District Court, For the District of Massachusetts, Eastern Division, Case No. 1:23-CV-12901-AK.

My name is Marc Friedman.  I'm a certified video legal specialist.  Your court reporter is Ken DiFraia, and we are both from the Firm of Veritext Legal Solutions.

I am not related to any parties in this

Page 246

action or financially interested in the outcome.

If there are any objections to these proceedings, please state them at the time of your appearance.

Counsel will now state their appearance and affiliations for the record, beginning with the noticing attorney, after which time our court reporter will swear in our witness and we can proceed.

MR. AYVAZIAN:  Ara Ayvazian, for the Defendants.

MR. DUNN:  Michael Dunn, on behalf of the Plaintiffs.

SHAUN CORDEIRO, Resumed a witness called for examination by counsel for the Defendants, having been satisfactorily identified by the production of his Passport and being resworn by the Notary Public, was examined and further testified as follows:

DIRECT EXAMINATION, Continued

BY MR. AYVAZIAN:

Q.  Hi, Shaun.  Thanks for coming back.  We spoke about two months ago in Day I of your deposition, do you remember that?

A.  Yes.  That was a long day.  I do remember

2 (Pages 243 - 246)

Page 247

that.

Q. It was a very long day, yes, I agree.

Are you currently located in that same portion of your apartment that you were there for Day I?

A. Yes, I am.

Q. Okay. Is anyone else in the room with you?

A. No.

Q. Okay. The same rules as the last time. If you need a break, let me know.

If you don't understand a question, I can rephrase it.

I don't want to take up too much of your time today. I'll be as efficient as possible, understanding how long Day I was, and agreement with counsel on what we will be covering today.

Have you taken any medications this morning that will affect your memory or your testimony?

A. No.

Q. Okay. Did you do anything to prepare for today's deposition?

A. Briefly spoke with Michael.

Q. Okay. And was that -- when did you speak with Michael last?

Page 248

A. Just this morning, a couple of text messages.

Q. Okay. Did you review any documents before today's deposition?

A. No, not that I can recall. Oh, yes. I'm sorry. I'm sorry. Some text messages.

Q. Okay. Are you aware that your counsel produced text messages and emails in Plaintiffs' Third Production?

A. I don't know about the Third Production, but yes, I'm aware. I actually got them all together and gave them to the attorneys.

Q. Got it. And that was after the last deposition that we talked, correct?

A. Yes, that's correct.

Q. Okay. And are you aware that the text messages -- so there were emails from you and Courtney about the Boston Globe article, and there were text messages from your phone, and then also text messages from Kevin's phone. Is that what you understand was in that group of documents?

A. Yes.

Q. Okay. All right. Besides reviewing text messages, did you review anything else before today?

A. No. I don't recall reading anything else

Page 249

for this deposition.

Q. And since your last deposition, did you review your transcript from Day I?

A. No.

Q. Okay. Have you reviewed Kevin's transcript from his deposition in Day I?

A. No.

Q. Okay. So just now you stated that you pulled those text messages and produced them. Can you tell me the process in which you got those text messages and provided them.

A. Yes. I believe I also wrote out the algorithm I used all about on that evening and sent that with those text messages. So this is kind of off the top of my head. I did some research and found a few software companies that their whole objective is to use metadata to go through text messages. I had to upload, like, 200,000, or something like that, all text messages from my iCloud, and then use specific search terms, and the system would go through all of my text messages and grab anything that had those search terms in it and any reply or emoji or anything, any sort of reaction of any kind to those text messages, and timestamp

Page 250

everything, and pull the metadata. So if anything was deleted, it would say delete or whenever I added something. So the company that I used, I don't recall, I something. It should be on there, the name of the company, and this is kind of what they do. This software is used in lots of court cases. I wanted to make sure that I used something that is common and used in discovery. So that's what I did.

Q. Okay. And so you used a program, and that program is what pulled together everything that was produced and formatted the way it was?

A. Yes, pulled metadata, which the original text messages that we sent were screenshots, and so it pulled each message and pulled any metadata that would be associated with it.

MR. AYVAZIAN: Okay. I will mark this as -- sorry -- Exhibit 36. This is Plaintiffs' Third Production of Documents, Bates stamped PLAINTIFFS 2282 to 2368.

(Document displayed on screen)

(Document marked as Defendants' Exhibit 36 for identification)

A. Can you increase the size possibly?

Q. Yes. Is that better (indicating)?

3 (Pages 247 - 250)

Page 251

A.  A bit more.  I'm sorry.

Q.  You can also make it -- on your screen, I think if you maximize the window, it might get bigger on your screen as well.  But let me know.

A.  It's okay.  I may have to lean in, but I can see it.

Q.  Okay.  So Plaintiffs 2282, these are the emails that you produced regarding The Boston Globe, correct?

A.  Yes.

Q.  Okay.  I'm just going to scroll through.  So the emails go from 2382 to 2296; is that correct?

A.  That appears to be correct.

Q.  Okay.  So here is where the text messages that you produced and I think -- is this what you were talking about in terms of --

A.  You can see on the bottom --

Q.  On the --

THE COURT REPORTER:  Hold on.  You guys have to speak one at a time so we have a clear record.  Could you finish the question.

Q.  So 2297, Plaintiffs 2297, is this the information regarding the program that was used to export and put together these text messages?

Page 252

A.  Thank you for increasing the size.  Let me just look.  (Examines document)  Yes.

Q.  Okay.

A.  I believe so.

Q.  Okay.  And these text messages go from 2297 to PLAINTIFFS 2353, correct?

A.  So I saw images of other text messages that were screenshots.  So they were in there.  I'm not really -- so those were from iMazing.  So I can say that 2353, I see that, and that is from iMazing.

Q.  And everything between the first one that we looked at and 2353 came from iMazing, correct, and these are your text messages?

