# Exhibit E

30(B)(6) Brandon Casteel Volume II            May 13, 2026
Cordeiro, Shaun, Et Al. v. Grep Atlantic LLC, Et Al.

Page 126

                              Volume II
                          Pages 126 to 193
                          Exhibits 13 to 15
              UNITED STATES DISTRICT COURT
                DISTRICT OF MASSACHUSETTS
                     EASTERN DIVISION
- - - - - - - - - - - - - - - - - -x
                                   :
  SHAUN CORDEIRO and KEVIN         :
  MATLOCK, individually and on     :
  behalf of all others            :
  similarly situated,              :  Civil Action
              Plaintiffs,          :  No.
                                   :  1:23:CV-12901-AK
          vs.                      :
                                   :
  GREP ATLANTIC, LLC, and EDDY     :
  OWNER, L.L.C.,                   :
              Defendants.          :
                                   :
- - - - - - - - - - - - - - - - - -x
         CONTINUED DEPOSITION OF GREP ATLANTIC, LLC,
through its designee, BRANDON CASTEEL, a witness
called by counsel for the Plaintiffs, appearing
remotely via Zoom, from Seattle, Washington, taken
pursuant to Rule 30(b)(6) of the Federal Rules of
Civil Procedure, before Jane M. Werner, Registered
Merit Reporter and Notary Public in and for the
Commonwealth of Massachusetts, appearing remotely
from Halifax, Massachusetts, on Thursday, May 13,
2026, commencing at 11:06 a.m.

PRESENT:

         ALL PARTICIPANTS APPEARED VIA
            ZOOM VIDEOCONFERENCE
     Maginnis Howard
         BY:  MICHAEL DUNN, ESQ.
         7706 Six Forks Road, Suite 101, Raleigh,
         North Carolina 27615, for the Plaintiffs.
         mdunn@maginnislaw.com
         919.526.0450

30(B)(6) Brandon Casteel Volume II          May 13, 2026
Cordeiro, Shaun, Et Al. v. Grep Atlantic LLC, Et Al.

Page 127

PRESENT: (Continued)
   Shook, Hardy & Bacon L.L.P.
      BY:  ARA K. AYVAZIAN, ESQ.
      One Federal Street, Suite 2620, Boston, MA
      02110, for the Defendants.
      ayvazian@shb.com
      617.531.1411

   Also Present:  Kristen Bor-Zale, Esq.
         Prab Singh
            * * * * *

Page 128

            I N D E X

WITNESS:          DIRECT  CROSS  REDIRECT  RECROSS

BRANDON CASTEEL
(By Mr. Dunn)       129        186
(By Mr. Ayvazian)          173

            * * *

         E X H I B I T S

EX. NO.                      PAGE

EXHIBIT 13  Spreadsheet labeled GREP-008155  168

EXHIBIT 14  Spreadsheet labeled GREP-008156  168

EXHIBIT 15  Spreadsheet labeled GREP-008157  168

            * * *

Page 129

            P R O C E E D I N G S
            BRANDON CASTEEL
a witness called for examination by counsel for the
Plaintiffs, having been satisfactorily identified by
the production of his driver's license and being
first duly sworn by the Notary Public, was examined
and testified as follows:
            DIRECT EXAMINATION
   BY MR. DUNN:
   Q.  Could you state your name for the record.
   A.  Brandon Casteel.
   Q.  And what's your -- well, who are you
employed by, Brandon?
   A.  I am employed by Greystar.
   Q.  And when you say "Greystar," what does that
mean?
   A.  Greystar is a property management and
development company in the multi-family housing
space.
   Q.  And is that Greystar LLC or what entity
pays you?
   A.  That's a great question.  I know there are
a lot of articles.  GREP I believe is the latest
one, but I would have to look that up.

Page 130

   Q.  Okay.  Got you.
      So my understanding is we're here to talk
about a few relatively limited topics.  Is that your
understanding as well?
   A.  Yes.
   Q.  Okay.  And I previously -- well,
previously -- and I assume this is a continued
deposition; but previously, Exhibit 9 was a notice
of deposition.  I can share my screen, if that's
helpful.
      MR. DUNN:  Ara, do you have the exhibits I
emailed to you?
      MR. AYVAZIAN:  I do.  I think if you can
share the screen, that would be helpful.  I don't
know if Brandon has them in front of him.
      MR. DUNN:  All right, well, let's give this
a whirl.  All right, let's see if we can do
something here.
      THE WITNESS:  Something's happening.  There
we go.
   BY MR. DUNN:
   Q.  All right.  So Brandon, can you see that?
   A.  I can.
   Q.  Okay.  And this is -- well, actually, do

2 (Pages 127 - 130)

Page 131

you want to take some time to read it?

A. I would love to. I don't believe I've seen Section 9.

Q. Okay. Just let me know. I'll go slowly.

A. Are you asking me to read the full thing? Oh, specifically --

Q. It was previously marked as Exhibit 9. I just want to go slowly so that you recognize it.

And then my understanding is the topics for discussion today are 17, 28, 29, 32 and 33. So I'm going to scroll down to get there.

A. Okay, I apologize. I have seen this. I thought Exhibit 9 was separate of Exhibit 17 or 29 or 33 or what have you. So that was my misunderstanding.

Q. No, that's fair. So this is a deposition notice. It's a corporate deposition notice. We call it a "Rule 30(b)(6)" in the federal world. But when you depose a corporate entity, you have to issue topics. And so to me, this is a continued deposition of Greystar. And I'm scrolling down fast here. My understanding was Topic No. 17, "The programming, settings or logic within Yardi or OneSite that determined the order in which tenant

Page 132

payments are applied to outstanding balances (e.g., application to fees versus rent) and GREP's ability to modify such settings." Along with -- that's Topic No. 17. Along with Topic No. 28, I believe, which is "The process by which GREP can identify tenants who may be members of the putative class action"; Topic 29, "The number of tenants who may be members of the putative class as defined by Plaintiffs"; and 32 and 33, which are "The process for gathering, creating and ensuring the accuracies of spreadsheets produced in this matter pertaining to the identity of putative class members"; and "The process for gathering, creating, and ensuring the accuracy of spreadsheets produced in this matter pertaining to the amount of eviction-related fees recovered from putative class members during the Relevant Time Period."

I know that was a handful. But did I read that correctly?

A. That's what I understand.

Q. And are you prepared to testify today about those topics?

A. Yes, sir.

MR. AYVAZIAN: Michael, I just want to put

Page 133

on the record that the preparation of Mr. Casteel was limited to the objections that we all agreed upon and the scope of those topics based on those objections and the agreements that we had coming into this deposition.

MR. DUNN: Okay. Well, that's fair.

BY MR. DUNN:

Q. So what did you do to prepare for your deposition today?

A. Ara and the team, we met just a few times over this past week, week and a half, to just review these items that you're sharing and to make sure that I had a good understanding of what we were going to be looking at.

Q. How long did you spend preparing for your deposition?

A. Over the few meetings, a few hours; three or four hours.

Q. And did you review any documents?

A. We did.

Q. And what documents did you review?

A. We looked at the Yardi export that was provided, the OneSite export files, the Entrata exports, and a believe a version of the document

Page 134

that you just shared as well.

