# Exhibit G

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

EASTERN DIVISION

_____

SHAUN CORDEIRO AND KEVIN MATLACK,

INDIVIDUALLY AND ON BEHALF OF

ALL OTHERS SIMILARLY SITUATED,

     PLAINTIFFS,

V.                                          C.A. NO.: 1:23-CV-12901-AK

GREP ATLANTIC, LLC AND

EDDY OWNER, LLC,

     DEFENDANTS.

_____

VIDEO-RECORDED DEPOSITION OF KEVIN MATLACK

CONDUCTED REMOTELY FROM

BOSTON, MASSACHUSETTS

MONDAY, FEBRUARY 24RD, 2026 AT 9:27 A.M. EST

Page 2

A P P E A R A N C E S

ON BEHALF OF THE PLAINTIFFS, SHAUN CORDEIRO AND KEVIN MATLACK, ET AL.:

MICHAEL DUNN, ESQ.
BRYSON HARRIS SUCIU & DEMAY, PLLC
900 W. MORGAN STREET
RALEIGH, NORTH CAROLINA 27603
TELEPHONE NO. (919) 600-5000
E-MAIL: MDUNN@BRYSONPLLC.COM

ON BEHALF OF THE DEFENDANTS, GREP ATLANTIC, LLC AND EDDY OWNER, LLC:

ARA K. AYVAZIAN, ESQ.
SHOOK HARDY & BACON, LLP
100 N. TAMPA STREET, SUITE 2900
TAMPA, FLORIDA 33602
TELEPHONE NO. (813) 202-7100
E-MAIL: AAYVAZIAN@SHB.COM
MARY K. GROVES, ESQ.
SHOOK, HARDY & BACON, LLP
ONE FEDERAL STREET, SUITE 2620
BOSTON, MASSACHUSETTS 02110
TELEPHONE NO. (617) 531-1411
E-MAIL: MGROVES@SHB.COM

ALSO PRESENT:

JOHN LOFTUS, VIDEOGRAPHER, VERITEXT LEGAL SOLUTIONS

Page 4

E X H I B I T S (CONTINUED)

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| EXHIBIT 13 | E-MAIL RE: FEES, PLAINTIFFS 227-229 | 104 |
| EXHIBIT 14 | E-MAIL RE: FEES, PLAINTIFFS 216-217 | 107 |
| EXHIBIT 15 | TAYLO SUMMARY PROCESS AGREEMENT FOR JUDGEMENT | 120 |
| EXHIBIT 16 | AMENDED CLASS ACTION COMPLAINT, 1/26/24 | 123 |
| EXHIBIT 17 | E-MAIL CORRESPONDENCE WITH NECHEV, PLAINTIFFS 42-47 | 128 |
| EXHIBIT 18 | TEXT MESSAGE, PLAINTIFFS 2151 | 133 |
| EXHIBIT 19 | TEXT MESSAGE, PLAINTIFFS 2152 | 136 |
| EXHIBIT 20 | TEXT MESSAGE, PLAINTIFFS 2153 | 138 |
| EXHIBIT 21 | TEXT MESSAGE, PLAINTIFFS 2154 | 140 |
| EXHIBIT 22 | TEXT MESSAGE, PLAINTIFFS 2155 | 141 |
| EXHIBIT 23 | TEXT MESSAGE, PLAINTIFFS 2156 | 144 |
| EXHIBIT 24 | TEXT MESSAGE, PLAINTIFFS 2157 | 145 |
| EXHIBIT 25 | TEXT MESSAGE, PLAINTIFFS 2158 | 146 |
| EXHIBIT 26 | TEXT MESSAGE, PLAINTIFFS 2159 | 147 |
| EXHIBIT 27 | TEXT MESSAGE, PLAINTIFFS 2160 | 148 |
| EXHIBIT 28 | TEXT MESSAGE, PLAINTIFFS 2161 | 150 |
| EXHIBIT 29 | TEXT MESSAGE, PLAINTIFFS 2162 | 151 |
| EXHIBIT 30 | E-MAILS RE: MISUSE OF RAFT FUNDING, PLAINTIFFS 1000-1003 | 155 |
| EXHIBIT 31 | E-MAIL WITH FINAL ACCOUNT STATEMENT, EXHIBIT 2 | 158 |

Page 3

I N D E X

PAGE

DIRECT EXAMINATION BY MR. AYVAZIAN        7

E X H I B I T S

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| EXHIBIT 1 | LEASE APPLICATION AGREEMENT, SUBMITTED 3/30/22, GREP 320-325 | 39 |
| EXHIBIT 2 | APARTMENT LEASE CONTRACT, 9/12/22, GREP 140-179 | 45 |
| EXHIBIT 3 | RESIDENT CHARGES/PAYMENT LEDGER, GREP 312-317 | 56 |
| EXHIBIT 4 | NOTICE TO QUIT, 12/9/22 | 59 |
| EXHIBIT 5 | SUMMARY PROCESS (EVICTION) SUMMONS AND COMPLAINT | 65 |
| EXHIBIT 6 | HOUSING COURT DOCKET, CASE DETAILS | 73 |
| EXHIBIT 7 | MOTION TO FILE ANSWER LATE AND COUNTERCLAIMS, 5/12/23 | 75 |
| EXHIBIT 8 | ACCOUNTING (INTERNAL) LEDGER, GREP 132-139 | 88 |
| EXHIBIT 9 | INVOICE, 4/14/23 | 95 |
| EXHIBIT 10 | INVOICE, 4/14/23 | 100 |
| EXHIBIT 11 | INVOICE, 8/9/23 | 102 |
| EXHIBIT 12 | INVOICE, 8/22/23 | 103 |

Page 5

S T I P U L A T I O N S

The videotaped deposition of KEVIN MATLACK was conducted remotely from Boston, Massachusetts on Monday, the 24th day of February, 2026 at 9:27 a.m., said deposition was taken pursuant to Notice for use in accordance with the Federal Rules of Civil Procedure.

It is agreed that Kelley K. Bohan, being a Notary Public and Court Reporter for the Commonwealth of Massachusetts, may swear the witness and the reading and signing of the completed transcript by the witness is not waived.

Veritext Legal Solutions
800-726-7007                                                                 305-376-8800

Page 6

PROCEEDINGS

VIDEOGRAPHER:  Good morning.  We are going on the record at the time of 9:27 a.m. on two -- I'm sorry, February 24th, 2026.  Please note this deposition is being conducted virtually.  The quality of the recording depends on the quality of the camera and the internet connection of all participants. What is seen from the witness and heard on the screen is what will be recorded.  Audio and video recording will continue to take place unless all parties agree to go off the record.

This is Media Unit 1 of the video-recorded deposition of Kevin Matlack taken by counsel in the matter of Shaun Cordeiro, et al. v. GREP Atlantic, LLC, et al.  It's filed in the United States District Court for the District of Massachusetts, Eastern Division, Case No. 1:23-CV-12901-AK.

This deposition is being conducted remotely using virtual technology.  My name is Jeff Loftus representing Veritext and I'm the videographer.  The court reporter is Kelley Bohan taken from the firm of Veritext.  I am not authorized to administer an oath, I am not related to any party in this action, nor am I financially interested in the outcome.

For any objections to the proceedings, please state them at the time of your appearance.  Counsel all present, including remotely, will now state their appearances and affiliations for the record beginning with the noticing

Page 7

attorney.

MR. AYVAZIAN:  Hi, this is Ara Ayvazian on behalf of the Defendants GREP Atlantic, LLC and Eddy Owner, LLC from the law firm of Shook, Hardy and Bacon, LLP.  Good morning.

MR. DUNN:  Hi, good morning.  Michael Dunn on behalf of Plaintiffs and Kevin Matlack with Bryson, Harris, Suciu and DeMay.

MS. GROVES:  This is Katie Groves also for GREP Atlantic, LLC and Eddy Owner, LLC with Shook, Hardy and Bacon.

KEVIN MATLACK,
a witness having been satisfactorily
identified by the production of a driver's
license, was first duly sworn, was examined
and testified as follows:

DIRECT EXAMINATION
BY MR. AYVAZIAN:

Q.  Good morning, Mr. Matlack.

A.  Good morning.

Q.  Can I call you Kevin?

A.  Yeah, absolutely.

Q.  Okay, great.  Thanks.  So my name again is Ara

Page 8

Ayvazian, and I'm representing the Defendants GREP Atlantic, LLC and Eddy Owner, LLC in this lawsuit.  Can you please state your full name for the record?

A.  Kevin Thomas Matlack.

Q.  And have you ever gone by any other names?

A.  No.

Q.  Have you ever been deposed in any other setting?

A.  No.

Q.  Okay.  Have you ever had to give sworn testimony?

A.  No.

Q.  Okay.  I'm going to go over some ground rules for depositions:

So this is a question and answer session.  I'll ask you questions, and I just ask that you answer each question as honestly as you can.  If you do not remember the answer to one of my questions when asked but later remember or recall an answer, feel free to interrupt me and just let me know.  If you don't understand a question, please let me know and I'll rephrase it.  Is that okay?

A.  Yes.

Q.  Okay.  If you do need to take a break, just let me know.  All I ask is that you answer the question pending before we take a break.

A.  Yes.

Page 9

Q.  You understand that we are here today to take your deposition in a lawsuit that you filed against GREP Atlantic and The Eddy, correct?

A.  Yes.

Q.  Okay.  And you're doing a great job so far.  So the court reporter is taking down everything that we say, so we just have to make sure that all of our answers are verbal answers rather than nodding of a head or saying uh-hmm or uh-uh.

Do you understand?

A.  Yes.

Q.  And do you understand that you are under oath today?

A.  Yes.

Q.  Okay.  Kevin, where are you currently located?

A.  In Boston, Massachusetts.

Q.  And are you inside of your residence?

A.  Yes.

Q.  And where inside of your residence are you located?

A.  In the main living room.

Q.  Okay.  Is anyone else in the room with you?

A.  No.

Q.  Is anyone else in the residence with you?

A.  Not currently.

Q.  Okay.  So as we proceed today, I just ask that you don't have any discussions with anyone about the substance of

3 (Pages 6 - 9)

Page 10

your deposition. Do you agree?

A. Yes.

Q. Do you have any documents related to this case in the room with you?

A. No.

Q. Are there any materials related to the case in the room with you?

A. Excuse me. No.

Q. Do you have any pulled up on your screen right now?

A. No.

Q. Okay. I'd ask that you please don't look at any documents related to this case during this portion of the deposition unless you're asked by me or your own attorney to look at those documents. Do you understand?

A. Yes.

Q. And is your cell phone in the room with you?

A. Yes.

Q. I ask that you don't use your cell phone while you're testifying. Do you agree?

A. Yes.

Q. And are there any other electronic communication devices in the room with you such as an iPad or something else?

A. No.

Q. Okay. Are you planning on recording this deposition

Page 11

at all?

A. No.

Q. Did you take any medications today?

MR. DUNN: Objection.

A. Yes.

MR. AYVAZIAN: Sorry, Mike. Did you object, Michael?

MR. DUNN: Yeah, objection. But you can answer.

A. Yes.

BY MR. AYVAZIAN:

Q. Okay. I just wanted to follow up. So today I'll be asking questions, and at certain points in time your counsel may object. As long as your counsel tells you -- or doesn't say, "Don't answer the question," you can still answer.

Do you understand?

A. Yes.

Q. Okay. What medications have you taken today?

A. Hydrocortisone; and Jatenzo, a testosterone replacement.

Q. Okay. Are there any potential side-effects that would affect your memory that you know of?

A. Not to my knowledge.

Q. Okay. Do you have any memory issues that you would say would affect your testimony today?

A. No.

Page 12

Q. Okay. And is there anything preventing you from giving honest and accurate testimony today to the best of your ability?

A. No.

Q. Okay. Now, you're represented by counsel in this lawsuit, correct?

A. Yes.

Q. And you're represented by Bryson Harris, correct?

A. Yes.

Q. And you're also represented by the law firm Maginnis Howard, correct?

A. Yes.

Q. And you're also represented by Greater Boston Legal Services, correct?

A. Yes.

Q. And are you also represented by Legal Services Center of Harvard Law School?

A. Yes.

Q. Are there any other law firms that you are represented by in this lawsuit?

A. Not to my knowledge.

Q. Are there any other attorneys that you've reached out to about this case besides anyone at those four firms?

A. I believe prior to retaining Bryson Harris, we

Page 13

consulted with other attorneys, but we did not, to my knowledge, enter into any contractual agreement.

Q. Okay. Do you know when you first hired Bryson Harris to represent you in this case?

A. I did not personally reach out, that was done by Shaun Cordeiro. I believe it was in the later months of 2023, possibly October.

Q. Okay. And do you remember what those other law firms were that you might have reached out to about the facts surrounding this case?

A. I do not know. I did not directly contact any of those attorneys myself.

Q. Was that Shaun?

A. Yes.

Q. And do you know if Shaun e-mailed or made phone calls?

A. I believe he did.

Q. Do you know if it was both or one or the other?

A. I do not know. No, I don't, uh-uh.

Q. Okay. Do you know when, timing-wise, when you all reached out or when you both reached out to those law firms and spoke with them?

A. I believe he would have reached out, again, the later part of 2023. I don't know when exactly.

Q. Okay. Have you ever reached out to the attorney

4 (Pages 10 - 13)

Page 14

general's office about this, the facts underlying this case?

A. I personally do not recall reaching out to the attorney general's office.

Q. Okay. Have you had any communication yourself with the attorney general's office regarding this case?

A. Not to my knowledge.

Q. Okay. What, if anything, did you do to prepare for your deposition today?

A. I consulted with my attorneys.

Q. And was that this morning? Was it a couple of days ago?

A. That was, I believe, about a week ago.

Q. Okay. Did you look at any documents?

A. I did.

Q. And what documents did you look at?

A. The original complaint that was filed in the case, the amended complaint, and -- What's it called? -- I believe I was sent the notices of depositions for myself and Shaun Cordeiro.

Q. Okay. How long did you meet with your attorneys a week ago?

A. I believe it was approximately an hour.

Q. Okay. And do you remember which law firms' attorneys you met with?

A. It was Sean Ahern and a law student who were both

Page 15

representing the Harvard Legal Services and Mr. Dunn --

Q. Do you know what --

A. -- from Bryson Harris.

Q. Got it, thank you.

Do you know what the law student's full name is?

A. James Morrison.

Q. Okay. And is he a law stool -- a law school student at Harvard Law?

A. I believe so.

Q. Okay. And have you reviewed any prior deposition testimony given in this case to prepare for today?

A. I did read portions of testimony given by Destinee Price. That was not as part of deposition prep with my attorneys, that was on my own after it had been completed and forwarded to me.

Q. Okay. Did you review the deposition that Marvin gave?

A. I did not.

Q. Okay. Have you spoken with anyone besides Michael Dunn about your deposition today?

A. I did speak with Mr. Cordeiro just to mention that it was happening, but we did not discuss details of the deposition or my potential answers.

Q. And when you say Mr. Cordeiro, is that your --

A. Shaun Cordeiro.

Page 16

Q. -- partner?

A. Yes.

MR. DUNN: Let him finish, Kevin.

Q. That's -- So Mr. Cordeiro is your partner?

A. Yes.

Q. That's Shaun?

A. Yes.

Q. Okay. And when was the last time you spoke with Shaun about this case?

A. This morning.

Q. Okay. What did you talk about?

A. He said good luck on the deposition.

Q. Okay. Before this morning, did you talk to Shaun yesterday about his deposition?

A. He mentioned that it was long and there were a lot of questions, but we did not discuss the substance of the questions or his answers.

Q. Okay. Did you review any documents after speaking with Shaun yesterday?

A. I briefly looked at the previously mentioned documents, the original and amended complaint.

Q. Okay. Besides Shaun and Mr. Dunn, is there anyone else that you spoke with about your deposition today?

A. No.

Page 17

Q. Okay. Have you spoken with anyone else besides your attorneys and Shaun about this lawsuit that you all have filed?

A. Yes.

Q. Who would that be?

A. Previously, there was neighbors of ours at The Eddy, Lindsay Beaudry, Elizabeth "Betsy" Hamilton, Stephanie Thomas, Shaun's mother Maribeth Adams. And those I believe are the only people I've discussed the case with.

Q. When was the last time you spoke with Lindsay about this case?

A. I don't recall. It was, um, it might possibly be while we were still living at The Eddy. I believe maybe it was 2024 that I personally spoke to her about it.

Q. Okay. And what did you talk about with Lindsay, if you can remember?

A. I don't recall. I don't believe I've ever gone into detail, beyond the fact that the case existed and the general facts of the case from public documents, with anyone other than my attorneys and Shaun Cordeiro.

Q. And how about with Betsy, when was the last time and what did you talk about?

A. Again, the same. I have not spoken to her about the case I believe since I last saw her in person, which also would have been in 2023 or 2024 depending on when exactly we spoke.

5 (Pages 14 - 17)

Page 18

It was most likely the same, that we are filing an action against The Eddy and Greystar or GREP Atlantic.

Q. Okay. And how about with Stephanie?

A. Possibly longer. I don't believe I've spoken to her since -- excuse me -- she moved out of The Eddy. I think that was in June of 2023. And again the same general facts of the case from public records.

Q. Okay. And are any of these three individuals attorneys?

A. No.

Q. Okay. Did you take any notes in preparation for your deposition today?

A. No.

Q. Okay. Prior to today, did you search for or collect e-mails or messages/texts relating to your tenancy?

A. Yes.

Q. And when was the last time you did that?

A. Maybe about, I believe, two weeks ago prior to submitting our responses to interrogatories requested by the Defendants.

Q. Okay. And as part of that collection, did that include text messages?

A. Yes.

Q. And were -- Did you have any text messages that were

Page 19

responsive?

A. Yes.

Q. And in -- if -- I'll withdraw that for a second. To search for your text messages, you were given search terms to search for?

A. Yes.

Q. And were those search terms given to you by Sean Ahern?

MR. DUNN: Objection.

A. I believe they were. They were given at the direction of our attorneys. I don't recall exactly by whom.

Q. And after you got those search terms, you searched your iPhone for any messages?

A. Yes.

Q. And after you found text messages, did you -- what did you do with those text messages?

A. I, as directed by my attorneys, took screenshots and sent them to our team at Bryson Harris.

Q. Okay. So you take the screenshot file and then send each file?

A. Yes.

Q. Okay. Did you create a timeline of events for this case?

A. I believe at one point we did; not recently. Did we

Page 20

create a timeline? We sent the text messages and e-mails with dates and timestamps, but we did not, to my knowledge and at any point recently, create a detailed timeline.

Q. And, if you remember, how many text messages do you believe that you turned over to your counsel?

A. I don't recall. It was I believe in the realm of 30 to 50.

Q. Okay. And do you know if the terms that were found to be responsive, was it the name "Destinee"?

A. I believe so.

Q. Were there any other search terms that hit on a text message that you turned over?

A. Yes.

Q. And what were those, if you remember?

A. I believe Eddy, Kayla, Marvin. I believe those were the only three, but I don't recall if there were others.

Q. Do you remember who those text messages were sent to?

A. Most were between Shaun Cordeiro and myself.

Q. Okay. And the others?

A. Others, I know some were part of a group message that did include Lindsay Beaudry or Betsy Hamilton or Stephanie Thomas.

Q. Okay. I just ask that you preserve those messages in case we did not receive them.

Page 21

MR. AYVAZIAN: And we'll just make a note, Michael, that we were -- we will follow up -- but we would ask that all of those messages be produced if they haven't already, and to leave the deposition open to ask Mr. Matlack if they are relevant and proportional to this case.

BY MR. AYVAZIAN:

Q. Did you speak with Shaun yesterday about any text messages?

A. Would that be Shaun Cordeiro or Sean Ahern?

Q. Sorry. Shaun Cordeiro.

A. I believe I did.

Q. Okay. And that was a result of what was brought up during yesterday's deposition?

A. No. We discussed generally what we would be covering. We discussed information about, uh, that we had previously discussed that we knew we would be covering in the deposition. We did not discuss specific text messages that I sent.

Q. Okay. And was this after Shaun's deposition yesterday?

A. Yes.

Q. Okay. Have you done any internet research regarding this case?

A. Um, I'm sor-- in what -- what type of research? I don't --

6 (Pages 18 - 21)

Page 22

Q. Sure. Did you ever research the claims that are brought in this lawsuit?

A. I have searched for both my name and Shaun Cordeiro's in general. I did some general research into the legal terms that were used in the original and amended complaints, like 93A violation, but I've not done extensive research into the legal technicalities of the case.

Q. Okay. Did you print out any of the research that you conducted?

A. I don't believe so.

Q. Okay. Have you ever done any research on the defendants in this case?

A. I think I have looked into previous actions against the -- Greystar. I don't know if they're considered GREP Atlantic or The Eddy. At one point prior to the case, we were trying to discern who the ultimate legal entity was, whether that was Eddy Owner, LLC or GREP Atlantic.

Q. Okay. Do you consider GREP Atlantic a landlord?

A. I don't know.

Q. Okay.

A. Honestly, I don't know technically who represents that. In general terms, we only ever say The Eddy or Greystar.

Q. Okay. Would you consider the Eddy Owner, LLC your landlord when you were at The Eddy?

Page 23

A. Yes. At that time, we discussed them specifically as the landlord.

Q. Okay. Would you have considered Greystar or GREP Atlantic as the property manager?

A. I believe so, yes. I don't understand the technical ownership and property management structure, but that was, I believe, my general understanding.

Q. Okay. Have you written anything about this case on a website?

A. I don't believe I have.

Q. How about on a blog?

A. No.

Q. Have you made any posts on social media --

A. No.

Q. -- about this case?

A. Sorry. No.

Q. Have you given -- sorry. Have you spoken to any media outlets about this case?

A. No.

Q. Have you spoken to any other entities about this case?

MR. DUNN: Objection.

A. No, I haven't.

Q. Okay. Have you spoken with the Boston Globe about this case?

Page 24

A. No.

Q. Have you spoken with the Guardian about this case?

A. No.

Q. Have you given interviews regarding this case to anybody?

A. No.

Q. Okay. Are you aware that Shaun has spoken to the Boston Globe about this case?

A. I am.

Q. And are you aware that Shaun has spoken with the Guardian about this case?

A. Yes.

Q. And what is your opinion about Shaun speaking to those two sources about this case?

A. I chose not to be involved in those media interviews just for privacy reasons, but I support his decision to do so.

Q. Were you there when he spoke with those two media sources?

A. I was not.

Q. Do you know if he spoke with them via e-mail or over the phone?

A. I believe he's had e-mail communication. I don't know about phone interviews or communication.

Q. Okay. Do you know if he still has the e-mails with

Page 25

his communications with them?

A. I do not.

Q. Okay. Do you know what Shaun said to the Boston Globe?

A. I don't know specifically. I understand that he discussed the generalities of the case and the facts included in the complaint and amended complaint as they are -- as, uh -- I'm sorry -- in those documents related to the case that are matters of public record.

Q. Okay. And same for the Guardian, do you know what he stated with the Guardian?

A. I don't know, again, the specifics. I, again, believe he discussed the facts of the case that are matters of public record.

Q. And do you know at whose direction he interviewed -- er, gave interviews to the Boston Globe and the Guardian?

A. I do not know who originally reached out to him or suggested those interviews.

Q. Okay. Do you know if he was the one that initiated reaching out to the Boston Globe?

A. I do not believe he did.

Q. And the same for the Guardian, do you know if it was him that initiated that communication?

A. I do not know for certain.

7 (Pages 22 - 25)

Page 26

Q.  Okay.  Do you know -- sorry.  When did you decide to file this federal lawsuit?

A.  I believe we decided in either October or November of 2023 after consulting with Bryson Howard -- I mean Bryson Harris and Maginnis Howard who, it's my understanding, represent us as a Massachusetts law firm allowing Bryson Harris to conduct this suit on behalf of us in the District of Massachusetts.