A.  Could you -- I'm not certain.  Could you continue to scroll up slowly so I can make sure.

Q.  Yes.  (Scrolling)

A.  (Examines document)  Okay.  Can you scroll up just one more, please.

Q.  (Scrolling)

A.  Okay.  Thank you.  That's fine.

Q.  Those are your text messages, right, not Kevin's?  They are from your phone?

A.  These are -- all of these text messages are from my phone.

Page 253

Q.  Okay.  And the ones after we get from the -- off of the iMazing where we start to see a background color where it says, "Shaun," are these your text messages or are these Kevin's text messages, starting at Page PLAINTIFFS 2354.

A.  Honestly, I don't recall, and I can't be certain, and that's why I used iMazing.  To clarify that continuation that we had last time, I wanted to eliminate or kind of mitigate the confusion and just let the software do its job.

Q.  Fair enough.  It is possible that these text messages that's on the screen now, PLAINTIFFS 2354, are Kevin's text messages that were produced?

A.  I don't know.

Q.  Okay.  If we look at 2358, it says, "Shaun," and then this message, "Ummmmmmm what's going on right now?  Life is so weird.  I may have to file stalking charges against the Real Real.  Our lawyers' arguments against Greystar are actually good Kevin and if we survive the Motion to Dismiss then we're a class and they may settle quickly.  Even if we get $15,000/each - my part would pay off the car or be used toward a down payment on an apartment," did I read that correctly?

Page 254

A.  You did read it correctly.

Q.  Does this context help inform you of whose text message this is between?

A.  I believe these are Kevin's text messages that he produced to you.  I can't be 100 percent certain.  I cannot remember if blue means I received it, but I believe blue is he sent it.

So I'm going to say that I believe these to be Kevin's text messages that he produced to you and not mine.

Q.  Okay.  That was my understanding as well.  I just wanted to double-check.

And here we see -- in blue it says, "That's awesome."  So if this was Kevin's messages, it would be Kevin saying, "That's awesome," correct?

A.  Again, I'm not 100 percent certain, but I believe.

Q.  Okay.  I understand that.  If we take a look at these messages starting at 2297, which you acknowledge were pulled from your phone, in blue, do you agree that these are the messages that you sent, and then the gray would be the message that the person you are texting with sent?

A.  Yes.  And that's why it has the metadata.

4 (Pages 251 - 254)

Page 255

Because it shows and tells you right above the gray --

Q. Yes.

A. -- who responded and what they said.

Q. Okay. Okay. So let's -- on your first day of testimony, do you recall that you stated you had spoken with an attorney before you hired your current counsel? Do you remember that?

A. Yes.

Q. Do you -- since -- do you recall stating that you weren't aware -- you didn't remember at the time of that Day I deposition of who that attorney was?

A. I did not recall his name. That's correct.

Q. Do you recall now after producing the text messages?

A. No. I remember -- well, let me say this. I remember Cioffi.

Q. Okay.

A. But I haven't looked at these, all of these, since I pulled them. So I do remember seeing Mr. Cioffi's name, but there is a second one I believe that I was referred to, but I don't recall his name. It should be in the text messages.

Page 256

Q. Okay. And I guess I should have asked this earlier. You reviewed these materials before you produced them to your counsel?

A. Yes. After the software exported everything, I went through them, but I didn't read every single message. But I made sure that, you know, they were pulled.

Q. Okay. Looking now at PLAINTIFFS 2317, do you see at the top left it says, "Messages - Mark Gardner"?

A. I see that.

Q. Who is Mark Gardner?

A. I don't remember. I believe that he was an attorney that Michael Cioffi referred me to. I believe he gave me his number and we started texting.

Q. Okay. Did you and Michael -- did you and Mark Gardner have any other further conversations besides this text message?

A. No, I don't believe so.

Q. Okay.

A. I don't believe he responded at all.

Q. Okay. Moving down to PLAINTIFFS 2318, do you see here Messages - Michael Cioffi or "Cioffi"? I think you said "Cioffi," so I'll go with your...

Page 257

A. "Cioffi."

Q. Okay. Did you have any other discussions with Mr. Cioffi besides this text message?

A. After or before these text messages?

Q. Let's start after.

A. No, I don't believe so.

Q. Okay. And before this text exchange -- well, the first sentence of the text message says, "Mr. Cioffi thank you for the advice last night," correct?

A. It does.

Q. And was this the attorney that you mentioned in your Day I deposition as possibly speaking to about the eviction case?

A. Yes.

Q. Okay. And do you recall what the advice was that Mr. Cioffi gave you?

A. I don't.

Q. Okay. Moving to PLAINTIFFS 2301, do you recognize this text message with Heather Schofield-James?

A. I mean, I see that there's a text message to Heather.

Q. And on Day I deposition, I don't believe we

Page 258

spoke about Heather Schofield-James. Who is this individual?

A. That's my cousin.

Q. Is she a lawyer?

A. No.

Q. Okay. In this text message, you note that, "I'm losing so much money dealing with this lawsuit again - of which we'll likely end up with $15,000 each," do you see that?

A. I do see that.

Q. Where did you get this $15,000 figure from?

A. I have no idea.

Q. Okay. Moving down to PLAINTIFFS 2303, do you agree that this shows text messages from you to Kirstie Pura; is that correct?

A. I see that it is, I believe, the same text message copy and pasted to Kirstie, yes.

Q. Okay. And that's when we are referring, again, to, "I'm losing so much money dealing with this lawsuit again - of which we'll likely end up with $15,000 each," correct?

A. That's correct.

Q. And again, do you know why you came up with the number -- or where you came up with $15,000 each

5 (Pages 255 - 258)

Page 259

from?