Q. So tell me, what's your understanding -- what is Yardi?

A. Yardi is a property management system.

MR. AYVAZIAN: Michael, I object. Just for the purposes of today's deposition, he's testifying on behalf of Greystar, as opposed to in his individual capacity. Just putting the reminder out there. When you say "your understanding," it will be for Greystar's understanding, correct?

MR. DUNN: That's correct. He mentioned Yardi. He mentioned OneSite. I'm just asking him to tell me what those are.

MR. AYVAZIAN: I understand. I just meant for purposes of using words like "you" or your "understanding," it's that he's testifying on behalf of Greystar. That's all.

MR. DUNN: Fair enough.

BY MR. DUNN:

Q. And what is your understanding of -- and when I say "you," I mean as the company. What is your understanding of OneSite?

A. OneSite is a secondary or property management platform, software.

30(B)(6) Brandon Casteel Volume II          May 13, 2026
Cordeiro, Shaun, Et Al. v. Grep Atlantic LLC, Et Al.

Page 135

Q.  And what is your role with Greystar?

A.  I am manager of the property systems integration team over technology services.

Q.  I'm going to ask you to repeat that.  It was the manager of the property system integration team?

A.  Correct.

Q.  And where are you based?

A.  I'm based out of Seattle.

Q.  And so is that -- are you nationwide?  Do you work nationwide?

A.  My responsibilities does involve all states in the U.S., yes.

Q.  Anything, like, outside of the United States --

A.  (Witness shakes head)

Q.  Okay.  Just domestic?

A.  Correct.

Q.  Have you ever been deposed before?

A.  I have not.  This is a new one for me.

Q.  My apologies.  I don't want to talk over you.  I normally go through some ground rules where this is a question-and-answer session.  I'm not allowed to interact with the defendant outside of

Page 136

the presence of the defendant's attorneys.  So you do understand that you need to answer verbally to the deposition questions.  And if at any point you want to take a break, we can do that.

I don't expect this will last very long; but, you know, obviously we've got a limited number of topics.  I just want to cover those and get your understanding of the information.

As I understand it, you reviewed some Excel spreadsheets that are for discussion today.  And so I just need to know what the company's answers are as to what that means, if that makes sense.

A.  Understood.

Q.  Hopefully it won't be too painful.  And by the way, I'm going to probably ask some really rudimentary dumb questions, just so you can explain it to me.  And I want to apologize in advance for that.

A.  No worries.

Q.  So let's just start with one of these documents, if you don't mind.

So I'm going to share my screen again here to the best of my ability.

All right.  That's the deposition notice --

Page 137

A.  There we go.  I do see your Excel file.

Q.  Okay.  It's up on my phone.  It is not up on my screen.  I don't know why that is.  Okay.  Here we go.

Have you reviewed this document before?

A.  The document looks familiar, if this is the one that was provided.  We reviewed that in briefings, yes.

Q.  It's labeled as GREP-008155 Confidential."

And what I'm looking at at the bottom, it says "Yardi."  Is that what you see?

A.  That is what I see, yes.

Q.  And can you tell me what this spreadsheet represents?

A.  Can you scroll all the way through so I can get a full scope of what that spreadsheet --

Q.  Yes.

A.  Scroll to the right, further down the columns.

Q.  Oh, fair enough.  This is weird.  I'm looking at this on my phone and computer screen at the same time.  So just bear with me.

A.  No worries.  So this looks like to be a charge and payment extract showing charge and

Page 138

payments related to what looks to be legal fees and the payments associated for Yardi.  I only see Yardi-Alliance at the moment as the PMS, the property management system.

Q.  Is there a different Yardi?

A.  Yardi provides -- Yardi is a separate entity of Greystar.  It's not part of Greystar whatsoever.  They provide licenses to various property management companies to leverage their platform for their purposes.

Q.  I guess what I mean is, you said "Yardi Alliance."  Are there different Yardis other than Alliance?

A.  Correct.  Yardi Alliance would be Alliance, the company's version of Yardi.  And that's their licensed version.  There would be a Greystar Yardi.  There would be potentially other third-party or other clients leveraging their own instance or license of that Yardi product.

MR. AYVAZIAN:  Michael, if you scroll over back to that column -- I'm doing this now so we don't avoid any discovery.  If you scroll down, you start seeing different -- see how it went from Yardi Greystar 7S --

4 (Pages 135 - 138)

30(B)(6) Brandon Casteel Volume II          May 13, 2026
Cordeiro, Shaun, Et Al. v. Grep Atlantic LLC, Et Al.

Page 139

MR. DUNN:  Yes.

MR. AYVAZIAN:  I'm just giving you that heads-up that it's that window.

MR. DUNN:  I think that's fair.  I was going to get there, but --

MR. AYVAZIAN:  Sorry about that.  I'll step back.  I just wanted to make sure you saw that before we started.

BY MR. DUNN:

Q.  In the first cell, what I'm looking at is "Property Operations Key."  What is that?

A.  That would be a unique property identifier within the Greystar data warehouse ecosystem.  It's a unique identifier to how the Greystar's data warehouse is consuming data out of and storing it.

Q.  Does that represent a property or -- when you say -- I guess I don't quite understand.  So does that represent a property?

A.  In this instance, 1358, I believe, is going to represent The Val.  And that's how the data warehouse is consuming that in giving it the unique identifier.

THE COURT REPORTER:  Did you say "val"?

THE WITNESS:  "The Val."  Under Column C,

Page 140

the property name is "The Val."  That's a unique identifier for that property.

MR. DUNN:  Gotcha.

BY MR. DUNN:

Q.  So what is the Yardi code?

A.  The Yardi code is the unique identifier for that property within the Yardi environment.

Q.  This is going to sound really dumb, but what's the difference between the property operations key and the Yardi code?

A.  They're different databases, different platforms.

Q.  Okay.  So -- well, let me just back up.

So where is this data coming from that's on this spreadsheet?

A.  This data would come from the Greystar data warehouse by way of an ETL or a flat file extract from the Yardi property system.

Q.  So you ran, like, a database query of, I guess, Greystar properties and extracted this data?

MR. AYVAZIAN:  Objection, form.  You can answer, Brandon.

A.  Correct.  It does come from the property systems that are under Greystar's management.

Page 141

Q.  So do you --

A.  Under Greystar's license.  Greystar licenses Yardi or various property systems.

Q.  Okay.  So were you the person that ran this query?

A.  I did not.

Q.  But you're the person most knowledgeable about what information is contained in here?

MR. AYVAZIAN:  Objection, form.  You can answer.