Q.  Okay.  And why did you file this lawsuit?

A.  After speaking with our attorneys and discussing our situation, we believed that we had been unfairly charged legal and eviction fees that had not been approved by the courts or been directed to pay by the courts.  And we were told that others have also had this problem and have been in the same situation.

Q.  Who told you that others had this same problem and had been in the same situation?

A.  I believe after speaking to Bryson Harris and Greater Boston Legal Services, that they mentioned other people have faced legal and eviction fees that were not approved by the court.

Q.  Okay.  So Bryson Harris is the first firm that you hired to bring this lawsuit, correct?

A.  Yes, I believe so.

Q.  Okay.  And then at some point, is it Edward -- er,

Page 27

sorry, Maginnis Howard is the next firm; or were they kind of a packaged deal with Bryson Harris, if you know?

A.  I don't know exactly how that worked out.

Q.  Okay.  So November of 2023, the federal -- this federal case gets filed, correct?

A.  I believe so.

Q.  At what point does Greater Boston Services get involved?

A.  I don't recall exactly when they became involved.

Q.  Do you know if it was before the case was filed or after the case was filed?

A.  I don't know for certain.

Q.  How about Legal Services of Harvard?

A.  They became involved more recently.  I believe that was due to Sean Ahern moving from Greater Boston Legal Services to Harvard Legal Services.

Q.  Okay.  What are the claims that you are alleging in this lawsuit?

MR. DUNN:  Objection.

A.  It's my understanding that we are alleging that legal and eviction fees were unfairly assessed to tenants without due judicial oversight.

Q.  Okay.  And do you understand that this is a class action lawsuit, correct?

Page 28

A.  I do.

Q.  And what does a class action lawsuit mean to you?

A.  It means that a large group of people were -- received the same treatment, unfair treatment or alleged illegal treatment by the Defendants, and that because the situations are so similar, it is more effective and efficient to try the cases rather than separately as one single entity.

Q.  And in your own words, what would the class of individuals be that you're seeking to represent as class representatives of this lawsuit?

A.  That would be present and past Massachusetts tenants of GREP Atlantic, of Greystar, who had been assessed legal recovery and eviction fees.

Q.  And I know you just stated that the unfair -- you believe that it's unfair -- Actually, you know what, withdraw that question.

What is specifically the unfair practice that you allege in this lawsuit that the Defendants conducted?

A.  We, I believe, are alleging that the fees charged to us as legal fees or eviction fees were unfairly assigned to us to pay on behalf of the landlords of GREP Atlantic.

Q.  Okay.  And we'll definitely, we'll break that down later, and we'll look at some of the invoices.

Besides this lawsuit, have any of the attorneys on

Page 29

this case assisted you in any other legal matters?

A.  I've not personally been assisted by any of the other attorneys.

Q.  Okay.  Have they represented you in any other capacity besides this lawsuit?

A.  No, not to my knowledge.

Q.  Okay.  Are you aware that Sean Ahern represented Shaun Cordeiro in a small claims matter before?

A.  Yes.

Q.  And were you a part of that matter?

A.  I was not.

Q.  Okay.  And are you aware that Sean represented Shaun in also a second small claims matter?

A.  Yes.

Q.  Okay.  Are any of these attorneys assisting you in any other lawsuits?

A.  Not to my knowledge.

Q.  How about future lawsuits?

A.  I don't know of any planned future lawsuits, so not to my knowledge.

Q.  Okay.  Have you spoken with Shaun Cordeiro about any future lawsuits against Greystar or The Eddy?

A.  We have no -- no plans of future lawsuits.

Q.  Okay.  A couple of easier questions now.  Could you

8 (Pages 26 - 29)

Page 30

please state your date of birth for the record?

A. June 16th, 1997.

Q. And what is your current address?

A. 5R Trenton Street, Unit 5 in East Boston 02128.

Q. And is that a house, condo, or apartment?

A. Apartment.

Q. And how long have you lived at this address?

A. For almost two years since March of 2024.

Q. Okay. So the prior residence was Apartment 1010 at The Eddy?

A. Yes.

Q. Okay. And in your current residence, who do you live with?

A. Shaun Cordeiro.

Q. Anyone else?

A. No.

Q. And what is your legal relationship with Shaun Cordeiro, if any?

A. I don't believe we have a legal relationship. We're partners, but we are not married.

Q. How about domestic partner?

A. We have no, I believe, domestic legal partnership.

Q. Okay. And who handles the bills for your current living situation?

Page 31

A. By "handles," what do you mean?

Q. Sorry. Who pays the bills?

A. We both share bills. Shaun mostly handles the actual act of organizing them, but we financially split most bills.

Q. Okay. Does anyone else contribute to household expenses besides you and Shaun?

A. No.

Q. And when you were living at Apartment 1010 at The Eddy, did you live with anyone else besides Shaun?

A. No.

Q. And did you both live there in Apartment 1010 during the entire tenancy?

A. During the entire time we lived at The Eddy?

Q. Yes.

A. No, we did not.

Q. Okay. When -- If not, what changed?

A. We originally lived in Apartment 509. That, I believe, was April to early September of 2022, and that was a large two bedroom, and so we downsized to Apartment 1010 which was a smaller, much less expensive one bedroom.

Q. Okay. So you both lived together through the entire time while you were in those two apartments, correct?

A. Yes.

Q. Okay. And before living at The Eddy, where did you

Page 32

reside?

A. We lived in Philadelphia. I don't recall if the building had a name. But we lived together from November of 2019 to, I think it was April -- March or April of 2022 in Philadelphia.

Q. Okay.

A. Do you want the exact address?

Q. No, that's okay. Thank you.

Before living at The Eddy, did you ever receive an eviction notice?

A. No.

Q. Had you ever received a notice to quit before?

A. I don't believe so.

Q. Have you ever, before living at The Eddy, have you ever had an eviction case filed against you?

A. Not to my knowledge.

Q. Before living at The Eddy, had you ever applied for rental assistance?

A. Yes.

Q. And what -- can you explain the circumstances of seeking rental assistance and when?

A. That was -- I don't know exactly when, but it was in Philadelphia during the COVID pandemic. I was furloughed from my job as a flight attendant at American Airlines, and Shaun was

Page 33

receiving much less, um, many less clients during that time. So we applied in, I believe it was through the City of Philadelphia.

Q. Okay. And do you remember what that program was called?

A. I don't. I know Shaun was the one who applied for that.

Q. Okay. And did you all receive the rental assistance that you applied for?

A. Yes.

Q. Okay. Is anyone in your family a landlord?

A. No.

Q. And what is your educational background?

A. I attended but have not yet graduated from Virginia Tech.

Q. Okay. And what degree were you seeking there?

A. A bachelor's degree.

Q. In any particular focus?

A. Nanomedicine.

Q. Okay. Any other education or certifications?

A. No.

Q. Have you ever served in the military?

A. No.

Q. And where do you currently work?

9 (Pages 30 - 33)

Page 34

A. I'm a clinical research coordinator for Ohio State University.

Q. And I'm assuming that's a remote position?

A. Yes. We -- Well, remote for the university. We work in person in our lab in Boston.

Q. Okay. And would your employer be Ohio State University?

A. Yes.

Q. Or "The" Ohio State University?

A. Yes.

Q. How long have you held this position?

A. Since June of 2023.

Q. And where did you work before that?

A. I worked for Tufts dental school as a PRA at -- patient registration assistant -- which is at the front desk.

Q. Okay. And when did you start working at Tufts doing that?

A. January of 2023.

Q. Okay. And before that?

A. I was working at -- and -- I was working at Del Frisco's steakhouse in Boston from August of 2022, and then through January full time; from January to April of 2023, I was working there occasionally on the weekends. But I held those jobs concurrently.

Page 35

Q. Okay. And I think you just mentioned before that you were a flight attendant at some point, correct?

A. Yes.

Q. When was that?

A. From June of 2019 through July of 2022, I was actively a flight attendant. I am technically on medical leave from them. I'm not actively working, but I don't know what they term it. I am still technically employed, I believe.

Q. Okay. You're currently on medical leave from American Airlines?

A. Yes.

Q. Are you getting paid for that?

A. No.

Q. Okay. In your current position now, what do you typically do for work?

A. We see patients for in-person visits for a facial paralysis study of surgery to restore the facial nerve. We collect motion capture data and write manuscripts, do data analysis.

Q. Do you ever have to review contracts?

A. We do not, no. We take informed consent, but we never review legal documents.

Q. And at your position at Tufts, did you ever have to review contracts?

Page 36

A. No.

Q. Okay. Do you have an employment contract now with The Ohio State University?

A. Yes.

Q. Did you negotiate that contract at all?

A. No.

Q. Okay. Did you read that contract before you signed it?

A. Yes.

Q. Okay. Have you ever drafted a contract before?

A. Yes.

Q. Can you explain the circumstances of that?

A. I've assisted Shaun Cordeiro with client contracts for his business.

Q. And when you say "assisted," can you explain a little bit deeper what that means?

A. We worked together to find form contacts online and modified it to his specific needs and now to create his standard private client contract.

Q. Okay. Do you know if any of his contracts for those clients have any legal provisions in them?

A. I don't know exactly what is meant by "legal provisions."

Q. Are there any provisions in there, that you're aware

Page 37

of, that refer to attorney's fees?

A. I don't know.

Q. Okay. When you were living at The Eddy, what was the primary household income source?

A. Shaun's clients and then my own jobs. He generally made more than I did.

Q. Okay. Did you experience any periods of unemployment during your tenancy at The Eddy?

A. No. I was always employed by one job or another, whether or not for any period of time I was not receiving payments.

Q. So did you experience any reduced income during your time at The Eddy?

A. Yes.

Q. Okay. And what were the circumstances of that?

A. When I was originally out on leave from American Airlines for several weeks at a time. In two periods, I was out from work and wasn't receiving payments during those times.

Q. Okay. Have you ever been arrested?

A. No, not to my knowledge.

Q. Okay. Have you ever been convicted of a crime?

A. No, not to my knowledge.

Q. Okay. Okay, so we went through a little bit of your resident -- resident history: Currently living in that Trenton

10 (Pages 34 - 37)

Page 38

unit; before that, Apartment 1010 at The Eddy; and then before that, Apartment 509 at The Eddy. Correct?

A. Uh-hmm.

Q. Do you remember when you moved into The Eddy, the time period?

A. April, I believe, of '22.

Q. Okay. And did you tour The Eddy, or did Shaun tour The Eddy initially?

A. I toured The Eddy.

Q. And do you remember who you were communicating with at The Eddy at first during that tour?

A. The leasing agent at the time, Christian Mazraani.

Q. Okay. And you understand that The Eddy, as a landlord, is in the business of providing apartments to tenants for a fee?

A. Yes.

Q. And when you first toured The Eddy, did you then submit an application to lease a unit there?

A. I believe so.

Q. Okay. So I'm going to bring up an exhibit. We'll be doing this a couple of times today. [Pause.] Okay, one second.

Do you see this exhibit on my screen?

A. Yes.

Q. Okay. I'm to mark this as Exhibit 1.

Page 39

(EXHIBIT 1 MARKED FOR IDENTIFICATION)

BY MR. AYVAZIAN:

Q. And would you agree that this is the lease application at The Eddy for you and Shaun for Apartment 509?

A. That is what it appears to be.

Q. Okay. And would you agree that under resident information it lists yours and Shaun's name?

A. Yes.

Q. And that the application has information about Shaun and then Shaun's current residence, and then at the bottom your application information?

A. Excuse me. Yes.

Q. Okay. And then for Shaun it says his estimated annual income at the time was 170,000. Do you see that?

A. Yes.

Q. And then for you it says 33,427?

A. Yes.

Q. And lists that "other annual income" is 11,424?

A. Yes.

Q. Do you know what job the estimated annual income was for?

A. That would have been for American Airlines.

Q. Okay. And then the other annual income, do you know what that was for?

Page 40

A. I don't recall what that was for at the time.

Q. Okay. Okay. And after you all submit that, um, after you all submit that --

One second, sorry. There we go.

-- application, you then move into Apartment 509 or at least sign a lease for Apartment 509?

A. Yes.

Q. Okay. And did you sign the lease for 509 or was it just Shaun?

A. I believe it was both of us.

Q. And did you read the lease in its entirety before signing?

A. I don't recall.

Q. Okay. Do you recall reading the provisions of the lease that regarded -- er, sorry, that were regarding default of a tenant?

A. I don't recall.

Q. Do you recall reading provisions related to any attorney's fees provisions in the lease?

A. I don't recall from the time.

Q. Okay. Do you remember asking any questions to anyone at The Eddy about attorney's fees, eviction-related fees that were included in the lease?

A. I don't recall asking at the time.

Page 41

Q. Okay. At some point you signed the lease, and you and Shaun took possession of Apartment 509, correct?

A. Yes.

Q. And at some point we know that you stopped living in Apartment 509, correct?

A. Yes.

Q. Okay. Why did you move out of that apartment?

A. We wanted to move into a less expensive apartment.

Q. And were there any circumstances that you wanted to save money?

A. Yes.

Q. And what were those circumstances?

A. I was no longer working as a paid employee at American Airlines.

Q. Okay. And why was that?

A. I was out on medical leave.

Q. And what was that medical leave for?

A. Developing a severe anxiety condition.

Q. And outside of developing a serious anxiety condition, did you have any -- actually, I'll withdraw that.

I understand at some point you did develop a brain tumor; is that correct?

A. That was previously in April of 2021.

Q. Did you ever have any surgeries or treatment for a

11 (Pages 38 - 41)

Page 42

brain tumor or related to your brain tumor after 2021?

A. Yes.

Q. Okay. And when was that?

A. January 2025.

Q. Okay. So at the time you were living in Apartment 509, that was after your first brain surgery and you were working for American Airlines; and then you had that medical condition and you stopped working, or went on pause I guess we should say, for American Airlines; is that fair?

MR. DUNN: Objection.

A. Yes.

Q. And you guys decided to downsize from Apartment 509 to a different unit; is that correct?

A. Yes.

Q. And after living in Apartment 509, the next eventual residence that you and Shaun move into is Apartment 1010; is that correct?

A. Yes, that we moved into.

Q. Right. And before moving into 1010, there was the possibility of you moving into another apartment in between 509 and 1010, correct?

A. Yes.

Q. And was that Apartment 1313?

A. Yes.

Page 43

Q. And what were the issues that you recall with going from 509 to 1313?

A. We were told after we had a signed lease that the current tenants would be extending their stay and our lease would not be enforced.

Q. And who told you that?

A. I believe Destinee Price.

Q. Okay. And at that point, had you been dealing with Destinee Price for a while?

A. I believe she was the main point of contact for us at The Eddy up to that time.

Q. Any other people at The Eddy that you remember dealing with besides Christian and Destinee at this point in time?

A. Kayla Agustin.

Q. Okay. Anyone else?

A. No, I don't believe so.

Q. Okay. And do you know who Destinee and Kayla and Christian worked for?

A. I don't.

Q. Okay. Do you know if they worked --

Sorry, go ahead.

A. It was my understanding they worked for The Eddy.

Q. Okay. When Destinee told you that they would not, or whoever, would not honor that lease for 1313, how did that make

Page 44

you feel?

A. Upset.

Q. How did that make Shaun feel?

A. Upset.

Q. Was Shaun more upset than you were?

A. I don't know.

Q. Okay. After that 1313 lease, um, or after you guys did not move into 1313, you moved into the apartment 1010, correct?

A. Yes.

Q. And prior to moving into Apartment 1010, you signed a lease, correct?

A. Yes.

Q. And do you remember reading the lease in its entirety before signing?

A. I don't remember.

Q. Okay. Do you remember reading the lease provisions regarding defaults by a tenant?

A. I don't remember.

Q. Okay. How about any lease provisions regarding attorney's fees?

A. No, I don't remember.

Q. Okay. In your past rental scenarios, had you ever disputed any provisions of a lease?

Page 45

A. I don't believe so.

Q. Okay. Did you ever try to negotiate any prior provisions of a lease before moving into The Eddy at any of your prior residences?

A. I don't recall doing so.

(EXHIBIT 2 MARKED FOR IDENTIFICATION)

BY MR. AYVAZIAN:

Q. Okay. I'll share what's been marked as Defendant's Exhibit 2. Do you recognize this document?

A. It appears to be our lease for Apartment 1010 at The Eddy.

Q. Okay. And do you see at the top "Date of Lease Contract: September 12th, 2022"?

A. I do.

Q. Okay. And is that about the time that you moved into Apartment 1010?

A. I believe so.

Q. And just moving to page, bumping ahead, to GREP 146 at the bottom right. And I'll -- if you need me to zoom in, I will. But do you recognize your signature at the bottom?

A. Yes.

Q. And to the left of that, is that Shaun's signature?

A. Yes, it appears to be.

Q. And then to the right, that's Kayla Agustin who you

12 (Pages 42 - 45)

Page 46

brought up before; is that correct?

A. It seems so.

Q. Okay. So would you agree that this, this is your and Shaun's lease for Apartment 1010?

A. Yes, it appears to be.

Q. Okay. And would you agree that when you signed this lease, that you were agreeing to the terms of the lease?

A. I believe so.

Q. Okay. And no one forced you to rent at The Eddy, correct?

A. No.

Q. And when you say "no," meaning no one forced you, right?

A. Correct.

Q. Okay. And there are other luxury apartment buildings in Boston, correct?

A. Yes.

Q. And at the top right of this document on GREP 140, do you see where it says, "This is a binding document. Read carefully before signing"?

A. Yes.

Q. Okay. And on the bottom left, do you see the copy right symbol "2021, National Apartment Association, Inc. - 6/2021, Massachusetts"?

Page 47

A. Yes.

Q. What does that copyright line and marking mean to you, if anything?

A. Nothing.

Q. Okay, fair enough. Looking at the "Rent and Charges" provision 6. Do you see that on the screen?

A. Yes.

Q. And it says here that your lease, unless modified, you will pay 3200 per month of rent. Do you see that?

A. Yes.

Q. And then outside of -- or just rent, there were other additional charges added on a monthly basis to your ledger; is that fair?

A. I believe so.

Q. And that would include things like parking and storage?

A. Yes, I believe so.

Q. Okay. And do you see that it states on the third line under the 1900 part -- 1920 part where it says, "Otherwise, you must pay your rent on or before the first of each month (due date) with no grace period"?

A. Yes.

Q. Would you agree that that means that you have to pay rent on the fir-- that rent was due on the first day of the

Page 48

month?

A. Yes.

Q. Okay. And do you see later down in this, under the 100, it says: "If you don't pay rent on time, you'll be delinquent and all remedies under this lease contract will be authorized"?

A. Yes.

Q. And this, then it says, "We'll also have all other remedies for such violation." Do you see that?

A. Yes.

UNKNOWN SPEAKER: [Inaudible] Julia --

Q. And would you agree that --

UNKNOWN SPEAKER: -- section [inaudible] --

THE WITNESS: I'm sorry.

MR. AYVAZIAN: Sorry, what was that?

THE WITNESS: I'm sorry, that was -- Alexa, be quite. I'm sorry. Alexa going off.

BY MR. AYVAZIAN:

Q. Do you say -- er, would you agree that those two provisions read together mean that if you don't pay rent on time, you will be delinquent under the lease?

A. Yes.

Q. Okay. And then it also -- it also talks about here that there will be a late charge, a flat rate of $50. Do you

Page 49

see that?

A. Yes.

Q. Now, moving ahead to provision 26. Do you see here it says "Joint and Several Responsibility"?

A. Yes.

Q. And that first line: "Each resident is jointly and severally liable for all lease contract obligations." Do you see that line?

A. Yes.

Q. And as you sit here today, what does that line mean to you?

A. I believe it means we are responsible together or separately for the obligations under the lease.

Q. Okay. And moving to GREP 144. At the top, do you see in the gray sort of background it says, "Responsibilities of Owner and Resident."

A. Yes.

Q. Okay. And on provision 29, there's a section that begins with "default by resident." Do you see that?

A. Yes.

Q. Okay. And on the first line it says: "You'll be in default if you or any guest or occupant violates any terms of this lease contract, including, but not limited to, the following violations:" "You don't pay rent or other amounts that

13 (Pages 46 - 49)

Page 50

you owe when due."  Do you see that?

A.  Yes.

Q.  And that later down on this provision, there's a paragraph starting with the word "eviction" and it states:  "If you default, we may end your right of occupancy by giving you a 14-day written notice to vacate in the event that the default is due to your non-payment of rent" --

Do you see that?

A.  Yes.

Q.  Okay.  And on the top right it continues:  "After giving notice to vacate or filing an eviction suit, we may still accept use and occupancy charges or other sums due; the filing or acceptance doesn't waive or diminish our right of eviction, or any other contractual or statutory right."

Do you see that?

A.  Yes.

Q.  And do you understand these provisions to mean that if you, a tenant, is in default for not paying rent, that an eviction can be sought for the past rent due and other charges?

A.  Yes.

Q.  And then in the "Other Remedies" section it states about five lines down:  "Upon your default, we have all legal remedies, including, but not limited to, termination of your tenancy, pursuit of an eviction, and reimbursement for any and

Page 51

all attorney's fee and/or litigation costs or expenses."

Do you see that?

A.  Yes.

Q.  And that, a little bit further down:  "Any and all amounts which remain unpaid for 30 days from the date due shall bear interest at the maximum rate permitted by law, in which event interest shall accrue at the highest amount permitted by law.  You shall be responsible for any and all attorney's fees, expenses, or other costs incurred by the landlord to enforce any provision of this lease" --

Do you see that?

A.  Yes.

Q.  Okay.  And would you agree that the terms of this lease agreement that we just read do not specifically require a court judgement in order to assess attorney's fees pursuant --

MR. DUNN:  Objection.

Q.  -- to the pursuit of an eviction?

MR. DUNN:  Objection.

A.  That's not written anywhere in these sections that we viewed.

Q.  Okay.  Do you recall reading these provisions when you signed the lease?

A.  I don't recall.

Q.  Okay.  Do you recall asking any questions about these

Page 52

provisions before signing the lease?

A.  I don't recall whether I did.

Q.  Okay.  How about after you signed the lease at any point?

A.  I don't recall whether we asked about these specific provisions.

Q.  Okay.  And during your tenancy at The Eddy, you and Shaun did make on-time payments at times, correct?

A.  Yes.

Q.  And then at some point while at Apartment 1010 you and Shaun fell behind on your rent; is that correct?

A.  Yes.

Q.  And what were the circumstances for why you both fell behind on your rent?

A.  I don't recall exactly.  We didn't have enough money.

Q.  Okay.  Was it -- do you remember if it was a medical issue or something else?

A.  I don't recall the exact circumstances.

Q.  Okay.  Do you remember after the circumstances began, whatever they may be, that you contacted management to let them know?

A.  I don't recall whether we contacted them or not.

Q.  Okay.

MR. AYVAZIAN:  So I know we've been going for about an

Page 53

hour now.  Does anyone need a break before I start moving on to another exhibit?

THE WITNESS:  No.

MR. AYVAZIAN:  Okay.

MR. DUNN:  Actually, if we could just take five minutes just to -- a quick bio break for me would be helpful.  And then I think Jeff needs to log off anyway.  Right?

VIDEOGRAPHER:  We have an hour and 30 minutes, but this is good for a break.

MR. AYVAZIAN:  Okay.  Let's, uh -- I know five minutes is usually always 10 minutes, so why don't we try for 10:42?  But we'll see what happens.

MR. DUNN:  Yeah, 10:42 works.  Sounds good, thank you.

MR. AYVAZIAN:  Okay.