A. No. I don't remember.

Q. Okay. Moving down to PLAINTIFFS 2306, who is Alysha McCluskey?

A. She is a friend that lived at The Eddy.

Q. Is she an attorney?

A. No.

Q. Okay. And in this text message it says, "The second suit is for what Destinee did. I'm talking to the MA attorney general's office and the state of MA. They sound very very soon advise Greystar that they are being investigated for the misuse, abuse or fraud of govt funding," did I read that correctly?

A. You did.

Q. And do recall what you meant by "The second suit is for what Destinee did"?

A. I don't.

Q. Okay. And moving down to PLAINTIFFS 2312, who is Rose Boateng?

A. A friend.

Q. And was Rose a tenant at The Eddy?

A. No.

Q. Is Rose an attorney?

Page 260

A. No.

Q. Okay. In this message, the first message from October 16, 2023, the second sentence, "Under MA law, you cannot charge tenants legal fees unless you win the case. It's plain and simple," do you see that?

A. I see that.

Q. Did I read that correctly?

A. Yes.

Q. Do you recall where you came up with that principle?

A. I'm sorry, principle?

Q. Where you came up with this sentence and belief that under MA law, you cannot charge tenants legal fees unless you win the case?

MR. DUNN: Objection.

A. I can't be certain of exactly --

THE COURT REPORTER: I'm sorry, did you object, Mr. Dunn?

MR. DUNN: Yes, sorry. I was delayed.

THE COURT REPORTER: And what was the answer, "I can't be certain"?

A. I can't be certain of exactly where I found that. Did you hear me?

Page 261

Q. Yes. Sorry.

A. No. That's fine. I just want to make sure the headphones aren't acting up. They have a propensity to do that here and there.

Q. No. So far so good.

A. Great.

Q. Okay. Moving to the next page, PLAINTIFFS 2313, this is text messages with Stephanie Elyse Mary Elyse Mary Thomas, correct?

A. That's correct.

Q. Okay. And in the second message from October 17, 2023, it states -- sorry. One second. In the second message, it states in that second sentence, "I need to find any current or former residents who have been charged any fees, especially 'legal recovery/eviction fees' without them knowing I'm mounting an attack," did I read that correctly?

A. You did.

Q. And did you in fact find any current or former residents who have been charged any fees, especially legal recovery or eviction fees?

A. I don't recall. I did not speak to anyone.

Q. Okay.

A. But I do recall, I do recall pulling up

Page 262

public data through court cases with Greystar Properties and looking at them and seeing the hundreds over the years for the past whatever period -- it was a few years -- and looking at them. I do recall doing that. But I never spoke to anyone.

Q. Do you still have that list and files?

A. No. No, I don't.

Q. Okay. And what did you mean by "mounting an attack" in this message?

A. I believe legal -- I'm mounting an attack is a reference to either finding an attorney or gathering as much evidence as possible to show that -- to provide support in what I was saying about what was occurring. So that's what I can recall.

Q. Okay. Now going down to PLAINTIFFS 2315, who is Tasha Berry?

A. She is a friend.

Q. Okay. Was she a tenant at The Eddy?

A. No.

Q. Is she an attorney?

A. No.

Q. And moving down to PLAINTIFFS 2320, I

6 (Pages 259 - 262)

Page 263

believe you did on Day I talk about Betsy Hamilton. Looking at the third message here from May 19, 2023, that states, "That mf-er lied. Yes, they are going to dismiss the case but then in the same email he said, 'As I mentioned in court, my client's position is that they spent money to file for the nonpayment of rent and can recover the legal fees under your lease sherbert. If they wanted to do so, they would have to obtain a judgment at a later date in a different action.' Basically they are going to sue us in small claims court and ruin our credit and ability to rent in the future if we do not pay those fees because they cannot legally collect them in housing court," did I read that correctly?

A.  You did.

Q.  And who are you referring to in that first sentence?

A.  Nechev.

THE COURT REPORTER:  I'm sorry?

THE WITNESS:  Nechev.

A.  I hope I'm pronouncing his name correctly, the attorney for The Eddy/Greystar/GREP who we met at the Housing Court at our hearing.

THE COURT REPORTER:  And you said HF?

Page 264

MR. AYVAZIAN:  I'll spell it for you, N-e-c-h-e-v, to clear up the record.

THE COURT REPORTER:  Thank you.

A.  That's correct.  That's how it's spelled.

Q.  And would you agree that in the last sentence it says, "Basically they are going to sue us in small claims court and ruin our credit and ability to rent in the future if we do not pay those fees because they cannot legally collect them in housing court"?  Do you know where -- I'll withdraw that question.

This last sentence, do you recall where that "they cannot legally collect them in housing court," where that statement came from, or your belief that that needed to happen?

A.  I'm sorry, I don't really understand the question.

Q.  I can rephrase.  Your belief here that "they cannot legally collect them in housing court," do you recall why you believed that at the time?

A.  I believe that that was my interpretation of Nechev's response in emails, our communication, what I have in quotes there, that was my interpretation.

Page 265

Q.  Okay.  So your interpretation was that if you did not pay the fees, the legal fees, that they, meaning Greystar or The Eddy, are going to sue you in small claims court?

A.  Yes, that was my interpretation of what he sent to me, his response in our correspondences.

Q.  And do you agree that you paid off those legal fees to avoid ruining your credit and ability to rent in the future?

A.  Yes.  To stop the eviction process, I was told over and over again that if the account -- as I said before, if the tenant ledger does not hit zero, you are still late, you are still in the eviction process.  It won't be stopped.  The clock doesn't start over until you hit zero.  Therefore, I had to pay them or this would continue and I could be thrown out in the street or sued.

And I had received an email from, I believe his name is, Marvin stating that Attorney Nechev refused to remove those fees from the ledger.  He instructed him not to remove them and so -- and I don't recall the dates.  It was after.

I emailed Marvin first.  He told me that. I emailed Nechev.  I can't be certain of the order.