(Off the record for technical difficulties)

A.  I am knowledgeable of this document, yes.

Q.  Column D, "Resident Key," can you tell me what that is?

A.  Resident key is the unique identifier for the resident account within the data warehouse.

Q.  And then resident ID, what does that mean?

A.  Resident ID would be the property system; in this case, Yardi's unique identifier for that resident's account.

Q.  And can you tell me the difference between the resident key and the resident ID?

A.  They are two different systems that have and require two different unique identifiers.

Page 142

Q.  Okay.  Moving to Column F, that would be the first name of the tenant?

A.  Correct.

Q.  And then Column G would be the last name of the tenant, correct?

A.  Correct.

Q.  But you said there were -- my understanding was as long as they entered it correctly when they apply?

A.  The data that comes into the property system would be based off of that online applicant's data entry.  So, yes, the first name should represent first name, Column F.  Classroom G should represent last name.

Q.  Gotcha.

And I don't want to cover any prior testimony, but so a tenant would be applying online and input this information in?

A.  Correct.

Q.  So this is not something that comes from, like, a lease?  Like, it's not getting manually entered by the company?

A.  No.

Q.  Column H, "Building."  What does that mean?

5 (Pages 139 - 142)

30(B)(6) Brandon Casteel Volume II          May 13, 2026
Cordeiro, Shaun, Et Al. v. Grep Atlantic LLC, Et Al.

Page 143

A. "Building" is based off of how a particular property is structured. So if a property has multiple buildings and they want to have a building as the unique identifier, that is an available option within the build-out of the property system's account.

Q. Are there a lot of those?

A. I would have to research that. I don't know what the frequency or cadence of properties meaning a unique building versus unique unit.

Q. And so moving on to Column I, what does "unit" mean?

A. That would be the door ID; so the unit number in and of itself that's part of the address.

Q. Okay. So just for my personal benefit, so, like, if you were in an apartment complex, 110 would be, like, your apartment?

A. That would be your door number.

Q. Right, okay. Gotcha.

"Address," Column J. Can you tell me what that is?

A. The street address of that particular property.

Q. Okay. So you have many units in that --

Page 144

like, at an address; is that correct?

MR. AYVAZIAN: Objection to form. Brandon, you can answer. When I object and say "form," feel free to answer afterwards, unless I instruct you not to answer.

THE WITNESS: Okay, got it.

A. Yes, there can be multiple units or an entire building associated with one address that's going to have multiple units in it.

Q. Gotcha. Okay.

Moving on to Column K, "City." I think that's self-explanatory, but can you tell me what that is?

A. That would be the city in which that property is located.

Q. Fair enough. And "State"?

A. The state in which that property is located.

Q. All right. So "Lease Start." What does that mean?

A. That would be the start of the current lease that a resident has on file.

Q. Column N, "Lease End"?

A. The defined date on the lease; when that

Page 145

lease is expected to end.

Q. And then I see "Move In Date." And what is that?

A. The move-in date in which they moved into the property.

Q. And then I'll move to the right, "Move out Date"; what would that mean?

A. That would be the date that they were -- that they had moved out and -- moved out of the property.

Q. So if there's no date there -- and I don't see one on this first person -- did they not ever move out?

MR. AYVAZIAN: Objection, form. At the time that this data was pulled. I would just add that limitation.

A. So in this instance, I do not see a move-out date. I would not have any idea why, if there is -- if they went to a month-to-month lease or did not. I would have to research that individual unit.

Q. Next column; "Eviction Start Date."

A. If the onsite teams registered an eviction and put that note within the property system, then

Page 146

it should reflect. It should show in the system.

Q. And then Column R, "Eviction Date"?

A. That would likely be the date that the eviction was granted, and that would be a manual fill that the property team would need to enter.

Q. And "Eviction Cancel Date," Column S?

A. The manual date that the property team would need to enter.

Q. Column T; what is "Line Type"?

A. "Line Type" in this extract would be based off of the activity that's being reported. So charges versus payments.

Q. Next column, Column U; what does "Code" mean?

A. "Code" would be the charge code associated with that activity, whether that be to a legal fee or the payment activity.

Q. So "Legal" means a legal fee?

A. Legal fee could be used in any number of reasons. I would need to understand that property's usage of it to understand why they're using and leveraging a legal fee. It could be charges related to anything legal; whether they're drafting a notice to a resident for a lease violation, whether they're

6 (Pages 143 - 146)

30(B)(6) Brandon Casteel Volume II                    May 13, 2026
Cordeiro, Shaun, Et Al. v. Grep Atlantic LLC, Et Al.

Page 147

drafting a response to a resident's complaint and they used a lawyer to draft the complaint back to the property; or a result of maybe an eviction, if it's an eviction. Maybe they're using that legal fee as part of the storage or removal of furniture from the unit post-eviction. There's not a clear definition without looking directly at the ledger and reading any kind of notes that are available per case.

Q. Fair enough. But "legal" means some sort of a legal fee. Whether eviction or not, it's some sort of a legal fee that the tenant is being charged?

MR. AYVAZIAN: Objection, form. You can answer.

A. My understanding would be that they would use that appropriately, but I could not in any one particular case, without doing any additional level of research, answer why that charge code was specifically used.

Q. I think that's fair. I'm not asking you to answer on a specific basis. But it would be some sort of legal fee that's being charged to the tenant, whether it's an eviction or not, right?

Page 148

A. That would be my understanding, yes.

Q. So the next code, Column B, "Description," it says "Legal Fee." Is there a difference between the code and the description?

A. The description is the definition of the code. And they go hand-in-hand. It's part of the way the system is structured. The onsite teams don't have the ability to change that description.

Q. And what does the "Original Date" mean?

A. The original date would be the date in which the charge or the payment was received and processed within the system.

Q. And the "Original Amount"?

A. The value of the charge for receipt.

Q. So on this spreadsheet, are those -- I mean, those are dollar amounts?

A. Yes.

Q. And then the next column, Column Y, "Apply Date," what does that mean?

A. That would be the date in which a payment was applied onto the ledger.

Q. So if I'm looking at these first two lines, I'm seeing, "Legal Fee 11 and 10/2021," "original Amount 40." I don't see an applied date, but then I

Page 149

see below it a payment of what looks like an original date and then an original amount.

I guess I'm having trouble understanding what the correlation between what the 40 and the 552 and then the applied amount is. Does that make sense? I was sure Ara was going to object to that question. But does that make sense?

MR. AYVAZIAN: Objection, form. Go ahead and please answer.

A. If you scroll a little further to the right, you're going to see "Transaction IDs." That is how we are able to map the transaction ID and the charge transaction ID to see -- this applied date is going to be the date in which that payment in full or in partial applied to the associated charge. So that's why you're going to see the applied date of that 55 -- 552.75 applied to the 40. You'll see the applied amount is saying or indicating that that legal fee of $40 for that first row has been satisfied and was applied on December 1st of 2021. And the transaction ID and payment IDs will correlate.

Q. So probably a dumb question. So a 552.75 payment was made, and that was applied to the $40

Page 150

amount?

A. $40 in Column Z was applied to the $40 charge on December 1st of 2021.

Q. But there was a payment; a 552.75 payment. And part of that was the $40?

A. Yes.

Q. I'm just trying to figure that out. Okay. So a payment was made. It was applied to that $40 charge, correct?

A. Correct.

Q. And it doesn't matter what the payment was. It was just, we had this charge that was 40; we applied it. Once the payment came in, we applied it to the charge, and it was credited, right?