VIDEOGRAPHER:  This ends Media Unit No. 1.  We're going off the record at the time of 10:37 a.m. as indicated on the video screen.  And we're off the record.

(WHEREUPON, a break was taken from 10:37 a.m. to 10:43 a.m.)

VIDEOGRAPHER:  This begins Media Unit No. 2.  We are back on the record at the time of 10:43 a.m.  You may begin.

MR. AYVAZIAN:  Thank you.

BY MR. AYVAZIAN:

Q.  Kevin, we just spoke about the certain provisions of the lease regarding, in the section titled "Responsibilities by

Veritext Legal Solutions

800-726-7007                                                          305-376-8800

Page 54

Owner and Resident."  Correct?

A.  Yes.

Q.  And would you agree that in the "Other Remedies" section that we just read where it states, "You shall be responsible for any and all attorney's fees, expenses, or other costs incurred by the landlord to enforce this provision of this lease," that that would include the attorney's fees, expenses, and costs incurred by Greystar or The Eddy to bring an eviction action against you and Shaun?

MR. DUNN:  Objection.

A.  That is what is written there, but we do not agree as per our complaint.

Q.  And do you believe that these provision-- or this provision that we just read is against public policy?

MR. DUNN:  Objection.

A.  I can't say specifically it is not.  I'm not an attorney.

Q.  I understand.  Would you say that the provisions that we just read are unconscionable?

MR. DUNN:  Objection.

A.  That's not for me to say.  I don't -- I can't decide whether or not it is.

Q.  Okay.  Would you say that this provision that tenants shall be responsible for any and all attorney's fees, expenses,

Page 55

or costs incurred by the landlord to bring an eviction is unfair?

MR. DUNN:  Objection.

A.  Again, that's not for me to decide.

Q.  Okay.  Well, earlier you stated that it was unfairly assessed -- or that what was unfair was that you and other potential class members were unfairly assessed fees without court approval, correct?

A.  I believe I did.

Q.  And here this provision, would you agree, says that tenants will be responsible for those fees and costs incurred by the landlord to bring an eviction?

A.  That is what is written there.

Q.  Okay.  And do you believe that it's unfair for the tenants to be responsible for costs and fees that a landlord had to bring because of an eviction action?

MR. DUNN:  Objection.

A.  I don't know "unfair" in the normal sense or whether they should be approved, that is the substance of our complaint.  Again, I'm not an attorney.  I can't speak to technicalities under the law.

Q.  Okay.  Would you agree at least that the allegations that Greystar or The Eddy assessed fees is at least located in this lease, that they were going to do that if an eviction

Page 56

action is brought?

A.  That is what is written in this provision of the lease, yes.

Q.  Okay.  And we left off with, before the break, that you and Shaun made on-time payments, and at some point in time you fell behind in your lease, correct?

A.  Yes.

Q.  And when I say "fell behind in your lease," I meant fell behind in payments for your lease in Apartment 1010, correct?

A.  Yes.

(EXHIBIT 3 MARKED FOR IDENTIFICATION)

BY MR. AYVAZIAN:

Q.  Okay.  Now, I'm showing you now what we'll mark as Defendant's Exhibit 3.  Do you recognize this document?

A.  It appears to be a ledger.  I can't verify the authenticity of the document.

Q.  Sure.  Do you see here that on the top left it says, "Name:" -- under the personal info -- "Shaun Cordeiro and Kevin Matlack"?

A.  Yes.

Q.  And for unit, as it lists here, is 1010?

A.  Yes.

Q.  And is there anything in this top section of this

Page 57

resident charges and payments ledger that is unusual?

A.  I don't know what you mean by unusual.

Q.  Sure.  That was a poorly worded question so I apologize.

Do you have any reason to believe that this is not yours and Shaun's ledger from January 1st, 2022 through January 24th, 2024?

A.  I can't say for certainty.  That's what it appears to be.

Q.  Okay.  We see here on, which is marked GREP 312, we see here that there are several charges and payments, and on right-hand column there's a balance listed.  Do you see that?

A.  Yes.

Q.  And that we have, um, we have in this third column, we have Apartment 509 is listed, correct?

A.  Yes.

Q.  And then, for example, on June 1st, 2022, there's a description of a payment for $141.23, and the payment is described as "WelcomeHome ACH payment - Shaun Cordeiro."

Do you see that?

A.  Yes.

Q.  Okay.  And we see down here -- sorry, we'll go to the next page on GREP 313.  We then see it goes from Apartment 509 to Apartment 1010; is that correct?

15 (Pages 54 - 57)

Page 58

A. Yes.

Q. And then on, we'll go to this entry, 9/26/22, it shows payment "WelcomeHome ACH payment - Shaun Cordeiro" for $590.35 and the balance is zero. Do you see that?

A. Yes.

Q. Okay. And this was around the time that you moved into Apartment 1010, correct, in September of 2022?

A. Yes.

Q. And we can see that, it looks like, in 9/10/22 there was still 509, and then 9/22/2022 is when it switches over to 1010. Correct?

A. Yes.

Q. With a water bill coming in a little bit later in October for the 509, right?

A. Yes.

Q. Okay. So, as we noted in your lease, the base rent 3200 appears on this ledger as being billed on 10/1/2022, correct?

A. Yes.

Q. And with the additional charges of storage for $50 each and that water bill coming in after you had moved into Apartment 1010, we see that there was a balance of $3,371.54. Right?

A. Yes.

Page 59

Q. And that the way that this ledger operates is when there's a payment, that number gets reduced; and when there's a charge, that balance number on the right increases. Is that fair?

A. Yes, it appears to be.

Q. Okay. So looking at the next page, we can see that when November rent hits on 11/1/2022 for 3200, the amount goes up to 4791 and change; is that correct?

A. Yes.

Q. And then we see a partial payment is made with the description "Check Scan - Shaun Cordeiro," and that drops the balance down to the 3400 number, right?

A. Yes.

Q. And then December rent hits, and it brings the balance up to $6823 and change, correct?

A. Yes.

Q. Okay. Now, that same month you and Shaun received a notice to quit from The Eddy; is that correct?

A. I don't recall at the time.

Q. Okay. So what we have on the screen here and what I was referring to was December of 2022, right?

A. Yes.

(EXHIBIT 4 MARKED FOR IDENTIFICATION)

BY MR. AYVAZIAN:

Page 60

Q. Okay. I'm showing you Defense Exhibit 4. Do you recognize this document?

A. It seems to be a notice to quit dated December 9th, 2022.

Q. Okay. And that's the same month that we were talking about with the rent, December 2022, right?

A. Yes.

Q. Would you agree then that in December of 2022, you and Shaun received a notice to quit?

A. It appears so.

Q. And that this document reflects that it was addressed to you and Shaun at Apartment 1010 in Boston?

A. That is what it says.

Q. And on the top right it has the date filed, January 17th, 2023 "Housing - Eastern (Boston)." Do you see that?

A. Yes.

Q. Okay. And do you see here that, um -- actually, I'll restate the question.

You agree that the notice to quit was served due to non-payment of full rent up until that point in the amount of what's listed, $6,429.03?

A. Yes, that's what the notice to quit states.

Q. And at this point in time when you and Sh-- when you and Shaun received the notice to quit, did you dispute the

Page 61

validity of the notice to quit with anyone?

A. I don't recall.

Q. Okay. Do you think that this notice to quit was served on you and -- sorry, not served. Do you believe that this notice to quit was factually wrong at all?

A. I don't recall at the time.

Q. Okay. As you sit here today, do you believe this notice to crit -- er, notice to quit was valid?

A. I believe.

Q. Okay. And when you received the notice to quit back in December of 2022, did you understand that an eviction action could be forthcoming?

A. Yes.

Q. Okay. And did you ever seek legal representation after receiving this notice to quit?

A. I don't recall whether we did.

Q. Okay. And would you agree that at this point, December of 2022 when you received the notice to quit, that you were considered default under your lease?

MR. DUNN: Objection.

A. I don't recall understanding that exact term "default" at the time.

Q. How about "delinquent" under the lease?

A. Yes, that's what it states for non-payment of rent.

16 (Pages 58 - 61)

Page 62

Q. Okay. And -- one second.

Okay. And you see that this notice to quit is signed by Kayla Agustin?

A. Yes.

Q. And this was, I believe, the first notice to quit that you had ever received, correct?

A. I don't recall.

Q. Okay. After you received this notice to quit, do you remember what actions or steps you took immediately?

A. I don't recall what we did immediately.

Q. Okay. Do you remember communicating anything to management about the notice to quit?

A. I don't recall off the top of my head.

Q. Okay. At this point in time, December of '22, was that when the hardship had started, the financial hardship had began?

A. I would say in regards to being unable to pay rent on time, yes.

Q. Okay. Do you remember if -- what, if anything, you did to try and pay the outstanding rent that was due and listed on this notice to quit?

A. We had applied for housing assistance through the RAFT program.

Q. And do you know when you applied for that RAFT

Page 63

assistance?

A. I don't recall the exact date it was submitted.

Q. Okay. And looking back at the ledger and knowing that the notice to quit came on December 9th, 2022, we see here that on December 6th Shaun made a payment of $500 and brought that balance down to 6323 and change, correct?

A. Yes.

Q. And that January 1st rent hits again and that with the base rent, the garage, and the two storage charges, that on January 1st, according to the ledger, the balance due went to $9822.83. Do you see that?

A. I do.

Q. And that on Jan-- the next entry, January 17th, 2023, in the description of "payment by government subsidy" for $6429.03, it brought the balance down to $3393.80. Do you see that that?

A. Yes.

Q. Okay. And would you agree that that payment by government subsidy did not occur until -- or did not hit the ledger until January 17th of 2023?

A. I agree it's not on the ledger until that day.

Q. Okay. Do you dispute the date that this check came in to The Eddy?

A. It is my understanding that, per e-mails from Nan

Page 64

McKay and RAFT, that the check was presented to the bank in the month of December, per my recollection.

Q. And when you say "presented to the bank," do you mean that The Eddy cashed that check in December of 2022?

A. I can't say what that phrase means. I believe that was their exact wording: "presented to the bank."

Q. Okay. And I guess to be clear, what do you believe that to mean?

A. I've never heard that phrase before. I -- if I were told that, I would understand that as a check was given to a bank for deposit, but I can't say with certainty what their meaning of that phrase is.

Q. Do you believe then that the eviction action that was filed against you and Shaun was brought unfairly?

A. I'm not an attorney and I don't have the exact details from the bank, so that's impossible for me to say.

Q. Okay. And do you know the date that the eviction action was brought against you and Shaun?

A. I don't know exactly.

Q. Okay. If the eviction action -- sorry, I'll withdraw that.

If the check was presented, meaning cashed by The Eddy in December of 2022 and the eviction action was brought after that, would you say that the eviction action was brought

Page 65

unfairly?

A. I am not an attorney. I don't know the nuance of housing law so I can't say with certainty.

Q. Okay. So we're at the point now where an eviction action is filed against you and Shaun in January of 2022, correct?

A. Yes.

Q. And do you know who brought the -- what entities brought the eviction action against you and Shaun?

A. I don't recall the exact entities named.

Q. Okay. Do you remember receiving service of the summons and complaint regarding the eviction action?

A. I don't.

(EXHIBIT 5 MARKED FOR IDENTIFICATION)

BY MR. AYVAZIAN:

Q. Okay. I'm showing you what we'll mark as Defendant's Exhibit 5. Do you recognize this document?

A. It seems to be the summons and complaint for the summary eviction process.

Q. And it states that it's for "Housing Court Department, Eastern," correct?

A. Yes.

Q. And it's to defendants/tenants/occupants; Shaun and you, right?

17 (Pages 62 - 65)

Page 66

A.  Yes.

Q.  And then in the middle of the page it says that the eviction action is being brought by "Plaintiff/Landlord/ Lessor/Owner: Greystar Management Services, LP and GEGC 2 New Street" for non-payment of rent in the amount $9,328.07; is that correct?

A.  Yes, that's what it states.

Q.  And then it itemizes how that amount is broken down, correct?

A.  It appears to.

Q.  Okay.  And would you agree that on page 3, this is the service where it lists your name, Kevin Matlack, and it has an officer's return with a date of January 6th, 2023?

A.  Yes, that is what it says.

Q.  Do you remember receiving this summons and complaint?

A.  By "receiving," how do you mean exactly?

Q.  Do you remember receiving it in the mail, at your door, or something else?

A.  I believe it was left at our door.

Q.  Okay.  And do you see here there's a breakdown of fees for service, that this individual Samuel Desrosiers with his signature and "Constable, City of Boston," lists?

A.  Yes.

Q.  Okay.  And the same for Shaun on page 2, signed by

Page 67

Samuel Desrosiers with a breakdown of certain fees for service?

A.  Yes.

Q.  Okay.  Looking at these fees for service, is there anything unfair about these charges as they're listed?

A.  I couldn't say.

Q.  Okay.  Do you see on page 1 -- one second.

MR. AYVAZIAN:  Could I just pause for a second?  I'm going to just -- Could we go off the record for a second?

MR. DUNN:  Yeah, sure.

VIDEOGRAPHER:  This ends Media Unit No. 2.  We're going off the record at the time of 11:07 a.m. as indicated on the video screen.  And we're off the record.

(WHEREUPON, a break was taken from 11:07 a.m. to 11:08 a.m.)

VIDEOGRAPHER:  This begins Media Unit No. 3.  We're back on the record at the time of 11:08 a.m.  You may begin.

MR. AYVAZIAN:  Thank you.

BY MR. AYVAZIAN:

Q.  Okay, looking back at the notice to quit -- sorry, the summons and complaint here, we see here that this summons and complaint is signed by an individual named Mark Laverty, Esquire.

A.  Yes.

Q.  And do you know if Mr. Laverty was part of the law firm that was handling the eviction that you -- sorry, was part

Page 68

of the law firm that you and Shaun dealt with in this eviction case?

A.  I do not know.

Q.  Okay.  Do you remember when you received this summons and complaint and saw the amount due on the non-payment of rent, did you dispute that amount?

A.  I believe we did so in our answer to the court.

Q.  Okay.  And you had mentioned earlier that when the hardship began, at some point you and Shaun apply for rental assistance through RAFT, correct?

A.  Yes.

Q.  And is it a joint application, or did you file it, or did Shaun file it?

A.  It is a joint application, I believe.  We included both of our information.

Q.  Do you have a copy of that application?

A.  I don't have a copy available.  I believe it's --

Q.  Okay.

A.  -- a copy is available through the program.

Q.  Okay.  Did you seek attorney assistance at all for that application?

A.  For the application, I don't believe so.

Q.  Okay.  And then as a result of the application, you received the amount of funds requested, correct?

Page 69

A.  I believe we did.

Q.  And that amount was for what we saw in your ledger, that 6400 amount that was paid and hit on January 17th, 2023?

A.  I believe so.

Q.  Okay.  Do you have to pay that amount back to RAFT?

A.  I do not believe you do.

Q.  Okay.  And do you know, between the time that you applied for RAFT and the time that it appears to have hit your ledger, were you all -- sorry, were you and Shaun in communication with The Eddy about that payment coming in from RAFT?

A.  Yes, we were.

Q.  And what in sum and substance were those communications?

A.  To the best of my recollection, we were asking them if they knew -- checking in, if they had received it, where it was, what would -- the process was.  I know Shaun had let them know that he'd be filing a payment inquiry with RAFT because it had been nearly a month since the payment had been disbursed but not yet entered into our ledger.  And I believe it was the next day that it was entered.

Q.  The next day after Shaun said the RAFT inquiry would be filed?

A.  I believe so.

18 (Pages 66 - 69)

Page 70

Q. And do you know who at The Eddy Shaun and you were in communication with about this RAFT payment?

A. I believe at the time it was both Destinee Price and Kayla Agustin. Although, I believe most communication was still being handled by Destinee.

Q. Okay. And do you believe that Destinee withheld that payment?

A. I can't say.

Q. As you sit here today, do you believe that Destinee withheld that payment?

A. I have no information to support that other than it was not entered until January 17th and whatever "presented to the bank" means, it was done so December 21st.

Q. Do you recall any messages from Destinee or Kayla saying what the issue was on their end with this outstanding check or payment?

A. I don't recall. There may be some messages via e-mail.

Q. Okay. Do you believe that they were trying to help you and Kevin -- sorry, you and Shaun have this RAFT check applied?

A. I can't say for certain.

Q. Okay. Is there anything that you believe that they were intentionally withholding the RAFT check on your account?

Page 71

A. I have no factual information to believe they did so.

Q. Does Shaun believe so?

A. I can't speak to what he believes.

Q. Has he had conversations with you that he believes?

A. I think he has.

Q. Okay. Do you believe that Shaun has any animosity towards Destinee about the possible and intentional withholding of a RAFT check?

A. I believe he does.

Q. Do you have any animosity towards Destinee?

A. I don't think so.

Q. Okay. How about towards Kayla?

A. No.

Q. Okay. Towards anyone else at The Eddy?

A. No.

Q. Okay. So going back to the eviction action that's filed against you and Shaun. We left off with counsel for Greystar filing the summons and complaint, and then we looked at those two service documents from the constable. Correct?

A. Yes.

Q. Now, do you understand that in this case, the one pending in federal court, that you on behalf of your attorneys filed the complaint?

A. Yes.

Page 72

Q. And do you understand that it costs money to file a complaint in court?

A. Yes.

Q. And do you understand that before filing a complaint, a complaint needs to either be filled out or drafted?

A. Yes.

Q. And would you agree that drafting a complaint takes time to do?

A. Yes.

Q. And that if an attorney drafted a complaint, that they should be compensated for their time working on a case?

A. Yes.

Q. And are you aware of the different types of ways attorneys can be paid in cases?

A. I have a limited knowledge of it.

Q. Okay. So you understand some attorneys can work on a contingency fee?

A. Yes.

Q. Or some attorneys can work for hourly rates?

A. Yes.

Q. And that attorneys could also work on a flat rate for a certain project?

A. Yes.

Q. Okay. As a general matter, do you think it would be

Page 73

unfair for attorneys to seek payment for their time working on a case?

A. No.

Q. Do you think it would be unfair for attorneys to seek reimbursement for out-of-pocket expenses that they had to incur on behalf of a client?

A. I can't say.

Q. And we'll take a look now at the housing court docket, which we'll mark as Defendant's 6, I believe.

(EXHIBIT 6 MARKED FOR IDENTIFICATION)

BY MR. AYVAZIAN:

Q. Do you recognize this document?

A. Yes. It appears to be the housing court trial docket.

Q. And this is the housing court trial docket for the eviction case brought against you and Kevin, correct -- oh, sorry, you and Shaun, correct?

A. That is what it seems to be.

Q. Okay. And you'd agree that as I scroll down on page 2 and 3, there are numerous events here on the docket, correct?

A. Yes.

Q. And that it shows the case went from January 17th, 2023 down to May 23rd, 2023 when a voluntary dismissal was filed. Do you see that?

A. Yes.

19 (Pages 70 - 73)

Page 74

Q. Okay. And as part of these events you see here, such as March 23rd, 2023 it lists alternative dispute resolution outcome and stating housing specialist conference that same day. Do you see that?

A. Yes.

Q. Do you remember if this was the mediation that took place in this case?

A. I believe it was.

Q. Were you in attendance for that mediation?

A. If that is indeed the mediation, I was in attendance.

Q. Okay. And do you know if counsel for the plaintiffs, which was Greystar, if they were in attendance?

A. I don't recall.

Q. Okay. Do you recall counsel for Greystar being present at any of these events?

A. I know counsel for Greystar was present at the scheduled in-person hearing.

Q. Okay. And do you understand that counsel for Greystar was paid for the work associated with the eviction case that was brought against you and Shaun?

MR. DUNN: Objection.

A. Yes.

Q. And earlier you stated that you and Shaun had filed motions in this housing eviction case, correct?

Page 75

A. Yes.

Q. Okay. I'm now showing you Exhibit 6?

COURT REPORTER: This will be Exhibit 7, I'm sorry.

MR. AYVAZIAN: Ah, I knew it. Sorry. Okay, Exhibit 7. Sorry about that.

COURT REPORTER: It takes me a minute to find my mute button. I apologize for the delay.

(EXHIBIT 7 MARKED FOR IDENTIFICATION)

BY MR. AYVAZIAN:

Q. Is this -- is this one of the motions that you were talking about?

A. Yes, it appears to be.

Q. Okay. And scrolling down to the bottom, is this your signature on this motion?

A. Yes.

Q. And we can see here it states that, "The undersigned Shaun Cordeiro hereby moves this Court to:" and then it's checked off "file answer late and counterclaims." Correct?

A. Yes.

Q. Did you work on this document at all, or was it just Shaun?

A. I don't recall at the time if I assisted him.

Q. Okay. Do you know if Shaun or you sought any legal assistance to draft this document?

Page 76

A. I don't recall.

Q. Okay. And I probably should have been more specific. What I mean by "legal assistance," seeking an attorney's assistance.

A. I don't recall if we did.

Q. Okay. Did you read this motion before Shaun filed it?

A. I believe so.

Q. Okay. And you see here it says "summary process answer with counterclaims" on page -- this is page 3, but on the bottom right it says page 1. Do you see that?

A. Yes.

Q. And that it notes that it's from Shaun Cordeiro in the "Facts" section: I have a written lease. I pay 3200 in rent. Do you see that?

A. Yes.

Q. Okay. And that it says, "I deny I owe the amount of rent listed in the landlord's complaint"?

A. Yes.

Q. And that's what you referred to earlier, that you believe that amount listed on the notice to quit, or at least the summons and complaint, was somewhat disputed?

A. Yes.

Q. And do you see that under "Defense," it's listed "Tenancy not properly terminated and/or not properly brought."

Page 77

Do you see that?

A. Yes.

Q. And beneath that we have for a "Defense and a counterclaim or offset to any claim," "Violation of the security deposit law"?

A. Yes.

Q. And this was a counterclaim that you and Shaun were bringing against the Eddy -- er, sorry, Greystar and the building owner at the time?

A. Yes, that's what it states.

Q. Okay. And right here we see under the "Violation of security deposit," we see "Mass. Gen. Laws." There's a couple of statutes listed, and then it say "c. 93A."

Do you see that that?

A. Yes.

Q. Okay. And that's referring to Chapter 93A?

A. Yes.

Q. Okay. And then the next defense and counterclaim is "Violation of the Consumer Protection Law," Massachusetts Law 239 8A, and/or Chapter 93A again. Correct?

A. Yes.

Q. And for 13(b) it states: "The landlord acted in the following additional unfair or deceptive ways: The landlord charged me constable or court fees unlawfully."

20 (Pages 74 - 77)

Page 78

Do you see that?

A. Yes.

Q. Is that the same claim you're bringing in this case?

MR. DUNN: Objection.

A. I don't believe so.

Q. Okay. Do you recall what your basis was in saying the landlord charged you constable or court fees unlawfully?

A. I don't recall.

Q. As for these other claims listed, such as the security deposit law violation counterclaim that was brought, do you know why they were not brought in this case, in this federal court case that we are here for today?

A. I don't know for certain. I don't recall discussing that with our attorneys.

Q. Do you know why this second counterclaim of violating 239 and 93A, if these are for different claims than what you brought in this federal action, why are they not brought in this federal case?

A. I'm not an attorney so I can't say what the specific statutes are or what the specific claim is.

Q. Okay. Were you talked out of not bringing these claims by anybody --

MR. DUNN: Objection.

Q. -- in this federal case?

Page 79

A. I don't recall being talked out of any claims that we wanted to bring forward.

Q. Okay. Are you contemplating bringing any of these claims against Greystar or The Eddy in the future?

A. I have no current plans for any future action.

Q. Do you know if Shaun is?

A. I don't know.

Q. Okay. And this motion for counterclaims was filed with the court, correct?

A. I believe so.

Q. And it states it was filed on May 12th of 2023?

MR. DUNN: Objection.