Page 266

And so at that point, my understanding of what he said was that they were going to sue me, meaning GREP/Greystar/The Eddy, in small claims court, and that those fees, those legal fees I knew were still on my tenant ledger and would not be removed despite being told by him that they would be removed.

Q.  Do you understand that the legal fees remaining on the ledger -- I'll strike that question.  One moment.

Would you agree that this message indicates that if you don't pay the fees, that they are going to sue you in small claims court and is not stating that the eviction would not proceed?

MR. DUNN:  Objection.

A.  What I am referring to in this text message is only that quote, and based on that quote from Nechev, that is what I am focused on, and that was my interpretation of that exact quote.

Q.  Okay.  And two texts down from that, October 17, 2023, you state, "They did.  Note I have proof and they are going down.  They cannot dispute the fact that they cashed it, it was in their account, they lied, committed govt fraud by charging legal fees which that money partially paid; filed a

7 (Pages 263 - 266)

Page 267

fraudulent eviction; purposely admitted receiving the check two hours before I started a payment inquiry so that they wouldn't get caught," did I read that correctly?

A. Yes.

Q. And is it -- at the time you wrote this, was it your belief that there was a fraudulent eviction brought against you and Kevin?

A. Yes.

Q. And is that still your belief?

A. I'm not certain if it's fraud in terms -- in legal terms. I'm not an attorney, so my use of the term "fraud" was colloquial. So I can't be certain that that is considered fraud.

Q. Yes. I'm not asking about a legal determination now. I'm just asking, as you write it on October 17, 2023, "filed a fraudulent eviction," do you still maintain that it was a fraudulent eviction in your sense of belief?

A. I believe that the eviction was filed, and it was -- it should not have been, and that the check was held and I was lied to; and so I used the term "fraudulent" in terms of filing an eviction knowing -- it was my belief that -- I know that

Page 268

Destinee knew that it had been paid because the check had been cashed. So "fraudulent" refers to lies and being deceptive.

And so do I believe that it was filed, that the eviction was filed and what was on that initial -- I can't recall the name, summons or whatever it's called, once it was filed was untrue. It was a lie, and that is still my belief.

Q. Okay. Moving down to PLAINTIFFS 2321, it states -- and this is from January 6th of this year -- "They are doing it" -- sorry. This is between you and Betsy Hamilton, correct, this text message thread?

A. Yes.

Q. On January 6th you state, "They are doing it solely to pick us off as lead plaintiffs. They don't want the judge to certify the class because once she does, it opens up the flood gates on them. They want to say 'well, they shouldn't be reps of a whole class because they are distinct and unlike others that may have been charged fees because they owe us money," did I read that correctly?

A. You did.

Q. And do you recall who told you that, "They

Page 269

are doing it solely to pick us off as lead plaintiffs"?

MR. DUNN: Objection.

A. No, I do not recall who.

Q. Do you understand what that means?

A. I do.

Q. What do you understand that first sentence to mean?

A. I understand that you have to have lead plaintiffs to file a class action suit and that those lead plaintiffs need to be representative of the class itself, and without lead plaintiffs, you can't continue a class action suit. That's my understanding.

Q. Plaintiffs 2323 now with you and Stephanie Elyse Mary Elyse Mary Thomas. Looking at the third message down -- sorry. One, two, three, four -- the fifth message down, "I've collected a list of a few hundred cases through court documents, but I don't know if it's weird to like...cyberstalk people to ask them about fees they had to pay," did I read that correctly?

A. You did.

Q. And is that that few hundred cases that you

Page 270

spoke about a few minutes ago?

A. It appears to be about that.

Q. I'm not saying you did, but did you cyber stalk people to ask them about fees they had to pay?

A. I did not.

Q. Okay. Did you communicate with any people via the internet, email, text message -- sorry -- any sort of instant message about fees they had to pay at The Eddy?

A. I do not believe I contacted anyone --

Q. Okay.

A. -- on that list.

Q. Okay. Moving down to PLAINTIFFS 2340, who is Shanika Coney?

A. A friend.

Q. Was she a tenant at The Eddy?

A. No.

Q. And is she a lawyer or an attorney?

A. No.

Q. Okay. And what does this message from August 5, 2025 refer to, if you can recall?

A. I don't recall.

Q. Okay. Looking now at PLAINTIFFS 2300, this is a text message again between and you Stephanie

8 (Pages 267 - 270)

Page 271

Elyse Mary Elyse Mary Thomas, correct?

A. Yes, that is correct.

I would like to say that is not her actual full name. We simply joked about the fact that she had a very waspy long name, so we just doubled it.

Q. And on March 3rd, 2026, you wrote a message to Mary saying, "So don't even think about it. I just told Betsy so I wanted to tell you. I have told all of my friends that they requested all my text messages with certain key terms. It's just a heads up. I've never asked any of my friends for legal advice. I specifically never spoke about this to Xandy or Alex, ever, because they are lawyers and that's inappropriate and could put them in a compromising position. They know that so don't be concerned. I think they thought the shit I said, animosity towards Destinee, would somehow embarrass me. It didn't and doesn't," did I read that correctly?

A. You did.

Q. Why did you feel the need to send this message to Mary -- sorry -- to Stephanie?

A. As it says, to give her a heads up that, hey, all our text messages about this issue, that

Page 272

your client requested, them that the attorneys, you, requested those text messages. So just a heads up. That's all it was.

Q. And a heads up for what reason?

A. Just to let them know that -- I mean, they are my friends. I just wanted to let them know that the text messages, you know, that we sent have now been sent to Greystar, Greystar's attorneys.