MR. AYVAZIAN: Objection to form.

A. It was satisfied. The charge was satisfied with that payment of $40.

Q. Perfect, thank you.

So what is this "Charge Transaction ID"?

A. The "Charge Transaction ID" is going to be the identification -- the charge ID of any charge that gets posted onto a ledger. It has a unique identifier.

Q. And that's not something that would be,

7 (Pages 147 - 150)

30(B)(6) Brandon Casteel Volume II                    May 13, 2026
Cordeiro, Shaun, Et Al. v. Grep Atlantic LLC, Et Al.

Page 151

like, in a tenant system? It's just something that you guys have internally?

A.   Correct, an accounting mechanism. That's how it's recording that transaction.

Q.   Gotcha. And what is the "Payment Transaction ID"?

A.   Similarly, any activity that's going on the ledger has a unique identifier. So "Payment Transaction ID" would be unique to "Payment."

Q.   So if I'm looking at 633864148, in that column, is that a payment transaction idea for the application of the $40?

A.   It is the unique transaction -- excuse me, it's the unique payment transaction ID for that one singular payment. So that that one singular payment transaction ID can be associated with multiple charges. And any one of those charges will have its own unique identifier.

Q.   Just to clarify, so going back to Column X, 552.75, that Payment Transaction ID is not limited just to the $40. It is the transaction of the 552.75?

A.   That one payment in excess of the $40, the remaining can be posted to any number of additional

Page 152

charges; rent, utility, etc., whatever is outstanding. And that payment ID will be reflective on each one of those individual charges, so that there's a correlation between the two.

Q.   Well, just scrolling down, I see the same Payment Transaction ID related to a -- what looks like 140 applied amount.

So same transaction ID applied to another charge on the tenant?

A.   Based off of this, I would say that that same payment, with the same payment transaction ID, applied to both of those two individual legal fee charges of 40 and 140.

Q.   Gotcha.

Is there any variance -- other than, like, this spreadsheet, is there any variance in the way that Greystar applies these payments and charges and transaction IDs?

A.   I'm not sure I follow. Can you rephrase that?

Q.   Yeah. I'm looking at this data. It's a really large spreadsheet, and I don't want to go through it line-by-line. But I'm asking, is this how your system tracks it for, I guess, all

Page 153

Yardi-related charges?

MR. AYVAZIAN: I'll object to form, but go ahead.

A.   The payment would be allocated based off of charge priorities that are set at a state level. Is that -- does that answer your question?

Q.   Well, what does "charge priority" mean?

A.   Based off of different state requirements, there is outstanding rent, utilities or legal fees, I wouldn't be able to speak to that order for every state, but there is a payment priority in which when a payment comes in, by default, it will want to satisfy No. 1 first; and whatever residual will satisfy subsequent charges, unless the onsite team -- whatever they pay, it allocates based off of that priority.

Q.   Oh, okay. That makes sense. That's an internal accounting mechanism that automatically applies to payments based on what comes in. It gives them the transaction ID. It applies it to however it applies it in the system. In this case, it's Massachusetts; so however they determine what the legal requirements are in Massachusetts. And then it applies it, and that's how it gets handled?

Page 154

A.   That is my understanding.

Q.   So "PMS," what is that?

A.   That's the property management system.

Q.   Here we've got, it looks like, Yardi Alliance, Yardi Greystar. How many different variations are there?

A.   I would not be able to give you an exact value. We do have client licensed systems that Greystar purely manages the sites, but does not actually license the property system. So there are quite a few versions.

Q.   So in Massachusetts, do you know how many versions there are?

A.   I do not.

Q.   Would you have a guess?

A.   I would not venture to guess. I genuinely would not have an idea, without looking it up.

MR. AYVAZIAN: Michael, are you asking about how many versions Yardi itself, as a PMS company, has their own versions or how many versions that Greystar uses for their -- for this particular spreadsheet?

MR. DUNN: I don't know. I'm looking at Yardi, Yardi Alliance. And within the spreadsheet,

8 (Pages 151 - 154)

30(B)(6) Brandon Casteel Volume II                May 13, 2026
Cordeiro, Shaun, Et Al. v. Grep Atlantic LLC, Et Al.

Page 155

I see "Yardi Greystar." I'm just curious what the witness knows as to these variations. I mean, if he can make a representation as to what's in Massachusetts. And if he doesn't know, that's fine. I'm just trying to narrow it down.

MR. AYVAZIAN: I understand. That drop-down box in the PMS system might help you get that clarification.

MR. DUNN: Thank you.

BY MR. DUNN:

Q. Yardi Alliance, Yardi Greyst 7S. Are there any other ones in Massachusetts that you know of?

MR. AYVAZIAN: And I'll just object to form. If you're asking about the Yardi systems that clients have licensed versus these two Yardi systems that are in this data? I just wanted to clarify the question.

A. So Greystar recently had acquired Alliance Residential. And there is a migration process of taking those properties and moving them into the Greystar ecosystem. So Greystar in this instance has access to Yardi Alliance. And that's why you'll see Yardi Alliance and Greystar 7S.

Page 156

Q. Gotcha.

A. But we do not have access to client-licensed platforms. And that applies to all property systems; Yardi, Entrata and RealPage or any other one that a client may use outside of those three core.

Q. Can you explain that for me?

A. There are multiple property management systems in the multi-family housing space. And we will manage properties. And if the clients want to use their own licensed system, whatever system that may be, we can still manage it. But this extract that we're looking at, what was provided by Greystar, will not have that information, as we are not able to access it and extract it.

Q. Just kind of following up on that. So you have property systems that you don't have access to the data, but you manage the properties. And that's because it's owned by, like, I guess, for lack of a better term, a third party?

A. It would be licensed by that particular client or ownership group directly. And we do not import that information into the Greystar data warehouse.

Page 157

Q. Well, do you have access to the information?

A. The onsite, yes; the property teams have access to that database. For the Greystar data warehouse and for the purposes of this document that we're looking at, it is not accessible.

Q. Okay. Let me move to another document. Can you guys see this?

MR. AYVAZIAN: I can still see 8155 right now.

MR. DUNN: I was trying to get to 8156. Let me see if this works.

MR. AYVAZIAN: Sometimes you might have to stop the Screen Share and then restart it.

MR. DUNN: All right. How are we doing?

THE WITNESS: There you go. I see something that says, "MA Class Action."

Q. Yeah. Can you explain what that is?

A. I'm -- it looks like the Massachusetts class action, if I'm reading the stated abbreviation correctly.

Q. Are you familiar with this document?

A. If you can scroll to the right, this looks very similar to the Yardi one. I just need to know

Page 158

what property system we're speaking to. (Scrolls through document) That's going to be a OneSite document.

Q. And I think you mentioned this earlier --

A. Excuse me, correct that. So that's the export from the OneSite database.

Q. And I think you mentioned this earlier; you use Yardi and OneSite?

A. Correct. Greystar uses multiple property systems based off of client needs.

Q. And are there any other ones beyond Yardi and OneSite?

A. Entrata.

Q. Entrata, okay.

A. They are licensed property systems by Greystar that we would have access to in this export.

Q. And I think this is probably pretty similar to the last one. We've got a "property operations key." What does that mean?