A. That is what it says.

Q. And on the top right we have date filed, May 12th, 2023?

A. Yes.

Q. Okay. Do you recall that by the time that these counterclaims were filed, May 12th, 2023, had you been aware of any legal or eviction fees being charged to your ledger at this point in time?

A. I don't recall if they had yet been charged.

Q. Okay. Do you know when that those -- the first eviction or legal fee was charged to your ledger?

A. I do not.

Page 80

Q. Okay. Were you a part of any conversations with counsel for Greystar in that eviction proceeding about those eviction fees on your ledger?

A. I don't recall what exactly we discussed with their counsel when we met for the in-person hearing.

Q. Okay.

A. Other than the motion to continue to allow time to settle the ledger and a voluntary dismissal to be filed by the building owner at the time.

Q. Okay. So what, um -- going back to the, uh, that time period when the motion to file late answer and counterclaims is done, what is your understanding of the eviction process and case at that moment?

A. Our particular case?

Q. Yes.

A. At that point I understood we would appear before the judge in housing court and be given the chance to present our answer to the case and our counterclaims and hear any motions that we had wanted to bring.

Q. And did you have that opportunity to present that information that you just mentioned?

A. We chose instead to, um -- I don't know what it's called, but we made an agreement with counsel for the building owner to delay our in-person hearing at the time. So we did not

Page 81

present before the judge at any point in this case.

Q. Okay. And when you say the agreement, is that the motion to continue the conference in front of the court to another date; is that what you're referring to?

A. I believe so. We agreed to continue to a specific date and that the building owners would file a voluntary dismissal in the event that the ledger was settled prior to that scheduled date.

Q. Okay. And who -- So you came to an agreement that a voluntary dismissal would be filed if, what you're saying, the ledger reads zero?

A. Yes.

Q. Okay. And who did you come to that agreement with?

A. The counsel that was present, Vladimir -- Nechev? I don't recall his last name. He, I believe, is mentioned in e-mails between ourselves, himself, and The Eddy management.

Q. Okay. And we see here on the housing court docket that the voluntary dismissal was filed on May 23rd, 2023. Correct?

A. Yes.

Q. Okay. So at the time this voluntary dismissal is filed, had you and Shaun paid any eviction or legal fees that were put on your ledger?

A. I don't recall if eviction fees or legal fees had been

21 (Pages 78 - 81)

Page 82

placed. If they had been, I imagine we must have paid them or we would not have been able to bring the ledger to zero.

Q. Okay. Did Vladimir Nechev tell you that you needed to pay all fees on your account and all charges on your account for the eviction action to be dismissed?

A. I believe he did. I believe that was my understanding at the time, that we would pay those fees, so yes, I believe there were fees that had been assessed. I think it was my understanding that we would pay those fees and then they would be refunded back to us.

Q. And when you say your understanding, do you remember if anyone -- or who told you that or where you gained that understanding from?

A. From my discussion with Mr. Nechev and Shaun.

Q. Okay. And --

A. Shaun Cordeiro.

Q. Was that discussion in person? over the phone? something else?

A. That was in person, I believe. That was the discussion we had on the date of the originally scheduled hearing at the courthouse.

Q. Okay. Was that the mediation?

A. No. I don't believe Mr. Nechev was present for that.

Q. Okay. And outside of Vladimir Nechev saying that, did

Page 83

anyone at The Eddy communicate to you that you had to pay the eviction or legal fees for your eviction case to be dismissed?

A. I believe they did. I don't recall with certainty if that's included in the e-mail messages or if that was part of an in-person discussion.

Q. Okay. And do you know who that would have been with if they did?

A. It would have most likely have been with Destinee Price.

Q. Okay. Do you remember ever receiving an e-mail from The Eddy that said you had to pay off the eviction or legal recovery fees in order for them to agree to a voluntary dismissal?

A. I don't recall. But if we had, I imagine it would have been submitted as part of our document search.

Q. Okay. When -- Did you ever come to an agreement with Vladimir Nechev about the voluntary dismissal?

A. What do you mean by "agreement"?

Q. Did you agree to give up pursuing your counterclaims in the eviction case if a voluntary dismissal was filed for your eviction case?

A. I don't know if that was part of the agreement that was made, or if that was -- no, I don't recall if that was part of our agreement.

Page 84

Q. Okay. And with the notice of voluntary dismissal being filed on May 23rd, do you know if the eviction charges that were assessed to your account were paid by the time that that voluntary dismissal was filed?

A. I don't recall if they were or if we had not paid them yet with the understanding that we would not be required to based on our discussion with Vladimir.

Q. Okay. Did Vladimir ever correspond with you directly and say that I'm not -- that he would not file the voluntary dismissal until you paid those fees with proof of payment?

A. I don't recall if he said that. I believe he did have communication with Shaun and myself and possibly involving one or more of the agents from The Eddy at the time, but I can't recall the substance of those conversations.

Q. Do you remember ever getting an e-mail or seeing an e-mail from The Eddy saying that the eviction case will not be dismissed until you and Shaun pay the eviction fees on the account?

A. I don't recall off the top of my head. Those e-mails, if they existed, would likely be included in our production of documents.

Q. Okay. Do you believe that you were forced to pay the eviction fees listed on your ledger for the eviction case to end?

Page 85

A. I believe we did. I believe that was -- [pause]. I believe we did end up paying them, and then having to correspond with the management at The Eddy to have them returned, partially returned. I don't believe they all ever were.

Q. Okay. But do you believe that you were forced to pay the eviction fees in order for your eviction case to be dismissed?

A. I do. I do believe we had to. I can't recall with certainty from that long ago whether we did at the time pay them, if they had already been paid partially prior to the agreement we made with Vladimir, I can't say with certainty without seeing the ledger.

Q. Okay. And we'll take a look at the ledger in a moment.

What do you believe would've happened with the voluntary dismissal if you had not paid the fees around Mar-- er, sorry, May 23rd, 2023 when that voluntary dismissal was filed?

A. If the fees were already on the ledger at that point and had not already been paid as part of a previous payment, I currently do not believe they would have proceeded with the voluntary dismissal.

Q. Okay --

A. At the time -- I'm sorry.

22 (Pages 82 - 85)

Page 86

Q. At the time?

A. At the time I can't recall what our thoughts were or what our understanding was without seeing our correspondence and the ledger.

Q. Okay. All right, so we just looked at the ledger, and on May 23rd Vladimir files that notice of voluntary dismissal. At this point is the eviction action over?

A. It's my understanding that it was. After that dismissal had been filed and approved and signed by the judge, that yes, the eviction action was over.

Q. Okay. And now we'll take a look at the ledger going back to that. [Pause.] Okay, so we're going back to the ledger. And this, we'll go to page GREP 314. Do you see here, four lines from the bottom, on March 20th, 2023?

A. Uh-hmm.

Q. Eviction as a char-- "CH - Eviction," a lega-- "Eviction/Legal Recovery - Cordeiro" for $477. Do you see that?

A. I do.

Q. And would you agree that this charge was added while your eviction case was pending?

A. Yes.

Q. Okay. And do you remember at any point in time during your eviction action if you brought up to the court, whether it was the judge or the housing specialist, that this charge was

Page 87

put on your ledger?

A. I don't recall whether we brought it up to the judge or the housing specialist, no.

Q. Okay. And this charge was added before you and Shaun filed that, your counterclaims, correct?

A. Yes, prior to the May 12th filing.

Q. Would the unfair constable and court fees that we discussed in that filing, was that for this $477?

MR. DUNN: Objection.

A. I can't say. I believe at the time we had thought also that the constable fees, there was some issue or irregularity with those so I'm not certain what exactly that counterclaim referred to.

Q. Okay. Did you have to pay any fees for the eviction that were not included on your ledger?

A. I don't recall.

Q. Okay. The next page, GREP 315, we see on May 1st another "CH - Eviction," "Eviction/Legal Recovery - Cordeiro" for 175. Do you see that?

A. Yes.

Q. And would you agree that that charge was also added to the ledger while the eviction case was pending?

A. Yes.

Q. Okay. And then -- Sorry, one second.

Page 88

So that would be, that May 1st, that was the second eviction charge to be added to your ledger, correct?

A. It appears so.

Q. Okay. Now, do you remember any other eviction charges being added to your ledger after this second charge?

A. I thought there was a third charge. It was my recollection that there was, but it doesn't seem that any additional charge appears on the ledger --

THE WITNESS: I'm sorry again. Alexa, be quiet. I apologize.

A. It does not seem that an additional legal recovery fee appears at this point at least on the ledger.

BY MR. AYVAZIAN:

Q. Do you remember that third charge being removed by The Eddy from your ledger?

A. I don't recall. I believe there was a discussion of the legal fees that took place over e-mails that were produced during discovery.

Q. Okay. And I'll show you -- I'll stop sharing this. I'll mark this as Exhibit 8.

(EXHIBIT 8 MARKED FOR IDENTIFICATION)

BY MR. AYVAZIAN:

Q. And do you see here this report starting on GREP 132 states "Accounting (Internal) Ledger" for you and Shaun in

Page 89

Apartment 1010, including five-oh -- or your apartment, prior apartment, 509, on the first page. Do you see that?

A. That is what it says.

Q. Okay. And we can go to, um, a few pages over. We can see here again on this 135, that RAFT payment hitting on January 17th for the 6429. Do you see that?

A. I do.

Q. Okay. And then we go to next page, and that $477 initial charge related to eviction/legal recovery, that it appears there, right?

A. Yes.

Q. And then on May 1st, there's the 175 that we just talked about?

A. Yes.

Q. Okay. And then on the next page I believe is the one that you're referring to, 8/24/2023 "CH - Eviction," "Legal Recovery," and there's the 175, correct?

A. Yes.

Q. And that's that third charge that you were talking about, correct?

A. Yes. I believe they referred to that as a courtesy removal.

Q. Right. And that next line says "CH - Eviction," "per attorney," D. Rossetti is the person entering this entry. And,

23 (Pages 86 - 89)

Page 90

it says, in parentheses, the 175 which shows there's a credit.

A. Uh-hmm.

Q. Right? Okay.

A. Yes.

Q. Okay. And would you agree that this 175 was disputed with Marvin at The Eddy when you all received it?

A. I can't recall who it was disputed with, but I do believe we disputed it and then had it refunded.

Q. Okay. So outside of those three charges and the last one with the refund or credit, but outside of those three charges added on to your ledger, were there any other charges related to the eviction or legal fees added to your ledger that you're aware of?

A. Not that I am aware of or I can recall.

Q. Okay. So that would -- 477 plus the 175, plus the 175, would you agree that that adds up to 827?

A. Yes.

Q. Okay. And with that second $175 amount being refunded, reversed, or credited, that takes it down to $652 being actually applied, not removed, at this point on your ledger, correct?

A. Yes.

Q. Okay. And looking at this ledger on 12/31. Do you see in the "PW - CONC/Other," "Legal fee credit," "D. Rossetti,"

Page 91

and it shows a credit of $490. Do you see that?

A. I do.

Q. And do you agree that that $490 credit reduced the balance on the account at that time from 3400 down to 2900 and change?

A. Yes.

Q. Okay. And that credit was applied to your account on 12/31/2023?

A. Correct.

Q. Okay. So just doing the math, and I apologize, but with the prior 652 that was actually on your ledger, and now subtracting the 490 that was credited to your account on December 31st, would you agree that the total amount of eviction fees and costs at this point after the 490 was applied would be $162?

MR. DUNN: Objection.

A. Yes.

Q. Do you understand at this point that the 162 -- sorry, I'll rephrase that.

Do you understand that the $162 represents just the court costs that Greystar had to incur for the bringing of the summary eviction action?

MR. DUNN: Objection.

A. I never recall receiving an itemized invoice, so I

Page 92

can't speak to what those costs represent.

Q. Have you ever seen an e-mail from Shaun to anyone breaking down those costs?

A. I don't recall. I believe we repeatedly requested a copy of invoices from the attorneys. I don't recall whether or not anything was produced.

Q. So when -- okay, when you say "we," you and Shaun requested invoices of those charges added to your ledger from the attorneys?

A. I believe we did, yes.

Q. And did they ever respond to you?

A. I don't recall ever receiving an actual invoice. I can't say with certainty. I do believe we were told that they were reaching out.

Q. Okay. And did you ever --

And when you said "attorneys," was it that one law firm that Vlad Nechev worked at and Mark Laverty worked at that we went over?

A. I believe so. Them, or whomever did the work for which we were charged.

Q. Okay. And did you ever request the invoices from anyone at The Eddy?

A. Yes. I believe that we requested them from Destinee or Marvin, whomever was at the time, I don't recall exactly when

Page 93

we asked her, when management changes happened.

Q. Okay. And do you know when you first --

Taking a step back. The $477 charge, do you remember when you first realized that that amount had hit your ledger?

A. I don't recall. I imagine it was sometime shortly thereafter.

Q. Okay. Would that have been when you first started requesting an invoice, or was it some time later?

A. I can't recall without seeing our communications.

Q. Okay. How about that second 175, when did you first realize that that hit your ledger?

A. I can't say with certainty. I don't recall exactly.

Q. Okay. And do you think that you requested that individual invoice when it -- when you first realized it?

A. Again, I don't recall when we began to request the invoices.

Q. Okay. And we just did the math of the 652 minus the 490 being 162. If the 162 is broken down to be court costs only, would you agree that at that point in time on December 31st, 2023 when you received that $490 credit, that all would -- that all that would have been left is court costs, and that the attorney's fees charges would have been removed -- er, sorry, credited?

MR. DUNN: Objection.

24 (Pages 90 - 93)

Page 94

A. I can't say with certainty. I don't have an itemized invoice, and I don't know how those charges were applied and refunded to specific line items.

MR. AYVAZIAN: Okay. Before I show any exhibit, and I see some stretching going on, does anyone want to take a 10-minute comfort break or anything?

THE WITNESS: Yeah, could we please?

MR. AYVAZIAN: Is 10 minutes? Do you want any longer?

THE WITNESS: That's good for me.

MR. AYVAZIAN: Okay --

MR. DUNN: That's good for me.

MR. AYVAZIAN: Great. So we come back at 12:05?

THE WITNESS: Sounds good.

VIDEOGRAPHER: This ends Media Unit No. 2 -- oh, I'm sorry -- Media Unit No. 3. We're going off the record at the time of 11:56 a.m. as indicated in the video screen. And we're off the record.

(WHEREUPON, a break was taken from 11:56 a.m. to 12:06 a.m.)

VIDEOGRAPHER: This begins Media Unit No. 4. We are back on the record at the time of 12:06 p.m. You may begin.

BY MR. AYVAZIAN:

Q. Okay. Kevin, I see you have moved rooms?

A. Yes.

Q. All right. Is anyone else in your apartment yet?

Page 95

A. Yes.

Q. Okay. Is anyone in the room with you?

A. No.

Q. And where in your residence are you located?

A. I'm in our bedroom.

Q. Okay. And when you said other people are there, I'm assuming that's Shaun?

A. Yes.

Q. Okay. All right, I would just ask that you let us know if he's sitting in the room with you?

A. Yeah. He won't be.

Q. Okay, fair enough. Thank you.

Last we left off with talking about some of the charges that were added to your ledger. So I am now going to show you what we'll mark as Defendant's Exhibit 9?

COURT REPORTER: That is correct.

MR. AYVAZIAN: Okay, thank you.

(EXHIBIT 9 MARKED FOR IDENTIFICATION)

BY MR. AYVAZIAN:

Q. All right. Okay, do you see what's on my screen now?

A. Yes.

Q. Okay. And do you see on the top left it has the law firm Scolnick, Laverty & Gouveia, LLP?

A. Yes.

Page 96

Q. Do you recognize that firm as being the firm that handled the eviction on behalf of Greystar?

A. I don't recall ever knowing the name.

Q. Okay. Is there anything for you to believe that they are not the law firm that handled your eviction?

A. No.

Q. Okay. And do you see on the bottom right the amount being $477?

A. Yes.

Q. I asked you earlier when did you first become aware of this charge and you weren't sure; is that still your memory?

A. Yes.

Q. Okay. Have you ever seen this invoice before?

A. I don't recall ever seeing it before.

MR. AYVAZIAN: Okay. And just a reminder for the record, we did turn this over. This copy is not the Bates stamped copy, Michael. I think I provided you those numbers yesterday just in case you needed them. I can pull them up, just let me know.

MR. DUNN: No, I've got Bates numbers. Yeah, they were produced on the 19th.

MR. AYVAZIAN: Okay, thanks.

BY MR. AYVAZIAN:

Q. Okay. So would you agree that this is the first --

Page 97

this is the invoice for the first amount that we saw that was put on your ledger for $477?

A. Yes, it seems so.

Q. And do you see at the top it says "customer" and it lists Greystar and The Eddy?

A. Yes.

Q. And the date of the invoice, invoice date is March 8th, 2023?

A. Yes.

Q. And would you agree that that was during -- or this invoice looks to have been created while the eviction action was pending?

A. Yes.

Q. Okay. And do you understand that this invoice was sent to Greystar, was charged to Greystar by this law firm at the top left?

A. Yes.

Q. Okay. Now, looking at the description section of this invoice, do you see where it references "Eviction Matter vs. Shaun Cordeiro, et al."?

A. Yes.

Q. And that it has different items going down in the description column?

A. Yes.

25 (Pages 94 - 97)

Veritext Legal Solutions

800-726-7007                                                          305-376-8800

Page 98

Q. Okay. And one of those items says "review notice to quit"; another says "preparation of court filing: summary process and complaint." Do you see that?

A. Uh-hmm.

Q. Okay. And then the next, the bottom four, it says:

"Expense: Summons fees: $5."

"Expense: Filing fees: $135."

"E-filing fee: $22."

Do you see that?

A. Yes.

Q. Do you agree that those charges added up, the $5, the $135 and the $22 equals $162?

A. Yes.

Q. Would you agree that this $162 was what we were talking about earlier with the court costs?

MR. DUNN: Objection.

A. I can't say whether it's per line item or as the total cost, but the amounts are the same.

Q. Okay. And then underneath that, we see a description that just says "billable hours" price being $140, and then on the left side in "quantity" 2.25?

A. Yes.

Q. And that earlier we discussed hourly rates for attorneys, and if you multiple 2.25 by 140 equals this 315. Do

Page 99

you see that?

A. Yes.

Q. Would you agree that this total amount and the 477 is what was passed back to you and reflected on your ledger?

MR. DUNN: Objection.

A. Yes.

Q. And do you believe, by looking at this invoice now, that the amount of legal fees charged was reasonable for the work performed by this law firm for your eviction case?

MR. DUNN: Objection.

A. It is the same as what was invoiced. I can't speak to what is reasonable.

Q. And why is that?

A. I'm not an attorney. It's outside the scope of my understanding. The amounts are the same. Whether or not that's reasonable is not for me to say.

Q. Okay. Who is it to say, in your opinion?

A. I don't know. I suppose the attorneys themselves, they set the price and Greystar agreed to pay it.

Q. Okay. Do you have any doubt that Greystar paid this bill that was sent to them by this law firm?

A. I can't say whether or not they paid it.

Q. Okay. Looking at, um -- we'll make this Defendant's Exhibit 10.

Page 100

(EXHIBIT 10 MARKED FOR IDENTIFICATION)

BY MR. AYVAZIAN:

Q. This is invoice 37265, and do you see here this invoice is from that same law firm as the prior invoice?

A. Yes.

Q. And this amount on the bottom right is for 175; do you agree?

A. Yes.

Q. And that the invoice date is April 14th, 2023, which was still during the pendency of the eviction matter?

A. Yes.

Q. Okay. And again the same customer as the first invoice, Greystar and The Eddy?

A. Yes.

Q. Okay. And looking at the description in this invoice, it refers to "Eviction Matter vs. Shaun Cordeiro et al."

Correct?

A. Yes.

Q. And this time it has different items listed such as review ledger card, appearance at hearing on 3/23/23, courthouse mediation with opposing party. Correct?

A. Yes.

Q. And then again down here: "Conference with housing specialist - continued for tier 2 trial; pending RAFT"?

Page 101

A. Yes.

Q. And beneath that you see the billable hours for those tasks being 1.25 and at a rate of 140 an hour equaling 175.

Do you see that?

A. Yes.

Q. Do you remember when you first --

Have you ever seen this invoice before?

A. I don't believe so.

Q. Okay. Looking at this invoice, is there anything unreasonable about the charges that were billed from the law firm to Greystar or The Eddy?

A. Again, I can't speak to "unreasonable," but they set an hourly price and it was charged to The Eddy.

Q. And do you agree that this is the 175, this invoice is for the 175, that was billed back to you on your ledger that we looked at earlier?

A. It's possible to believe that. I can't say with certainty, but we were charged 175 and this is an invoice for 175.

Q. One moment. [Pause.] Do you remember that after learning about these two invoices that we just looked at, if you ever reviewed your lease to identify any provisions that related to the assessment of legal fees to your ledger?

A. I don't recall whether or not I did.

Veritext Legal Solutions

800-726-7007                                                              305-376-8800

Page 102

Q. Okay. Do you remember performing any research regarding the enforceability of legal fees at the time you realized that they hit your ledger?

A. I don't remember.

Q. Okay. I'm showing you what we'll mark as Defendant's 11.

(EXHIBIT 11 MARKED FOR IDENTIFICATION)

BY MR. AYVAZIAN:

Q. This is an invoice dated 8/9/23 for $140. Have you ever seen this invoice before?

A. I don't believe so.

Q. Okay. And this is for -- again, the same law firm to Greystar and The Eddy, correct?

A. Yes.

Q. And this one is for $140, correct?

A. Yes.

Q. And do you recall seeing any eviction or legal charge on your ledger that we went over today that included an entry for $140?

A. I don't believe so.

Q. And do you see here in the description it states for the tasks, it references the "Eviction Matter vs. Shaun Cordeiro" and lists one of the tasks being "preparation and filing of notice of voluntary dismissal." Correct?

Page 103

A. Yes.

Q. Okay. Would you agree that if this was not on your ledger, that you were never billed for it?

A. I can't say.

Q. Okay. And then last we'll look at, Defendant's Exhibit 12.

(EXHIBIT 12 MARKED FOR IDENTIFICATION)

BY MR. AYVAZIAN:

Q. And this is an invoice for $175 on 8/22/2023, correct?

A. Yes.

Q. And, again, same law firm to Greystar, The Eddy, and referencing the Shaun Cordeiro eviction matter, correct?

A. Yes.

Q. Okay. And have you ever seen this invoice before?

A. I don't believe so.

Q. Is this the invoice that you referenced earlier about Marvin possibly providing to you and Shaun?

A. I don't recall. I don't recall being provided with an invoice from anyone at The Eddy.

Q. Okay. Do you understand this invoice to be the one that was contested with Marvin and eventually removed as a courtesy?

A. Possibly. The dates appear to align.

Q. Okay. Hold on one second. [Pause.]

Page 104

Okay, I'm showing you what's been marked as Exhibit -- Defendant's Exhibit 13. This is Plaintiff's 227 through 229 that you all produced.

(EXHIBIT 13 MARKED FOR IDENTIFICATION)

BY MR. AYVAZIAN:

Q. Have you recogni-- or do you recognize this e-mail chain? And I can scroll down as you wish.

A. I don't recall it, but it appears to be between Shaun and Marvin and myself.

Q. Okay. Okay. And as we scroll down to Monday, August 28th on Plaintiff's 228 at 12:14 p.m., do you recall seeing this e-mail before?