Q. Okay. Did Stephanie respond to that message?

A. I don't think that she did in terms of a text message.

Q. Do you remember having any communications with her about this text message that you sent her?

A. I do remember us speaking on the phone briefly after this text message was sent.

Q. Okay. And you also sent this message or something similar to Betsy; is that correct?

A. I did, yes.

Q. And did you have any conversations with Betsy over the phone about the sharing of messages?

A. I don't believe that I did. I believe that she may have responded to the text message directly, but I don't recall having a specific conversation with Betsy about it.

Page 273

Q. Okay. Moving up to the October 17, 2023 message, it states, second sentence, "I have obviously had major issues and refuse to pay rent." Then the next sentence, "They tried to evict me. I fought back." Do you recall what you meant by "obviously had major issues and refused to pay rent"?

A. I don't recall specifically what I'm referring to.

Q. Okay. And then it continues, "It was voluntarily dismissed by them, but I have proved that they 'misappropriated' govt funds. I'm going to prove that Destinee committed fraud, and they will not remove legal fees from my tenant account, which I will not pay. In MA you CANNOT collect on legal fees unless you successfully obtain an order of execution (eviction). However, they failed to do that," did I read that correctly?

A. You did.

Q. Do you recall why you stated in Massachusetts, you cannot collect on legal fees unless you successfully obtain an order of execution (eviction)?

A. I recall reading a great deal online

Page 274

through opinions about this. Specifically I remember an organization in Massachusetts that provides information, a great deal of information when someone is involved in an eviction case or has a housing-based issue with a landlord, and that was talked about in those materials. So I can say with certainty that that statement was at least, in part, influenced by those materials in what I read.

Q. Okay. Did any attorney ever -- without getting into discussions with your current counsel, did any of the attorneys that you spoke with before retaining your current counsel tell you that in Massachusetts, you, meaning the property manager or the building owner, cannot collect on legal fees unless you successfully obtain an order of execution (eviction)?

MR. DUNN: Objection.

A. I can't be certain, but I honestly do not believe -- I do not recall having that conversation -- I'm sorry -- that being part of any conversation and don't recall those attorneys ever stating that to me.

Q. Okay. Moving down to PLAINTIFFS 2310, would you agree this is a text message thread

9 (Pages 271 - 274)

Page 275

between you and Kevin Matlack?

A. Yes.

Q. Okay. And on October 23, 2023, you stated, "If they file an eviction, we are not paying rent anymore," did I read that correctly?

A. You did.

Q. Do you recall why you sent this?

A. I do not.

Q. Okay. And moving down to PLAINTIFFS 2358 -- and we briefly looked at this earlier when going through which text messages were yours and which text messages were Kevin's, do you remember that?

A. Yes.

Q. Okay. So this 2358 shows at the top that this is a message that has your name, "Shaun," correct?

A. I see that, yes.

Q. Okay. And the first message which we read -- and I'll go down to the second sentence -- "Our lawyers' arguments against Greystar are actually good Kevin and if we survive the Motion to Dismiss, then we are a class and they may settle quickly," did I read that correctly?

Page 276

A. You did.

Q. Do you recall who told you if you survived a motion to dismiss that you would be a class?

MR. DUNN: Objection.

A. No.

Q. Is that your belief today, that you and Kevin are a class?

MR. DUNN: Objection.

A. The class has not been certified as of yet.

Q. Okay, okay. So you would agree it is not a certified class at this point in time; is that correct?

A. That's my understanding.

Q. Okay. And the last sentence of that text message says, "Even if we get $15,000 each, my part would pay off the car or be used toward a down payment on an apartment," did I read that correctly?

A. You did.

Q. And are you aware that you were offered that amount of money to settle this case?

A. I did receive an offer my attorneys gave me from you guys, from Greystar/GREP, from the Defendants, and, in part, there was an offer for $15,000 each to dismiss this case and promise to not

Page 277

sue or pursue any legal action against your client for anything. So I do recall that being part of a settlement offer that was sent to us.

Q. What is your understanding if you accepted that settlement offer?

MR. DUNN: Objection.

A. My understanding would be that if we accepted the settlement offer, we would each receive $15,000. However, there was no mention of a class or any other parties affected by this. My understanding was this was a personal offer, and it would only be for me and Kevin, and it would have nothing to do with -- it would not provide any relief for any other people, parties that were affected by being charged eviction, legal recovery fees or any other fees; and also my understanding was if we were to accept the offer that was sent to us, that it would only compensate Kevin and I and that we would not have the ability to pursue legal action against your client for other violations of various Massachusetts statutes or work with the Attorney General's Office or any other Government agency to sort of catalyze an investigation over the RAFT funds; and that we would give up any right to

Page 278

take any action, and that by doing so, it would eliminate or significantly impede the ability of others that we are meant to represent to get any relief for being charged these fees, and whatever consequences and pain and distress that they suffered would be -- if we accepted it, it would significantly impede the ability of those people, those parties, to get any relief from going through a similar situation, and that your clients would be free of this case completely.

Q. And who told you that that would be the case?

MR. DUNN: Objection.

A. It's my understanding, and that was my understanding when I reviewed that offer. So I wasn't instructed. This is just to the best of my recollection.

This specific text message is my interpretation of the offer that was sent to us.

Q. What is your understanding of what the Court would do if you accepted an individual settlement?

MR. DUNN: Objection.

A. My understanding is just what I said, but I

10 (Pages 275 - 278)

Page 279

will repeat that. So I am not totally certain -- I recall after receiving the offer doing some research and finding some Supreme Court decision that said that if a lead plaintiff were to accept an offer, there's sort of -- it doesn't totally eliminate the class or the ability to continue, but impedes it. So basically as I said before, it would be a significant obstacle. And so I remember kind of reviewing that.

So I'm not sure what the Court would do, but my understanding is that it would be more difficult for others, for those people that we're meant to represent, to receive any relief of any kind, and that's just my understanding.

I can't say what the Court would do. I can't predict what a judge would do.