A. That's going to be the unique ID within the data warehouse.

Q. To the specific property?

A. To the specific property, correct.

9 (Pages 155 - 158)

30(B)(6) Brandon Casteel Volume II       May 13, 2026
Cordeiro, Shaun, Et Al. v. Grep Atlantic LLC, Et Al.

Page 159

Q.  And that would be -- looking at Column 2, 2457 goes to Jefferson at Dedham Station?

A.  Correct.

Q.  "Yardi Code"?

A.  Unique property system ID.

Q.  And that's internal?

A.  Correct.

Q.  "Resident Key"?

A.  Unique to the data warehouse, Greystar's ecosystem.

Q.  So I mean, the same deal as the other spreadsheet?

A.  Correct.

Q.  "Resident ID"?  Same deal as the other spreadsheet?

A.  Correct.

Q.  Assuming entered correctly in the application, "First Name" and "Last Name"?

A.  Correct.

Q.  All right.  We're moving right along here. Sorry.  "Building"; the same deal as the other spreadsheet?

A.  Yes, sir.

Q.  "Unit" is the door number, correct?

Page 160

A.  Yes, sir.

Q.  Okay.  "Address"; self-explanatory?

A.  Agreed.

Q.  "City"?

A.  Same.

Q.  "Date"?

A.  Agreed.

Q.  All right.  "Lease Start"?

A.  Same.

Q.  "Lease End"?

A.  The same.

Q.  "Move In Date"?

A.  The same.

Q.  I tried to warn you this might be a little silly.

A.  No, I get it.  I understand.

Q.  All right.  "Move Out Date"?

A.  The same.

Q.  "Eviction Start Date"?

A.  The same as before.

Q.  "Eviction Date"?

A.  Same as before.

Q.  "Eviction Cancel Date"?

A.  Same as before.

Page 161

Q.  "Line Type"?

A.  Same as before; charge code.

Q.  All right.  "Code"?

A.  Yes, sir.

Q.  "Description"?

A.  It would be the same as before with Yardi.

Q.  Okay.  Are there any differences between, well, I guess this spreadsheet and the last spreadsheet we were looking at?

MR. AYVAZIAN:  Objection as to form.

A.  I believe there are.  OneSite is a little bit more complex in its tracking of payments and charges.

Q.  And what do you mean by "more complex"?

A.  If we scroll past the Original Date, Original Amount, Applied, Applied Amount, Transaction ID, Payment ID, PMS, all of that, Transaction Due Amounts, all of that is going to be pretty consistent.  We do have a couple of more columns in this document that is going to be relative to the accounting period, the accounting month in which that activity has taken place.

Q.  Well, I guess, can you elaborate on that? The accounting period and when that's taking place?

Page 162

A.  Sure.  So if you reference Column AP, there is "Cash Paid Current."  That's going to be monies paid in the current accounting financial period. And then there's "Cash Paid Previous."  That's going to be cash that may be reallocated and applied to a charge to a previous period.

So there's just a little bit more granularity in the movement or activities.  That's all.

Q.  I mean, in the last spreadsheet, where we had the -- you had the payment, you had the transaction ID; it gets applied to a certain amount. You're saying this just is more detail -- monthly detail?

A.  Yes.  It's telling you what financial period that the property is operating in.  So they're operating today, in the month of May or they're operating in April, because they don't roll over until the 14th of May.  So they're just operating periods for financial reporting purposes. That's all that's indicating.

Q.  But there's no difference between how the payments are received and applied?

A.  No.  I do not believe so.

10 (Pages 159 - 162)

Page 163

Q.  Okay, all right.  We're moving along.

So we've gone through 8155, 8156, and I think now 8157.  I just want to pull this one up.

A.  There you have it.

Q.  Okay.  Glad we're on the same page.

So is there any difference -- well, do you recognize this spreadsheet?

A.  I do.

Q.  And can you tell me what this is?

A.  If you can scroll to the property system column.  (Document scrolling) I can confirm that this is a similar extract to the previous two, but this is based off of the Entrata environment under Greystar's license.

Q.  Okay.  So we've gone through Yardi, OneSite.  Now we're at Entrata?

A.  Correct.

Q.  And if I understood your earlier testimony, outside of the certain licensed detail, this is all you guys have access to?

A.  Through the data warehouse extraction, yes.

Q.  And after going through Yardi and OneSite, is there anything that's different really about Entrata versus Yardi and OneSite?

Page 164

MR. AYVAZIAN:  I'll object to form.  As it relates to this data?  As it relates to the systems themselves?  What are you referring to?

MR. DUNN:  The spreadsheet.  I mean, we can go through it again.  I'm just trying to save us some time.

BY MR. DUNN:

Q.  To the best of your knowledge, is there much difference between the data that we've looked at in the two other spreadsheets, 8156 and 8155, as compared to this one?

A.  The column headers and data should be representative of each, and they should be very similar, yes.

Q.  And so we've got, as in the other two spreadsheets, "Property Operations Key"; that translates to the property location, correct?

A.  That would be the data warehouse's unique identifier.

Q.  "Yardi Code"?

A.  Yardi's unique identifier.

Q.  "Resident Key"?

A.  Data warehouse's unique identifier for resident.

Page 165

Q.  "Resident ID"?

A.  Entrata's unique identifier for resident.

Q.  "First Name"/"Last Name"; self-explanatory?

A.  Yes, sir.

Q.  We've got "Building," we've got "Unit," "Address," "City," "State"; all the same?

A.  Yes, sir.

Q.  "Lease Start," "Lease End," "Move In Date," "Move Out Date"; all the same?

A.  Yes, sir.

Q.  And moving to Column T, we've got "Line Type."  Is that the same?

A.  Yes, sir.

Q.  "Code"?

A.  Yes, sir.

Q.  "Legal Fees"?

A.  The same as before.

Q.  The description is tied to the code?

A.  Yes, sir.

Q.  And I guess, again, from a general perspective, the three spreadsheets that we've looked at; they all represent pretty much the same thing?

MR. AYVAZIAN:  I'll object to form on that.

Page 166

MR. DUNN:  That's fair.

Q.  You can answer that.

A.  Yes.  There would be an extraction of charge and payments based off of the charge codes used.

Q.  We've got the Greystar system, we've got Entrata, we've got OneSite, we've got Yardi.  We're looking at eviction fees -- we're looking at legal fees that were charged to tenants on all three spreadsheets; is that correct?

MR. AYVAZIAN:  I'll object to form.

A.  That is what I see based off of your sharing your screen.

Q.  And to the best of your knowledge, do you know of any sort of differences between all of that data that we just looked at?

MR. AYVAZIAN:  I'll object to form on that.  Go ahead and answer.

A.  I need a little bit more clarity on that.  Any of the differences meaning -- can you rephrase that?  I'm not sure I understand.

Q.  I think that's fair.  I'm looking at multiple spreadsheets, but it looks like we're looking at three different systems.  You know, we've

11 (Pages 163 - 166)

30(B)(6) Brandon Casteel Volume II    May 13, 2026
Cordeiro, Shaun, Et Al. v. Grep Atlantic LLC, Et Al.