A. I don't recall.

Q. Okay. In the e-mail beneath that, September 6th, 2023, 11:32 p.m., do you see that e-mail from Shaun to Marvin with you cc'd?

A. Yes.

Q. Okay. And this e-mail is part of this entire thread, correct?

MR. DUNN: Objection.

A. It seems so.

Q. Okay. Looking at the second paragraph where it states: "I'm not blaming you in any way, but I will tell you that the law states that a landlord cannot collect legal fees of

Page 105

any kind unless they win an eviction case."

Do you know what the basis of that statement was from Shaun?

A. I don't.

Q. Do you know what law he was referring to?

A. I don't.

Q. Have you had any conversations with Shaun about that statement?

A. I believe at the time we discussed it. I don't recall what we discussed or under what provision of the law.

Q. Okay. Did you have any attorney tell you that that was the law, that you're aware of?

A. Not that I'm aware of.

Q. Okay. As you sit here today, does that statement ring true that the law states that a landlord cannot collect legal fees of any kind unless they win an eviction case?

MR. DUNN: Objection.

A. I'm not an attorney. I can't interpret the law, so I can't say.

Q. Okay. And in the second-to-last paragraph where Shaun writes, "This situation has been non-stop insanity and discriminatory" -- Do you see that that?

A. I do.

Q. Do you know why Shaun is saying the situation is

27 (Pages 102 - 105)

Page 106

non-stop insanity and discriminatory?

A. I don't know. I can't speak to what he's describing.

Q. Would you characterize the situation being discriminatory to you?

A. Um, it felt very personal, very targeted.

Q. And who do you think was targeting you and Shaun?

A. I can't say who would have made such a decision.

Q. Would you say then it was The Eddy or was it Vlad or someone else?

A. I don't know who would have. It felt persistent and constant for almost a year at that point -- over a year, actually.

Q. Okay. And when you said targeted, what do you mean by that? Can you explain it?

A. Specifically done to us.

Q. And was that because of using funds from RAFT or something else?

A. I can't say when it started. We had issues when we moved in, communication was poor at best, and persistent issues were not resolved for months at a time, if at all.

Q. And when you say "persistent issues," that was persistent issues with The Eddy and property management?

A. Yes.

Q. So when you say -- Actually, withdrawn.

Page 107

Okay, I'm showing you Defendant's 14, Plaintiff's 216 and 217.

(EXHIBIT 14 MARKED FOR IDENTIFICATION)

BY MR. AYVAZIAN:

Q. Do you recognize this e-mail from Shaun to Marvin with you cc'd on October 14th, 2023?

A. I don't recall the e-mail off the top of my head, but it appears to be from Shaun to Marvin and myself.

Q. Do you see in the second paragraph that Shaun writes: "Moreover, I sent proof that Greystar may not, under Massachusetts law, collect those fees once a case has been voluntarily dismissed."

Do you see that?

A. I do.

Q. Do you know what proof Shaun is referring to that he sent to Greystar?

A. Not off the top of my head.

Q. Okay. Are you aware of any proof that shows under Massachusetts law Greystar cannot collect eviction or legal fees --

A. I have not --

Q. -- once a case has been voluntarily dismissed?

A. Not off the top of my head. I'm not an attorney.

Q. Okay. How about the next line that Shaun writes on

Page 108

this e-mail with you cc'd: "Under Massachusetts law, Greystar can only collect those fees when a tenant eviction proceeding results in the eviction (removal) of a tenant," and then he says, "If Greystar wanted to collect those fees, they could have done through another venue, i.e., small claims court."

Do you know the basis for those statements?

A. I don't.

Q. Okay. Do you know if at that point in time you and Shaun had conferred with any attorney?

A. I can't say with certainty by that point.

Q. Okay. And was it -- is it your understanding that these statements are true?

A. I'm not an attorney. I can't assess whether statements are true under the law.

Q. Okay. And further down in the paragraph, "While I don't want to start another legal battle with Greystar, I will." Do you see that Shaun states -- Shaun states that, "Their lawyer may have gotten away with lying to my face three times last time. I was a fool to believe him and take him at his word, but that won't happen twice"?

A. I see that.

Q. Do you know which lawyer he's referring to when he says that?

A. Vladimir Nechev.

Page 109

Q. And do you know why Shaun is saying that that individual lied to his face three times?

A. I believe, to my recollection, that he was the one who told us, and I think this was at the in-person court hearing, "we can't collect these fees after the dismissal." I believe he stated it is illegal, but I don't recall his exact words. The, um, the overall impression that he gave us was these fees would be removed, and they could not be collected after a voluntary dismissal since there would be no judgment against us.

Q. Do you recall him saying to you and Shaun that Greystar would have to seek -- if Greystar wanted to collect those fees, they could have done so through small claims court or another action?

A. I don't recall whether or not he said that or if that comes from another source.

Q. Okay. So in that e-mail we just read, Shaun writes to Marvin about the possible collection of those fees in a small claims court, correct?

A. Yes.

Q. Okay. We just went over those invoices that were for, presumably for your case as you stated, and two of which were presumably applied to your ledger, correct?

A. Yes.

Q. Okay. What specifically do you believe was unfair

28 (Pages 106 - 109)

Page 110

about Greystar's conduct as to those charges and invoices as you sit here today?

A. We were led to believe, due to our research and the statements made by their attorneys, that those fees would and could not be collected. And after consulting with our attorneys, we believe they did not have the right under the law.

Q. Do you believe that if those fees could not be collected at the time the case was voluntarily dismissed, then Greystar itself would have been out of money for bringing an eviction case against you all?

MR. DUNN: Objection.

A. What do you mean by "out of" when they...

Q. That Greystar had to pay money to eviction counsel to bring an eviction action that resulted in a voluntary dismissal without any fees being paid by a tenant, that Greystar at that point would have paid a firm to bring an eviction action and it would not be able to recoup fees from its tenants?

A. Do I believe that would have been the case?

Q. Yes.

A. Yes, I do.

Q. And what should Greystar have done at that point to recoup its fees for having to bring an eviction action from a tenant?

A. I personally can't say what their legal recourse would

Page 111

have been.

Q. Going back to the small claims court example, would that have been one option?

A. I can't say what their options are under the law. I'm not an attorney.

Q. Okay. Going back to what we spoke about, the amount billed in each of those invoices. If the amount billed in those invoices was found to be not reasonable, would that have made the charges more unfair than if they were found by a court to be reasonable?

A. By "reasonable," do you mean able to be charged, or the amount itself was not reasonable relative to the amount of work done?

Q. The latter.

A. Then, yes, it would have been. If they were to charge them regardless, then charging an increased amount for work for the sa-- yes, yes, that would be more unfair.

Q. Okay. And in this -- okay. In situations where there's not a voluntary dismissal, and if it was, these charges were paid before the voluntary dismissal was done, is there anything unfair about Greystar seeking charges from tenants for having to bring an eviction action and what Greystar paid to eviction counsel and seeking fees back from the tenants?

MR. DUNN: Objection.

Page 112

A. So you started with if there isn't -- if there is voluntary dismissal and then said there isn't, so I just -- In what sense, after a voluntary dismissal or if the eviction has been...

Q. I'll rephrase the question. You stated that it's unfair to collect the fees after the case is voluntarily dismissed, correct?

A. Yes.

Q. And that was, in your instance --

A. Yes.

Q. -- where they sought to collect fees after the case was voluntarily dismissed, right?

A. Yes.

Q. But we --

A. In the event -- I'm sorry. In the event of a voluntary dismissal, not necessarily the specific time after it has occurred.

Q. Okay. But we know from looking at your ledger that there was two charges, the 477 and the 175, were added to your ledger as due while the eviction case was pending, right?

A. Yes.

Q. Okay. So at that point in time, what is unfair about that practice of adding those charges to your ledger?

A. I can't speak to what the law describes. My

Page 113

understanding is that there has been no judgment against us, and therefore why would they be responsible for my -- for their -- why would I be responsible, I'm sorry, for their attorney's fees. It's my understanding in other situ-- in any other situation you could not bill attorney's fees to a defendant were the court not to rule they owed you those fees. It's my understanding, after discussion with our lawyers, that that is also the case in these matters, and therefore it would be unfair for us to be charged those fees and also have to pay them in order to bring our balance to zero to receive the voluntary dismissal.

Q. Okay. And would you agree then that the unfair practice is the billing of these fees to your ledger and showing as due without getting court approval first?

MR. DUNN: Objection.

A. I -- I don't know if I can describe that as the only unfair practice, but I believe that the practice would be unfair under the law --

Q. Okay. And I'm not --

A. -- to assign the cost to us that have not been adjudicated.

Q. Okay. And I'm not trying to pigeonhole you into one act of unfairness. I'm just asking in terms of --

A. Yeah, okay.

29 (Pages 110 - 113)

Page 114

Q. -- in terms of the, what you stated in looking at those two charges while the case was pending, okay?

A. Uh-hmm.

Q. Before the voluntary dismissal is even contemplated, that what you're alleging is that the unfair -- adding those to your ledger and showing them as due before a court has said that you are, as a tenant, have to pay those; that is an unfair practice?

A. Yes.

Q. Okay. Now, if at that point in time while the eviction case is pending, are you stating that Greystar's attorneys should have filed a motion for those attorneys' fees to be have been approved?

MR. DUNN: Objection.

A. I can't speak to what they should have done. I don't know what their recourse is under the law.

Q. Okay. So these invoices are generated as the work is performed; would you agree?

A. Yes, it appeared so.

Q. Okay. When do you believe these attorneys should have sought court approval for those fees before they were billed back to Greystar and then to you?

MR. DUNN: Objection.

A. I, again, can't speak to their legal recourse. I

Page 115

don't know the judicial process and when it's appropriate for them to request that from the court.

Q. Okay. But do you agree that the unfair practice of needing court approval, that it would be a request to the court to approve those fees before they are billed back to you?

A. Yeah, I believe that that not -- that assessing fees that have not been approved by the court is the unfair -- an unfair practice rather. Whether it's before or after the dismissal or a judgement or as part of a motion prior, without court approval, that's an unfair practice.

Q. Okay. And do you understand that for a court to approve fees, it would have to look at the invoice before an approval, correct?

A. I would imagine.

Q. Okay. And for it to get in front of the court, that the attorneys would have to do some act to get it in front of the court, correct?

A. I assume.

Q. Okay. And we talked about hourly rates before, and if an attorney spends a minute on a case, they are going to charge back their client for the work that they did, at minimally, correct?

A. Yes.

Q. Okay. So would you agree then that if attorneys had

Page 116

to seek approval of the court to approve their fees, that they would then bill back that time to a client that they had to, um -- Let me rephrase that.

That attorneys, in order to get approval by the court, they would have to do some sort of work to get that in front of the court that eventually a client would have to pay for?

A. Whether a client would pay for it or not, I don't know. But they would do additional work as our attorneys or we would if we were requesting those same costs incurred back to us.

Q. Right, right. And if the lease were to say, which it does here, that tenants are responsible for the costs incurred, that eventually any work that these attorneys are doing in addition would have been billed back to a tenant eventually, right?

MR. DUNN: Objection.

A. If that were the case under the law, then yes. If they were able to charge us attorney's fees, period, and without reservation, then it would.

Q. And do you think that another aspect of the unfairness is the decision of whether an invoice's charges are reasonable or not?

A. I'm sorry, I'm not sure what you mean. I'm sorry.

Q. Do you think that there's circumstances where what an

Page 117

attorney has charged, for example, an entity like Greystar, that there could be charges that a court deems are unreasonable?

A. I'm not a judge or an attorney, I couldn't say. I imagine there could be a circumstance.

Q. Okay. Now, if a court found -- if a motion -- Sorry, I'll restart.

If an attorney moved for its fees and a court looked at the invoice and found it to be reasonable and ordered that you were to pay those fees, would you have paid those fees?

A. If there was a court order executed by a judge, then yes, I would, and that I would imagine that I'd have to pay those fees or make some sort of appeal, if that's a legal recourse under the law.

Q. Okay. Having looked at those invoices for the 477 and the 175, is there any reason that you believe a court would not order payment of those invoices by you or Shaun?

MR. DUNN: Objection.

A. I can't say what a court would or would not order. I'm not an attorney, I do not know the law.

Q. Okay. And if a court had to weigh in on attorney's fees before they were assessed, would you agree that eviction actions could be prolonged waiting for that approval?

A. It's possible.

Q. For example, in your circumstance, a notice of

30 (Pages 114 - 117)

Page 118

voluntary dismissal was filed, but at that point no court had assessed any or looked at any of the fees assessed to your ledger, correct?

A. I can't say with certainty, but I don't believe those invoices were submitted to the court.

Q. But if a court had to approve invoices before an eviction case could be closed, then your eviction case would have been prolonged?

MR. DUNN: Objection.

A. I can't say what the theoretical process would be under the law.

Q. Well, otherwise, your eviction case would not have ended with the voluntary dismissal at that stage if there were attorney's fees still to be assessed and sought for court approval?

MR. DUNN: Is that a question?

Q. Correct?

MR. DUNN: Objection.

A. I can't speak to the law or the hypothetical law, but I could imagine the court could approve a dismissal of an eviction charge without dismissing a request for attorney's fees.

BY MR. AYVAZIAN:

Q. In your situation where the fees were assessed to you

Page 119

during the action, would it have been more preferable for you for the attorneys to have brought a separate action after the eviction case concluded to collect your fees -- sorry, collect their fees?

A. I don't know if that would have been preferable. It would have felt preferable because we would have ultimately received a decision by a judge whether or not those fees would be assessed rather than a unilateral assessment by the plaintiff who failed to receive a judgment in their favor.

Q. And as you sit here today, you're not aware of any law that says that that situation has to happen, correct?

A. A law that says a judge must rule that attorney's fees are to be paid by the defendant?

Q. A law that says that attorney's fees or eviction fees cannot be assessed without court approval.

A. I'm not an attorney, again, so I'm not aware of what the law is or is not. After consulting with my attorneys, I believe that whether there is a written law or a precedent that states that, that yes, that is the case.

Q. And if a court were to rule -- er, sorry. If the court were to enter an order saying that fees can be assessed in the future, would that be less unfair than if no order had been entered at all?

A. An order in our specific case, or as a matter of

Page 120

precedent?

Q. We'll start with your specific case.

A. Yes. It would always have felt more fair for there to be judicial oversight where we would have had a chance to defend ourselves rather than being unilaterally assessed by the party who brought a suit and did not receive a judgment in their favor.

Q. Okay. I am going to show you -- One second, please. [Pause.] Okay, I'll mark this as Exhibit 15, Defendant's Exhibit 15.

(EXHIBIT 15 MARKED FOR IDENTIFICATION)

BY MR. AYVAZIAN:

Q. I'm showing you a document which is titled "Summary Process Agreement For Judgment," and it's against a Ryan Taylo. Do you see that?

A. I do.

Q. Okay. And do you see that this is filed in the housing court, Northeast Housing Court, Commonwealth of Massachusetts?

A. Yes.

Q. Okay. And this states that there's a judgment for possession, and it states that it's in favor of the landlord?

A. Yes.

Q. Okay. So looking at 5(c) wherein this document --

Page 121

and, actually, before we go down to 5(c). It is digitally signed or a signature signed by a chief housing specialist, plaintiff's attorney, and this individual Ryan Taylo. Do you see that?

A. Yes.

Q. Okay. So in 5(c), "the parties further agree as follows: Defendant" -- who is Ryan Taylo -- "acknowledges that he/she/they are responsible for attorney's fees pursuant to the written lease agreement and shall be billed separately at a later date for those fees, and will comply with the lease in regards to the payment of the same."

Do you see that?

A. I do.

Q. Okay. Is this a more fair way for attorney's fees to have been ordered by the court?

A. I don't know if it was more fair, but it appears that the defendant agreed to that stipulation; and in this case, we do not --

Q. And would you agree --

A. -- so --

Q. Okay, sorry, I didn't mean to cut you off.

A. I'm sorry. No.

So if they agree to something, whether or not I believe it's fair, it's not for me to argue with their written

31 (Pages 118 - 121)

Page 122

agreement.

Q. Do you agree though that for this particular defendant who is a tenant, that 5(c) does not state an actual number, monetary amount of fees being sought at that time?

A. Correct, it does not state that.

Q. And that it does not state that the court is going to review what these attorney's fees are that Ryan Taylo was responsible for under the lease?

A. Correct.

Q. Okay. Is there anything unfair about this provision -- er, sorry, this -- yeah, this provision of this judgment as you read it regarding attorney's fees being assessed?

A. If the defendant acknowledges and agrees to it, I don't think it can be unfair.

Q. Okay. And you would agree that the housing court approved, in this example, and summary process agreement, that the written lease agreements, that if the written lease agreement has attorney's fees contemplated, that the tenant shall be billed separately at a later date?

A. I believe that it states that. The defendant acknowledged that and agreed to it as part of this summary process and the housing court did approve it --

Q. And --

A. -- but whether that holds for further cases in which

Page 123

we do not agree is not for me to say.

Q. Okay, fair enough. Do you agree though that in this circumstance if the court is saying and the defendant is acknowledging that they're responsible for attorney's fees and will be billed separately at a later date, that the payment of those fees will be made without a court judgment reviewing the reasonableness of those fees?

MR. DUNN: Objection.

A. I believe it will be made without a review of the reasonableness, but there's a judicial judgment for the landlord that they can collect those fees.

Q. Okay. Pursuant to the lease provision?

A. Pursuant to the defendant's agreement to it, yes.

(EXHIBIT 16 MARKED FOR IDENTIFICATION)

BY MR. AYVAZIAN:

Q. I am now showing Defendant's 16. This is the amended class action complaint. Do you recognize this document?

A. Yes.

Q. Okay. Going to paragraph 4, it states:

"Massachusetts law does not allow for such costs to be assessed prior to a judgment, as whether or not to award attorney's fees and costs is subject to the discretion of the court, as is the amount to be awarded."

Do you see that?

Page 124

A. I do.

Q. Okay. Do you know what Massachusetts law this is referring to?

A. I don't know specifically, it doesn't state there. I know we're bringing an action under Chapter, I believe it is, 93A. I don't know if that is the only statute under which we're bringing this action.

Q. Okay. And in paragraph 2: "Defendants assess eviction legal fees prior to the voluntary dismissal of summary ejectment actions, as provided in their lease agreements, and prior to the issuance of any judgment or assessment of fees by a court of law." Correct?

A. Yes, that is what it states.

Q. Do you believe that the class of individuals that you're seeking to represent would be only individuals who are assessed eviction or legal fees prior to a voluntary dismissal of an ejectment, a summary ejectment action?

MR. DUNN: Objection.

A. I can't interpret a legal document, I'm not a lawyer. I believe, set in paragraph 4, expands the class for costs assessed prior to any judgement.

Q. Okay.

A. But, again, it's not for me to interpret.

Q. Okay. And scrolling down to paragraph 18, would you

Page 125

agree with this statement in your amended complaint that, "Pursuant to Greystar's standard leases, tenants are required to pay eviction legal fees to Greystar"?

A. I agree that that is what is stated in our lease and...

Q. And in 23 you stated: "Tenants pay these fees upon belief that if they do not, they will be evicted and forced to leave their homes." Is that correct?

A. Absolutely. We were told explicitly the balance had to be brought to zero, and because those fees had already been assessed, we would have to pay them or the action would not be dismissed. That was made clear to us by Vladimir Nechev.

Q. Okay. That was my next question, where are tenants getting this from.

A. Uh-hmm.

Q. And if it's not you -- Sorry.

Outside of you and Shaun's experience with Vladimir, what if -- er, do you know of any other tenants that believed this, that if they did not pay the fees, they would have been evicted?

A. I personally do not know of any other tenants.

Q. Okay. Do you believe that all these tenants that have been assessed legal or eviction fees, at The Eddy at least, thought that they will be evicted and forced to leave their

32 (Pages 122 - 125)

Page 126

homes if they didn't pay?

A. I can't say what their discussion were -- their discussions were with management and The Eddy's legal team. If it were the same as ours, that is what they would, not just believe, but have been told.

Q. And do you think they would have been told by The Eddy or the attorneys, or both?

A. I don't recall if we were ever told specifically by management that the case would not be dismissed without payment of those fees. I do believe that it's intimated by the fact that the fees have been assessed, and they tell you the ledger must be brought to zero; therefore, it's assumed the fees must be paid.

Q. The next line -- Sorry. Okay, 25, sorry. "Greystar is not alone its failure to file petitions for attorneys' fees."

Do you see that?

A. I do.

Q. What do you believe that sentence to mean in your amended complaint?

A. I believe that means they are not the only landlord and/or property management company who has committed this action.

Q. Okay. When you say here "failure to file petitions for attorneys' fees," that goes back to our discussion earlier

Page 127

about the additional work that needs to be done to get it present-- to get it before a court for it to rule on not only the reasonableness of the fees, but the assessment before -- er, sorry, but whether they can be put on a tenant's ledger; is that correct?

MR. DUNN: Objection.

A. I'm not an attorney, I can't speak to what the work would be. But as a layperson, that would be my understanding, whether filing a separate action or requesting it at the end of an appearance before a court.

Q. Okay. And in paragraph 43, it says: "Greystar never even filed a petition for attorneys' fees. Instead, Greystar simply assessed these fees without a valid basis." Correct?

A. Yes, it states that.

Q. Okay. Do you agree then that if Greystar filed a petition for attorney's fees, it would have cost more money for Greystar than the process of just simply assessing the fees?

MR. DUNN: Objection.

A. If it were something that required any significant amount of work, then I imagine they could have billed it to their clients and included that amount in their petition.

Q. And that would mean that this process of simply assessing the fees without asking the attorneys to do more work to get in front of the judge actually winds up saving the

Page 128

tenants' money if they are billed back fees; is that correct?

MR. DUNN: Objection.

A. If a judge were to approve the fees, in that case it would. If they do not, then it certainly does not save the tenants' money.

MR. AYVAZIAN: Okay. How are we doing on the camera time, Jeff?

VIDEOGRAPHER: We've been going about an hour.

MR. AYVAZIAN: Okay.

(EXHIBIT 17 MARKED FOR IDENTIFICATION)

BY MR. AYVAZIAN:

Q. Okay, I'm now showing you Defendant's 17. This is Bates stamped Plaintiff's -- starting Bates stamped Plaintiff's 42. Okay, do you see this e-mail titled "Dismissal" from Shaun to Kevin with you -- er, sorry, to Shaun to Vlad with you cc'd on May 19th, 2023?

A. Yes.

Q. Okay. And do you see that in the second e-mail from Vlad to Shaun with you cc'd at 2:20 p.m., Vladimir states that, "Yes, the case will be dismissed and you do not need to appear in court" in sum and substance, and then it says, "My client's position is that they had to spend legal fees to bring you to court for non-payment of rent, and they can recover the legal fees under your lease agreement"?

Page 129

A. Yes, it does say that.

Q. Okay. And do you dispute the factual accuracy of that statement?

A. To the best of my recollection, yes, that is not what was said explicitly or implicitly.

Q. By who?

A. By Vladimir Nechev at our in-person meeting.

Q. Okay. And what specifically, explicitly or implicitly, did he say in person at that conference or outside that conference?

A. He stated explicitly -- I can't remember his exact words -- we were left with the very clear understanding that those fees would be either removed or refunded after the voluntary dismissal, not that we would have to pay them simply because the lawyer has charged The Eddy.

Q. If Vlad didn't tell you, as you're saying, that you had to pay those fees or your eviction action wouldn't be dismissed, would you have paid those fees?

A. If he hadn't told us that they needed to be paid?

Q. Right.

A. We would not have paid them.

Q. Okay. And --

A. Because he also states if they wanted to do so, they would have to obtain a judgment at a later date. It appears

33 (Pages 126 - 129)

Page 130

contradictory that we have to pay them but separately they have to obtain a separate judgment. It was confusing and did not align with the information we received from management that the legal fees would remain and the balance would have to go to zero.