Q. Is it your belief that you cannot take an individual settlement because you are plaintiffs in a purported class action?

A. Would you mind clarifying "cannot take" for me, please.

Q. Is it your belief that you would not be allowed to accept an individual settlement in this case?

Page 280

A. I mean, I can accept a settlement offer. I mean, I have the ability to say yes.

MR. AYVAZIAN: Sorry, I don't know if you guys can hear this, but my dog is dreaming. Let me wake him up real quick. One moment.

(Pause)

Q. Okay. And you stated that one of the reasons why an individual settlement would not be in your interest is because of a potential release of other claims you may have against Greystar or The Eddy; is that correct?

A. Based on the offer that I received, what I read, my interpretation, yes, that was my interpretation, that I would not -- sorry -- that we would not pursue any other legal actions for any reason against Greystar or The Eddy if we accepted the settlement amount that was sent.

So I would like to point out I can't see the date associated with this screenshot. So my response is not based on the screenshot as much as it was based on your question about the most recent settlement offer letter because I don't know when I sent this.

Q. And I'll just represent --

Page 281

A. Also --

Q. Go ahead, Shaun.

A. Sorry. Also, while I believe I wrote this, again, I can't be 100 percent certain because the metadata is not here and it doesn't say "Shaun," "Kevin." I believe that I did, but again, this is a screenshot.

Again, my answer was based on your specific question regarding the most recent settlement offer that was provided to me from my attorneys that they received from you.

I just want to make that clear because I am not 100 percent sure.

Q. And I'll --

A. So I --

THE COURT REPORTER: I'm sorry?

THE WITNESS: No. Actually, I was just going to repeat myself.

THE COURT REPORTER: Try to speak one a time because this is being videoed.

A. As I said, I just want to make it clear that my response is based on your question about the most recent settlement offer and my understanding because I don't have the dates and I'm not

Page 282

100 percent certain specifically as to who said what. I'm sorry.

Q. Okay. I will just make the record that in PLAINTIFFS 2358, there's no date, so. All we can see at the top is what you can see on the screen, which is presumably July, but that is it. So just to make the record clear, the date does not appear on this document.

Okay. At this point in time, do you understand that this case is currently only about your claims as there's no certified class?

MR. DUNN: Objection.

A. I'm not a lawyer. What I understand is that the class is yet to be certified.

Q. And has anyone informed you that it is not permitted for you or Kevin to settle individually in this case?

MR. DUNN: Objection. Ara, you are going really close to invading the attorney-client privilege.

MR. AYVAZIAN: I'll withdraw that, Michael. I'll withdraw that question.

Q. Shaun, do you know what mediation is?

A. I do know what mediation is.

11 (Pages 279 - 282)

Page 283

Q. Are you aware that the Defendants in this case were interested in a mediation?

A. I recall the offer letter stating something to the effect of should we want to participate in mediation -- I believe it was referred to as an arbitration -- that that was an option.

Q. And are you aware that a mediation in this case would be in front of a Federal magistrate judge?

A. No.

Q. Okay. Do you understand -- do you have an understanding of how you will be compensated in this case if it does proceed as a class action and you ultimately prevail?

A. The judge will make that decision. What I understand is that the judge makes that decision. So I don't. I don't know exactly what would happen. If we were to prevail, I believe the lead plaintiffs and the rest of the class will be compensated for Greystar's actions. But I don't know what the judge will do.

Q. More specifically, do you understand how you and Kevin will be compensated if this case does get certified as a class action and you -- the case prevails in Plaintiffs' and the class' favor?

Page 284

A. I don't know how other than what I said in terms of the judge will make a decision. I believe the attorneys will ask the judge pursuant to the compensation for the lead Plaintiffs and that the judge will make that determination.

Q. Are you under -- sorry. Are you under -- sorry. Withdrawn.

Do you have an understanding that you would receive a certain percentage of damages or an award as the representatives of a class if you all prevail?

A. I don't know. I don't believe it's a percentage, but I don't know exactly. I just know that the judge determines that. The attorneys will ask, and the judge makes that decision. I don't know if that's based on a percentage or precedence or -- I don't know how she would determine that.

Q. Okay. How about if the Court denies class certification?

A. I don't know what really happens at that point. I'm not sure. I'm not an attorney. I don't know if that means that everything is dismissed or -- I'm not totally certain.

Q. Okay.

A. Can I ask something? I know that we're,

Page 285

you know, getting close to the next time, but if it's okay, could we just do ten quick minutes of a break so I can get some more water and put on a sweater maybe, if that's okay?

Q. Yes. If you want to come back at 10 -- just to make it even, 12 minutes, at 10:55 on my end. I know I'm about a minute behind the videographer. Does that sound good for everyone?

MR. DUNN: Yes.

A. Yes.

THE VIDEOGRAPHER: Stand by, please. The time is 10:44 a.m. We are going off the record. This will end Media Unit No. 1. One second. We are off.

(Recess at 10:44 a.m.)

THE VIDEOGRAPHER: The time is 10:56. We are back on the record as we start on Media Unit No. 2. Counsel.

MR. AYVAZIAN: Thank you.

BY MR. AYVAZIAN: (10:56 a.m.)

Q. Shaun, did you speak to anyone over the break?

A. I did. I walked out, and I saw Kevin and my dog. I said, "Speak no evil, see no evil, hear

Page 286

no evil," and walked out.

Q. Was that to the dog?

A. Both to the dog and to Kevin.

Q. Great. Thanks. We are nearing -- I believe we are almost done here. Let me pull up PLAINTIFFS 2367.

(Document displayed on screen)

Q. Do you see this on the screen?

A. I do. I don't know that it's 2367, but I see it.

Q. Here we go. Can you see on the bottom right in black PLAINTIFFS 2367?

A. Yes, I do see that.

Q. Okay. Okay. And in this message, which is Kevin's text messages, and this is from Shaun at the top. It says, "April 2, 2024, 2:01 p.m."; is that correct?