Page 167

got this data. Generally, it represents tenants. And I'm not asking you to accept my representation. But then I see the charges. I see the payment applications.

Is there anything, to your knowledge, that like, makes them different from any other one?

MR. AYVAZIAN: Objection to form.

A. No, I don't believe there's anything that's going to be unique of it. And just a little bit more clarity around the transaction timing; that's going to be represented on the OneSite document versus the other two.

Q. Thank you. Bear with me. Give me a minute.

A. No worries.

MR. DUNN: We've been going for an hour. We can take a break if you guys want to. If you want to roll through -- I just want to look through a couple of things.

MR. AYVAZIAN: Why don't we come back at 12:15 our time; a ten-minute comfort break.

MR. DUNN: That sounds good.

(Recess taken from 12:04 to 12:16)

MR. AYVAZIAN: And, Michael, did you want

Page 168

to introduce or mark those spreadsheets as exhibits?

MR. DUNN: Yes. I guess they would be --

MR. AYVAZIAN: 9, 10 and 11 --

MR. DUNN: I think it was 13, 14 and 15. That was my understanding.

Exhibit 9 was previously introduced.

MR. AYVAZIAN: All right.

MR. DUNN: So, yes, I do.

(Documents marked as
Exhibits 13 to 15 for identification)

MR. DUNN: Can you guys see my screen?

THE WITNESS: Yes.

BY MR. DUNN:

Q. So this was produced yesterday in discovery. Are you familiar with this document?

A. I've seen a version of this, yes.

Q. And can you tell me what it is?

A. If you scroll down, I can get a little bit more clarification. This is just general movement information. This is the lease document, outlining terms and conditions for residency.

Q. So your understanding is that's a -- was that a typical lease for one of your properties in Massachusetts?

Page 169

MR. AYVAZIAN: Objection to form.

A. If I could see the address a little further down, then I can say this is for Massachusetts. But this is a National Apartment Association lease, which is pretty consistent, so...

Q. When you say "scroll down," do you see "21 Bay View Drive"?

A. I do.

Q. In Cohasset. That's in Massachusetts?

A. I do see that.

Q. And do you know why this was sent to us yesterday?

MR. AYVAZIAN: Objection to the extent he's asked for legal strategy or any communications with counsel.

Michael, I will just say if we could limit the questions as they relate to the data, I think you'll be able to make more headway with this document and the witness.

MR. DUNN: That's fair. I just want his testimony.

BY MR. DUNN:

Q. You can answer --

MR. DUNN: Unless you're instructing him

Page 170

not to.

MR. AYVAZIAN: Without divulging any strategy or communication -- legal strategy or communications with counsel, if you have anything to answer, go ahead. But if it involves discussions with your attorneys, then I would instruct you not to answer.

A. Can you repeat the question?

Q. I was trying to figure out why this was produced yesterday.

A. That, I can't answer.

Q. Would it surprise you that 21 Bay View Drive is not on any of the spreadsheets that we discussed today?

A. I do not know every name of the properties that Greystar has under management and what property system they're operating on without doing individual research, so...

Q. I mean, it looks in Part 1, there's a blacked-out area. That would be the tenant name, correct?

A. From reading through Item 1, yes, that looks like that would be the names of the individuals that signed this contract.

12 (Pages 167 - 170)

30(B)(6) Brandon Casteel Volume II          May 13, 2026
Cordeiro, Shaun, Et Al. v. Grep Atlantic LLC, Et Al.

Page 171

Q.   Any reason why that would be blacked out?

MR. AYVAZIAN:  I'll object to form.  If you know.

A.   I would surmise that if we're sharing any kind of information in a particular channel, we would want to redact information, just to protect the identity of those residing at Greystar properties.  That's just standard practice to make sure that we're not divulging data that we shouldn't.  But I don't know -- I didn't provide this document, so I can't really fully answer.

Q.   That's fair.  But we looked at three different spreadsheets that all have a tenant name; first name/last name.  You mentioned that the resident, key resident ID; all of that data is in internal?

A.   Uh-hum.

Q.   There is nothing on this lease that I can find that would identify any tenant.  And I can't match it to any tenant, other than what appears to be the owner.  Is that your understanding?

A.   The resident ID and property ID that we're referencing are unique property system identifiers.  That's not going to be represented directly on the

Page 172

lease.  It would have to be the names specifically that would need to match up.

Q.   So without a tenant name, I can't match this to anybody, right?

A.   That would be my understanding, yes.

Q.   And do you know what "King Fee Owner LLC" is?

A.   I would assume, which is probably not a safe thing to say, but I would assume that that's going to be a client that Greystar is managing their property for.

Q.   I mean, are you familiar with that entity?

A.   I am not.

Q.   But you wouldn't have any reason to be familiar with that entity, right?

A.   Correct, I would not have a reason to be familiar with all of the 600 plus clients that Greystar manages sites for.

Q.   And when you say "600 plus," is that Massachusetts alone?

A.   No.  Just an arbitrary number.  I know we have a lot of clients that we manage assets for -- that Greystar manages assets for.  I do not know the total value or number of individual clients that

Page 173

Greystar manages within the State of Massachusetts.

MR. DUNN:  Okay.  Well, I don't really have any further questions.  I appreciate your time, unless Ara has something.

MR. AYVAZIAN:  Just one minute.  Can we go off the record for a moment?

MR. DUNN:  Yes.

(Off the record)

CROSS EXAMINATION

BY MR. AYVAZIAN:

Q.   Mr. Casteel, I just have a few questions.

And just going back to the data spreadsheets that you were shown a little bit earlier.  And I'm going to pull up the 8155, if you can see it on my screen.

A.   I can.

Q.   Okay.  So this was the Yardi spreadsheet.  Do you recall looking at that earlier this morning?

A.   I do.

Q.   And earlier, you testified about Column U.  Do you recall that in terms of code?

A.   I do.

Q.   And you discussed the different codes being legal, payment; do you recall that?

Page 174

A.   I do.

Q.   And if you click the drop-down in Column U, there's different codes that are used for charges and for payments.  Is that fair?

A.   Correct.

Q.   And this is for the Yardi -- this is in particular in reference specifically to Yardi has different codes; such as an Evict Code, a Legal Code, a Legal Res Code, Payment Code, PMT CHS Code, a PMT OP Card Code; is that fair?

A.   Right.

Q.   And if a code is labeled "Legal," does this data reflect -- I believe you testified earlier that it could include moving costs or eviction or legal-related letters.

Is it your understanding that this code could, for legal, for example, could encompass various situations that may or may not actually be connected to a legal fee?

A.   That's correct.  It could be any charges associated with that or a misuse of the code, yeah.

Q.   And we see, for example, there's code -- we'll stick to evict and legal.

Is it your understanding that some

13 (Pages 171 - 174)

Page 175

properties use the code "legal," while others use the code "evict" to cover a legal fee or an eviction fee or an attorney fee or some other fee?