Q. Okay. Would you say that your reliance on Vlad's statement then that you had to pay the fees in order for your eviction case -- Let me rephrase it.

Did you and Shaun rely on Vlad's statement that you had to zero out your balance by paying those fees in order for your eviction case to be dismissed?

MR. DUNN: Objection.

A. Yes. Yes. We absolutely relied on that.

Q. Okay. And did Greystar tell you the same exact thing?

A. I can't recall exactly what they told us without seeing the content of our communication.

Q. Okay. Okay. And looking at the top e-mail from Shaun to Vlad and Kevin, it says: [As read.] "Vlad, I got an e-mail from Marvin informing me that the case will be dismissed, but the legal fees will remain on the account." Correct?

A. Yes.

Q. Did you interpret any of that to mean that, what we were talking about, that the eviction case will not be dismissed unless you pay the legal fees?

Page 131

A. Yes. But --

Q. Okay -- Sorry to cut you off.

A. I was going to say, at this point I believe we had already made payments since those fees were assessed, and it's a total balance, not a line item balance, so in part we had already paid them.

Q. Okay. So at this point then, you were expecting the credit back of those $652 in fees; is that correct?

A. Yes, yes.

Q. Okay, got it. So at that point, the 652 you believe had been paid, and Marvin says the case will be dismissed but the legal fees are going to, at least as they appear on the ledger, are going to remain on that ledger in your account?

A. Yes.

Q. Okay. [Pause.]

MR. AYVAZIAN: Okay, I think at this point we can take a break. Does everyone want to do a 10-minute break again? a little bit longer, 15 minutes?

THE WITNESS: I'm okay with 10.

MR. DUNN: Yeah.

MR. AYVAZIAN: Okay. So if we can go off the record and come back at 1:26.

VIDEOGRAPHER: This ends Media Unit No. 4. We are going off the record at the time of 1:16 p.m. And we're off the

Page 132

record.

(WHEREUPON, a break was taken from 1:16 p.m. to 1:26 p.m.)

VIDEOGRAPHER: This begins Media Unit No. 5. We are back on the record at the time of 1:26 p.m. You may begin.

MR. AYVAZIAN: Okay, thank you.

BY MR. AYVAZIAN:

Q. Kevin, I see you're in a new room this time?

A. Yes. I like a nice change of scenery.

Q. Okay. Did you speak with Shaun during your break at all about this case?

A. No. We just swapped rooms.

Q. Okay, got it. All right, at this -- do you remember filling -- er, sorry, responding to written discovery requests in this matter?

A. Yes.

Q. And do you remember identifying certain individuals that you had conversation with about this case?

A. Yes.

Q. Okay. And that would be Stephanie Thomas, Lindsay Beaudry, Betsy Hamilton, and Patrick Matlack. Correct?

A. The first three, yes. Patrick Matlack, my dad, I've never discussed the case with. The eviction action, yes, but never the case.

Q. Okay. Can you just tell us about your conversations

Page 133

with Stephanie Thomas?

A. So I haven't, I think -- I'm not aware of personally discussing the case with her. I know that Shaun did talk to her about the fact that we were bringing an action, sort of why it was happening, very general, like, major updates; although, I don't know that he's spoken to her about it in quite a while.

Q. Okay. And I know at the beginning of our day today we discussed Lindsay and Bets-- Betsy, right, Elizabeth Hamilton?

A. Yes.

Q. And we kind of went over those discussions in the time frame of when you spoke with them, so we can get through that.

A. Uh-hmm.

Q. We also discussed this morning the pulling of text messages that you searched for, okay?

A. Yes.

Q. Okay. I'm going to show you -- we'll mark this as Exhibit -- Defendant's Exhibit 18.

(EXHIBIT 18 MARKED FOR IDENTIFICATION)

BY MR. AYVAZIAN:

Q. Now, do you see what's on my screen?

A. Yes.

Q. Okay. Do you know -- This, at the top, you can see that the file name is "Kevin Matlack IMG 1521.pdf." Correct?

A. Yes.

34 (Pages 130 - 133)

Page 134

Q.  Okay.  And this is Plaintiff's Bates stamped 2151, correct?

A.  Yes.

Q.  Okay.  As you sit here today looking at Defendant's 18, is this your text messages or is this someone else's?

A.  That is Shaun's.

Q.  Okay.  Do you know why it is labeled Kevin Matlack IMG 1521?

A.  When we submitted the files to be uploaded to the Bryson Harris SharePoint, you had to input your name of who's submitting it, and because I submitted all the screenshots on behalf of both us, they all have my name on the file.

Q.  Okay.

A.  I can say any text that looks like this, the search bar, is from Shaun.  Mine come from inside the individual message and will have them pulled out to show a timestamp.

Q.  Okay.  Would you agree with me that without that explanation I would not know if this is yours or Shaun's text messages?

A.  Yes, yes, that's absolutely fair.

Q.  Okay.  And we see here in Defendant's 18 in Shaun's text message, he's texting Andrea at The Eddy, correct?

A.  Yes.

Q.  Did you ever have communications with Andrea about any

Page 135

of the factual circumstances of this federal lawsuit?

A.  No, not to my knowledge.  I have never discussed it with her.

Q.  Okay.  And we see here Shaun saying things like, "Destinee is an idiot and Kayla is lying hooker," correct?

A.  Yes.

Q.  Do you agree with what he's saying to Andrea about Destinee and Kayla?

A.  Yes.

Q.  That's your sentiment as well about both of them?

A.  Yes.

Q.  Okay.  Why do you say that about Destinee?

A.  She was an idiot.  She was unhelpful at best; actively at times seemed to be working against us at worst.  She did not seem to understand any process by which anything happened at the building she allegedly managed.

Q.  Okay.  And how about Kayla?

A.  Ditto.  Kayla was the one who would let our subsequent, after the first, RAFT applications expire and time out because she could not complete them despite having done so before.

Q.  And --

A.  It was problem after problem that did not seem to exist until we had gotten the first one and the eviction process

Page 136

had been started.

Q.  And do you think that Destinee and Kayla were doing what they were doing intentionally against you and Shaun?

A.  I cannot say what their intentions or their thoughts were.

Q.  Okay.

A.  It may have felt like it, but I have no factual basis for believing either of them acted with malice aforethought.

Q.  Okay.  And when Shaun texts Andrea that he's being a cunt to Destinee, do you know what he is meaning by that?

A.  Yes.  Especially after the eviction was filed, he generally stopped any pretense of casual politeness to her.  Because suddenly the day after we let them know "tomorrow we're filing a state payment inquiry to determine exactly where this check is and has been all this time, this one month that has allowed to file an eviction suit," suddenly it appeared.  We did not belive that was a coincidence.  Again, we have no proof, but we gave up on being polite to them in an effort to receive any assistance.

Q.  Got it.  Okay.  I'm now showing you this next, Defendant's 19, Plaintiff's 2152.

(EXHIBIT 19 MARKED FOR IDENTIFICATION)

BY MR. AYVAZIAN:

Q.  Again, at the top "Kevin Matlack," which we'll go

Page 137

through a couple of these, but they all say Kevin Matlack IMG and then a number?

A.  Yes.

Q.  Okay.  Now, this text message, is this yours or Shaun's?

A.  Shaun's.

Q.  Okay.  And how do you know that again?

A.  Because it's --

Q.  -- sorry --

A.  -- uh, this is how it appears when you search for a term, and you can see individual highlighted texts; mine do not appear that way, and they include timestamps of the messages.

Q.  Okay.  And you uploaded your -- sorry, you produced your text messages that were responsive to your counsel, correct?

A.  Yes.  These are ones that Shaun produced, and because his were so numerous, he sent them to me to upload en masse.

Q.  Okay.  And he sent them to you as screenshots?

A.  Yes.  These screenshots, he uploaded as e-mail attachments so I could download all of them.

Q.  And did you take the screenshot and then put it into a word document, or did someone else do that?

A.  So he took a screenshot and then e-mailed them as pictures, attachments.

35 (Pages 134 - 137)

Page 138

Q. Okay. And --

A. And I uploaded them as the, whatever type file, the PNG, the JPEG.

Q. Okay. You --

A. And at some point I imagine they were converted to PDF.

Q. Got it. So the formatting that it's in right now with a white background --

A. Is not how --

Q. -- you did not create this document?

A. No.

Q. Okay. Between the times he sent you a message, one of his screenshots, and the time you produced them to counsel, did you not include any text messages that he took a screenshot of?

A. Not to my knowledge.

Q. Okay. Did you filter any out?

A. No, not to my knowledge.

Q. Okay. Okay. I'm showing you Defendant's 20. This Plaintiff's 2153.

(EXHIBIT 20 MARKED FOR IDENTIFICATION)

BY MR. AYVAZIAN:

Q. Again, whose phone -- whose scree-- messages are these?

A. Shaun's.

Page 139

Q. Okay. And when he says in the top message in, it looks like that group thread that I believe you were on as well, do you know why he said at that point in time that he's going to go downstair-- "If Destinee even gets kind of slick out her mouth, imma swing on her"?

A. I don't know the exact context.

Q. Okay. And on May 14th to Betsy Hamilton who --

That's Elizabeth Hamilton as well, right?

A. Yes.

Q. Okay. Would you agree that 5/14/23, that was during the pendency of the eviction case, correct?

A. Yes.

Q. Okay. And when he says, "I'll get the whole thing continued, then depose Destinee and Kayla, subpoena their e-mails and price [sic] that she committed fraud. However, Greystar will settle with me before they go through a fraud case," do you know what case he's referring to?

A. I can't say with certainty, no. I would imagine this was our perceived -- And at this point I don't know whether we had gotten confirmation, as I said before, from Nan McKay that the check had been presented to the bank on the 21st, I think it was, of December, and yet not added to our ledger for a month. That may likely be what he's referring to since at that point we hadn't contacted an attorney for this particular case.

Page 140

Q. Okay. And we'll move to the image file 1524. We'll mark this Defendant's 21.

(EXHIBIT 21 MARKED FOR IDENTIFICATION)

BY MR. AYVAZIAN:

Q. Is this again Shaun's text messages?

A. Yes.

Q. And at the top we can see, it's blurred out a little bit, but I think you can make out it says Kevin Matlack; that's you, right?

A. Yes.

Q. Okay. And we see a text from Shaun to you, 10/16/23, and it says, with that bar blocking it, but it says something about going to buy a gun and drive over to Destinee's office and blow her fucking head off. Do you see that?

A. I do.

Q. Do you remember getting that message from Shaun?

A. I don't.

Q. Okay. Do you know why he would say that?

A. He was probably angry.

Q. Is he still angry at Destinee about this?

A. I can't say what he feels now.

Q. Okay. Are you still angry at Destinee about this treatment?

A. Not really.

Page 141

(EXHIBIT 22 MARKED FOR IDENTIFICATION)

BY MR. AYVAZIAN,

Q. Okay. And this one, Defendant's 22, this is also Shaun's messages, right?

A. Yes.

Q. And there at the bottom again we see that message to you more clearly about going to the office, correct?

A. Yes.

Q. Above that to Stephanie --

Actually, sorry, while we focus on that message to you, did you respond to that message?

A. I don't know. I must have said something.

Q. Okay. Would you agree then that at least this, the way that it's produced here, does not show the context of the communication before or after if you said anything?

A. Yes.

Q. Okay. Do you remember when you pulled your text messages, did it include this text?

A. It did not. I don't know if this was explained in the responses to the interrogatories. I did not have messages for around this period because my phone had gotten stolen and backed-up messages were not available. So I have a lot of older messages and newer messages, but this time period is not available on my phone.

36 (Pages 138 - 141)

Page 142

Q. Okay. Did you file a police report for that stolen phone?

A. No. It was -- Well, I believe it was stolen. I went outside with it. I'm sorry, "stolen" is not the right word. I lost it and I'm almost entirely sure I know who picked it up off the ground from behind me, but I have no proof of anything and so I just bought a new one.

Q. Got it, okay. And in that message above the one that was sent to you, we see a few messages to Stephanie and Lindsay, correct, from Shaun?

A. Yes.

Q. Okay. Shaun texts Lindsay on 10/19 about an e-mail to the MA state and federal government who will be investigating The Eddy, Destinee, Kayla, and Greystar for misuse, abuse, and fraud with government funds with a smiley face.

Do you see that?

A. I do.

Q. Okay. Do you -- were you a part of that e-mail to the MA -- uh, Massachusetts state and federal government?

A. I don't recall. I believe I know what e-mail to the Massachusetts attorney general he's referring to. I don't know about anything to the federal government.

Q. Okay. And do you see here he's talking about, when he says "misuse, abuse, and fraud with government funds," do you

Page 143

know what he's referring to?

A. I believe the delayed entry of our RAFT funds in order to -- or what we believe was in order to file an eviction case that should not have gone.

Q. Okay. And above that in the message to Stephanie, there's a [as read] "...witness, I don't care if I get thrown out on the street, two things at bare minimum will happen: Destinee will get fired from Greystar, and Greystar will pay me something. I don't care if it's 20,000 or --" and then we have a numerical amount that we don't see complete, correct?

A. Yes.

Q. Okay. Do you know what he's referring to by "Greystar will pay me something"?

A. Probably wanting compensation. I can't say exactly what he wanted.

Q. That was before -- this text though was before this federal lawsuit was filed, correct?

A. I believe so, yes.

Q. Okay. And then do you think that this "Greystar will pay me something" was contemplating this lawsuit being filed?

A. I can't say or whether it was in relation to something else.

Q. Okay. And what about the statement, "Two things at a bare minimum will happened: Destinee will get fired" --

Page 144

Do you agree with that statement?

A. Agree how?

Q. Sorry. Do you agree that that would be one of your goals of bringing this case?

MR. DUNN: Objection.

A. In this case, no. I don't think that's something we could request, and it's not what we're seeking, or at least it's not what I am seeking.

Q. Okay. Is it something that Shaun is seeking?

A. I don't know. I don't believe so. I don't -- I don't recall speaking about this with him any time recently.

(EXHIBIT 23 MARKED FOR IDENTIFICATION)

BY MR. AYVAZIAN:

Q. Okay. And we'll mark this Defendant's 23. Is this another -- This is another Shaun text message thread, right?

A. Yes.

Q. Okay. And Shaun texts you on November 21st, 2023, "...get through some period of self-induced misery or getting fucked over by some douchebag cunts like Destinee. Very soon this prothesis won't be able to take the force of chewing and snap too and then I'll look...."

Do you know what he's talking about there?

A. I don't know exactly what he's referring to.

Q. Did you respond to this text?

Page 145

A. Probably. I generally respond to him when he texts me.

Q. Would you agree that this text message, the way that it's shown, doesn't show the context of any communications with you?

A. Yes.

Q. Okay. And do you know what he means by, the message above to Stephanie about "Destinee made me believe that she was giving me a deal for screwing me out of another apartment," do you know what he means by that?

A. I don't. No, I can't say with certainty what that was regarding, possibly the aborted lease for 1313.

Q. Okay. And that aborted lease was done in -- before you moved into 1010 after 509, right?

A. Yes. I believe that was in late August of 2022.

(EXHIBIT 24 MARKED FOR IDENTIFICATION)

BY MR. AYVAZIAN:

Q. Okay. So we see here, we'll mark here Defendant's 24, and I think this is the first message where we see the little dinosaur icon next to your name; is that correct?

A. Yes.

Q. Okay. Is this still Shaun's text messages?

A. Yes.

Q. Okay. And going back to the prior exhibit for

37 (Pages 142 - 145)

Page 146

November 21st, '23. Do you have the text messages still? Was this one that was included in what you produced?

A. I don't believe so, but I can't be certain.

Q. Okay. How about this one on 12/8/23, would that have been one you pulled?

A. I don't recall having that. No, I don't think so.

(EXHIBIT 25 MARKED FOR IDENTIFICATION)

BY MR. AYVAZIAN:

Q. Okay. And then now this is Defendant's 25. And at the top, this is Shaun texting Stephanie Thomas: "You don't 'know' this, but we've discussed in the lawsuit. Guess who I'm forcing my lawyers to depose and absolutely grill to a crisp? Destinee Price."

That's his text message?

A. Yes.

Q. Okay. Did you and Shaun ever talk about Destinee Price's deposition before she was deposed?

A. Yes. We discussed in general terms wanting her deposed.

Q. Okay. And why was it that you wanted her deposed?

A. She was incredibly active in almost every step of our dealings and issues with The Eddy before, during, and after the eviction.

Page 147

(EXHIBIT 26 MARKED FOR IDENTIFICATION)

BY MR. AYVAZIAN:

Q. Okay, Defendant's 26. Again, this is a Shaun text message, correct?

A. Correct.

Q. And this is Shaun talking to Lindsay Beaudry about the motion to dismiss in this case, correct?

A. I believe so.

Q. Okay. Were you on any of these text message -- uh, text messages?

A. No. These appear to be individual messages, not group chats.

Q. Okay. And did you text Betsy Hamilton or Stephanie Thomas or Lindsay Beaudry about this case the way that Shaun has?

A. No. I believe almost all of the texts I was able to produce were messages between Shaun and myself, and a handful from group messages that predate the eviction, or that mentioned the search terms in general but were not related to this action.

Q. Okay. And at this top message to Lauren --

Is it Bergame [ph.]?

A. Bergamo.

Q. Bergamo, okay.

-- in July of 2025, "...I demanded my lawyers depose

Page 148

that lying bitch Destinee that held the check to make us late and lied to me over and over. Lucky for her, I have this gorgeous...."

Do agree with this text message that Destinee "held the check to make us late"?

A. I see that easily being true, I do. The only proof we have of when the check was sent -- presented to the bank and added to our ledger is our ledger; and an e-mail from the RAFT agency showing those specific dates; and I believe a communication or a discussion with Marvin Colindres during which he stated Destinee was the one who cashed or entered or signed in the check.

Q. Okay. And when Shaun says "lied to me over and over," did Destinee lie to you over and over?

A. I can't say exactly what he's referring to. She did say many times, "I don't know where the check is, please stop asking. We haven't received anything yet." And so he certainly -- Well, no, I won't speak to him. I do still hold some belief that it's entirely possible she had it and did not put it in, failed to put it in through, whatever -- whatever reason, malicious or not, incompetence, who can say, that caused the eviction to be able to proceed.

(EXHIBIT 27 MARKED FOR IDENTIFICATION)

BY MR. AYVAZIAN:

Page 149

Q. Okay. Okay. We'll mark this as Defendant's 27. Again, this is a Shaun e-mail -- er, sorry, text message thread?

A. Yes.

Q. Okay. And then we can see on July 25th, 2025 a series of messages. And the first one on the bottom -- sorry, the last one to you: "Do you remember the name of that cunt bag new manager post-Destinee?" And is that showing your response, "Destinee Price, Kayla Agustin, Marvin Colindres"?

A. That was in response to, I believe, our attorneys asking for a list of people involved that we would like to have deposed, and I included those. And I believe below, I would have added the name he was asking for, which was Danielle Rossetti.

Q. Okay. But you'd agree that that text message is not on here?

A. Yes, correct.

Q. Okay. Would this have been a message that you would have produced --

A. Yes --

Q. -- or that would have been --

A. -- almost certainly because I believe I remember submitting that. That's a very recent message, and I would almost certainly still have that on my phone.

Q. Okay. And do you know why he's calling Danielle

Page 150

Rossetti a cunt bag?

A. She was the same as Destinee, unhelpful in the extreme; felt like she went out of her way to make things difficult; was unavailable most the time. After Destinee and Kayla were gone, we almost exclusively dealt with Marvin Colindres because he was almost always the one you could find or get an answer from in any timely manner.

Q. Okay. And then we see a message that Shaun sent to you that same -- later that day I guess: "Destinee Price is about to find out she's going to be deposed in a federal lawsuit." And did you respond to that message?

A. I believe I did.

Q. Okay. And then above, we have a text message from Shaun to Betsy about mentioning "that lying lawyer Nechev." Do you see that?

A. Yes.

(EXHIBIT 28 MARKED FOR IDENTIFICATION)

BY MR. AYVAZIAN:

Q. Okay. This is Defendant's 28. Again, this is another Shaun text message thread, correct?

A. Yes.

Q. And my question is, do you see how that top -- sorry, the top is a little bit cut off, and then at the bottom you see Kenedy McGrath?

Page 151

A. Yes.

Q. Was there any responsive text for Kenedy McGrath here, or is this just what the screenshot looked like when Shaun took it, if you know?

A. Yeah, I don't know if there was a text that included Kenedy, that may have been just what the screenshot looked like, that included messages down below to her.

Q. Okay. Okay. And when -- One second.

Okay. And then this exhibit is Shaun's texts as well, correct?

A. Correct.

Q. And that there's a text message to you on 12/5/25 about e-mails from Destinee?

A. Yes.

Q. Okay.

COURT REPORTER: [Seeks clarification on exhibit number.]

(EXHIBIT 29 MARKED FOR IDENTIFICATION)

BY MR. AYVAZIAN:

Q. Okay. And Defendant's, we'll show Defendant's 29. And at the top that's a text message from Shaun to you, correct?

A. Yes.

Q. And it just says "Friday" as the date. Do you know what -- which Friday that was?

Page 152

A. I couldn't say without checking.

Q. Okay. Would you agree that that was more recent than the one beneath it, January 23rd, 2026?

A. Yes.

Q. Okay. And then in that top message Shaun writes to you: "Actually, I hope they fire Destinee and blame her for everything and pay us off." Do you see that?

A. Yes.

Q. Okay. Would you agree with Shaun's sentiment that he hopes they fire Destinee?

A. Not really. I don't care what happens to her.

Q. Okay. How about the second part, blaming her for everything; would you agree with that?

A. If it turns out that she held the check, this whole situation, yes, would not have occurred without her.

Q. Okay. And then the third part of that statement, "pay us off," do you believe he's referring to this lawsuit that we're in?

A. Yes, I believe he's referring to getting a payment for the class from Greystar than just settling with us without having the whole class to go to court.

Q. Okay. And then beneath that text message, the other one to you, is that talking about searching for texts responsive to that discovery request?

Page 153

A. Yes. That would have likely been responsive for both him and myself.

Q. Okay. And we can see here you writing that you lost a lot of texts when your phone got stolen "so I searched Destinee's name and not a lot came up." Correct?

A. Yes.

Q. And then you say, "but I'm sure there's plenty of us calling her a cunt and hoping she dies..."?

A. Yes.

Q. Okay. And that's a text you sent to Shaun, correct?

A. Yes.

Q. Do you agree with me that the dot, dot, dot before and dot, dot, dot after means that there's more context to that text message than what's shown?

A. Yes.

Q. Do you remember producing this text message to your counsel?

A. I believe I did.

Q. Okay. And do you still believe that, about -- about a month ago from today?

A. No. That's both hyperbolic and reflective of old text messages from which we were actively being evicted by people who lied to us over and over.

Q. Okay. And then on the bottom, you see here Shaun is

Veritext Legal Solutions

800-726-7007                                                  305-376-8800

Page 154

texting you: "My message to Scott, our lawyer: 'Thanks for chatting with me last night. It put me at ease. My stepdad died suddenly a few weeks ago and I've been dealing with a lot. My initial reaction was...great...more bullshit. However, our conversation alleviated some of that. Just beat these fuckers into the grou--"

Do you see that?

A. Yes.

Q. Okay. Do you know what he's referring to when he says "my initial reaction was...great...more bullshit"?

A. I don't. Based on the context of the text right above on the same date, it's possible he's referring to the counterclaims, I believe it was, filed against us.