A. Again, I don't know if these are Kevin's. I see the date and the time you said. I can see that.

Q. Okay. In this message at the -- the top message, it says, "We will be receiving more money than any other class," and then the photo blocks the rest of it, did I read that portion correctly?

A. Yes.

12 (Pages 283 - 286)

Page 287

Q.  Is it your belief that as class representatives, you would be receiving more money than any other class member if this class does get certified?

MR. DUNN:  Objection.

A.  I don't know.

Q.  Do you know why you would have said that back on April 2, 2024?

A.  I don't know that I did say it.

Q.  Okay.  And is that because you don't believe for sure that this is your text message to Kevin?

A.  I believe it's a text message between us. I don't know who said what.

Q.  Okay.  We spoke earlier about the texts in blue coming from the person whose phone it is and the texts in the lighter color or darker color or non-blue color coming from the other individual.  Is it your testimony that you don't know if that top left -- or the top message is your message or Kevin's message?

A.  I don't know for certain.

Q.  Okay.  And you see on the bottom of the second message where it says, "Yup," and it has a

Page 288

little cone going off to the right in the blue message; do you see that?

A.  I do see that.

Q.  Okay.  And that would be in blue.  That's coming from the phone of the person who is sending the message; is that correct?

A.  I believe so.

Q.  Okay.  All right.  Is it your understanding today that you would be receiving more money than any other class member if this class gets certified and you prevail?

MR. DUNN:  Objection.

A.  No.

Q.  What is your belief, then?

A.  About what specifically?  I'm sorry.

Q.  What compensation you would receive as a representative for the class action.

A.  I don't know.

Q.  Okay.  Earlier you stated one of the reasons, when we were talking about individual settlement numbers, was the potential release of future claims against The Eddy and Greystar, do you recall that?

A.  Yes.

Page 289

Q.  Okay.  Are you aware -- withdrawn.

Are you familiar with the term "claim preclusion"?

A.  No.

Q.  Are you aware that resolving some claims could bar future claims arising out of the same events?

A.  I don't know.

Q.  Do you understand that potential claims you may have against The Eddy or Greystar or GREP could be affected by how this case is resolved?

A.  I do not understand the exact consequences.

MR. AYVAZIAN:  At this point in time, counsel, I would like to show the Witness what is marked as PLAINTIFFS 2356 and 2357 from Exhibit 36. It's our understanding that Plaintiffs and Plaintiff's counsel previously asserted the privilege over these two pages of Exhibit 36.  It's Defendants' position that that assertion of privilege has been waived.

I would like to ask the Witness about these text messages.  Do you have any position about myself asking Mr. Cordeiro about the substance of these text messages?

Page 290

MR. DUNN:  Yes.  Plaintiffs object to any questioning about the text messages to the extent -- I mean, under -- you know, for attorney-client privilege purposes.

MR. AYVAZIAN:  Okay.

MR. DUNN:  He's not going to answer any questions about them.

MR. AYVAZIAN:  For the record, we do believe that the privilege was waived as the protective order states on the different -- or the -- what is needed to preserve the privilege of these documents.

Michael, I'll ask the questions.  If you have an issue, you can raise it.  I just want to try to get through it without putting the messages in front of him right now.

BY MR. AYVAZIAN:

Q.  Shaun, do you believe that you owe duties to unnamed class members before certification?

MR. DUNN:  Objection.

A.  I don't understand the question.  I'm sorry.

Q.  Is it your understanding as a representative, or class representative, before certification, that you owe duties to unnamed class

Veritext Legal Solutions

800-726-7007                                                                    305-376-8800

Page 291

members?

MR. DUNN: Objection.

A. I believe I have a moral, ethical and fiduciary duty to potential or future class members and those people -- even though it hasn't been certified yet, the people that have been affected by this, by these business practices, that I do have an ethical, moral and fiduciary duty as a lead plaintiff.

Q. Do you believe that it was unethical for Defendants to make a settlement offer to you on an individual basis as you sit here today?

MR. DUNN: Objection.

A. I don't know that I would characterize it as unethical. Specifically in legal terms, I don't know how you conceptualize that.

Q. Do you believe that the judge in this matter would be mad or upset if you attempted to settle this matter on an individual basis?

MR. DUNN: Objection.

A. I don't know that she would have an emotional response.

Q. Do you believe that the Defendants' individual settlement offer to you and Kevin in this case was made in good faith?

Page 292

MR. DUNN: Objection.

A. I don't know that they are acting in good faith.

Q. Do you believe that it was made in bad faith?

MR. DUNN: Objection.

A. I don't know how you are conceptualizing good and bad faith, so it's difficult for me to answer that question.

Q. Do you think that there's anything wrong with the timing of the settlement offer in this case?

A. I don't know what wrong or right means in terms of making a settlement offer. I don't know that I would characterize it as wrong or right.

Q. Okay. Shaun, do you recall speaking with Kevin about a possible bankruptcy plan that you have if this case does not prevail in your favor?

MR. DUNN: Objection.

A. No.

Q. Do you have a bankruptcy plan in mind for the future?

A. No.

Q. Have you ever spoken with anyone about a bankruptcy plan for -- pertaining to you?

A. You just Kevin. But I don't know. I don't

Page 293

recall ever speaking to anyone about that.

Q. Okay. Is it your testimony today that you have never raised the possibility of having a bankruptcy plan related to the outcome of this case?

MR. DUNN: Objection.

A. I don't recall saying that or having a plan.

Q. Okay. At the bottom of Page 2357, the very last text message states, "Moreover, I have a bankruptcy plan which will inevitably fuck all of," and then it cuts off. Is that -- is it your testimony that you did not send that to Kevin?

MR. DUNN: Objection.