A. Yes.

Q. And that there may not be more than that one option to select a charge for besides that one code?

A. Correct.

Q. So, for example, for this $40 legal fee, in order to determine whether that $40 is actually a legal fee, what information would you need to do to figure that out?

A. We would need to have somebody go into the property system and review any kind of documentation or notes that may be available to see what that's associated with. The ledger, in and of itself, is not going to have that detail. We would have to go into documents, or we would have to go into resident notes and engagements, any number of different locations, or even contacting the property to see why that was charged, if we have the ability to do so.

Q. And what other documents would you look at besides the ledger?

Page 176

A. There is a document section within the property management systems, whereby the onsite or the property teams can load any document, any correspondence as needed -- emails, what have you -- and then we would have to just search through that litany of different communications to see where did that $40 come from, in this instance, for that unit that we're looking at.

So we would have to look at every individual charge, every individual resident, each individual charge per resident to find what is that mapping to and what's the reason behind it.

Q. And the actual amount for that charge to determine what that was for, what would you have to look for to line up this data to be a legal code or a legal description, as Column V indicates?

MR. DUNN: Objection.

Q. You can answer.

A. We would, again, just have to look at every single instance and look at every document to see where did that $40 come from and then extrapolate or whatever term you want to use to say, Oh, that looks like it would be a legal fee or is this a lease violation or is this a -- whatever reason they used

Page 177

that charge. It would be a case-by-case basis. There would be not any way that we could get that data from the property systems into this data warehouse to get a cohesive picture.

Q. Okay. And then for the payment, does this data reflect the circumstances of why a payment was made?

A. No.

Q. And in the same vein, how would you -- how would it be determined the circumstances for why a tenant paid $40 towards a $40 legal fee, for example?

MR. DUNN: Objection.

Q. You can answer.

A. I couldn't answer why it would be. It's most likely going to come down to the allocation and the kind of charge priority based off of the system's settings for each state.

Q. Okay. If a tenant was ordered by a court or settled an eviction case -- say it was an eviction -- does this data reflect that, or would you have to look at a case-by-case basis to figure that out?

MR. DUNN: Objection.

Page 178

Q. You can answer.

A. We would have to go in and look and see if there's a settlement document, any kind of notification in the document settings to say, Yes, this is applicable or not.

Q. And that would be for every -- what we just discussed would be for every charge here and every payment corresponding with that charge; is that correct?

A. That's correct.

MR. DUNN: Objection.

Q. And you indicated earlier that moving fees might be listed as a legal fee or an eviction fee; is that correct?

A. Correct.

Q. And in order to determine that a moving fee might be listed as a legal fee, is it fair that you'd have to look at either the Yardi, Entrata, or OneSite system description, if there is one, or then go to an invoice or something else?

A. Correct.

Q. Now, I believe you were asked earlier if the information is the same for across the three spreadsheets.

14 (Pages 175 - 178)

Page 179

Does Entrata -- sorry. Do certain buildings -- let's just say in Entrata -- use the same code or description as what is reflected in Yardi's code or description, or are they different?

A. Can you rephrase that for me?

Q. Sure. Is the codes here -- evict, legal -- are these going to be the same on the Entrata data sheet, or does Entrata use its own codes?

A. Independently of Yardi and RealPage?

Q. Yes.

A. Charge codes can vary across property systems, as they are unique property systems with no ties to one another.

Q. Okay. I'm going to pull up 8157.

So would you agree this is the Entrata PMS spreadsheet?

A. Can you scroll to the right? I can see "Entrata GIG," yes. So I would say this looks to be representative of the Entrata database information.

Q. Okay. And again, going to the Column U, we see here there is different codes; "Eviction Fees," "Legal Fees." Do you see that?

A. I do.

Q. And would you agree that whether the code

Page 180

"Eviction Fees" is used or the code "Legal Fees" is used is dependent just on how that site-specific setup is with Entrata?

A. Yes. Yes, I would agree.

Q. And the same with Column V, "Description"? We see here "Eviction Fees," "Legal Fees." The same thing; that it's site-specific the way that they use that information?

A. Yes.

Q. And just like Yardi, these codes are manually entered by the onsite individual for the specific charge; is that correct?

A. When you say "manually entered," I'll say they're in a drop-down, but yes --

Q. Let me rephrase.

A. -- there is a person pushing that.

Q. So let me rephrase. So for example, if $160 appeared in Column X and it's linked to a charge code of legal fees, with a "legal fees" description, that $160 was selected by an onsite employee to post that charge as it appears in this data?

A. Yes. The code is selected from a drop-down.

Page 181

Q. Okay. Selected, instead of posted, okay.

A. There's a post button, if that's helpful.

Q. Okay. And again, just like Yardi, when we see a charge -- say, in this instance, $1,475.36 -- it is listed as a "legal fee" charge. In order to see what this charge was for, the data doesn't reflect what that charge was for outside of just the "legal fee" description; is that correct?

A. Correct.

Q. And in order to figure out what that amount, $1,475 charge, is actually for, you'd have to look at this tenant-specific record in Entrata in this circumstance?

A. Yes.

Q. And may that information be outside of Entrata, or will it always say what that 1,475 would be in Entrata?

A. We would only have access to view what has been loaded to the database. So if there's a hard resident file, then we would have to contact the property to get that information; so management.

Q. Okay. And again, we see here another example of a eviction fee charge being $1,900,

Page 182

labeled as an eviction fee. And eviction fee; would you agree that that was, again, the same circumstance in the way that it's labeled, was selected by an onsite employee for that specific amount and charge?

A. Yes.

MR. AYVAZIAN: All right. If I could just go off the record for just a minute or so. I'll be right back.

(Off the record)

BY MR. AYVAZIAN:

Q. And lastly, I'll just show you 8156. And again, you were asked earlier if the data on each is the same.

Would you agree that across these three spreadsheets -- we're now looking at this OneSite spreadsheet that was produced -- that there are columns that are the same across the three. And there are columns that differ across each spreadsheet? Is that fair?

MR. DUNN: Objection.

Q. You can answer, Brandon.

A. OneSite has additional, based off of financial periods that are not within the Yardi and

15 (Pages 179 - 182)

30(B)(6) Brandon Casteel Volume II          May 13, 2026
Cordeiro, Shaun, Et Al. v. Grep Atlantic LLC, Et Al.

Page 183

Entrata spreadsheets.

Q.   Right.  But the column labels, themselves, to a certain point, OneSite has the same column headers as Entrata and Yardi to a certain point; is that fair?

A.   That's fair, yeah.

Q.   But the data, itself, such as the codes used across these different platforms, differ when you start looking at the substance of the data in the columns.  Is that fair?

A.   Correct.

Q.   So for example, Column U, which is the code in this OneSite, includes "ATTRNY," "Eviction," "Legal," "Other" as examples, correct?

A.   Yes, I see that.

Q.   And in the description drop-down, we see items such as "Attorney" or "Legal Charges," various check scan payments information, but also "Eviction," "Legal Recovery," "Legal Cost Court Fees" as descriptions for different charges; is that fair?

A.   Yes.

Q.   Okay.  And the data itself across these three spreadsheets is specific to not only each

Page 184

tenant, but each charge and payment relating to that tenant; is that fair?