Q. Okay. And do you agree with his sentiment of "just beat these fuckers into the grou--" presumably meaning "ground"?

A. Into the ground.

Q. Okay. Do you agree with that?

A. Yeah. Oh, I want to win, yeah --

Q. And when you say these --

A. -- that's the point.

Q. When you say "these fuckers," who are you referring to?

A. Everyone we're suing.

MR. AYVAZIAN: Okay. I just want to put on the

Page 155

record, Michael. We've looked at the production. We do not see any text messages belonging to Kevin Matlack that he alleges to have produced. So we are asking that the deposition remain open to ask him about those text messages since he said he did produce them, but we'll follow up with you all about that request.

BY MR. AYVAZIAN:

Q. Okay. Those were all the text messages that I had produced by you and Shaun. Do you believe that there are more text messages?

A. Yes. I have the screenshots on my phone. I reviewed them yesterday and earlier today.

Q. Okay. I would just ask that, until we get further clarification between me and your attorneys, if you could just preserve those?

A. Yeah.

Q. Okay, thank you. One moment. [Pause.]

(EXHIBIT 30 MARKED FOR IDENTIFICATION)

BY MR. AYVAZIAN:

Q. Okay. I'm showing you Defendant's 30. This is an e-mail exchange Bates stamped Plaintiff's 1000. Do you recognize this e-mail from Shaun to you on October 17th, 2023?

A. Yes.

Q. And what do you recognize this e-mail to be.

Page 156

A. That is him forwarding me the e-mail response from RAFT, Nan McKay, who I believe who were the supervisors/ overseers of disbursement of the RAFT funds, confirming that the check was presented to the bank after being issued five days previously, and subsequently not added to our ledger for an additional 27 days.

Q. Okay. And above that e-mail is Shaun's e-mail to you, correct?

A. Yes.

Q. And that's where he said, "They have committed a crime." Do you see that?

A. I do.

Q. And when he's saying "they," who do you believe he was talking about?

A. Greystar, The Eddy, the agents of such.

Q. Okay. And then you see he says, "I am going to make sure that Destinee and Greystar go down for this." Correct?

A. I do.

Q. Okay. Do you know if you responded to this e-mail?

A. I don't know if I did. I probably would have texted him back about it.

Q. Okay. Before I move on, do you know if Shaun typically deletes e-mails that he receives as he gets them in his inbox?

Page 157

A. I don't.

Q. Okay.

A. I know we have made a habit of preserving as many e-mails as possible from Eddy, RAFT, anything related to this action.

Q. Okay. How about correspondence with Boston Globe or the Guardian individuals, would you think that Shaun would have saved those e-mails?

A. Possibly. I can't say what he would have done or if he has e-mails directly between them or if that communication went through an intermediary or our attorneys.

Q. Okay, I understand. Okay, let me clear some of these files from my screen.

Okay. As we looked over some of those text messages, you brought up, and which I'll talk about now, you understand that you and Shaun are facing a counterclaim in this case, correct?

A. Yes.

Q. Okay. And you understand that the counterclaim is being brought by The Eddy, correct?

A. Yes.

Q. Okay. What is your understanding of that claim that is pending against you and Shaun?

A. Do you mean what they are alleging?

40 (Pages 154 - 157)

Page 158

Q. Yeah, what do you -- sorry, what do you believe that that counterclaim is against you?

A. I believe that they are alleging that there are monies owed to them from the end of our tenancy.

Q. And do you dispute that there are monies owing to The Eddy from you and Shaun?

A. Yes.

Q. Do you dispute that any money is owed, or is it an amount that you dispute?

A. I can't say, between monies owed to us as damages and reimbursement from legal and eviction fees, what would be owed to us. I leave that to the lawyers to determine.

Q. Okay. Earlier we discussed when you signed the lease, you agreed to pay a fixed amount of rent monthly, correct?

A. Yes.

Q. Okay. And you and Shaun moved out of The Eddy in March of 2024, correct?

A. Yes, I believe so.

Q. Okay. Do you remember receiving a final account statement from Marvin at The Eddy after you moved out?

A. I believe we did.

(EXHIBIT 31 MARKED FOR IDENTIFICATION)

BY MR. AYVAZIAN:

Page 159

Q. Okay. I am showing you Defendant's 31. Do you recognize this e-mail on April 11th, 2024 at 4:46 p.m. from Marvin to -- it's blacked out, but Shaun and you?

A. Yes.

Q. Okay. And the subject line of the e-mail, "The Eddy - Final Account Statement." Do you see that?

A. Yes.

Q. Okay. And I'll give you a chance to read it if you like. But do you agree that the e-mail states that your final account balance due in April 2024 was $5,142.65?

A. That is what they allege.

Q. Okay. And do you see it says they came to that amount after applying your $3200 security deposit?

A. I see that they say that, yes.

Q. Okay. And then beneath that it notes that a legal fee credit of 162 has also been applied to your ledger account. Do you see that?

A. I see that.

Q. And do you remember earlier today talking about the $162 that was the remainder of the 652 minus the 490 in legal credit that you received, and that was the balance that was left?

MR. DUNN: Objection.

A. I recall that conversation.

Page 160

Q. Okay. And now you see here that a legal fee credit of 162 being applied to your account, correct?

A. Yes.

Q. Okay. So at that point in time, according to this e-mail, if a $490 credit was given to you precisely, and now a 162 credit has been applied, that that would mean zero dollars was -- zero dollars had gone to those prior eviction and legal charges that added up to 652, correct?

MR. DUNN: Objection.

A. I can't say exactly. They call it a legal fee. It doesn't go to a line item, it goes to a balance.

Q. Okay. And in the next line Marvin writes: "Your balance does not include, and we are not seeking to recover, the costs associated with the eviction action arising from your tendency." Correct?

A. Yes, it says that.

Q. Okay. And then at the bottom of the e-mail we see a PDF is attached "Cordeiro and Matlack - FAS.pdf." Correct?

A. Correct.

Q. All right. So moving to page 3, which is "1 of 2" on the bottom right, "3 of 4" at the top right. We see here that this is the actual final account statement that Marvin attached to that e-mail, right?

A. Yes.

Page 161

Q. Okay. So if we have the breakdown of the final account statement where it has "Ledger account at move-out," and it states "Parking - 276.03." And then we go through various charges of storage, storage, base rent in the amount of $7638.71, an insufficient funds fee, and then two water charges, do you see how those items add up to an amount, where it says "Balance at move-out, $8,347.73"; do you see that?

A. I see where it says that. I can't confirm the math.

Q. Sure. Do you dispute any particular item that has an amount next to it in this breakdown?

A. I mean, I can't say specifically anything we would dispute. We dispute the amount owed. I don't know how these numbers came to be and came to be so uneven when the charges for storage, rent, and parking are all round numbers.

Q. Okay.

A. But that is what they appear to be charging us.

Q. Okay. Is there a possibility that interest was charged to any of these fees?

A. It's certainly possible.

Q. Okay. And then we see beneath that 8,000 amount, that's where the security deposit is taken into account, at least as we go down this account statement, and eventually 8,347.73 with the deposit of 3200 applied and the removal of 508 for interest on deposit held, it says a "Total account balance

41 (Pages 158 - 161)

Page 162

due: $5,142.63." Do you at least see that on -- reflected on this statement?

A. I do see that.

Q. Okay. And it says the FAS, final account statement, prepared by Marvin on April 11th, 2024. Do you see that?

A. Yes.

Q. Okay. So have you or Shaun paid any amount towards this $5,142.65?

A. I don't believe so, but I'm not certain.

Q. Okay. Would you agree that this, if this amount is true, that that would mean that The Eddy is at a financial loss from your tenancy based on five thousand one hundred -- for $5,142.65?

MR. DUNN: Objection.

A. They are alleging that they are at a financial loss it seems, yes.

Q. Okay. And why have you or Shaun not paid any monies towards this account balance due?

A. We've consulted with our attorneys, and we believe we are owed more or equal to or even a partial amount, but the amount is not for me to determine, than what is claimed to be owed to them, in specific fees, potential damages to be determined.

Q. And you didn't file this lawsuit until November of

Page 163

2024, correct?

A. No. November 2023, I believe.

Q. Okay, okay. Is it your belief then that you're not paying the $5,142.65 because it may be offset by a higher amount that is owed to you by Greystar or The Eddy?

MR. DUNN: Objection.

A. I don't know actually know why we haven't. I believe we came to that conclusion through discussion between Shaun and myself and potentially our lawyers.

Q. Okay. And looking back at the lease itself --

Which I'll have to re-share my screen, I'm sorry.

-- I believe this was Defendant's Exhibit 2. If we look at Bates stamped GREP 145, page 6 of 7 of the lease, do you see on the lease where it says "When Moving Out" in gray up top?

A. Yes.

Q. Okay. And you and Shaun moved out of The Eddy, right; you were not evicted?

A. Correct.

Q. Okay. And in "44. Deposit Return" -- sorry, "43. Security Deposit Deductions and Other Charges" it states: "You'll be liable for the following charges, if applicable:" "Unpaid rent."

Correct?

A. Yes, it states that.

Page 164

Q. Okay. So at least according to the lease, when you moved out you would be liable for any unpaid rent?

A. That is what it states.

Q. Okay. Do you believe that there is anything unfair about this counterclaim being brought against you and Shaun?

A. I don't know whether or not it's unfair. It's their right to allege that money is owed to them.

Q. Okay. But is there anything that you can think of that is discriminatory against you in bringing this counterclaim?

MR. DUNN: Objection.

A. I wouldn't know. I couldn't say whether it's discrimination under the law.

Q. Okay. Is there anything deceptive about bringing this counterclaim again you and Shaun?

A. I don't know what's meant by "deceptive."

Q. Okay. You agree that earlier we spoke about this being a class action brought on behalf of a proposed number of individuals that were under similar circumstances, correct?

A. Yes.

Q. Would you also agree to the fact that you and Shaun still owe money to The Eddy is personal to you and not the class?

MR. DUNN: Objection.

Page 165

A. I can't say whether it's personal to us. I don't know whether or not that's relevant, and I don't think that's for me to decide; that'll be between our lawyers and the judge.

Q. Okay. Do you agree that there may be other circumstances of tenants owing money to The Eddy after they moved out just like you and Shaun?

A. It's certainly possible there are.

Q. And do you agree that they might also be facing counterclaims for unpaid rent?

MR. DUNN: Objection.

A. Possibly. I don't know the mechanics of how class members individually face counterclaims.

Q. And converse-- or the opposite of that, do you believe that there are tenants and possible class members that would not -- that moved out without owing any money, and therefore not facing any breach of contract case by Greystar or The Eddy?

MR. DUNN: Objection.

A. It's certainly possible that there are potential class members who were harmed by charges of eviction and legal fees not assessed by a judge or a judicial order. Whether or not that means they were or were not in breach of contract is not for me to say.

Q. Right. But do you understand it'd be a case-by-case basis to understand the circumstances of each tenant's situation

42 (Pages 162 - 165)

Page 166

that might be a potential class member and whether they face a counterclaim or not?

MR. DUNN: Objection.

A. I don't believe that that matters in my understanding. The commonality of the class is the harm done by the unfair and non-judicial assessment of legal and recovery fees, not any monies owing or not to Greystar at time of move out.

Q. What if -- sorry. What if a tenant wanted to, um, what happens if a tenant wanted to pay an eviction or legal fee to avoid further costs being added to their ledger?

MR. DUNN: Objection.

A. I don't know what you would mean by "further costs."

Q. Well, such as Greystar trying to collect those costs by filing a petition for motion for fees like alleged in your complaint?

MR. DUNN: Objection.

A. Regardless, I imagine they still would be harmed by the charging of those fees regardless. I don't know the legal technicalities of those circumstances. But if they were charged the fees without judicial order, then whether or not they paid them under the knowledge that they may be charged even more the longer the action proceeds, they were charged them.

Q. And then there's also the situation where they could come to a settlement about paying the eviction fees as well,

Page 167

right, before a court judgment?

MR. DUNN: Objection.

A. In this case, or?

Q. In that a potential class member could have come to a settlement with Greystar to pay the fees in order to have their tenancy reinstated, correct?

MR. DUNN: Objection.

A. I believe that's a possible scenario. It's not for me to determine whether or not that makes them a suitable class member.

Q. Okay. What damages are you seeking individually?

A. Individually, we're representing the class so I do know that lead plaintiffs may be awarded additional compensation by petitioning the judge or during settlement, but that's between our lawyers.

Q. And what you're referring to is a service fee or a class representative fee?

A. I don't know the specific term, but I -- I know that we may possibly receive more compensation than is granted to the class. I don't actually know how it's broken down, if you receive a proportional amount to your fees or everyone receives the same, but that's for our attorneys to handle.

Q. Okay. And what damages do you believe that the class suffered?

Page 168

A. I believe they suffered damages caused by the legal fees, potential other damages, again, not for me to determine, but I believe that the class commonality is legal fees charged, even with -- I'm sorry, just legal fees charged. I don't know.

Q. Okay. If those legal fees were reasonably charged to Greystar by the attorneys and then passed back to the tenants, are those tenants damaged at all?

MR. DUNN: Objection.

A. It's my understanding, and I believe the claim that we're making that -- excuse me -- yes, without judicial order, it is a damage to class members to be charged these fees.

Q. Okay. And if those charges, like I just mentioned, were reasonable, wouldn't you agree that that would mean -- or that those tenants would have owed those monies anyway?

MR. DUNN: Objection.

A. Wait, I'm sorry. Could you say that again?

Q. Yeah, sure. If the fees that were applied to tenants' ledgers were reasonable, wouldn't those tenants owed those monies for the eviction action being brought against them for whatever reason the eviction action was brought?

MR. DUNN: Objection.

A. I don't believe so.

Q. Okay. Do you believe that Greystar should have eaten the costs of having to bring eviction actions against tenants

Page 169

where fees were reasonable?

MR. DUNN: Objection.

A. If the fees were not ordered by the court, yes.

MR. AYVAZIAN: Okay, if I can just have a five-minute break to go over my notes, I think that I'm almost done. So we certainly won't go as long as Shaun's yesterday. But say we come back at 3:33 -- or 3:34 let's make it, if that's okay?

THE WITNESS: Yeah.

MR. AYVAZIAN: Or 2:34, it's 2:34.

VIDEOGRAPHER: Okay, this ends Media Unit No. 5. We're going off the record at the time of 2:28 p.m. as indicated in the video screen. We're off the record.

(WHEREUPON, a break was taken from 2:28 p.m. to 2:35 p.m.)

VIDEOGRAPHER: This begins Media Unit No. 6. We're back on the record at the time of 2:35 p.m. You may begin.

MR. AYVAZIAN: Okay, thank you.

BY MR. AYVAZIAN:

Q. Kevin, are you aware of any e-mails with the attorney general's office about the possibility of you and Shaun bringing future claims against Greystar?

A. Claims beyond this?

Q. Correct.

A. I don't believe so. I -- Not to my knowledge, no.

Q. Any related to a security deposit?

43 (Pages 166 - 169)

Page 170

A.   I can't -- I don't recall what the content of his e-mails were with them.  I believe they were quite a while ago, or at least the ones that I can recall.  They were maybe in 2023 or 2024.  But I don't have anything I can recall about things we have currently planned beyond this.  I know we're at times contemplating other actions.  But since we've filed this suit, we have no future plans -- I have no future plans, I'm sorry.  I cannot speak for him.

Q.   Okay.  All right.  So just a couple of little things I wanted to follow up with.  In the e-mails, even looking at the ones going back with Vlad, there were numerous travel trips and I just wanted to ask, did you know why -- were you -- did you go to Buenos Aires with Shaun back in 2023?

A.   No.  Shaun has always gone by himself since the one time I visited in 2019.

Q.   Okay.  There were also mentions of going to India or Nepal, were you on any of those trips?

A.   No.  He does a yearly best friends trip.

Q.   Okay.  And I know last month in January when we were trying to schedule some depositions, were you all traveling then as well?

A.   Yes.  He was going back and forth to Charlotte after his stepfather died.

MR. AYVAZIAN:  Okay.  Let me just check my notes real

Page 171

quick.  I don't think I have anything else.  One second.

Okay, I have no further questions right now.  I will say, like I said earlier, we did not receive any of the text messages that you pulled and produced.  We would just ask that those text messages be preserved.

And, Counsel, if you have them and produced them, the only ones that we have are the ones labeled "Kevin Matlack," but as we identified yesterday and today, they are all for Shaun only.

So we would just remind you, Kevin, to keep those messages preserved, and that there may be a chance that you and I speak again over Zoom in the near future.  But I have no further questions at this time, and thank you for today.

THE WITNESS:  Yep.  Thank you.

MR. DUNN:  I have no questions for myself.

VIDEOGRAPHER:  Okay.  We are off the record then, the time is 2:38 p.m., and this concludes the testimony given by Kevin Matlack.  The total number of media units was six and will be retained by Veritext.  And we're off the record, folks.

COURT REPORTER:  And then, counsel, on the written record just like yesterday, would you like to order a copy of the transcript when it's ready?

MR. DUNN:  Yes, e-trans.

MR. AYVAZIAN:  Yes, we'll request a copy.

Page 172

(WHEREUPON, the deposition of KEVIN MATLACK was suspended at 2:38 p.m.)

Page 173

COMMONWEALTH OF MASSACHUSETTS          HAMPSHIRE, ss.

I, KELLEY K. BOHAN, a Court Reporter and Notary Public duly commissioned and qualified in and for the Commonwealth of Massachusetts, do hereby certify that there came before me on the 24th day of February, 2026 at 9:27 a.m., the person hereinbefore named, identification as prescribed by Executive Order 455 (03-13) issued by the Governor of the Commonwealth of Massachusetts, was by me duly sworn to testify to the truth and nothing but the truth of his knowledge concerning the matters in controversy in this cause; that he was thereupon examined upon his oath, and his examination reduced to typewriting under my direction; and that this is a true record of the testimony given by the witness to the best of my ability.

I further certify that I am neither attorney or counsel for, nor related to or employed by, any of the parties to the action in which this deposition is taken, and further, that I am not a relative or employee of any attorney or counsel employed by the parties hereto or financially interested in the action.

Dated this 24th day of March, 2026.

Kelley K. Bohan
Court Reporter/Notary Public

My Commission Expires:  December 25, 2026

44 (Pages 170 - 173)

Page 174

Kevin Matlack c/o
Michael Dunn, Esq.
mdunn@brysonpllc.com
                    March 24, 2026
RE: Cordeiro, Shaun, Et Al v. Grep Atlantic, LLC, Et Al
    2/24/2026, Kevin Matlack (#7904543)

    The above-referenced transcript is available for
review.
    Kevin Matlack should read the testimony to
verify its accuracy. If there are any changes,
Kevin Matlack should note those with the reason
on the attached Errata Sheet.
    Kevin Matlack should, please, date and sign the
Errata Sheet and email to the deposing attorney as well as
to Veritext at Transcripts-fl@veritext.com and copies will
be emailed to all ordering parties.
    It is suggested that the completed errata be returned 30
days from receipt of testimony, as considered reasonable
under Federal rules*, however, there is no Florida statute
to this regard.
    If the witness fails to do so, the transcript may be used
as if signed.
            Yours,
            Veritext Legal Solutions

    *Federal Civil Procedure Rule 30(e)/Florida Civil Procedure
    Rule 1.310(e).

Page 175

Cordeiro, Shaun, Et Al v. Grep Atlantic, LLC, Et Al
2/24/2026, Kevin Matlack (#7904543)
        E R R A T A  S H E E T
PAGE_____ LINE_____ CHANGE_____
_____
REASON_____
PAGE_____ LINE_____ CHANGE_____
_____
REASON_____
PAGE_____ LINE_____ CHANGE_____
_____
REASON_____
PAGE_____ LINE_____ CHANGE_____
_____
REASON_____
PAGE_____ LINE_____ CHANGE_____
_____
REASON_____

Under penalties of perjury, I declare that I have
read the foregoing document and that the facts
stated in it are true.

_____  _____
  (Kevin Matlack)              DATE

Veritext Legal Solutions

800-726-7007                                    305-376-8800

Federal Rules of Civil Procedure

Rule 30

(e)  Review By the Witness; Changes.

(1)  Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A)  to review the transcript or recording; and

(B)  if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2)  Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.

Page 176

Volume II
Pages 176 to 209
Exhibits 32 to 33

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
EASTERN DIVISION

- - - - - - - - - - - - - - - - - -x
                                    :
SHAUN CORDEIRO AND KEVIN            :
MATLACK, INDIVIDUALLY AND ON        :
BEHALF OF ALL OTHERS                :
SIMILARLY SITUATED,                 :
              Plaintiffs,           :
                                    :
        vs.                         :  C.A. No.
                                    :  1:23-CV-12901-AK
GREP ATLANTIC, LLC AND EDDY         :
OWNER, LLC,                         :
              Defendants.           :
                                    :
- - - - - - - - - - - - - - - - - -x

CONTINUED REMOTE VIDEOTAPED DEPOSITION OF KEVIN MATLACK, appearing remotely from Boston, Massachusetts, a witness called by counsel for the Defendants, taken pursuant to the Federal Rules of Civil Procedure, before Ken A. DiFraia, Registered Professional Reporter and Notary Public in and for the Commonwealth of Massachusetts, appearing remotely from Peabody, Massachusetts, on Wednesday, April 29, 2026, commencing at 1:33 p.m.

(ALL PARTICIPANTS ATTENDED VIA ZOOM)

PRESENT:

Bryson Harris Suciu & DeMay, PLLC
        (by Michael Dunn, Esq.)
        900 W. Morgan Street,
        Raleigh, NC 27603,
        mdunn@brysonpllc.com
        919.600.5000
        for the Plaintiffs.

(Continued on Next Page)

Page 177

PRESENT: (Continued)

Shook Hardy & Bacon, LLP
(by Ara K. Ayvazian, Esq.)
100 N. Tampa Street, Suite 2900,
Tampa, FL 33602,
aayvazian@shb.com
813.202.7100
for the Defendants.

THE VIDEOGRAPHER: Marc Friedman

* * * * *

Page 178

INDEX

WITNESS         DIRECT  CROSS  REDIRECT  RECROSS

KEVIN MATLACK, Resumed
BY MR. AYVAZIAN      180

* * * *

EXHIBITS

NO.          DESCRIPTION          PAGE

Exhibit 32  Copy of Plaintiffs' Third        183
        Production of Documents, Bates
        Nos. PLAINTIFFS 002282-002368

Exhibit 33  Copy of Memorandum and Order in   194
        Kulig matter

* * * *

Page 179

PROCEEDINGS

THE VIDEOGRAPHER: Good afternoon. We are going on the record at 1:33 p.m., Eastern Daylight Time, on Wednesday, April 29, 2026.

Please note this deposition is being conducted virtually. The quality of the recording depends on the quality of the camera and internet connection of all participants. What is heard from the Witness and seen on screen is what will be recorded. Audio and video recording will continue to take place unless all parties agree to go off the record.

This is Media Unit No. 1 of the video recorded deposition of Kevin Matlack, in the matter of Kevin Matlack, et al., versus GREP Atlantic, LLC and Eddy Owner, LLC. This case is filed in the United States District Court, for the District of Massachusetts, Eastern Division, Case No. 1:23-CV-12901.

My name is Marc Friedman. I'm a certified video legal specialist. The court reporter is Ken DiFraia. We are both from Veritext Legal Solutions.

I'm not related to any party in this

Page 180

action, nor financially interested in the outcome.

If there are any objections to this proceeding, please state them at the time of your appearance.

Counsel will now state their appearances and affiliations for the record, beginning with the noticing attorney, after which time our court reporter will swear in our witness and we can proceed.

MR. AYVAZIAN: Ara Ayvazian, for the Defendants. Good afternoon.