A. My testimony is I can't be certain who said it, whether it was me or Kevin. Again, I don't even know what I'm referring to. If that was me, I don't even know what I'm referring to.

Q. Okay. So if this was you, you just don't have a recollection of why that was written?

A. That's correct. I don't know --

Q. Okay.

A. -- what exactly I'm referring to, if that is me.

Q. Okay.

MR. AYVAZIAN: I would like to ask Shaun

Page 294

about the text message on 2356 from April 21, 2024 at 9:25 starting with "So..." Is it your statement that I cannot ask him about that?

MR. DUNN: You can ask him. I'm just going to object to it and not let him answer. You can ask the question, and we'll just keep going.

MR. AYVAZIAN: Okay.

*Q. Shaun, looking at PLAINTIFFS 2356, this text message, do you recall sending this text message to Kevin that states, "They cannot ethically make the offer they did"?

MR. DUNN: Objection.

A. (No response)

MR. DUNN: You can answer.

THE WITNESS: I can?

A. Can you repeat the question for me, please.

MR. AYVAZIAN: Ken, can you please read that back.

*(Question read)

A. No.

Q. Do you remember sending that text message?

A. No.

Q. Okay. The text message continues, "It's not a good faith offer because they didn't respond

14 (Pages 291 - 294)

Page 295

to the demand letter." Do you remember sending that portion of the message?

MR. DUNN: Objection.

A. No, I don't. I don't remember sending this message at all.

Q. Okay. The message continues, "Now, if we took it, it would piss the judge off because they are acting unethically and we are also because it looks like we are trying to make a quick buck and fuck the class," did I read that correctly as it's written?

A. You did.

Q. Okay. Do you recall sending that message to Kevin?

MR. DUNN: Objection.

A. Again, this is all part of the same text message. I don't recall sending any portion of this text message at all.

Q. And is it your belief today that an individual settlement would piss the judge off because they are acting unethically?

MR. DUNN: Objection. He's not answering that.

Q. Shaun, will you abide by your counsel's

Page 296

instruction not to answer?

A. Yes.

Q. Okay. And the text message continues, "However, he said that if they do try to sue us that he could add the security deposit violations to a separate filing then 'release them' from that second action if they erase our debt to them." Do you recall sending that message to Kevin?

MR. DUNN: Objection. You can answer.

A. No.

MR. DUNN: I believe it was asked and answered, that question, already.

Q. And, Shaun, in this message when it says, "He said that if they do try to sue us," do you know who "he" is referring to?

MR. DUNN: Objection. He can't answer that.

Q. Shaun, will you abide by your counsel's instruction not to answer?

A. (No response)

Q. Sorry, you cut out.

A. Yes.

Q. Okay. And the next text message starts off with, "He also said they had made this offer." In that second message at 9:28 a.m., on PLAINTIFFS

Page 297

2356, do you know who "he" is referring to?

MR. DUNN: Objection. He can't answer that.

Q. Shaun, will you abide by your counsel's instruction not to answer?

A. Yes.

Q. Looking now at Plaintiffs 2357, in the text message sent to Kevin, "However, our lawyers will clap back by filing a second security deposit suit and they are convinced Greystar will answer THAT demand with a good faith offer to wipe our debt away," do you remember sending that message?

MR. DUNN: Objection. You can answer.

A. No.

Q. And do you believe that you did not send that message?

MR. DUNN: Objection. Asked and answered.

A. I don't know. I'm not denying nor confirming. I'm not certain. I have to be honest and say I'm not certain.

Q. And do you know what is meant by "second security deposit suit" in this message?

A. What is meant?

Q. Yes.

A. Again, I don't remember sending it, so I

Page 298

don't know what was in my mind at that time.

Q. Okay. And the third line of this message referring to "they" in "They are convinced," who are you referring to in "they"?

MR. DUNN: Objection.

A. I don't --

MR. AYVAZIAN: Is he permitted to answer?

MR. DUNN: Sorry. I was reading it again.

Objection. No, he can't answer that.

Q. Shaun, will you abide by your counsel's instruction not to answer?

A. Yes.

Q. Okay.

(Pause)

MR. AYVAZIAN: Okay. I have nothing further.

MR. DUNN: I don't have any questions.

THE VIDEOGRAPHER: Is it okay to close the record, counsel?

MR. AYVAZIAN: Yes.

Thank you, everyone. Thank you, Shaun.

THE VIDEOGRAPHER: Stand by. This concludes today's deposition of Shaun Cordeiro. The number of media units used is two. It will be retained by Veritext Legal Solutions.

15 (Pages 295 - 298)

Page 299

We are going off the record at 11:18 a.m.

THE COURT REPORTER:  Attorney Dunn, did you need the transcript?

MR. DUNN:  Yes.  An electronic copy would be fine.

MR. AYVAZIAN:  Same for Defendants.

(Whereupon the deposition was concluded at 11:18 a.m.)

Page 300

COMMONWEALTH OF MASSACHUSETTS)
SUFFOLK, SS.              )
   I, Ken A. DiFraia, RPR and Notary Public in and for the Commonwealth of Massachusetts, do hereby certify that there came before me remotely on the 29th day of April, 2026, at 9:37 a.m., the person hereinbefore named, who was by me duly sworn to testify to the truth and nothing but the truth of his knowledge touching and concerning the matters in controversy in this cause; that he was thereupon examined upon his oath, and his examination reduced to typewriting under my direction; and that the deposition is a true record of the testimony given by the witness.
   I further certify that I am neither attorney or counsel for, nor related to or employed by, any attorney or counsel employed by the parties hereto or financially interested in the action.
   In witness whereof, I have set my hand and affixed my notarial seal this 13th day of May, 2026.

_Ken A. DiFraia_
Notary Public
Commission expires 2/8/2030

16 (Pages 299 - 300)