MR. DUNN:  Objection.

Q.   You can answer, Brandon.

A.   The charges will be -- to get any information on any of the charges, there's going to have to be an individual touch to each one of those to confirm specifically a reason behind the charge and if there's any associated documentation about it.

Q.   And more broadly, the data in the OneSite -- sorry, let me rephrase that.

The actual data for each tenant is going to be different than another tenant's data when you factor in charge amounts, payment dates, move-in dates; things like that?

MR. DUNN:  Objection.

Q.   You can answer or I can rephrase.

A.   They will be different, because they're all going to be individual unique cases.  Even a unique case between one resident having multiple eviction or legal charges may be different for different purposes.  We wouldn't be able to identify that without looking into it.

Page 185

Q.   And for OneSite, for example, we talked about the differences in the accounting data that appears in this spreadsheet; again, the Yardi and the Entrata, correct?

A.   We did, yes.

Q.   And the OneSite data itself; the accounting that is different is how application, Column Z, "Applied Amount," differs in how it's applied or reflected in this data than how it was applied and reflected in the Entrata and the Yardi spreadsheet; is that fair?

MR. DUNN:  Objection.

A.   I'm not sure I follow.

Q.   Okay.  For example, in the Entrata -- I'm sorry, in this OneSite spreadsheet, you have to look further than the applied amount to a specific charge to figure out if that charge was paid by looking at these additional rows -- sorry, columns of information.  Is that fair?

A.   Yes.

MR. DUNN:  Objection.

Q.   And that's specific to this OneSite data spreadsheet?

MR. DUNN: Objection.

Page 186

Q.   You can answer.

A.   Yes, it does differ.

Q.   Okay.  And that's because they're different systems?

MR. DUNN:  Objection.

A.   Yes, they are different products, different systems, and they operate very much differently than one another.

Q.   And you would agree that the circumstances for each payment that is reflected on these three data spreadsheets can vary based on the timing of the payment or whether a payment was reversed for any reason; is that fair?

MR. DUNN:  Objection.

Q.   You can answer.

A.   I would agree, yes.

MR. AYVAZIAN:  Okay.  I have no further questions.  I'm not sure if Michael has any follow-up, but thank you, Mr. Casteel.

MR. DUNN:  Yeah, I do, if you don't mind. This will be quick.

REDIRECT EXAMINATION

BY MR. DUNN:

Q.   Brandon, you don't have any reason to

16 (Pages 183 - 186)

30(B)(6) Brandon Casteel Volume II    May 13, 2026
Cordeiro, Shaun, Et Al. v. Grep Atlantic LLC, Et Al.

Page 187

dispute the line item charges that are assessed a legal fee in the spreadsheets we looked at, right?

MR. AYVAZIAN: I'll object to form.

A. I have no knowledge of the reason why they were charged. I'm not onsite, so I do not know the reasons behind them, other than what's documented. I can research if I have to research them, but...

Q. Yeah, I guess I'm paraphrasing your testimony. But your testimony was, the only way that you would know whether it was -- a legal fee was accurate or eviction fee -- whether it was accurate or inaccurate, would be to go specifically into the individual account and then look at whether it was a charge that was appropriate, right?

A. A person would have to research every individual instance of that charge, review notes, review documentation, review any associated invoices, yes. Everybody -- each individual charge and payment would need to be reviewed to assure certainty, I guess, if that's the better way of phrasing that.

Q. That's fair. Sitting here today, you don't have any reason to dispute any of the charges on any of those three spreadsheets, correct?

Page 188

A. I do not have any reason to dispute the data that's been provided. Yes, I do not have any reason to dispute the data that's provided. I would not have any reason to dispute the data that was provided in those spreadsheets. I do not have any knowledge of why those charges were associated or put onto those resident ledgers without any level of due diligence and review and confirming if those associated invoices -- what those charges were for.

Q. And I think, if I heard you correctly, I thought I heard you say that you heard somebody might misuse a code; one of the eviction codes or legal fee codes?

A. Sure. There's always a human error element involved with any charges being associated onto a ledger. So if there was a charge and they selected X, Y, Z charge in that drop-down and then put a value, they could reverse it and then actually put the next charge that they want, because it's alphabetical in that list. So there's always a level of human error that could be potential in any of those charges that are getting assigned onto a ledger.

Q. But again, you're not disputing the data,

Page 189

and you don't have personal knowledge of whether any of those charges were a misuse of a code, correct?

A. I would have no knowledge of that, yeah; that's correct.

MR. DUNN: Thank you. No further questions.

MR. AYVAZIAN: Okay. I think we're all set.

And we'd like Brandon to read over his testimony. Thank you.

(Whereupon, the deposition was concluded at 12:52 p.m.)

Page 190

C E R T I F I C A T E

I, BRANDON CASTEEL, do hereby certify that I have read the foregoing transcript of my testimony, and further certify under the pains and penalties of perjury that said transcript (with/without) suggested corrections is a true and accurate record of said testimony.

Dated at _____, this ____ day of _____, 2026.

_____

Veritext Legal Solutions
800.743.DEPO (3376)        calendar-carolinas@veritext.com        www.veritext.com

Page 191

SUGGESTED CORRECTIONS

RE:  SHAUN CORDEIRO and KEVIN MATLOCK, individually and on behalf of all others similarly situated vs.

GREP ATLANTIC, LLC, and EDDY OWNER, L.L.C.

WITNESS: BRANDON CASTEEL, Vol. II

The above-named witness wishes to make the following changes to the testimony as originally given:

PAGE  LINE     SHOULD READ          REASON

____ ____ _____ _____
____ ____ _____ _____
____ ____ _____ _____
____ ____ _____ _____
____ ____ _____ _____
____ ____ _____ _____
____ ____ _____ _____
____ ____ _____ _____
____ ____ _____ _____
____ ____ _____ _____
____ ____ _____ _____
____ ____ _____ _____
____ ____ _____ _____
____ ____ _____ _____
____ ____ _____ _____
____ ____ _____ _____
____ ____ _____ _____

Page 192

COMMONWEALTH OF MASSACHUSETTS)

SUFFOLK, SS.              )

I, Jane M. Werner, RMR and Notary Public in and for the Commonwealth of Massachusetts, do hereby certify that there came before me on the 13th day of May, 2026, at 11:06 a.m., the person hereinbefore named, who was by me duly sworn to testify to the truth and nothing but the truth of his knowledge touching and concerning the matters in controversy in this cause; that he was thereupon examined upon his oath, and his examination reduced to typewriting under my direction; and that the deposition is a true record of the testimony given by the witness.

I further certify that I am neither attorney or counsel for, nor related to or employed by, any attorney or counsel employed by the parties hereto or financially interested in the action.

In witness whereof, I have hereunto set my hand and affixed my notarial seal this 18th day of May, 2026.

Jane M Werner
Notary Public

Commission expires 1/27/2028

Federal Rules of Civil Procedure

Rule 30

(e)  Review By the Witness; Changes.

(1)  Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A)  to review the transcript or recording; and

(B)  if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2)  Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.