MR. DUNN: Michael Dunn, on behalf of the Plaintiffs and Kevin Matlack.

KEVIN MATLACK, Resumed a witness called for examination by counsel for the Defendants, having been satisfactorily identified by the production of his driver's license and being resworn by the Notary Public, was examined and further testified as follows:

DIRECT EXAMINATION, Continued
BY MR. AYVAZIAN:

Q. Hi, Kevin. We met about two months ago, and I think it was February 24th when you gave your first day of deposition. Do you recall testifying in this case on that date?

Page 181

A. Yes.

Q. Okay. Have you been deposed since we last spoke in any other case?

A. No.

Q. Okay. And where are you currently located for today's deposition?

A. I'm in my apartment in Boston.

Q. Okay. And is Shaun in the apartment as well?

A. Yes.

Q. Okay. Is anyone in the exact room you are in right now besides you?

A. No.

Q. Okay. Did you have any discussions with Shaun after his deposition this morning?

A. No.

Q. Okay. What did you do to prepare for today's deposition today?

A. I looked at copies of the text messages we'd be discussing from my lawyers.

Q. Okay. And when did you last take a look at those text messages?

A. Earlier this morning.

Q. Okay. And did you review the text messages on the phone or in the documents -- the document

Page 182

that was produced to counsel?

A. I believe it was a copy of the document produced, sent as a PDF attachment to me.

Q. Okay. And was that roughly around 87 pages, does that sound familiar?

A. Oh... Yes, I think so.

Q. Okay. Besides looking at those text messages, did you look at anything else to prepare for today's deposition?

A. No.

Q. Did you review your prior transcript from Day I at any point?

A. No.

Q. Did you review Shaun's Day I transcript at any point?

A. Excuse me. No.

Q. Okay. And when did you last meet with counsel before today -- or before right now?

A. Probably before my last deposition.

Q. Okay. Are there any medications that you are on today that would affect your testimony?

A. No.

Q. And the text messages that you reviewed, were those both your text messages and Shaun's or

Page 183

was it just your set?

A. It was a set of text messages I produced between mostly Shaun and myself.

Q. Okay.

MR. AYVAZIAN: I'm going to mark this as Exhibit 32.

(Document displayed on screen)

(Document marked as Matlack Exhibit 32 for identification)

Q. Can you see my screen, Kevin?

A. Yes.

Q. Okay. Showing you the bottom right, do you see where it says, "PLAINTIFFS 2282"?

A. Uh-huh.

Q. And I'm showing you an 87-page document that is titled, "Plaintiffs' Third Production of Documents."

A. Uh-huh.

Q. Is this what you reviewed this morning in that PDF?

A. No.

Q. Okay. How about starting at 2297?

A. (Examines document) No.

Q. Okay.

Page 184

A. I had a different version. This looks like what Shaun produced.

Q. Okay. Let me go down to -- do you know if the documents that you reviewed had the wording on the bottom right that said, "PLAINTIFFS" and then a certain number?

A. I don't know. I don't believe so.

Q. Okay. Well, let me go to -- starting at PLAINTIFFS 2354, does this look like the messages that you reviewed?

A. Yes.

Q. Okay. And that goes from 2354 to 2368. I'm guessing -- by my math, that's about 14, 15 pages of text messages. Does that sound familiar?

A. That does sound more correct.

Q. Okay. And just for reference -- let me find the messages to you. (Examines document) Okay. Looking at PLAINTIFFS 2330, do you see at the top left of this document it says, "Messages - Kevin Matlack"?

A. Yes.

Q. And then there's a series of messages, "Kevin Matlack: Or Kayla"; "Kevin Matlack: Destinee Price, Kayla Augustin, Marvin Collindres"; "Kevin

3 (Pages 181 - 184)

Page 185

Matlack:  Also I hope her (Kayla's) baby dies," do you see those messages?

A.  Yes.

Q.  Is that your phone number that's next to the name Kevin Matlack?

A.  Yes.

Q.  And are these text messages with Shaun?

A.  They seem to be, yes.

Q.  Okay.  Are these numbers on the top right -- do these numbers belong to Shaun?

A.  They appear to be old numbers of Shaun's, yes.

Q.  Okay.  Do you remember sending these messages to Shaun that's in PLAINTIFFS 2230?

A.  No, I don't.  It looks like they were a few years ago.

Q.  How about this last one from January 23, 2026, 3:22 p.m., the message?

A.  I don't remember sending that.

Q.  Okay.  Moving down to the messages that you started to review, PLAINTIFFS 2354, can you tell me the process of how these messages were gathered and produced.

A.  My attorneys gave me a list of terms to

Page 186

search in my text messages, and I took screenshots and produced those for my attorneys for all messages -- excuse me -- that matched those terms.

Q.  And was this process done after the first day's deposition?

A.  I don't recall.  I believe part of it was done -- part or all of it was done before.  I don't recall whether I produced additional texts after the first day.

Q.  Okay.  Is it possible that you did produce additional texts after the first day?

A.  It's possible, yes, but I can't say for certain.

Q.  Okay.  So just looking at this 2354, for example, this message, is this message between you and Shaun?

A.  Yes.

Q.  Okay.  And would you agree that the messages in blue come from you and the messages in dark blue, gray, however you want to describe that, would come from Shaun?

A.  Yes.

Q.  Okay.  And is this the emoji photo that you used for Shaun at the time or presently?

Page 187

A.  Yes.

Q.  Okay.  And how did you collect, for example, this screenshot?  Was it just a screenshot taken by you and then downloaded or sent somewhere?  What was the process?

A.  Yes.  When I found texts that matched the terms given to me by my attorneys, I took screenshots on my phone and then uploaded them to the portal provided by the attorney.

Q.  Okay.  And did you review these text messages before you provided them to your counsel?

A.  I looked over them when I was screenshotting them, yes.

Q.  Okay.  And you would agree that, for example, this message -- looking now at PLAINTIFFS 2364, the message at 10:52 a.m., that starts off with "My message," do you see that?

A.  Yes.

Q.  Okay.  And looking at the substance of this message, would you agree that this text message also appears in Shaun's produced text messages on PLAINTIFFS 2298 at 10:52 a.m., that it's the same message that's being sent to your phone number?

A.  I think so, yes.

Page 188

Q.  And really that's just to show that this message appears both in Shaun's production and also appears in your production, meaning we have both sides of the message; is that fair to say?

A.  I believe so, yes.

Q.  I'll represent to you earlier today Shaun testified to having conversations with two attorneys, Mark Gardner and Michael Cioffi.  Do those names sound familiar?

A.  Michael Cioffi does.  I don't recall ever hearing about the other lawyer, Mark Gardner.

Q.  Okay.  Did you ever have conversations with Michael Cioffi about your eviction case?

A.  No.

Q.  Were you present when Shaun was having conversations with Mr. Cioffi?

A.  No.  I never met him.

Q.  Okay.  Looking now at PLAINTIFFS 2358, would you agree that this is a conversation -- a text message thread between you and Shaun?

A.  Yes.

Q.  Okay.  And do you see here Shaun's message at 4:18 p.m., he mentions, "Even if we get $15,000/each" -- actually, sorry.  A little bit

4 (Pages 185 - 188)

Page 189

higher up he says, "Our lawyers' arguments against Greystar are actually good Kevin and if we survive the Motion to Dismiss then we're a class and they may settle quickly. Even if we get $15,000/each - my part would pay off the car or be used toward a down payment on an apt," did I read that correctly?

A. Yes.

Q. And then you responded, "That's awesome"; is that correct?

A. Yes.

Q. What was your understanding at the time of when Shaun said, "if we survive the Motion to Dismiss we're a class"? Did you agree with -- do you agree with that statement?

A. That was my understanding at the time, that surviving the motion to dismiss was the last hurdle to being certified as a class.

Q. And what is your understanding as you sit here today?

A. I believe it's the same. That process is not something that I've discussed in-depth with our attorneys. It's not relevant to me.

Q. Okay. And then Shaun mentions, as we just read, "even if we get $15,000/each" -- I'll withdraw

Page 190

that question right now.

Kevin, are you aware that you and Shaun were offered $15,000 each to settle your individual claims in this case?

A. I am.

Q. And without going into the specific conversations, how did you become aware of that?

A. We were forwarded the settlement offer made to us by our attorneys.

Q. Okay. And what was your understanding -- sorry. What is your understanding if you accepted the $15,000 offer to settle your individual claim?

A. I don't remember the particulars, but I believe that we would forfeit other claims against Greystar and they would as well, although I don't remember the exact terms of the settlement off the top of my head.

Q. And when you say "they will as well," who are you referring to "they" as?

A. The Defendants.

Q. Okay. And why did you have that understanding?

MR. DUNN: Objection to the extent that any of our conversations are protected by the

Page 191

attorney-client privilege.

But you can answer, Kevin.

A. Again, I'm not certain that I'm recalling the terms of the settlement offer correctly. I haven't reviewed them since they were originally sent.

I believe that it was stated within it that both parties, us and the Defendants, would release any claims, any futures claims against each other as part of the settlement offer. But that may not be correct. I haven't read it in some time.

Q. And when you say "future claims," what are you referring to?

A. Any future potential legal actions for money owed or future litigation against each other.

Q. Do you have the belief that the Court would not allow you to accept an individual settlement?

A. No, I don't.

Q. Okay. Do you believe that you can individually settle the case despite this being a purported class action?

MR. DUNN: Objection.

A. I do.

Q. Okay. Do you believe that you have a

Page 192

fiduciary duty to the purported class members?

MR. DUNN: Objection.

A. I do. That has been explained to myself by our attorneys.

Q. And what is your belief of this fiduciary duty to the purported class members?

MR. DUNN: Objection.

A. I don't have a technical understanding of it, insomuch as it's my understanding that we are allowed to settle -- or at least we are allowed to accept a settlement offer, but that it is subject to approval by the judge in this case, given that we have a financial duty to the other potential members of the class.

Q. And do you have a -- did you sign a retainer agreement in this case?

A. Yes, I did.

Q. Are you aware of any language in there that prohibits you from accepting an individual settlement?

A. I'm not.

Q. Okay. As you just noted, you believe that the individual -- do you believe that an individual settlement would need to be approved by the judge in this case?

5 (Pages 189 - 192)

Page 193

MR. DUNN: Objection.

A. That is my understanding, yes.

Q. Okay. One moment. And do you believe that the reason you would need approval is because you have a responsibility to the class?

A. I don't know exactly that that is why. Again, I can't speak to the law, but it's my understanding that any settlement would be subject to judicial review.

Q. Okay. And do you understand that this case does not have a certified class yet?

A. Yes, I do.

Q. Okay. And do you understand that you have no obligations to any potential members of a future class --

MR. DUNN: Objection.

Q. -- not to settle on an individual basis?

THE COURT REPORTER: I'm sorry. You skipped out.

MR. DUNN: Sorry. I thought he was done. My apologies.

THE COURT REPORTER: Would you repeat the question.

MR. AYVAZIAN: Sure.

Page 194

Q. Do you understand that because there's no certified class in this case, you do not have any obligations to potential members of a future class not to settle individually?

MR. DUNN: Objection.

A. That was not my understanding previously.

MR. AYVAZIAN: Okay. I'm going to mark this exhibit as Defendants' No. 33.

(Document displayed on screen)

(Document marked as Matlack Exhibit 33 for identification)

Q. Do you see my screen?

A. Yes.

Q. Okay. What I'm showing you is a case out of the Southern District of New York, Case No. 13-cv-4715. It's Document 106 from the docket, dated 9/26/14. This case caption is Carol Kulig, on behalf of herself and all others similarity situated, Plaintiff, against Midland Funding, and other Defendants, do you see that on Page 1?

A. Yes.

MR. DUNN: Ara, I'm just going to object as any question here is outside the scope of this deposition.

Page 195

MR. AYVAZIAN: Well, I'll stop right here for a moment, okay? Let me --

Q. Going back to Exhibit 32, Page PLAINTIFFS 2367, Kevin, do you see at the top here Shaun saying, "We will be receiving more money than any other class," and then it's hidden behind the emoji?

A. Yes.

Q. Do you understand what he meant by, "We will be receiving more money than any other class"?

A. I can't say with any certainty.

Q. Okay.

A. I think he was referring to being lead Plaintiffs but --

Q. What is your understanding as lead Plaintiffs on how you would be compensated in this case if it is certified as a class action and you prevail?

A. It's my understanding that we can petition for an additional payment outside the share by each member of the class but that it is not guaranteed.

Q. Okay. Are you referring to what is known as a "service award"?

A. I'm not familiar with that terminology

Page 196

but --

Q. Okay.

A. -- basically it is an additional payment for being the class representatives and the lead Plaintiffs.

Q. Okay. "And do you see here, again, on Page 2367 Shaun says, "And we will get our lawyers to pay additional legal fees for any efforts to coordinate with them on a separate case"; do you see that? Did I read that correctly?

A. Yes.

Q. Okay. Do you know what he's referring to as "a separate case"?

A. I don't know.

Q. Okay. A little bit further down at 2:02 p.m., Shaun says, "I want $50,000," and then you respond, "That would be a lovely little gift. Each or total?" Did I read that correctly?

A. Yes.

Q. And then you state at 2:04, "It'll be separate o think. A settlement would be one offer to the class in general and a separate amount to us," do you see that?

A. Yes.

6 (Pages 193 - 196)

Page 197

Q. Okay. And would you agree that you are referring to a settlement encompassing one settlement to the class and then also one settlement to you and Shaun?

MR. DUNN: Objection.

A. Yes, I believe that is what I was referring to.

Q. Okay. And at that time, did you believe that a settlement had to encompass both you and Shaun as well as the class?

MR. DUNN: Objection.

A. No. I was aware that it was a potential, that it was possible Shaun and I could receive an additional award or settlement in the event we prevail from the Defendants, but that it was in no way guaranteed.

Q. Okay.

MR. AYVAZIAN: I understand your objection, but I think based on the testimony that Kevin just gave about his thoughts on the settlement and the individuality of the settlement, that I can ask him questions about this case. If would you like to object, I understand.

MR. DUNN: Yes. I mean, it's a case. I

Page 198

mean, it sounds like you are about to make a legal argument. You know, I thought we were reopening the deposition specifically related to any subsequent production and obviously text messages that were not produced for Kevin. So, you know, 2014 obviously this would have been available at the prior deposition.

MR. AYVAZIAN: I think these text messages that Kevin produced are new and allow for this information to come in, or at least for me to ask questions. If you would like to object to the questions that I ask, feel free.

MR. DUNN: No. I mean, I just made my objection. I want to leave it on the record for this line of questioning.

MR. AYVAZIAN: Okay.

Q. All right. Kevin, looking at this Southern District of New York case, it states on Page 9, the second paragraph starts off with, "The provision in the document attached to Kulig's retainer agreement, which strongly implies that a class representative accepting an individual settlement instead of a classwide settlement is a wrongful act, is also troubling," do you see that?

Page 199

A. Yes.

Q. And did I read that correctly?

A. Yes.

Q. Okay. And it then states, "In its explanation of a class representative's role in decisionmaking on behalf of the class, the latter document states the following:

Because this is a class case, you must make decisions that are fair to everyone else in the class.... This includes making decisions about whether to settle the case. If the Defendant wants to settle just with you, you need to think about your responsibilities to the class. Just like a politician shouldn't sell out his constituents by taking a bribe, you need to think of the class before settling the case."

Counsel is wrong to the extent he is of the view that Ms. Kulig's acceptance of an offer, prior to class certification, is a betrayal of the class or comparable to 'a politician selling out his constituents taking a bribe.' Prior to the 2003 amendments to the Federal Rules of Civil Procedure, settlement of the claims of the putative class representative of an uncertified class required

Page 200

Court approval. The 2003 amendments to Rule 23 eliminated that requirement."

Then it jumps down to, "When the claims of the named plaintiff are settled prior to certification, the claims of putative class members remain unaffected."

Do you understand that this Court is stating that it was wrong for counsel to give his clients the impression that they had a responsibility to the class before it was certified?

MR. DUNN: Objection. Relevance.

A. Yes, I understand that that's what the document is saying.

Q. And that the Court says that they -- actually, withdrawn.

Would you agree that you are relying on your attorneys for your understanding about whether or not you can settle individually in this case?

MR. DUNN: Objection. Just, Kevin, don't disclose anything that we've discussed, but you can answer to the extent you can.

A. I can't say for certain whether my complete understanding is from my attorneys or also from Shaun and some research he may have done on his own.

7 (Pages 197 - 200)

Page 201

We haven't -- I don't recall any exact discussions with my attorneys.

Q. Okay. Do you have a full understanding of whether or not you have a responsibility to the class before class certification?

A. I guess -- I mean, I'm not certain. I can't be certain of the entirety of the scope of our responsibilities or what the law or any precedent set means exactly. I can't interpret those with certainty.

Q. Okay. And you stated earlier that you had discussions about the fiduciary duty with counsel, correct?

MR. DUNN: Objection.

A. I believe we have previously, but I'm not certain whether that's something we discussed or if that's something Shaun and I discussed privately from something he understood to be true.

Q. Okay. If a class action attorney were to mislead his or her class representatives about whether they had a responsibility to the class, would you agree that would not be fair to the class representative?

MR. DUNN: Objection.

Page 202

A. I can't say what would be fair. That's not really for me to decide.

Q. Okay. Are you aware that the Defendants in this case have offered to have a confidential mediation with the Federal magistrate judge?

A. I believe that that sounds familiar. I do believe we discussed that. I can't say for certain. It does sound familiar.

Q. Okay. Do you think it would be helpful for you to be able to talk directly and confidentially with a magistrate judge about this case?

A. I guess possibly. It would depend entirely on the substance of the conversation.

Q. If it was to discuss resolution of this case for you and Shaun.

A. It's possible. I don't know that it would have a different outcome than any other confidential and private discussion we had between our attorneys and the Defendants attorneys.

Q. Okay. Outside of the service award that we spoke about, do you have any understanding how you will be compensated -- actually, withdrawn.

Do you understand how you and Shaun will be compensated in this case if the Court denies class

Page 203

certification and you two prevail on your claims?

A. So do you mean if we do not succeed in certifying a class but if Shaun and I were to prevail on our individual claims against the Defendants?

Q. Correct.

A. Then that's not something I believe I've had a discussion about, and I don't think that's a possibility we discussed. I am not certain how that would work, other than I would imagine the same way as any typical nonclass action suit.

Q. Do you recall ever having a conversation with Shaun about a bankruptcy plan as a result of this case?

A. As a result of this case? I don't recall. It's certainly something we discussed previously as a general financial strategy, but not to my knowledge in direct relation to this case.

Q. Okay. And what was the bankruptcy plan you discussed generally with respect to financial strategy with Shaun?

A. Just that it was an option insofar as other matters, other financial and credit-related matters that were not -- unrelated to this case.

Page 204

Q. Okay. Would that bankruptcy plan involve the possible counterclaim success against you and Shaun in this case?

A. I can't say -- I don't believe that's a possibility we discussed.

Q. One moment. Did there ever come a point in time, Kevin, that -- actually, withdrawn. Let me start over.

Do you feel that being a class representative has negatively affected your ability to resolve your individual claims and the counterclaim against you and Shaun?

A. No, I don't believe so.

Q. Okay.

MR. AYVAZIAN: Michael, I'm planning on showing Kevin PLAINTIFFS 2357 right now, which is, again, one of the two pages that we previously discussed, and we understand that in the last deposition there's disagreement between us. I just wanted to give you that preview before I pull it up.

MR. DUNN: Yes, that's fine. I don't think there's Kevin's text messages -- I mean, I don't think he sent any text messages. I think they were Shaun's.

Veritext Legal Solutions

800-726-7007                                    305-376-8800

Page 205

MR. AYVAZIAN: Okay. I just wanted to give you the heads up, to perk your ears up in case you see something just so we can keep the record clean.

MR. DUNN: That's fair.

Q. Kevin, looking at PLAINTIFFS 2357, this is a message between you and Shaun, correct?

A. Yes.

Q. And do you see in the blue box, which is your message to Shaun at 9:35 a.m., you state, "So basically we get screwed? They say we can't tell the judge or take it and we have to move forward even though they will sue us"; do you see that message?

A. Yes.

Q. Did I read that accurately?

A. Yes.

Q. Okay. Now, going back to my last question, do you believe that by being class representatives, to quote what you said, Basically we get screwed because we can't tell the judge or take the settlement and that they will have to move forward even though they will sue us, is that referring to the counterclaim?

A. I don't believe that. I believe we had

Page 206

discussions with our attorneys that I won't go into the substance of, but no, I do not believe that at this time.

I can say I believe I was previously misinformed as to not to decide -- not misinformed. That's not correct. I misunderstood how the process would work.

But I have had discussions with our attorneys as well. Well, I won't speak for Shaun, but after hearing from our attorneys, I understand the process and the options available to us more completely, and at this time I don't believe that to be true.

Q. And looking at the bottom of 2357 under the iMessage entry point, it says, "Moreover, I have a bankruptcy plan which will inevitably fuck all of," and then you can't read it further, do you see that?

A. I do.

Q. And that was a message from Shaun, right?

A. Yes.

Q. And does this refresh your recollection about any discussion about a bankruptcy plan which will inevitably...

A. No. I guess that just refers to the fact

Page 207

that there may be one that exists. But from that half text message, I have no idea what the context is.

Q. Okay. As you sit here today, do you believe that it was unethical for the Defendants to make a settlement offer to you on an individual basis?

A. No.

Q. Okay. Do you believe that the Defendants' individual settlement offer was not made in good faith?

MR. DUNN: Objection.

A. I can't say without recalling the exact terms, but I don't think so.

I believe we had frustration because of a misunderstanding or a misremembering of previous conversations. Again, I'm not an attorney. I don't have a full understanding of how the process works.

MR. AYVAZIAN: Can we take a five-minute break and come back at 2:25.

THE VIDEOGRAPHER: Stand by. The time is 2:20 p.m. We are going off the record.

(Recess at 2:20 p.m.)

THE VIDEOGRAPHER: The time is 2:26, and we are back on the record.

MR. AYVAZIAN: (2:26 p.m.) Thank you,

Page 208

Kevin. I have no further questions.

MR. DUNN: And I have no questions. Thank you. Appreciate it, Kevin.

THE WITNESS: Thank you.

THE VIDEOGRAPHER: This concludes today's deposition given by Kevin Matlack, and the number of media units used is one. It will be retained by Veritext Legal Solutions.

We are going off the record at 2:26 p.m., Eastern Daylight Time.

Thank you everybody, and stay safe.

THE COURT REPORTER: Counsel, will you be ordering this transcript also?

MR. DUNN: Yes, an electronic.

I would like to state for both depositions, we are waiving the reading and signing.

MR. AYVAZIAN: And we will take copies of both transcripts, electronic.

(Whereupon the deposition was concluded at 2:26 p.m.)

9 (Pages 205 - 208)

Page 209

COMMONWEALTH OF MASSACHUSETTS)
SUFFOLK, SS.              )
    I, Ken A. DiFraia, RPR and Notary Public in and for the Commonwealth of Massachusetts, do hereby certify that there came before me remotely on the 29th day of April, 2026, at 1:33 p.m., the person hereinbefore named, who was by me duly sworn to testify to the truth and nothing but the truth of his knowledge touching and concerning the matters in controversy in this cause; that he was thereupon examined upon his oath, and his examination reduced to typewriting under my direction; and that the deposition is a true record of the testimony given by the witness.

    I further certify that I am neither attorney or counsel for, nor related to or employed by, any attorney or counsel employed by the parties hereto or financially interested in the action.

    In witness whereof, I have set my hand and affixed my notarial seal this 18th day of May, 2026.

*Ken A. DiFraia*

    Notary Public
Commission expires 2/8/2030

10 (Page 209)

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.